# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

———————————————————————
:
COALITION OF AMERICAN : 
MANUFACTURERS OF MOBILE : 
ACCESS EQUIPMENT, : 
:
      Plaintiff, :  Court No. 22-00152
:
      v. :  **PUBLIC**
:  **VERSION**
UNITED STATES, :
:
      Defendant, :
:
      and :
:
ZHEJIANG DINGLI MACHINERY : 
CO., LTD., :
:
      Defendant-Intervenor. :
———————————————————————:

## DEFENDANT-INTERVENOR DINGLI'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD PURSUANT TO USCIT RULE 56.2

Ned H. Marshak
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

599 Lexington Ave., 36th Floor
New York, New York 10022

(212) 557-4000
**

1201 New York Ave., NW,
Suite 650
Washington, DC 20005

*Counsel for Defendant-Intervenor*
*Zhejiang Dingli Machinery Co.,*
*Ltd.*

Dated: March 27, 2023

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................ii

GLOSSARY ...........................................................................................v

ARGUMENT ........................................................................................2

   I.   COMMERCE LAWFULLY VALUED DINGLI'S OCEAN
       FREIGHT COSTS ..................................................................2

   II.  COMMERCE LAWFULLY VALUED DINGLI'S DRIVE
       MOTOR 1 ............................................................................15

   III. COMMERCE LAWFULLY VALUED DINGLI'S MINOR
       FABRICATED STEEL COMPONENTS .....................................20

   IV. COMMERCE LAWFULLY ACCEPTED DINGLI'S REBUTTAL
       FACTUAL INFORMATION ...................................................25

      A.  Mill Test Certificates ................................................26

      B.  Drive Motor Information............................................30

      C.  Cast Iron Billet Information ......................................32

CONCLUSION .....................................................................................34

# TABLE OF AUTHORITIES

## Cases

*American Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 523 (1970) ................................................................................. 29

*Arch Chems., Inc. v. United States*, 33 CIT 954 (2009) .......................... 24

*Calgon Carbon Corp. v. United States*, 443 F.Supp.3d 1334 (CIT 2020) ........................................................................................... 16

*Cathedral Candle Co. v. ITC,* 400 F.3d 1352 (Fed. Cir. 2005) ............... 30

*CS Wind Vietnam Co. v. United States,* 971 F.Supp.2d 1271 (CIT 2014) ........................................................................................... 23

*Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369 (Fed. Cir. 2015) ...................................................................... 19

*F.W. Myers, Inc. v. United States*, 12 CIT 566 (1988) ............................ 17

*Great Am. Ins. Co. of N.Y. v. United States*, 738 F.3d 1320 (Fed. Cir. 2013) ...................................................................... 25

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 29 CIT 288 (2005) ............................................................................ 3

*Home Depot U.S.A. v. United States*, 435 F.Supp.3d 1311 (CIT 2020) .. 17

*Jinan Yipin Corp. v. United States*, 800 F.Supp.2d 1226 (CIT 2011) .... 14

*La Crosse Tech., Ltd. v. United States*, 723 F.3d 1353 (Fed. Cir. 2013) 17

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) .... 17

*MTZ Polyfilms, Ltd. v. United States*, 33 CIT 1575 (2009) ................... 25

*PAM S.p.A v. United States*, 463 F.3d 1345 (Fed. Cir. 2006) ................ 29

*Risen Energy Co. v. United States*, 477 F.Supp.3d 1332 (CIT 2020) ...... 13

*SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216
(Fed. Cir., 2018) ............................................................. 19, 21

*Taian Ziyang Food Co. v. United States*, 783 F.Supp.2d 1292 (CIT 2011)
.................................................................................................. 14

*Taian Ziyang Food Co. v. United States*, 918 F.Supp.2d 1345 (CIT 2013)
.................................................................................................. 32

*Thomas Jefferson Univ. v Shala*, 512 U.S. 504 (1995) ........................... 30

*Vinh Hoan Corp. v. United States*, 317 F.Supp.3d 1295 (CIT 2018), *aff'd*,
786 F. App'x 258 (Fed. Cir. 2019) ........................................... 23

*Witex, U.S.A., Inc. v. United States*, 28 CIT 1907 (2004)........................ 23

*Zhengzhou Harmoni Spice Co. v. United States*, 617 F.Supp.2d 1281
(CIT 2009) .............................................................................. 13

## Statutes

19 U.S.C. § 1500 ................................................................................. 19

19 U.S.C. § 1675 ................................................................................. 19

## Regulations

19 C.F.R. § 351.301 ...................................................................... 28, 29

## Administrative Decisions & Publications

*Aluminum Foil from China: Final Determination of Sales at LTFV*,
83 Fed. Reg. 9282 (Mar. 5, 2018) ........................................... 11

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into
Modules, from China: Final Results of ADD Administrative Review
and Final Determination of No Shipments; 2018-2019*,
86 Fed. Reg. 58,871 (Oct. 25, 2021) .......................................... 9

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into
Modules, from China: Final Results of ADD Administrative Review*

*and Final Determination of No Shipments, 2016-2017*,
84 Fed. Reg. 36,886 (July 30, 2019) ...................................................... 10

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into
Modules, from China: Final Results of ADD Administrative Review
and Final Determination of No Shipments, 2017-2018*,
85 Fed. Reg. 62,275 (Oct. 2, 2020) ................................................. 10, 34

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into
Modules, from China: Final Results of ADD Administrative Review
and Final Determination of No Shipments; 2019-2020*, 87 Fed. Reg.
38,379 (June 28, 2022*)* ...................................................................... 24

*Mobile Access Equipment from China: ADD Order*, 87 Fed. Reg. 22,190
(Apr. 14, 2022) ..................................................................................... 1

*Mobile Access Equipment from China: Final Affirmative Determination
of Sales at LTFV*, 86 Fed. Reg. 15,922 (Mar. 25, 2021) .............. passim

*Manganese Metal from China: Final Results of ADD Administrative
Review*, 65 Fed. Reg. 30,067 (May 10, 2000) ....................................... 11

*Metal Lockers and Parts Thereof from China: Final Affirmative
Determination of Sales at LTFV,* 86 Fed. Reg. 35,737 (July 7, 2021) . 10

*New Pneumatic Off-the-Road Tires from China: Final Results of ADD
Administrative Review; 2012-2013*, 80 Fed. Reg. 20197 (Apr. 15, 2015)
................................................................................................................ 12

