# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT,

          PLAINTIFF,

      V.

UNITED STATES,

          DEFENDANT,

      AND

ZHEJIANG DINGLI MACHINERY CO., LTD.,

          DEFENDANT-INTERVENOR.

Court No. 22-00152

**NON-CONFIDENTIAL VERSION**

**Business Proprietary Information Removed from Pages 11-13, 23, 34**

## COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT'S REPLY BRIEF

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition of American Manufacturers of Mobile Access Equipment*

Dated: April 24, 2023

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................. 1

II. GLOSSARY OF CASE-SPECIFIC ACRONYMS AND ABBREVIATIONS ............ 1

III. ARGUMENT ................................................................................... 2

    A.   Commerce's Rejection of Petitioner's Maersk Data to Value Respondent's Ocean Freight Was Unreasonable and Unsupported by Substantial Evidence ....................................................................... 3

        1.   Defendant's Rationale for the Selection of Respondents' Dataset Alone Is Unreasonable and Unsupported by the Record ..................................... 3

        2.   Defendant Fails to Support Commerce's Conclusion that the Respondents' Dataset Was Equally or More Reliable than the Maersk Data ................................................................. 10

        3.   Commerce's Determination Not to Adjust Respondents' Dataset Was Unsupported by Substantial Evidence and Inconsistent with Law ............................................................................... 17

    B.   Commerce's Selection of the Surrogate Value for Minor Fabricated Steel Components Was Not Supported by Substantial Evidence nor in Accordance with Law .............................................................. 20

    C.   Commerce's Selection of the Surrogate Value for Dingli's Drive Motor 1 Input Was Not Supported by Substantial Evidence nor in Accordance with Law ........................................................................................ 25

D.    Commerce Unreasonably and Arbitrarily Accepted
           Information Filed by Dingli that Was Untimely,
           Contradicting Its Regulations and Practice ........................... 30

IV.    CONCLUSION ......................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Algoma Steel Corp. v. United States,*
865 F.2d 240 (Fed. Cir. 1989) .............................................................. 10

*Altx, Inc. v. United States,*
25 CIT 1100, 167 F.Supp.2d 1353 (2001) ............................................ 28

*Arch Chems., Inc. v. United States,*
33 CIT 954 (2009) ........................................................................ 24, 25

*F.W. Myers, Inc. v. United States,*
12 CIT 566 (1988) ........................................................................ 27, 29

*Hiep Thanh Seafood Joint Stock Co. v. United States,*
34 CIT 1428, 752 F.Supp.2d 1330 (2010) ............................................ 28

*Home Depot U.S.A., Inc. v. United States,*
435 F.Supp.3d 1311 (Ct. Int'l Trade 2020) ......................................... 28

*Huzhou Muyun Wood Co. v. United States,*
279 F.Supp.3d 1215 (Ct. Int'l Trade 2017) ......................................... 31

*Jinan Yipin Corp. v. United States,*
35 CIT 1254, 800 F.Supp.2d 1226 (2011) ............................................ 25

*Jinxiang Hejia Co. v. United States,*
35 CIT 1190 (2011) .............................................................................. 28

*Lasko Metal Prods., Inc. v. United States,*
43 F.3d 1442 (Fed. Cir. 1994) ............................................................. 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (2009) .............................................................................. 22

*Taian Ziyang Food Co. v. United States,*
33 CIT 828, 637 F.Supp.2d 1093 (2009) ............................................... 8

*Taian Ziyang Food Co. v. United States,*
    35 CIT 863, 783 F.Supp.2d 1292 (2011)................................. 8

*United States Steel Grp. v. United States,*
    24 CIT 1326, 123 F.Supp.2d 1365 (2000)............................... 9

**Statutes**

19 U.S.C. § 1677b(c)(1)(B) ..................................................... 13

**Regulations**

19 C.F.R. § 351.301(c)(1) ...................................................... 36

19 C.F.R. § 351.301(c)(3)(iv)................................................... 32

**Administrative Materials**

*Carbon and Certain Alloy Steel Wire Rod from Ukraine,* 67
    Fed. Reg. 55,785 (Dep't Commerce Aug. 30, 2002)............................ 34

*Certain Aluminum Foil from the People's Republic of China,*
    86 Fed. Reg. 11,499 (Dep't Commerce Feb. 25, 2021) ......................... 6

*Certain Mobile Access Equipment and Subassemblies Thereof
    from the People's Republic of China,* 87 Fed. Reg. 9,576
    (Dep't Commerce Feb. 22, 2022)............................................ 2

*Certain New Pneumatic Off-the-Road Tires from the People's
    Republic of China,* 80 Fed. Reg. 20,197 (Dep't Commerce
    Apr. 15, 2015) ........................................................... 19

*Chlorinated Isocyanurates from the People's Republic of China,*
    86 Fed. Reg. 22,932 (Dep't Commerce Apr. 30, 2021) ....................... 19

*Common Alloy Aluminum Sheet from the People's Republic of China,*
    87 Fed. Reg. 54,975 (Dep't Commerce Sept. 8, 2022)......................... 7

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled
    into Modules, from the People's Republic of China,* 87 Fed. Reg.
    38,379 (Dep't Commerce June 28, 2022)..................................... 16

*Hydroflourocarbon Blends from the People's Republic of China,*
   84 Fed. Reg. 17,380 (Dep't Commerce Apr. 25, 2019) .......................... 7

**Other Authorities**

*Harmonized Tariff Schedule of the United States*, Section
   XVI, Note 3 ........................................................................................ 27

## I.   INTRODUCTION

On behalf of Plaintiff the Coalition of American Manufacturers of Mobile Access Equipment ("Petitioner"), we respectfully submit the following reply to the response briefs of Defendant United States and Defendant-Intervenor Zhejiang Dingli Machinery Co., Ltd. ("Dingli"). *See* Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. on the Agency R. (Feb. 13, 2023), ECF No. 31 ("Defendant Brief"); Def.-Intervenor Dingli's Resp. to Pl.'s Mot. for J. on the Agency R. Pursuant to USCIT Rule 56.2 (Mar. 27, 2023), ECF No. 36 ("Def.-Int. Brief").