*Passenger Vehicle and Light Truck Tires from Vietnam: Final
Determination of Sales at LTFV*, 86 Fed. Reg. 28,559 (May 27, 2021)
................................................................................................................ 11

*Seamless Refined Copper Pipe and Tube from China: Final Results of
ADD Administrative Review; 2014-2015*, 82 Fed. Reg. 27,688 (June 16,
2017) ...................................................................................................... 12

*Xanthan Gum from China: Final Results of ADD Administrative
Review, Final Determination of No Shipments, Final Partial
Rescission; 2014-2015*, 82 Fed. Reg. 11,434 (Feb. 23, 2017) ............... 20

iv

## **GLOSSARY**

| Abbreviation | Term |
|---|---|
| Average unit value | AUV |
| Business proprietary information | BPI |
| Coalition of American Manufacturers of Mobile Access Equipment | Petitioner |
| Confidential Record | C.R. |
| Explanatory Note | EN |
| First Administrative Review | AR1 |
| Harmonized System of Nomenclature | HSN |
| Harmonized Tariff Schedule | HTS |
| Issues and Decision Memorandum | IDM |
| Less-than-fair value | LTFV |
| Mill test certificates | MTC |
| Mobile access equipment | MAE |
| New factual information | NFI |
| Nonmarket economy | NME |
| People's Republic of China | China/ PRC |
| Period of Investigation | POI |
| Period of Review | POR |
| Public Record | P.R. |
| Supplemental Section D Questionnaire Response | SDQR |
| Surrogate value | SV |
| Transshipment Local Instruction | TLI |
| U.S. Court of Appeals for the Federal Circuit | CAFC/ Fed. Cir. |
| U.S. Customs and Border Protection | CBP/ Customs |
| U.S. Department of Commerce | Commerce/ Department |
| Zhejiang Dingli Machinery Co., Ltd. | Dingli |

PUBLIC VERSION

This Response Brief is filed on behalf of Defendant-Intervenor Zhejiang Dingli Machinery Co., Ltd. ("Dingli"), in opposition to the Motion for Judgment on the Agency Record filed by Plaintiff Coalition of American Manufacturers of Mobile Access Equipment ("Petitioner") on November 9, 2022, ECF 26-27 ("Pet. Br."), challenging aspects of the U.S. Department of Commerce's ("Commerce" or "Department") final determination in its less-than-fair-value ("LTFV") investigation of certain mobile access equipment and subassemblies thereof ("MAE") from the People's Republic of China ("China" or "PRC"), *MAE from China: Final Affirmative Determination of Sales at LTFV*, 86 Fed. Reg. 15,922 (Mar. 25, 2021), P.R. 514, Appx___-___ ("*Final Determination*"), and accompanying Issues and Decision Memorandum (Feb. 14, 2022) ("IDM"), Appx___-___, resulting in issuance of the antidumping duty ("ADD") order on MAE from China. *MAE from China: ADD Order*, 87 Fed. Reg. 22,190 (Apr. 14, 2022), P.R. 521, Appx___-___.

Dingli fully supports the position of Defendant United States ("Defendant") in opposition to Petitioner's arguments in its Response Brief filed on February 13, 2023, ECF 31-32 ("Def. Br."). In accordance with this Court's instruction, Rule 16 Notice (June 26, 2022), ECF 21,

1

Dingli provides the following supplemental points in support of those made by Defendant in defending the *Final Determination*. Def. Br. at 14-47.

## ARGUMENT

### I.   COMMERCE LAWFULLY VALUED DINGLI'S OCEAN FREIGHT COSTS

Commerce's decision to value ocean freight based on Descartes, Freightos, and Drewry data, submitted by Dingli, rather than Maersk data, submitted by Petitioner, is supported by substantial evidence. Def. Br. at 17-29. Commerce has analyzed the relative merits of Descartes and Maersk data in multiple decisions, and has repeatedly selected Descartes data. Freightos and Drewry share similar attributes of Descartes data, and are without the infirmities underlying the Maersk data.

If Petitioner had not placed the Maersk data on the record, Commerce's selection of the Descartes, Freightos, and Drewry data undeniably would have been a reasonable surrogate value ("SV") for Dingli's shipments to the United States. Petitioner's arguments do not directly dispute this fact. Thus, the sole question for this Court to consider is whether Commerce's selection of Descartes, Freightos, and

PUBLIC VERSION

Drewry – rather than Maersk – was reasonable. Commerce's comprehensive comparison of the competing data sets in the *Final Determination* reveals that it carefully weighed the evidence, IDM at 8-13, Appx____-____, and Defendant's discussion of these data shows that Petitioner fails in its attempt to convince this Court to reweigh the evidence. Def. Br. at 17-29. Additional reasons as to why Petitioner's arguments are unsupported by substantial evidence are set forth below.

First, Petitioner argues that Dingli predominantly used Shanghai to [        ] port route while "respondents' freight data predominantly reflect shipments from Shanghai to New York . . . {and} is therefore not reflective of Dingli's actual shipments during the period of investigation" ("POI"). Pet. Br. at 24-25. However, Petitioner does not dispute that Dingli actually used the Shanghai-New York route. As such, Descartes, Drewry, and Freightos data are route-specific and satisfy the paramount product-specificity criterion for valuing factors of production ("FOP"). *See, e.g.*, *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 29 CIT 288, 300 (2005). Moreover, Petitioner fails to identify any Commerce practice or precedent supporting a

weighted-averaging of ocean freight SV data that involves weighing by the number of shipments for each port combination used.

Second, Petitioner claims that Maersk data is more product-specific compared to Descartes data:

> {T}he Maersk data most specifically reflected the actual types of merchandise shipped by Dingli to the United States during the {POI}: "[
>
>                                          ]" . . . . By contrast, respondents' Descartes data reflected a much broader, and less representative, pool of merchandise: "Furniture, *Machinery Parts*, Bearings, Chains, Hub, Plastic Bags, Fabric, Gate Valve, Plastic Tube, Pallet Cable, Hardwares, Drilling Parts, *Bakery Machines*, TBEP, Paper Cup and Cones, Suspension Assembly, Sofa Cover, Vanilin, NOS."

Pet. Br. at 25 (emphases added).