## II.   GLOSSARY OF CASE-SPECIFIC ACRONYMS AND ABBREVIATIONS

| **BPI** | Business proprietary information |
|---------|----------------------------------|
| **Dingli** | Zhejiang Dingli Machinery Co., Ltd. |
| **GDLSK** | Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP |
| **HTS** | Harmonized Tariff Schedule |
| **MAE** | Mobile access equipment |

| **Petitioner** | Coalition of American Manufacturers of Mobile Access Equipment |
| --- | --- |
| **POI** | Period of investigation |
| **Respondents' Dataset** | The ocean freight dataset sourced from Descartes, Drewry and Freightos |
| **SVs** | Surrogate values |

## III.  ARGUMENT

This appeal arises from an antidumping duty investigation into certain mobile access equipment and subassemblies thereof ("MAE") from China.  *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*, 87 Fed. Reg. 9,576 (Dep't Commerce Feb. 22, 2022) (final affirm. deter. of sales at less than fair value), P.R. 514, Appx1172-1175 ("Final Determination") and accompanying Issues and Decision Memorandum ("I&D Memo"), P.R. 504, Appx1035-1171.  Petitioner has appealed (1) the U.S. Department of Commerce's ("Commerce") reliance on Descartes, Drewry and Freightos shipping rate data, and rejection of Maersk data submitted by Petitioner, to value ocean freight; (2) Commerce's selection of surrogate values ("SVs") forminor fabricated steel components; (3) Commerce's

selection of SVs for drive motors; and (4) Commerce's determination to accept certain untimely information submitted by Dingli.

## A.    Commerce's Rejection of Petitioner's Maersk Data to Value Ocean Freight Was Unreasonable and Unsupported by Substantial Evidence

Commerce's determination to value respondents' ocean freight with data sourced from Descartes, Drewry and Freightos ("Respondents' Dataset"), and *not* with data sourced from Maersk submitted by Petitioner, was not supported by substantial evidence and thus unlawful.

### 1.    Defendant's Rationale for the Selection of Respondents' Dataset Alone Is Unreasonable and Unsupported by the Record

In defense of Commerce's action, the Government argues that Commerce utilized the Respondents' Dataset alone for three reasons: (1) it was "contemporaneous with the period of investigation" ("POI"); (2) "unlike the Maersk data, the Descartes, Freightos, and Drewry data were based on an average of three different ocean freight sources, therefore representing a broad market average"; and (3) it was "publicly available." Defendant Brief at 18-20. None of these reasons withstand

scrutiny.  This reasoning also fails to account for the significant ways that the Maersk data was superior to the Respondents' Dataset.

First, Defendant states that the Respondents' Dataset reflected prices contemporaneous with the POI.  *Id.* at 19.  But the Maersk data were also contemporaneous with the POI.  Letter from Wiley Rein LLP to Sec'y Commerce, re: *Final Submission of Surrogate Values (Confidential Data)* (Aug. 25, 2021) at Exhibit 1, C.R. 260-261, P.R. 294, Appx3719-3732 ("Petitioner Aug. 2021 SV Submission").  Indeed, nowhere does Defendant allege that the Maersk data were *not* contemporaneous.  Thus, Defendant's proffered reasoning regarding contemporaneity fails to distinguish the Respondents' Dataset from the Maersk data.

Second, Defendant's statement that sole reliance on Respondents' Dataset was justified because it was comprised of prices from three data sources, thus representing a broader market average than the Maersk data alone, is illogical.  Defendant Brief at 19-20.  If data reflecting three sources was preferable because it resulted in a broader market average, why would data from four sources not be more preferable?  Defendant's reasoning does not justify the exclusion of the Maersk data.

Third, Defendant's arguments regarding the publicly available nature of the various data sources are unavailing. As Defendant notes, "one of the criteria that Commerce uses to evaluate surrogate value data is whether the prices are from publicly available data." *Id.* at 19. Consistent with this preference, the Maersk data submitted by Petitioner were "from publicly available data." There was a single reason that Petitioner could not submit otherwise-public prices onto the record publicly: the respondents had requested, and Commerce granted, business proprietary treatment for their particular trade routes. Because the Maersk data was specific to ocean freight costs for the respondents' routes, the information was protected under Administrative Protective Order.[1] *See* Letter from GDLSK to Sec'y Commerce, re: *Dingli Response to Sections C&E Questionnaires* (June

---

[1]    Defendant-Intervenor states that Petitioner has not explained why it designated all of the Maersk data as business proprietary information ("BPI"). Def.-Int. Brief at 5. It is unclear which portion of the information Defendant-Intervenor believes could have been made public, given Defendant-Intervenor's own bracketing of the information. Petitioner was required to bracket the shipping routes for which Dingli had claimed business proprietary treatment, and the freight rates for those specific routes. If the rates themselves had not been bracketed, parties would have been able to use Maersk (because it is public) to reproduce the rates and, thus, derive Dingli's proprietary shipping routes.

21, 2021) at 25, C.R. 119-135, P.R. 200-205, Appx2099 ("Dingli Sections C&E Response") (claiming business proprietary treatment for the routes); I&D Memo at cmt. 1 (p. 9), Appx1043.