However, unlike Maersk data, Descartes data encompass at least one full machine and several machinery parts. As such, Descartes covers merchandise comparable to scope goods and – contrary to Petitioner's assertions – is as product-specific, if not more, than Maersk data. Therefore, Commerce made a reasonable choice in selecting Descartes based also on its product-specificity. Further, while repeating its argument made before Commerce that "Dingli's other data sources – Drewry and Freightos – did not specify at all what types of merchandise

PUBLIC VERSION

the shipment rates reflected," *id.*, Petitioner tellingly fails to counter

Commerce's reasonable conclusions that:

1. "we find this fact does not render the ocean freight rates unusable because we find that Drewry and Freightos' published ocean freight rates suggest that the ocean rates are representative of, and equally applicable to, all types of merchandise, including mobile access equipment and subassemblies thereof"; and

2. "there is no evidence on the record to the contrary."

IDM at 10, Appx____.

Third, Petitioner has not satisfactorily answered or rebutted

Commerce's question as to why Petitioner designated all of the Maersk

data as business proprietary information ("BPI"), rather than limiting

the BPI designation to certain  shipping routes. This Court should not

accept Petitioner's unavailing retort that "if the Maersk rates were

revealed, it would have been possible to relatively easily derive Dingli's

proprietary shipping routes" Pet. Br. at 28. This claim is clearly wrong.

Fourth, Petitioner peremptorily claims that "Maersk is a public

source . . . {since} Commerce has previously explained that certain

international freight data is considered public when it can be accessed

by the government online without charge." Pet. Br. at 29. However,

Petitioner has not even attempted to establish how Maersk data can be

5

publicly accessed, rendering its claim as hollow. Moreover, the precedent cited by Petitioner in support of this claim reveals that Descartes, not Maersk, is publicly available. Petitioner has not established why Commerce or this Court should presume the public availability of Maersk based on Descartes, an altogether different data source.

Fifth, Petitioner's suggested "public availability invitation" path should be rejected. Petitioner asks that "the Court should remand to Commerce, where Commerce can request the respondents to submit their freight routes publicly and the Maersk data can then be treated as public as well." Pet. Br. at 31. A decision by this Court accepting this suggestion would allow Petitioner to untimely cure its defective response by redoing its submission long after the record had closed. That train has already left the station.

Sixth, recognizing its vulnerability on this issue, Petitioner makes a last ditch argument that "public availability is merely one of a number of considerations to be weighed by Commerce in evaluating the relative merits of competing sources of data." Pet. Br. at 32. Petitioner's rationale that "Commerce must balance the interest in accurate

information against the interest in publicly-available information," *id.*, misses the essential purpose of the public availability criterion – to ensure a document's reliability. Absent reliability, Petitioner's claim to simply presume the accuracy of Maersk data is without merit.

Seventh, there is an obvious answer to Petitioner's rhetorical question – "why are four sources not better than three?" Pet. Br. at 33. The fourth data source, Maersk, being BPI and beset with data quality defects, is demonstrably unreliable; therefore, averaging it with three other high-quality data sources would distort the resulting average SV.

Eighth, in response to Commerce's findings that Maersk data are price quotes while Descartes data represent actual transaction prices, Petitioner unpersuasively advances a false equivalence. According to Petitioner, "the Descartes data to which Commerce cites state, on page after page: '*Estimates* of freight charges are furnished as a convenience to the shipping public and represent *nothing more than an approximation* of freight charges which is *not binding* either on the carrier or shipper. Rates are *subject to change* and should be verified prior to shipment.'" Pet. Br. at 34 (emphasis in original). Petitioner misconstrues Descartes' declaration, which simply cautions the public

against relying, for current shipments planning, on a historical

transaction-specific price data. Jinko's First SV Comments (July 26,

2021), P.R. 242-49, Exhibit 7(A)(i), Appx____-____, Appx____-____;

Dingli's Final SV Comments (Aug. 25, 2021), P.R. 302-15, Exhibit

7(A)(i), Appx____-____, Appx____-____.

The fact that each Descartes sheet bears a unique Transshipment

Local Instruction ("TLI") number of the licensed freight forwarder and

the name of the carrier establishes that all Descartes price data

represent actual transactions on those dates. *Id*. In contrast, Maersk

data states that "{r}ate information is an indication only and Maersk

rates are subject to {} terms and conditions." Def. Br. at 25.

Ninth, Petitioner argues that "with regard to the Descartes data,

Dingli omitted from the freight rates provided items such as the bunker

adjustment factor of $65.00, the destination delivery charge of $485.00

that is added to the freight charge, and local port surcharges of $66.00."

Pet. Br. at 34-35. However, Petitioner fails to demonstrate how local

port charges are not subsumed under the "Border Compliance"

component of the brokerage and handling charges. Petitioner likewise

fails to explain why destination delivery charges, an inland

transportation charge, should be included in an ocean freight calculation. In support of the inclusion of bunker adjustment factor, Petitioner cites to agency precedent, *id.* at 35-36, but fails to point to any record evidence explaining the nature of this charge. Absent such record evidence, Petitioner's cited precedent – based on different records – are *ipso facto* inapplicable.

Finally, Commerce's analysis in the investigation, and its conclusion that in contrast to Maersk, Descartes is an appropriate SV for shipments of merchandise from China to the United States conforms with Department practice in myriad cases. Several of these decisions are cited below.

| Commerce Decision | Commerce Rationale |
|---|---|
| *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, ("CSPC") from China: Final Results of ADD Administrative Review and Final Determination* | "We disregarded the petitioner's Maersk rates, because they were treated as proprietary information on the record of this review. . . . We do not find convincing the petitioner's claim that it was forced to present all of the Maersk data as proprietary information because Risen treated its shipping routes as proprietary information. We do not believe the petitioner adequately explained why it treated the entirety of the Maersk data as proprietary information rather than simply treating the routes as proprietary information.[8] Based on the petitioner's decision to treat all of the underlying Maersk data as proprietary information, none of the Maersk data, or the details regarding that data that |