Defendant merely brushes aside Petitioner's argument on this point, repeating that "the Maersk data are not public." Defendant Brief at 20. But the underlying data *are* public. As noted, Petitioner was required to treat the specific Maersk prices submitted as proprietary information only because the quotes were specific to the routes reported in respondents' Section C databases, which *the respondents* had treated as BPI. The underlying Maersk data is publicly available, published and freely accessible. Defendant-Intervenor now appears to challenge this, stating that "Petitioner has not even attempted to establish how Maersk data can be publicly accessed." Def.-Int. Brief at 5-6. Defendant-Intervenor's implication that Maersk data is not publicly accessible is surprising. As both Commerce and Defendant-Intervenor are well aware, Maersk data is publicly available through the Maersk website. Indeed, Commerce has acknowledged the public nature of Maersk data many times. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Aluminum Foil from the People's Republic of*

*China*, 86 Fed. Reg. 11,499 (Dep't Commerce Feb. 25, 2021) (final

results of antidumping duty admin. rev.; final deter. of no shipments;

2017-2019) at 8 ("the Maersk data are publicly available"); Issues and

Decision Memorandum accompanying *Hydroflourocarbon Blends from*

*the People's Republic of China*, 84 Fed. Reg. 17,380 (Dep't Commerce

Apr. 25, 2019) (final results of antidumping duty admin. rev. and final

deter. of no shipments; 2016-2017) at 15 ("{t}he Maersk data are

publicly-available price quotes from market economy suppliers"); Issues

and Decision Memorandum accompanying *Common Alloy Aluminum*

*Sheet from the People's Republic of China*, 87 Fed. Reg. 54,975 (Dep't

Commerce Sept. 8, 2022) (final results of antidumping duty admin. rev.;

2020-2021) at 50-51.

The proper course of action in this case is for the Court to remand

to Commerce to request that the respondents submit their freight

routes publicly, as Commerce as done in more recent cases.  The Maersk

data can then be unbracketed and not treated as respondents' BPI.[2]

---

[2]     Dingli's opposition to this request noting that this "would allow
Petitioner to untimely cure its defective response" is baseless.  Def.-Int.
Brief at 6.  Petitioner's response was not defective; it protected
information that Dingli had classified as business proprietary.  Should
the agency direct Dingli *not* to classify such information as business

Moreover, because the Maersk data is publicly available, it can be replicated, and so the bracketing of a particular subset of that data does not implicate the concerns of reliability and transparency that underlie Commerce's preference for public information. *See Taian Ziyang Food Co. v. United States*, 35 CIT 863, 891, 783 F.Supp.2d 1292, 1317 (2011). As the CIT has previously explained in a similar circumstance, "to the extent that the reliability of data is the true concern behind Commerce's policy favoring publicly-available information, the nature of the Descartes data {as being published rates} should go a long way toward assuaging Commerce's fears . . . ." *Taian Ziyang Food Co. v. United States*, 33 CIT 828, 907, 637 F.Supp.2d 1093, 1160-61 (2009). Here too, the Maersk data were publicly published rates.

Thus, Commerce's statement in the final determination, and again in Defendant's brief, that "{p}ublicly available, published prices generally do not suffer from potential biases compared to those price quotes obtained through research by private firms" is inapposite. I&D Memo at cmt. 1 (p. 10), Appx1044; Defendant Brief at 24. The Maersk

---

proprietary, the Maersk data could be unbracketed, and there would be no question that it is publicly available.

data was not obtained through any sort of private research or

investigation.  In fact, the Maersk data is not *Petitioner's* proprietary

information.  Petitioner made clear in its SV submission that the

Maersk data was the "Chinese respondent's {BPI}" and that "{t}his

information is {BPI} because it references information for which a

Chinese respondent (or respondents) claimed business proprietary

treatment in this proceeding."  Petitioner Aug. 2021 SV Submission,

Appx3703-3818.  Being Dingli's own information, Petitioner had and

has no objection with the Maersk data being shared with Dingli (rather

than having disclosure limited to Dingli's counsel).  The Maersk data

thus does not suffer from the potential biases noted by the agency.  It is

reliable and transparent.  Therefore, Commerce's reasoning does not

uphold its conclusion.  *United States Steel Grp. v. United States*, 24 CIT

1326, 1329, 123 F.Supp.2d 1365, 1368-69 (2000) (citing *Burlington*

*Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962)).

While Defendant notes that one CIT opinion upheld Commerce's

decision not to rely upon Maersk data in part because it was submitted

confidentially, *see* Defendant Brief at 21, the case involved a different

factual record, it is not binding on this Court, and Commerce does not

have an established practice on this issue. *See Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989). Indeed, Commerce has also required respondents to resubmit freight routes publicly, so that Maersk data referencing them also could be submitted publicly, as it should have done in this case if it chose not to rely on the Maersk data as submitted.

### 2. Defendant Fails to Support Commerce's Conclusion that the Respondents' Dataset Was Equally or More Reliable than the Maersk Data

Defendant states that "the reliability of Maersk data is not a dispositive factor when compared to an equally or more reliable source of data." Defendant Brief at 22. Defendant further notes that "where there exist on the record alternative sources of data that would be equally or more reliable . . . it is within Commerce's discretion to use either set of data." *Id.* (quoting *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Grp. Corp. v. United States*, 227 F.Supp.3d 1375, 1381 (Ct. Int'l Trade 2017)). Yet neither Defendant nor the agency could show that Respondents' dataset was more – or even equally – reliable to the Maersk data. To the contrary, the Maersk data were: (1) more specific to the freight route actually used by Dingli; and (2)

more specific to the types of merchandise shipped by Dingli.  Mem. in

Supp. of Pl.'s Rule 56.2 Mot. for J. on the Agency R. (Nov. 8, 2022), ECF

No. 25 at 24-26 ("Plaintiff Opening Brief").

Defendant appears to concede the first point. It acknowledges that

"{t}he Maersk data reflects shipments from Shanghai, China to [

]." Defendant

Brief at 22 (emphasis added).  Indeed, [

].  Dingli Sections C&E

Response at 24, Appx2098.  Defendant further explains that the

Respondents' Dataset "covers ocean freight rates for shipments between

Shanghai to New York, and Shanghai to Long Beach, California,"

noting only that these shipping routes are "very *similar* to those used by

Dingli."  Defendant Brief at 22-23 (emphasis added).

While even the [

],

Defendant also failed to note that the Respondents' Dataset

predominantly reflected shipments to New York.  *See id.*  Defendant-

Intervenor does raise this point, stating that "Petitioner does not

dispute that Dingli actually used the Shanghai-New York route."  Def.-

Int. Brief at 3.  Although this is true, this route was used for [


].  *See* Letter from GDLSK to Sec'y Commerce, re: *Dingli's*
*First Surrogate Value Comments* (July 26, 2021) at Exhibit 7A, P.R.
242-249, Appx7403-7408 ("Dingli July 2021 SV Submission").  Thus, the
Maersk data overwhelmingly reflected the shipping route used by
Dingli, and the Respondents' Dataset data did not (reflecting data
points for [

]).