| | |
|---|---|
| *of No Shipments; 2018-2019*, 86 Fed. Reg. 58,871 (Oct. 25, 2021), IDM Comment 10 | were provided by the petitioner, are publicly available on this record. This contrasts with the Descartes data, where all of the details were treated as public information on the record of this review." |
| *Metal Lockers and Parts Thereof from China: Final Affirmative Determination of Sales at LTFV*, 86 Fed. Reg. 35,737 (July 7, 2021), IDM Comment 2 | "we disagree that the Maersk data, though contemporaneous, reflect usable data from which to derive the ocean freight SV, as these data are bracketed as business proprietary information as submitted.◊ It is Commerce's normal practice to use publicly available information to value FOPs.◊ While Zhejiang Xingyi's ocean freight data are based on price quotes from just prior to the POI in October 2019,◊ these data were submitted without bracketing and, thus, reflect the only publicly-available information on the record from which to derive the ocean freight SV." |
| *CSPC from China: Final Results of ADD Administrative Review and Final Determination of No Shipments, 2017-2018*, 85 Fed. Reg. 62,275 (Oct. 2, 2020), IDM Comment 5 | "We continue to find Descartes data to be the best available information on the record for valuing ocean freight expenses. The record comprises the following data for valuing ocean freight expense: (1) Descartes data for 20 foot and 40 foot dry containers shipped to both the West and East coasts of the United States;◊ and 20 foot dry containers shipped to the West Coast;◊ (2) Xeneta data for 40 foot high cube containers shipped to both the West and East coasts of the United States;◊ and (3) Maersk data treated as {BPI};◊ and a list of Maersk rates (public information) with no supporting documentation.◊ The Maersk rates cited by the petitioner are not usable because they are merely lists of rates in a spreadsheet for which the petitioner has not provided any supporting data." |
| *CSPC from China: Final Results of ADD* | "We disregarded the petitioner's Maersk rates, because they were treated as proprietary information on the record of this review. In Policy |

| | |
|---|---|
| *Administrative Review and Final Determination of No Shipments, 2016-2017*, 84 Fed. Reg. 36,886 (July 30, 2019), IDM Comment 16 | Bulletin 04.1, Commerce explained that 'in assessing data and data sources, it is the Department's stated practice to use investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the {POI} or review, and publicly available data.'" |
| *Manganese Metal from China: Final Results of ADD Administrative Review*, 65 Fed. Reg. 30,067 (May 10, 2000), IDM Comment 12 | "we derived surrogate ocean freight rates for the U.S. east and west coasts, separately, based on actual freight rate data for manganese ore and electrolytic manganese metal obtained from the Federal Maritime Commission . . . . By contrast, Eramet's proposed freight surrogates have been bracketed in their entirety, are not for manganese metal or even a remotely similar product, and may not be contemporaneous with the {period of review ('POR')}." |
| *Aluminum Foil from China: Final Determination of Sales at LTFV*, 83 Fed. Reg. 9282 (Mar. 5, 2018), IDM Comment 2 | "we agree that the SV for ocean freight utilized in the Preliminary Determination {Maersk data} was not fully supported by information on the record. Specifically, although the petitioners' submission contained a suggested SV, it did not contain any supporting documentation for that value. Therefore, we have revisited our selection of an ocean freight SV, based on the information available on the record, which includes SV data from Descartes and Xeneta."<br><br>"We find that the Descartes ocean freight quotes represent the best information available on the record with which to value ocean freight. These data are publicly available information and represent ocean freight costs between various locations in China and the west coast of the United States. Moreover, the information from Descartes is free of |

| | |
|---|---|
| | taxes and import duties and is the best available information on the record with regard to product specificity, while also being nearly contemporaneous with the POI." |
| *Passenger Vehicle and Light Truck Tires from Vietnam: Final Determination of Sales at LTFV*, 86 Fed. Reg. 28,559 (May 27, 2021), IDM Comment 7 | "{F}or these final results, we are using the ocean freight weights provided in the Descartes international ocean freight quotes, on a weighted-average basis, to derive the overall ocean freight SV. . . ." |
| *Seamless Refined Copper Pipe and Tube from China: Final Results of ADD Administrative Review; 2014-2015*, 82 Fed. Reg. 27,688 (June 16, 2017), IDM Comment 1 | "the Department finds that Descartes data for one shipment from Ningbo, PRC to Detroit, Michigan are the best available information within the meaning of section 773(c)(1)(B) of the Act for valuing Hailiang's international freight." |
| *New Pneumatic Off-the-Road Tires from China: Final Results of ADD Administrative Review; 2012-2013*, 80 Fed. | "While the Descartes ocean freight quotes are issued on a per-container basis, the quotes also provide an assumed weight for each quoted shipment.{ } Therefore, because the quotes include a weight, we find the weights on the Descartes freight quotes to be more specific to the quotes than the average weights of respondents' own shipments. Thus, for these final results, we are using the ocean freight |

12

| Reg. 20197, (Apr. 15, 2015), IDM Comment 11 | weights provided in the Descartes international ocean freight quotes, on a weighted-average basis, to derive the overall ocean freight {SV.}" |
|---|---|

Commerce decisions to rely on Descartes data, rather than

Maersk data, have been affirmed by this Court.

| **Opinion** | **Court Rationale** |
|---|---|
| *Risen Energy Co. v. United States*, 477 F.Supp.3d 1332, 1346-47 (CIT 2020) | "Commerce's determination that Descartes data, without Maersk data submitted by petitioners, better satisfies its selection criteria is supported by substantial evidence. . . . In addition to being contemporaneous with the POR and relating to the container size that respondents use, Commerce observes that Descartes freight rates are product-specific to the extent that they relate to shipments of solar panels and other solar products. . . . Moreover, Commerce explains that, unlike Maersk data rates submitted by the petitioners, Descartes data freight rates are publicly available. . . . It is thus reasonable for Commerce to disregard Maersk data and rely exclusively on Descartes data to value ocean freight expenses . . . ." |
| *Zhengzhou Harmoni Spice Co. v. United States*, 617 F.Supp.2d 1281, 1307-12 (CIT 2009) ("*Zhengzhou Harmoni I*") | "The Chinese Producers also contest the {SV} that Commerce calculated for ocean freight costs, which the agency based on price quotes for refrigerated containers as published by Maersk Sealand. The Chinese Producers first argue that the Maersk rates used by Commerce reflect distortions and are not representative of the expenses that the Chinese Producers and other respondents actually incurred. In addition, the Chinese Producers fault Commerce for rejecting the three alternative data sources that the respondents placed on the record. . . . Not only |

13

|  | |
|---|---|
|  | did Commerce fail to sufficiently analyze those alternative sources of data, but—in addition—it failed to adequately explain why the Maersk data that it used was appropriately representative for the purpose (*i.e.*, to approximate the respondents' ocean freight costs). . . . On remand, Commerce is directed to reconsider its determination as to the {SV} for the respondents' ocean freight expenses, in light of the Chinese Producers' arguments and the record evidence, consistent with this opinion." |
| *Jinan Yipin Corp. v. United States*, 800 F.Supp.2d 1226, 1278 (CIT 2011) | "On remand following *Zhengzhou Harmoni I,* Commerce re-evaluated all sets of data on the record—including the Maersk data, the Descartes data, and the publicly available ranged data on the prices paid by certain of the Chinese producers. . . . Based on that review, Commerce determined that 'the best available information with which to value ocean freight is price data obtained from the Descartes database." |
| *Taian Ziyang Food Co. v. United States*, 783 F.Supp.2d 1292, 1342-43 (CIT 2011) | "Commerce determined that, because the Descartes data constitute 'a publicly available source for ocean freight rates . . . that features routes more representative of those used by respondents,' there is 'no need to resort to the Maersk data to value ocean freight' here. . . . Commerce thus concluded that, given 'the public availability, contemporaneity, and representativeness of the Descartes data, . . . the lack of specificity in the Maersk data leaves the Descartes database as the best source on the record for ocean freight {SVs}.'" |

In sum, Commerce's selection of Descartes, Freightos, and Drewry data, submitted by Dingli, rather than Maersk data, submitted by Petitioner, to value ocean freight was supported by substantial evidence

14

in this investigation and fully conformed to established Commerce

precedent – as affirmed by this Court.