Defendant states that Commerce is not required to duplicate the
precise experience of the manufacturer and instead seeks to identify the
data that most accurately represents the fair market value of the
relevant input.  Defendant Brief at 23 (citing *Nation Ford Chemical Co.*
*v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999)).  But it fails to
explain how data reflecting a different shipping route could "most
accurately represent{} the fair market value" of Dingli's ocean freight,
when data for the exact shipping route was on the record.  *Id.*  Of
course, shipping costs can vary significantly based on destination, even
between two ports in the same state, and certainly between two ports

[                                        ].  The shipping routes reflected by each dataset thus undermine Defendant's statement regarding the reliability of the Respondents' Dataset to value Dingli's ocean freight.

Similarly, Defendant argues that, "{j}ust as Commerce is not required to use data reflecting the exact route, Commerce is not required to use data reflecting the exact types of merchandise shipped." *Id.* at 25.  At this point, Defendant appears to have abandoned any argument that would show the Respondents' Dataset alone to be the best information available.  And while Commerce may not be required to duplicate the exact experience of the respondent, it *is* required to select the best information available.  19 U.S.C. § 1677b(c)(1)(B).

Defendant argues that both datasets included shipments for a broad range of merchandise.  Defendant Brief at 26.  However, the merchandise covered by the Descartes data reflected a much broader, and less representative, pool of merchandise than the Maersk data. The Maersk data reflected shipments of: "[

                                        ]."  Petitioner Aug. 2021 SV Submission at Exhibit 1, Appx3719-3732.  By contrast, respondents' Descartes data reflected shipments of: "Furniture, Machinery Parts,

Bearings, Chains, Hub, Plastic Bags, Fabric, Gate Valve, Plastic Tube, Pallet Cable, Hardwares, Drilling Parts, Bakery Machines, TBEP, Paper Cup and Cones, Suspension Assembly, Sofa Cover, Vanilin, NOS." Dingli July 2021 SV Submission at Exhibit 7A(i), Appx7409-7415. Defendant-Intervenor's point that the Descartes data refers to "bakery machines" does not support Commerce's reasoning. *See* Def.-Int. Brief at 4. While that may be the closest Defendant-Intervenor can get in this list of substantially different merchandise, a bakery machine is not comparable to, *e.g.*, a telehandler. It is simply unreasonable to conclude that rates for shipments including plastic bags, paper cups and sofa covers would be equally representative of shipments of MAE than rates for shipments only including machinery parts – let alone *more* representative. And, as Defendant notes, Dingli's other data sources – Drewry and Freightos – did not specify at all what types of merchandise the shipment rates reflected, which does not support their relevance or reliability. *See* Dingli July 2021 SV Submission at Exhibits 7A(ii), 7A(iii), Appx7416-7424. This does not constitute substantial evidence to support a conclusion that the Respondents' Dataset "rates are

representative of, and equally applicable to, the subject merchandise."
Defendant Brief at 26.

Next, Defendant states: "Plaintiff argues that because the
Descartes data for ocean freight rates contains language that says that
'{e}stimates of freight charges are furnished as a convenience to the
shipping public and represent nothing more than an approximation of
freight charges which is not binding on either the carrier or shipper' it
is not superior to the Maersk data." *Id.* at 25. To clarify, Petitioner
made this argument not only to point out another way in which the
Maersk data is superior to the Respondents' Dataset, but because it
directly contradicts part of Commerce's findings. Commerce stated in
the final determination that the Maersk data reflected price *quotes*,
while the "Descartes data for ocean freight charges represent *actual,
consummated transactions.*" I&D Memo at cmt. 1 (p. 10), Appx1044
(emphasis added). Plaintiff quoted the language above in the Descartes
data because it undermines a purported "fact" upon which Commerce
relied in its determination. In other words, it shows that Descartes
data do *not* represent actual, consummated transactions. Defendant's
assertion that the Maersk data contains similar language does not

change Commerce's unsupportable and obviously mistaken factual

finding.  At best, Defendant merely notes a way in which the datasets

are similar, and the Respondents' Dataset is *not* superior to the Maersk

data.

Defendant-Intervenor's continued argument that the Descartes

data do in fact represent "historical, transaction specific price data" is

contradicted by the language in the Descartes data itself.  *See* Def.-Int.

Brief at 7-8.  *See also* Issues and Decision Memorandum accompanying

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into*

*Modules, from the People's Republic of China*, 87 Fed. Reg. 38,379 (Dep't

Commerce June 28, 2022) (final results of antidumping duty admin.

rev. and final deter. of no shipments; 2019-2020) at 24 (noting, in

rejecting respondents' claim that Descartes data are based on actual

arm's length transactions, "{h}owever, Descartes reported that its data

are '{e}stimates of freight charges . . . furnished as a convenience to the

shipping public . . . .'").

In sum, the record lacks substantial evidence supporting

Commerce's conclusion that the Respondents' Dataset was equally or

more reliable than the Maersk data.  To the contrary, the record

demonstrates that the Maersk data is more reliable than Respondents' Dataset and, thus, that the Maersk data is the best information available to value respondents' ocean freight.

### 3. Commerce's Determination Not to Adjust Respondents' Dataset Was Unsupported by Substantial Evidence and Inconsistent with Law

Finally, Defendant argues that Commerce, even if it relied on Respondents' Dataset, was not required to adjust that data to more closely match the respondents' experience. *See* Defendant Brief at 27-29. *See also* Plaintiff Opening Brief at 34. Specifically, Petitioner argued that Dingli omitted from its submitted Descartes freight rates items such as the bunker adjustment factor, the destination delivery charge, and local port surcharges – all of which are costs that a shipper would have to pay, separate from brokerage and handling expenses.