## II.  COMMERCE LAWFULLY VALUED DINGLI'S DRIVE MOTOR 1

Commerce's decision to value Jinko's Drive Motor 1 as a hybrid

motor-cum-generator in Harmonized Tariff Schedule ("HTS")

subheading 8501.32 (which encompasses motors and generators), rather

than in HTS subheading 8501.32.10 (which covers "electric motors"), is

supported by substantial evidence. Def. Br. at 33-41; IDM at 67-68,

Appx____-_____. In its *Final Determination*, Commerce explained its

choice as follows:

> Because HTS subheading {8501.32} encompasses both the
> motor and generator features of this input, as described by
> Dingli, we continue to find that the best HTS subheading for
> this input is 8501.32, whereas the petitioner's suggested
> HTS subheading {8501.32.10} encompasses only one of the
> features (*i.e.*, electric motor).

IDM at 68, Appx____. Defendant establishes why this Court should

reject Petitioner's attempt to convince this court to reweigh the

evidence. Def. Br. at 33-41.

Further, there is no merit to Petitioner's argument to value the

input exclusively as a motor based on its label – "drive motor 1" – or

description – "drive motor assembly." Pet. Br. at 47. This approach is contrary to this Court's affirmation of Commerce's practice that the SV selection should be based on an input's essential character, not its commercial name:

> The court discerns from Commerce's discussion that the **separate inputs of coal tar and pitch reflect what the "inputs actually were,"** . . . **based on pitch content of the input material and not simply the label Respondents attached to the input**.

*Calgon Carbon Corp. v. United States*, 443 F.Supp.3d 1334, 1343-44 (CIT 2020) (emphases added) (citations omitted).

Petitioner also questions the input's hybrid character and specifically whether it includes a generator. According to Petitioner, "a generator will typically contain a fuel reservoir tank, an engine, a starter assembly, spark plugs, an alternator, a fuel system (carburetor, fuel and air filter)," *inter alia*. Pet. Br. at 51. This claim is hollow because Petitioner did not contest the plethora of record evidence regarding a class of goods known as a "motor cum generator." Dingli's Final SV Rebuttal Comments (Sept. 8, 2021), C.R. 198-214, P.R. 356-372, Exhibit 2B, Appx____-____, Appx____-____; Dingli's Redacted Rebuttal Brief (Dec. 8, 2021), C.R. 330, P.R. 496, at 81, Appx____.

Likewise, Petitioner speculates that the motor, not the generator, is the primary component accounting for "99% of the . . . function" (with "generators . . . less than 1%"). Pet. Br. at 49. This argument is unaccompanied by any supporting evidence. "*It is well established that speculation does not constitute substantial evidence.*" *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009) (emphasis added) (internal citation omitted).

Assuming *arguendo* that the motor is the primary component, the precedent cited by Petitioner does not support its argument to classify the Drive Motor 1 input solely under HTS 8501.32.10. Pet. Br. at 50. Unlike the unitary HTS 8501.32 classification for motor-cum-generator, in each case cited by Petitioner the HTS subheadings for primary and secondary functions fall under different HTS subheadings:

- <u>*F.W. Myers, Inc. v. United States*</u>, 12 CIT 566 (1988): Tariff Schedule of the United States subheadings 692.11 and 692.35;

- <u>*Home Depot U.S.A. v. United States*</u>, 435 F.Supp.3d 1311 <u>(CIT 2020)</u>: HTS subheading 8301 and 8302; and

- <u>*La Crosse Tech., Ltd. v. United States*</u>, 723 F.3d 1353 (Fed. <u>Cir. 2013)</u>: HTS subheadings 9015 and 9025.

17

As such, in each of these instances, U.S. Customs and Border Protection

("CBP" or "Customs") was compelled to choose only one HTS

subheading to classify a product whose components fell within two

distinct HTS subheadings. In contrast, in this case HTS 8501.32 covers

both motors and generators.

Moreover, Petitioner's arguments impermissibly conflate

Commerce's paramount objective of obtaining an accurate valuation of

goods with CBP's paramount objective of obtaining an accurate tariff

classification. The CAFC's guidance from the first administrative review

("AR1") of the ADD order on CSPC from China is instructive:

> Commerce is "not required to engage in a classification
> analysis" but instead is "required to determine which of the
> competing subheadings constituted the best available
> information. . . . Consequently, even if some aluminum
> frames do not contain perfectly uniform cross-sections as
> discussed in the explanatory note, Thai HTS Heading 7604
> still constitutes the best available information under
> § 1677b(c)(1)(B), given the other similarities detailed above
> between Yingli's inputs and the products covered by Thai
> HTS Heading 7604. . . .
>
> To the extent SolarWorld argues as a legal matter that
> Customs' rulings must be afforded more weight than other
> evidence on the record, we disagree. Whereas Customs is
> tasked with "fix{ing} the final classification" of imported
> merchandise under the HTSUS, . . . Commerce is
> authorized . . . to "determine . . .  the amount of any {ADD}"

> necessary to remedy the effect of foreign merchandise being
> sold in the United States at less than its fair value, . . . the
> statute affords Commerce "broad discretion" in identifying
> the best available information on the record to value factors
> of production. . . .

*SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1224-25 (Fed.

Cir. 2018) (quoting *Downhole Pipe & Equip., L.P. v. United States*, 776

F.3d 1369, 1379 (Fed. Cir. 2015); 19 U.S.C. §§ 1500, 1675(a)(1)(B)).

Therefore, for selecting the best HTS subheading to value an

input, Commerce is not constrained by tariff classification principles.