Defendant's response to this argument is unpersuasive. First, Defendant states that Commerce excluded these charges from ocean freight "because they are included in the brokerage and handling surrogate value, based on the World Bank's Doing Business in Brazil 2020 report." Defendant Brief at 27-28. Then, it notes that Petitioner claims this is not true. Defendant does not attempt to show that it is in

fact true (as it is not). It simply states that "there was no record

evidence to support the petitioner's assertion that the Descartes,

Freightos, and Drewry ocean freight data did not include all the

appropriate ocean freight charges or that any charges were

unaccounted for." *Id.* at 28. But there *is* record evidence to support

Petitioner's assertion. The brokerage and handling SV used by

Commerce reflects only amounts for "Border Compliance" and

"Documentary Compliance." Commerce Memorandum, re: *Final*

*Analysis Memorandum for Zhejiang Dingli Machinery Co., Ltd.* (Feb.

14, 2022) at Attachment III, C.R. 464-466, P.R. 505-509, Appx6777

("Dingli Final Calc Memo"). The World Bank Doing Business in Brazil

report does not appear to even reference a bunker adjustment factor

rate. *See* Dingli July 2021 SV Submission at Exhibit 6, Appx7143-7401.

The finding that such charges are already included in that report is

thus unsupported.

Defendant further fails to address Commerce's practice on this

issue. In other proceedings, Commerce has specifically rejected freight

rates that represented only the base, bare movement charge and did not

include "other associated charges related to freight costs (*e.g.*, terminal

handling charges, documentation fees, surcharge rate, and bunker

adjustment factor)." Issues and Decision Memorandum accompanying

*Chlorinated Isocyanurates from the People's Republic of China*, 86 Fed.

Reg. 22,932 (Dep't Commerce Apr. 30, 2021) (final results of

antidumping duty admin. rev., and final deter. of no shipments) at cmt.

2 (p. 11). As another example, in a *Certain New Pneumatic Off-the-*

*Road Tires from China* administrative review, Commerce found that

these types of charges, including port surcharges, were not already

covered by the brokerage & handling SV, and included them in the

ocean freight SV. Issues and Decision Memorandum accompanying

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of*

*China*, 80 Fed. Reg. 20,197 (Dep't Commerce Apr. 15, 2015) (final

results of antidumping duty admin. rev.) at cmt. 12. There, the agency

also cited another case, *Stilbenic Optical Brightening Agents*, where it

"included certain additional charges (*i.e.*, fuel surcharges, destination

delivery charges, and bill of lading charges) in the ocean freight

calculation because these charges, in addition to the base ocean freight

charge, are incurred by the surrogate freight forwarders and are not

separately covered by the brokerage and handling surrogate value." *Id.*

Yet Defendant improperly excluded those necessary fees here, without justification.

In sum, Commerce acted unreasonably in excluding the Maersk data to value international ocean freight, as sole reliance on Respondents' Dataset was not supported by substantial evidence. If the agency maintains the respondents' data in the freight calculation, it must adjust those rates to include certain necessary fees.

### B. Commerce's Selection of the Surrogate Value for Minor Fabricated Steel Components Was Not Supported by Substantial Evidence nor in Accordance with Law

Commerce's valuation of Dingli's minor fabricated steel component inputs was not supported by substantial evidence and unlawful. Commerce valued 18 of Dingli's minor fabricated steel components[3] using 9 Harmonized Tariff Schedule ("HTS") subheadings, I&D Memo at cmt. 6 (pp. 35-36), Appx1069-1070, which apply to raw, plain steel inputs rather than manufactured products. These HTS

---

[3] Due to the large number of inputs, Commerce termed this group of inputs "minor fabricated steel components." *See, e.g.*, I&D Memo at cmt. 6 (p. 35), Appx1069. While they may have been smaller in size, the margin impact of their valuation is substantial. Defendant-Intervenor's emphasis on the word "minor" is thus misleading. *See* Def.-Int. Brief at 24.

subheadings did not accurately reflect the substantial further

processing that Dingli's steel components had undergone, resulting in

significant undervaluation of the inputs and understatement of Dingli's

dumping margin.

Defendant acknowledges the processing that had been performed

on Dingli's minor fabricated steel components, as shown in letters from

Dingli's suppliers, including cutting with laser machines, bending to

specific angles using a bending machine to meet drawing specifications,

and the drilling of holes. Defendant Brief at 30 (citing Letter from

GDLSK to Sec'y Commerce, re: *Dingli Response to Section D*

*Questionnaire: Part II (Section D)* (Aug. 16, 2021) at Exhibit SD-3A,

C.R. 241-258, P.R. 285-291, Appx3289-3321). Defendant claims that

Commerce considered this information when selecting the SVs. *See*

Defendant Brief at 31. Indeed, Commerce did acknowledge that

Dingli's suppliers performed processed such as cutting, bending, or

punching holes – and, in some cases "more in-depth fabrication or

processing." I&D Memo at cmt. 6, Appx1060-1143. Yet Commerce

inexplicably selected HTS subheadings reflecting, *e.g.*, plain hot-rolled

steel, to value these fabricated, processed components. *Id.* at cmt. 6 (p.

35), Appx1069 (selecting HTS subheading 7211.14, for Flat-Rolled High-Strength Iron Or Non-alloy Steel Under 600 mm Wide Hot-Rolled, Not Clad, Coated Or Plated 4.75 mm Thick Or More). *See also* Plaintiff Opening Brief at 43-44 (listing various fabricated steel parts for which Commerce selected a raw steel SV).

In response, Defendant simply notes that "the possibility of reaching a different 'conclusion{} from {the} evidence in the record . . . does not prevent Commerce's determination' that the data from multiple HTS subheadings are the best available information "from being supported by substantial evidence." Defendant Brief at 31-32 (citing *Am. Silicon Tech. v. United States*, 261 F.3d 1371, 1376 (Fed. Cir. 2001)). While this may be true, Commerce also must reach a conclusion that is reasonable given the record as a whole, and it must articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice{s} made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (2009). In addition, Commerce's selection of the best available information must conform to its mandate to calculate antidumping

margins as accurately as possible.  *See Lasko Metal Prods., Inc. v.*

*United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994).