*Id.* at 1223-25. Commerce is required to select an HTS subheading that

results in a more accurate valuation of goods – even if that HTS

subheading would not have been selected by CBP for tariff classification

purposes. Towards that end, Commerce has selected six-digit HTS

subheadings to value an input in which that input was comprised of

components arguably categorized in more specific eight- or ten-digit

subheadings.

> {T}he Department selected Thai HTS category 2815.12 as
> the category most closely matching the input consumed by
> the respondents. Given that there is no record information
> regarding the consumption of sodium hydroxide by Fufeng at
> the 20 percent or less concentration level (HTS category
> 2815.12.00101) versus consumption at the greater than 20
> percent concentration level (HTS category 2815.12.00102),
> there is no basis to assume that the consumption of sodium

19

hydroxide at the two concentration levels was in equal proportions (a simple average) or some other proportions. Because consumption was at both concentration levels, but the proportion of the concentration levels consumed is not known, the Department determined that Thai HTS category 2815.12 most closely matches the input consumed by the respondents.

*Xanthan Gum from China: Final Results of ADD Administrative Review, Final Determination of No Shipments, Final Partial Rescission; 2014-2015*, 82 Fed. Reg. 11,434 (Feb. 23, 2017), IDM Comment 11.

Likewise, in this LTFV investigation of MAE from China, since "the proportion of the {motor: generator function} is not known, the Department determined that {Brazilian} HTS category {8501.32} most closely matches the input." *Id*. Petitioner's arguments to the contrary are unsupported by substantial evidence.

## III. COMMERCE LAWFULLY VALUED DINGLI'S MINOR FABRICATED STEEL COMPONENTS

Commerce's decision to value Jinko's minor fabricated steel components in the HTS subheadings covering the main underlying steel input, rather than in the basket HTS subheading 7326.90.90 for "other articles of steel" submitted by Petitioner, was supported by substantial evidence. Def. Br. at 29-33; IDM at 35-38, Appx____-_____.

20

PUBLIC VERSION

Defendant has already specified in detail the flaws in Petitioner's arguments. Def. Br. at 29-33. In addition, Dingli emphasizes that Petitioner errs by approaching the HTS subheading selection from a pure CBP classification perspective – instead of obtaining the most accurate valuation, which is Commerce's paramount objective. *SolarWorld Ams.*, 910 F.3d at 1223-25. Towards that end, Commerce correctly weighed the relative merits of the competing HTS alternatives and properly selected the HTS subheading that captured the cost of the main underlying steel input (*e.g.*, bars, rods, plates, sheets), rejecting the miscellaneous broad basket HTS 7326.90.90 ("Other articles of iron or steel"):

> Thus, the record does not support the petitioner's allegations. Although the letters from certain suppliers provided on the record indicate a wide range of fabrication that may be involved, depending on the input and specification requirements, record evidence demonstrates that Dingli's suppliers may do minimal work on a particular part, such as cutting, bending, or punching holes or in some cases, they may do more in-depth fabrication or processing. In addition, we find that the petitioner did not provide any evidence that HTS subheading 7326.90.90 is a more appropriate HTS subheading to use to value these inputs. As we indicate above, this HTS subheading is a basket category that contains "other articles of iron or steel, which include various types of finished steel articles including consumer articles."

21

PUBLIC VERSION

IDM at 38, Appx____ (quoting Dingli's Pre-Preliminary Comments,

(Sept. 2, 2021), P.R. 344-45, Exhibit 1, Appx____-____ (footnotes

omitted)).

HTS subheading 7326.90.90 is the "ultimate" basket subheading.

It encompasses iron and steel articles which are not classified in any

other HTS subheading. The Harmonized System of Nomenclature

("HSN") Explanatory Notes ("EN") for HTS heading 7326 provides as

follows.

The heading includes {*inter alia*}:

(1)

1. Horseshoes;
2. boot or shoe protectors;
3. tree climbing irons;
4. non mechanical ventilators;
5. Venetian blinds;
6. Binding hoops for casks . . . .

Dingli's Final SV Comments Exhibits 13 & 20, Appx____-____,

Appx____-____.

As such, HTS subheading 7326.90.90 is distorted by myriad

disparate consumer goods and is less specific than any other iron/steel

product HTS subheading. Reviewing courts have repeatedly held that

for valuing specific inputs, basket subheadings represent an inferior

choice compared to subheadings covering reasonably comparable goods. *See, e.g., Witex, U.S.A., Inc. v. United States*, 28 CIT 1907, 1916-17 & n.16 (2004). Petitioner's argument, if accepted, would result in "valuing a red onion not based on the prices of yellow or white onions but based on the prices of a basket of all root vegetables, simply because one red onion is in the bushel." *CS Wind Vietnam Co. v. United States,* 971 F.Supp.2d 1271, 1284 (CIT 2014). The possibility that "there is a small amount of identical merchandise in the . . . {HTS} . . . category . . . {proposed by Petitioner} . . . is not substantial evidence to support . . . {that} . . . choice." *Id.*

"It is reasonable for Commerce to determine that, on this record, the {SV} that results from the use of data from HTS category . . . {7326.90.90} . . . is not representative of the value of . . . {minor steel components} . . . because many of the products covered by that category are not sufficiently similar to {Dingli's minor fabricated steel components}." *Vinh Hoan Corp. v. United States*, 317 F.Supp.3d 1295, 1303 (CIT 2018), *aff'd*, 786 F. App'x 258 (Fed. Cir. 2019). This Court's rationale in AR1 of the ADD order on chlorinated isocyanurates from China is directly applicable to the facts in this investigation:

> {I}t was reasonable for Commerce to reject import data
> under HTS subheading 2501.00.90 covering "other salts of
> pure sodium chloride" because that category of imports was
> overbroad as it is a "basket" provision. . . . {T}he Department
> noted that it "does not prefer an overly broad HTS category
> where a more product-specific surrogate value is available."

*Arch Chems., Inc. v. United States*, 33 CIT 954, 972 (2009) (citations

omitted).

Finally, the essential character of the <u>minor</u> fabricated steel

components at issue did not materially change from those of the primary

steel materials from which they were produced. Commerce's valuation of

Jinko's minor fabricated steel components in an HTS subheading in

which the primary material is classified is consistent with its practice.

*See, e.g.*, *CSPC from China: Final Results of ADD Administrative*

*Review and Final Determination of No Shipments; 2019-2020*, 87 Fed.