In this case, by valuing Dingli's machinery parts – processed,

fabricated steel components of MAE [                                        ]

as raw steel, Commerce's decision was not reasonable, was not

rationally connected to the facts found, and did not result in the

calculations of antidumping margins as accurately as possible.

Fundamentally, Commerce cannot value a finished part using the raw

material input for that part.

Defendant and Defendant-Intervenor further challenge the HTS

subheading that Petitioner proposed to value these inputs, HTS

7326.90.90, arguing that it is a basket category including various

finished steel articles.  Defendant Brief at 32; Def.-Int. Brief at 22.

Defendant notes that "{s}electing the plaintiff's recommended HTS

subheading would require Commerce to choose a broad HTS category

over a specific category to value the minor fabricated steel inputs."

Defendant Brief at 32.  But it fails to note that the "specific categories"

chosen are not reflective of the merchandise they were used to value.  In

other words, Commerce's selected HTS subheadings may have been

specific, but they were specific to raw steel products, which Dingli's

fabricated steel components were *not*.  To the contrary, Plaintiff's

proposed HTS subheading of 7326.90.90 is the category into which

Dingli's minor fabricated steel components are in fact classified,

according to U.S. Customs and Border Protection rulings on the exact

inputs in question.  *See* Letter from Wiley Rein LLP to Sec'y Commerce,

re: *Case Brief* (Nov. 24, 2021) at 13-24, C.R. 456, P.R. 471 Appx6539-

6550.

    Defendant-Intervenor's citation to *Arch Chemicals* does not

support Commerce's decision.  *See* Def.-Int. Brief at 23-24.  While the

Court in that case concluded that Commerce was reasonable in

rejecting a basket category SV and instead selecting rock salt data as a

surrogate to value sea salt, Commerce's conclusion was supported by

substantial reasoning regarding the similarities between rock salt and

sea salt.  *See Arch Chems., Inc. v. United States*, 33 CIT 954, 969-74

(2009).  For example, Commerce analyzed the purity and crystal size of

the various salts, and compared the production process for each to the

respondent's production process.  *Id.*  After an extensive discussion

regarding the products falling within each SV option, the Court found

that Commerce acted reasonably "under the facts presented." *See id.* at 971. In this case, Commerce has no such evidence supporting its unreasonable decision that Dingli's highly fabricated inputs should be valued as raw steel.

Selecting a value that is specific to the actual input consumed by the respondent is a fundamental consideration. *See Jinan Yipin Corp. v. United States*, 35 CIT 1254, 1348, 800 F.Supp.2d 1226, 1304 (2011). By selecting SVs that did not represent the inputs used in Dingli's production, Commerce substantially undervalued the respondent's inputs and dumping margin, requiring remand.

### C. Commerce's Selection of the Surrogate Value for Dingli's Drive Motor 1 Input Was Not Supported by Substantial Evidence nor Lawful

Commerce's valuation of Dingli's Drive Motor 1 input was not supported by substantial evidence and not consistent with law. Commerce's SV selection resulted in the significant undervaluation of the drive motor and Dingli's dumping margin. Commerce also failed to consider and address Petitioner's key arguments on this issue.

Commerce valued Dingli's Drive Motor 1 using HTS subheading 8501.32, which covers Dc *Motors* N.E.S.O.I. *And Generators* Of An

Output Exceeding 750 W But Not Exceeding 75 Kw. Dingli Final Calc Memo at Attachment III, Appx6777; I&D Memo at cmt. 6 (p. 64), Appx1098. Commerce rejected Petitioner's proposed, more specific SV for Drive Motor 1 of HTS subheading 8501.32.10, which covers Electric *Motor{s}* Of Continuous Current, 750W<Pot<=75Kw. Petitioner Aug. 2021 SV Submission at Exhibit 1, Appx3719-3732; Dingli Final Calc Memo at Attachment III, Appx6777; I&D Memo at cmt. 6 (p. 64), Appx1098.

Defendant argues that Commerce was reasonable in selecting HTS 8501.32 because Dingli described its Drive Motor 1 as both an electric motor and a generator. Defendant Brief at 34-35. Defendant also states that "{t}he Coalition does not contest that the drive motor input functions as both a motor and a generator. *Id.* at 35. To clarify, Plaintiff stated that Dingli's drive motor can function as both a motor and generator only insofar as *all* motors can function as generators in some capacity. Plaintiff Opening Brief at 49. That, of course, does not mean that all motors should be considered motor-generators. If that were the case, the HTS subheading specific to motors alone would not exist.

Because the purpose of Dingli's drive motor is to provide propulsion power to (*i.e.*, to motor) the driving wheels and thus functions nearly exclusively to power the vehicle's motion, substantial evidence did not support Commerce's determination to value the input as a motor-generator. This is consistent with Defendant-Intervenor's arguments regarding "the essential character" of the merchandise: the essential character of Dingli's drive motor is to act as a motor. *See* Plaintiff Opening Brief at 49, 51. While Defendant points to Dingli's explanation of "regeneration," that is, at most, a "subordinate or secondary function" of Dingli's motor. *See* Defendant Brief at 37-38.

Aguiding principle for classifying goods classifiable under Chapter 84 or 85 (Section XVI) is that, for items that are composite items or have more than one function, the primary or "principal function" of the item is the controlling function in terms of tariff classification. *Harmonized Tariff Schedule of the United States*, Section XVI, Note 3. As the Court has explained, "{i}t is well established that where merchandise has a single or primary function and an incidental, subordinate, or secondary function, the merchandise is classifiable on the basis of its primary design, construction, or function." *F.W. Myers,*

*Inc. v. United States*, 12 CIT 566, 574 (1988). *See also, e.g.*, *Home Depot*

*U.S.A., Inc. v. United States*, 435 F.Supp.3d 1311, 1339 (Ct. Int'l Trade

2020).