Reg. 38,379 (June 28, 2022), IDM Comment 6 ("a category consisting of

semi-manufactured imports (HTS 7106.92) is more specific to the

manufactured silver paste consumed by respondents than Malaysian

HTS 7115.90.10, which consists of articles of silver and gold, which

would consist of silver and gold articles such as toys, figurines,

ornaments, cups, money clips, and other such items.")

24

Accordingly, Commerce correctly concluded that Dingli's minor steel components should be valued in HTS subheadings for steel bars / rods / plates / sheets because they yield more accurate SVs than valuing these components based on a broad basket category – which includes multiple, diverse, further-processed, and higher-valued consumer goods. IDM at 35-38, Appx____-____.

## IV. COMMERCE LAWFULLY ACCEPTED DINGLI'S REBUTTAL FACTUAL INFORMATION

Petitioner paints with a broad brush to argue that Commerce unlawfully declined to reject several different categories of documents submitted by Dingli,[1] claiming that these documents should have been rejected for several reasons. Pet. Br. at 53-63. Yet when examined in isolation, as set forth in turn below, it is apparent that Commerce acted properly by keeping the Dingli information on the record.

---

[1] This Response Brief addresses only those categories of exhibits specifically challenged by Petitioner. Pet Br. at 53-63. Although Petitioner notes that it is challenging a broader universe of Dingli information, *id.* at 53. n.10, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *MTZ Polyfilms, Ltd. v. United States*, 33 CIT 1575, 1578 (2009) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones"). "It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived." *Great Am. Ins. Co. of N.Y. v. United States*, 738 F.3d 1320, 1328 (Fed. Cir. 2013).

A.   <u>Mill Test Certificates</u>

Dingli placed mill test certificates ("MTC") on the record with the express purpose to: "Rebut{} Petitioner's SV proposal of exclusively" using HTS subheadings for alloy steel by demonstrating the inputs were non-alloy steel grade. Dingli's Final SV Rebuttal Comments, List of Exhibits With Explanation, Exhibits 1A-1I, Appx____-____. Petitioner claims that the MTCs constitute untimely new factual information ("NFI") "more specifically defining several of its steel inputs." Pet. Br. at 59. Petitioner is wrong. Dingli had already reported that these steel inputs were of non-alloy steel grades – primarily grade Q345. Dingli Section D Questionnaire Response, C.R. 125-27, P.R.285-89 (June 24, 2021) ("DQR"), Exhibits D-2 & D-12, Appx____-____, Appx____-____, Appx____-____; Dingli Supplemental Section D Questionnaire Response, C.R. 241-45, P.R. 285-89 ("SDQR"), Exhibit SD-3A, Appx____-____, Appx____-_____. Dingli had established the non-alloy grade of these inputs through "letters from suppliers of certain complex steel welded inputs . . . describing the characteristics of the main inputs and the manufacturing process used to produce such inputs." SDQR at 5, Exhibits SD-3D.1–13, Appx____, Appx____-____.

The MTCs thereby confirmed information that Dingli had already reported concerning the grade of its inputs. *Id*. Although they identified the steel grade as Q355, Dingli's Final SV Rebuttal Comments Exhibits 1A-1I, Appx____-____, "Q345 steel ha{d} been replaced by Q355 in the latest version of GB standard." *Id*. Exhibit 1J, Appx____-____. The MTCs did not redefine inputs, but rather became necessary for rebuttal when Petitioner challenged Dingli's assertions concerning the steel grade of those inputs by proposing that they be valued using alloy steel HTS subheadings. Petitioner's Final SV Comments (Aug. 25, 2021), P.R. 295-300, Exhibit 1, Appx____-____.

Petitioner claims to have been prejudiced by the MTCs remaining on the record. Pet. Br. at 56-57. Yet Petitioner not only had the opportunity to challenge the MTCs in subsequent briefing, Def. Br. at 46, but actually did so – thereby rebutting any suggestion of prejudice. Petitioner Case Brief (Nov. 24, 2021), C.R. 323, P.R. 471, at 1, 12-14, 28-37, 42-23, Appx____, Appx____-____, Appx____-____, Appx____-____. Moreover, Petitioner could have but "did not provide any pre-verification comments raising any concerns over the information placed on the record by Dingli." IDM at 25, Appx____. By neglecting to do so,

PUBLIC VERSION

Petitioner forewent an opportunity to have Commerce assess any concerns with respect to Dingli's MTCs.

Petitioner asserts that Commerce is prohibited by regulation from accepting Dingli's proprietary MTCs. Pet. Br. at 53-54. Yet nothing in Commerce's regulations prohibits the submission of proprietary information to rebut SV information; that parties may "submit publicly available information to rebut, clarify, or correct" public information submitted for Commerce's surrogate valuation does not prevent parties from submitting proprietary rebuttal information when necessary. 19 C.F.R. § 351.301(c)(4). Indeed, Petitioner itself submitted proprietary rebuttal factual information when rebutting Dingli's SV submission. Petitioner's Final SV Rebuttal Comments (Sept. 7, 2021), C.R. 217-23, P.R. 385-390, Exhibits 19 & 25, Appx____-____, Appx____-____, Appx____-____.

Petitioner's submission of proprietary rebuttal SV information, which properly remained on the record, establishes the hypocrisy of its claim that parties are prohibited by regulation from doing so. *Id*. Besides being necessary, Def. Br. at 25, the MTCs were submitted in rebuttal because Petitioner waited until the day that the record closed

28

PUBLIC VERSION

to first raise concerns as to the grade of Dingli's steel inputs.

Petitioner's Final SV Comments Exhibit 1, Appx____-____; 19 C.F.R.

§ 351.301(c). Had Petitioner raised these concerns earlier, the MTCs

could have been provided earlier. Dingli's Redacted Rebuttal Brief (Dec.

8, 2021), at 123-26, Appx____-_____.

Under Petitioner's theory, parties could wait until immediately

before the record closes to sandbag their opponents with alleged facts

that could never be rebutted. In its decision, Commerce properly

declined to credit Petitioner's regulatory interpretation that would

reward gamesmanship at the expense of calculating ADD margins as

accurately as possible based on a complete administrative record.

Commerce Preliminary SV Memorandum (Sept. 24, 2021), P.R. 415, at

6-12, Appx____-____. That the regulation speaks only to public

information does not prevent Commerce from exercising its CAFC-

recognized "discretion . . . to relax or modify its procedural rules . . .

when, in a given case, the ends of justice require it." *Id*. n.66 (quoting

*PAM S.p.A v. United States*, 463 F.3d 1345, 1348 (Fed. Cir. 2006);

*American Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 523, 538-39

(1970)). "{I}t is well settled that an agency's interpretation of its own

regulations is entitled to broad deference from the courts." *Cathedral Candle Co. v. ITC,* 400 F.3d 1352, 1363-64 (Fed. Cir. 2005) (citing *Thomas Jefferson Univ. v Shala*, 512 U.S. 504, 512 (1995)).