The primary function of Dingli's drive motor is undoubtedly to act

as a motor. Yet Commerce erred by failing to even address Petitioner's

"primary function" argument in its final determination. *See* I&D Memo

at cmt. 6, Appx1060-1143; *Altx, Inc. v. United States*, 25 CIT 1100,

1117-18, 167 F.Supp.2d 1353, 1374 (2001) (Commerce "must address

significant arguments and evidence which seriously undermines its

reasoning and conclusions"). Defendant's attempt now to address

Plaintiff's "primary function" argument is *post hoc* reasoning that

cannot support the agency's decision, and remand is required for the

agency to address Plaintiff's argument in the first instance. *See*

*Jinxiang Hejia Co. v. United States*, 35 CIT 1190, 1195 (2011) ("A *post*

*hoc* rationalization is an impermissible justification for a determination

supplied by counsel for the Department in judicial proceedings"). *See*

*also Hiep Thanh Seafood Joint Stock Co. v. United States*, 34 CIT 1428,

752 F.Supp.2d 1330 (2010) (addressing the impermissible nature of

later-in-time rationalizations for agency action supplied by Commerce's counsel from the Department of Justice).

Aside from being impermissibly *post hoc*, Plaintiff disagrees with Defendant's argument that "{i}n each of the cases that the Coalition cites, the courts applied the General Rule of Interpretation (GRI) 3(b)'s 'essential character test' to determine the appropriate HTS heading." Defendant Brief at 38.  In fact, in *F.W. Myers, Inc.*, the Court held that "where merchandise has a single or primary function and an incidental, subordinate, or secondary function, the merchandise is classifiable on the basis of its primary design, construction, or function," outside of the General Rule of Interpretation (GRI) framework outlined by Defendant. *F.W. Myers, Inc.*, 12 CIT at 574.  But in finding that Dingli's product should be valued as both a motor and a generator, Commerce disregarded this important principle (without even addressing it). While it was not Petitioner's argument that Commerce was bound by the same objectives as U.S. Customs and Border Protection is bound, *see* Def.-Int. Brief at 18-19, the primary function of Dingli's merchandise was a valid and important consideration regarding the

appropriate SV selection.  Commerce was required to address this

argument, and it failed to do so.

### D. Commerce Unreasonably and Arbitrarily Accepted Information Filed by Dingli that Was Untimely, Contradicting Its Regulations and Practice

In the final determination, Commerce declined to reject from the

record certain information submitted by respondent Dingli[4] that was

not timely filed, contradicting agency practice and its regulations, and

unlawfully prejudicing Petitioner.

There were two types of information that were improperly

accepted by Commerce: (1) business proprietary rebuttal SV

information; and (2) information defining Dingli's factors of production

submitted well after the deadline for Commerce's Section D

questionnaire and supplemental questionnaire.  *See* Plaintiff Opening

---

[4]     The specific new factual information at issue is: 1) Letter from GDLSK to Sec'y Commerce, re: *Dingli's Final Surrogate Value Rebuttal Comments* (Sept. 8, 2021) at Exhibits 1A – 1I, C.R. 286-302, P.R. 356-372, Appx3828-3876 ("Dingli Sept. 2021 Rebuttal SV Submission"); (2) *id.* at Exhibits 2, 3, and 5, Appx3897-4400, Appx4407-4417; (3) Letter from GDLSK to Sec'y Commerce, re: *Dingli's Final Surrogate Value Rebuttal Comments (Part 2)* (Sept. 8, 2022), C.R. 303-304, P.R. 354-355, Appx4413-4418; and (4) Letter from GDLSK to Sec'y Commerce, re: *Dingli's Comments on Petitioner's Final SV Rebuttal Submission* (Sept. 10, 2021), P.R. 396, Appx21428-21433.

Brief at 53-63. Defendant has only responded to Plaintiff's arguments regarding the business proprietary nature of the information. It did not address Plaintiff's arguments regarding information that improperly defined Dingli's inputs past the deadline for such information and thus appears to have conceded such points.

First, Defendant states that Commerce is entitled to "deference in its interpretation of what type of factual information is submitted by a party." Defendant Brief at 43 (citing *Royal Thai Gov't v. United States*, 436 F.3d 1330, 1340 (Fed. Cir. 2006)). However, "Commerce's exercise of its discretion . . . must be reasonable in light of Commerce's statutory obligations." *Huzhou Muyun Wood Co. v. United States*, 279 F.Supp.3d 1215, 1224 (Ct. Int'l Trade 2017) (citing *Sterling Fed. Sys. Inc. v. Goldin*, 16 F.3d 1177, 1182 (Fed. Cir. 1994)). Specifically, "Commerce is also obligated to calculate antidumping duty margins as accurately as possible," and "{p}roviding interested parties a meaningful ability to comment on the information in the record, and to submit rebuttal information, if necessary . . . support{s} that endeavor." *Id.* at 1225. Commerce failed to act consistently with those obligations in this case.

The BPI that Dingli submitted in rebuttal to Petitioner's SV submission violated the regulation's requirement that rebuttal SV information must be publicly available.  19 C.F.R. § 351.301(c)(3)(iv).  As explained in Petitioner's opening brief, unlike Petitioner's bracketing of the public Maersk freight data, Dingli's rebuttal SV information implicates the exact reliability, manipulation and transparency concerns underlying the requirement that information be public.  For example, Dingli's information included proprietary mill test certificates, which Petitioner's counsel was unable to share with Petitioner, and which could not be independently corroborated.[5]

Like Commerce, Defendant claims that submission of the proprietary information was the only way Dingli could rebut, clarify, or

---

[5]     Dingli argues that Petitioner also submitted proprietary rebuttal SV information.  Def.-Int. Brief at 28.  Rather than demonstrating "hypocrisy," there is a critical distinction between the information submitted by Petitioner and by Dingli.  Petitioner again had to bracket certain information provided about Dingli's inputs to protect information that *the respondents* had bracketed.  *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Submission of Information to Rebut, Clarify or Correct Surrogate Value Information* (Sept. 7, 2021) at 3, C.R. 317-323, P.R. 385-390, Appx4421 ("Owing to the nature of the information, this information is bracketed to maintain the proprietary nature of it for Dingli").  Because it was Dingli's own BPI, Dingli's counsel was permitted to share it with Dingli, and there were no transparency concerns.

correct the Coalition's information.  Defendant Brief at 44.  However,

this is an insufficient justification to depart from the agency's clear

regulations.  Undoubtedly there are many cases in which parties feel it

would be helpful to submit information in violation of the regulations

(for example, after a deadline has passed), but it cannot be done,

because Commerce has established rules for its proceedings to which

parties must adhere.