In maintaining Dingli's MTCs on the record, Commerce did not contradict its own conduct in this investigation, as Petitioner alleges, citing the rejection of Maersk data. Pet. Br. at 54-56. That strained analogy fails because: (1) Petitioner submitted the Maersk data for use in surrogate valuation, whereas the MTCs were submitted only for rebuttal; and (2) Commerce did not reject Petitioner's Maersk data, but instead declined to use it on account of public availability concerns. IDM at 9, Appx_____. Thus, Commerce's decision to not rely on the Maersk data as a SV for ocean freight does not in any way undermine its decision to accept Dingli's MTCs.[2]

B.    Drive Motor Information

Dingli submitted an engineer declaration and articles about motor-generator to "{r}ebut{}" Petitioner's SV proposal of . . . HTS 8501.32.10 for valuing Drive Motor 1." Dingli's Final SV Rebuttal

---

[2] Although Petitioner had initially requested that Commerce reject the MTCs based on a claimed lack of translation, Commerce Preliminary SV Memorandum at 6-12, Appx____-____, that incorrect assertion appears to have been abandoned on appeal.

Comments, List of Exhibits With Explanation, Exhibits 2A-2D,

Appx____, Appx____-_____. Petitioner claims that these documents

"provided new information on the nature of its drive motor inputs." Pet.

Br. at 59. Petitioner is wrong. Dingli had already reported this input as

a combination of a motor and generator. Dingli DQR Exhibits D-2, D-6,

D-13, Appx____-____, Appx____, Appx____; DQR Dingli SDQR Exhibits

SD-2C, SD-3A, SD-3B.2, SD-4A, SD-4B.1, SD-4B.2, SD-5C, Appx____,

Appx____, Appx____-____, Appx____, Appx____, Appx____-____.

Dingli reported that its Drive Motor 1 was properly valued under

HTS 8501.32. Dingli's Final SV Comments Exhibit 1, Appx____-____.

The engineer declaration and articles were necessary to confirm that

the input was "a dual device, Motor cum Generator," Dingli's Final SV

Rebuttal Comments List of Exhibits With Explanation, Appx____-____ –

in response to Petitioner's claim they should be valued under HTS

8501.31.10 that is limited to motors. Petitioner's Final SV Comments

Exhibit 1, Appx____; Dingli's Redacted Rebuttal Brief at 126, Appx____.

Dingli also submitted price quotes for its Drive Motor 1 and 2

inputs, to "{r}ebut{}" Petitioner's SV proposal of AUV of 44 $/Kg." Dingli's

Final SV Rebuttal Comments, List of Exhibits With Explanation,

31

Exhibits 2C-2D, Appx____, Appx____-____. "These price quotes of 10 $/Kg are not being proposed as a direct {SV} source; rather they are submitted to impeach Petitioner's aberrationally high SVs of 44 $/Kg." Dingli's Redacted Rebuttal Brief at 127, Appx____; Petitioner's Final SV Comments Exhibit 1, Appx____- ____.

Petitioner claims that Dingli "did not provide any context for the information," such as "how the [                              ] . . . which provides ample opportunity for manipulation." Pet. Br. at 55-56. This claim should be rejected. "{T}he record is utterly devoid of evidence that {Dingli's} price quotes are in any way unreliable." *Taian Ziyang Food Co. v. United States*, 918 F.Supp.2d 1345, 1362-63 (CIT 2013). As Petitioner did not provide any basis to question these quotes, Commerce properly kept them on the record as rebuttal evidence. IDM at 25, Appx____-____.

C.    Cast Iron Billet Information

Dingli submitted pricing information, a published article, and an HSN EN to "{r}ebut{} Petitioner's SV proposal of . . . HTS 7206.90 for valuing Cast Iron Billets." Dingli's Final SV Rebuttal Comments, List of Exhibits With Explanation, Exhibits 3A-3D, Appx____, Appx____-____.

Petitioner claims that these documents "redefine{d} its cast iron billet inputs." Pet. Br. at 59. Petitioner is wrong. Dingli had already reported this input as a cast iron billet. Dingli DQR Exhibits D-2, D-6, D-13, Appx____, Appx____, Appx____; DQR Dingli SDQR Exhibits SD-2C, SD-3A, SD-4A, SD-4B.1, SD-5C, Appx____, Appx____, Appx____, Appx____, Appx____. Indeed, Dingli submitted declarations from its suppliers attesting to the nature of this input. Dingli SDQR Exhibit SD-3D.1, Appx____.

Dingli reported that its cast iron billet was properly valued under HTS 7207.19. Dingli's Final SV Comments, Exhibit 1, Appx____. The pricing information, article, and EN were "submitted as a rebuttal to Petitioner's aberrationally high {SV} of more than 18 $/kg for ingots, not . . . to value the input." Dingli Redacted Rebuttal Brief at 128, Appx____; Petitioner's Final SV Comments Exhibit 1, Appx____. This information distinguished the input from an upstream ingot, establishing that HTS 7206.90 did not include cast iron billets, and that actual market prices of billets or even upstream ingots are less than $0.5/Kg. Dingli's Final SV Rebuttal Comments, List of Exhibits With Explanation, Appx____. As Petitioner did not provide any basis to

33

question this information, Commerce properly kept it on the record to

serve a rebuttal purpose. IDM at 25, Appx____.

## CONCLUSION

For the foregoing reasons, Defendant-Intervenor Dingli

respectfully requests that this Court affirm Commerce's *Final*

*Determination* as supported by substantial evidence and otherwise in

accordance with law.

Respectfully submitted,

*/s/ Ned H. Marshak*
Ned H. Marshak
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO,
LEBOWITZ, SILVERMAN &
KLESTADT LLP

599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
**
1201 New York Ave., NW,
Suite 650
Washington, DC 20005

*Counsel for Defendant-Intervenor
Zhejiang Dingli Machinery Co.,
Ltd.*

Dated: March 27, 2023

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Consolidated Defendant-Intervenors' Response Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 6,959 words, less than the 7,000 word limit.

_/s/ Jordan C. Kahn_
*Counsel for Defendant-Intervenor*
*Zhejiang Dingli Machinery Co.,*
*Ltd.*

Dated: March 27, 2023