Regarding the business proprietary nature of the information,

Defendant next cites Commerce's 1996 notice of proposed rulemaking

regarding antidumping and countervailing duties, stating that "the

Secretary will normally consider '{f}actual information of a type that

has been published or otherwise made available to the public by the

person submitting it' to be public information."  Defendant Brief at 45

(citing *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308,

7,355 (Dep't Commerce Feb. 27, 1996) (notice of proposed rulemaking

and request for public comments)).  It is unclear how this supports the

agency's position.  The mill test certificates had not been published or

otherwise made available to the public by the person submitting it.

Indeed, Dingli claimed business proprietary treatment for this

information.  Dingli Sept. 2021 Rebuttal SV Submission at 2, Appx3820.

There is no reasonable argument that this information did not violate

Commerce's regulation.

Similarly, Defendant argues that Exhibit 2C of Dingli's surrogate

value submission, which [

], "do not propose a direct surrogate

value source as the Coalition suggests, but rather propose publicly

available price quotes."  Defendant Brief at 46.  *See also id.* ("The price

quotes Dingli placed on the record are publicly available pricing data . .

. .").  This is inaccurate.  The price quotes were *not* publicly available

pricing data.  While Dingli may have made the decision to submit it

without bracketing, the information reflected Dingli's proprietary

internal company records and documentation and could not be

corroborated by third parties, including Petitioner or Commerce.  Dingli

Sept. 2021 Rebuttal SV Submission at 2, Appx3820.  *See also* Issues and

Decision Memorandum accompanying *Carbon and Certain Alloy Steel

Wire Rod from Ukraine*, 67 Fed. Reg. 55,785 (Dep't Commerce Aug. 30,

2002) (notice of final deter. of sales at less than fair value) at cmt. 1

("Respondent's own comment casts doubt as to whether other parties,

including the Department, would be able to replicate Respondent's success in getting information from this source. This undermines Respondent's contention that this information is in fact publicly available to all").

Defendant next states that "Commerce found no prejudice resulting from accepting this information because this information was already on the record . . . ." Defendant Brief at 46. Again, this is inaccurate. Commerce did not find that this information was already on the record. Commerce found that the mill test certificates placed on the record were "to support information in documents already on the record." I&D Memo at 24, Appx1058. That is not the same thing. The mill test certificates – and other newly submitted information – were not already on the record . As explained in Plaintiff's opening brief, "{i}t does not matter whether the purpose of the proprietary information was to support information already on the record. The fact remains that the additional 'supportive' information was proprietary, was inconsistent with Commerce's regulations, raised concerns regarding reliability and transparency, and prejudiced Petitioner." Plaintiff's Opening Brief at 56-57.

With regard to Plaintiff's argument that Dingli submitted untimely information defining its factors of production, Defendant-Intervenor disagrees. Dingli argues that it had already reported that its steel inputs were of non-alloy grades, and that the mill test certificates it later submitted simply "confirmed information that Dingli had already reported." Def.-Int. Brief at 27. But Dingli then immediately acknowledged that the certificates identified a *different* steel grade than had previously been reported. *Id.* This information constituted "detailed information regarding the nature, form, degree of fabrication or processing, grade, and size of each input" and, as such, was requested in Commerce's *questionnaire.* *See* Letter from GDLSK to Sec'y Commerce, re: *Dingli Response to Supplemental Questionnaire: Part II (Section D)* (Aug. 16, 2021) at 4, C.R. 241-258, P.R. 285-291, Appx3048. If Dingli wanted to submit this information for the record, it was required to do so in its Section D questionnaire response or, at the latest, in its supplemental Section D questionnaire response, pursuant to 19 C.F.R. § 351.301(c)(1).

Defendant-Intervenor claims that Petitioner was not prejudiced by the submission of this information, because it was able to make

arguments about it during the briefing process. Def.-Int. Brief at 27. This misses the point. Dingli's information redefined its factors of production *after* the deadline for submitting SVs to value those factors. As further explained in Plaintiff Opening Brief at 60-61, Petitioner had *no* opportunity to respond to Dingli's revised definitions with new information and Petitioner was effectively denied of the ability to provide complete surrogate value information for the agency's consideration.

With regard to the new factual information submitted about its drive motor, Dingli argues that it did not provide new information on the nature of its input. *See id.* at 31. But the declaration, by its plain language, purports to "provide a technical explanation" of the motor used in Dingli's scissor lifts – *i.e.*, it further describes Dingli's input.

At the late point in the proceeding when Dingli submitted this additional information about its inputs, the parties should only have been arguing about how Dingli's inputs should be valued – not what Dingli's inputs *were*. For Petitioner to have the ability to effectively argue regarding valuation and submit factual information in support, Dingli's inputs needed already to have been clearly defined. Instead,

Dingli used its rebuttal SV submissions to provide additional information defining its inputs, to which Petitioner could not submit information in response. As such, Dingli "sandbag{ged its} opponent{} with alleged facts that could never be rebutted," *see* Def.-Int. Brief at 29, and Commerce was required to reject such information.

## IV. CONCLUSION

For the reasons detailed above and in our opening brief, we respectfully submit that this Court should remand the final determination in the antidumping duty investigation to Commerce consistent with the arguments made in this brief.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for the Coalition of American Manufacturers of Mobile Access Equipment*

Dated: April 24, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for the Coalition of American Manufacturers of Mobile Access Equipment's Reply Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 6,969 words.

*/s/ Timothy C. Brightbill*
(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

Coalition of American Manufacturers of Mobile Access Equipment
(Representative Of)

April 24, 2023
(Date)