UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT,<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>    and<br><br>ZHEJAING DINGLI MACHINERY CO., LTD.,<br><br>        Defendant-Intervenor. | Court No. 22-0152<br><br>NON-CONFIDENTIAL VERSION<br><br>Business Proprietary Information Removed From Pages 22, 45 |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL

Brishailah Brown
Attorney
Office of the Chief Counsel for Trade
    Enforcement & Compliance
U.S. Department of Commerce

KRISTIN E. OLSON
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480 | Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-6299
kristin.olson@usdoj.gov

*Attorneys for the United States*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iv

GLOSSARY ...........................................................................................ix

STATEMENT PURSUANT TO RULE 56.2 ..............................................1

    I.    The Administrative Determination Under Review ...............1

    II.   Issues Presented For Review ...................................................2

STATEMENT OF FACTS .......................................................................3

    I.    Initiation Of The Antidumping Duty Investigation ..............3

    II.   The Parties' Submission Of Factual Information..................4

    III.  Preliminary Determination .....................................................8

    IV.  Final Determination ................................................................9

SUMMARY OF THE ARGUMENT .........................................................10

ARGUMENT ..........................................................................................13

    I.    Standard Of Review ...............................................................13

    II.   Commerce's Surrogate Value Selections Are Supported
           By Substantial Evidence And Are Otherwise In
           Accordance With Law ............................................................14

          A.   Legal Framework For Surrogate Value Selection.......14

          B.   Substantial Evidence Supports Commerce's
              Determination That The Descartes, Freightos,
              and Drewry Data Were The Best Available
              Information To Value Dingli's Ocean Freight
              Costs .............................................................................17

          C.   Surrogate Value For Minor Fabricated Steel.............29

D.      Surrogate Value For Drive Motor Input ...................... 33

III.    Commerce Lawfully Accepted Timely Factual Information Submitted By Dingli in its Rebuttal ............... 41

    A.      Legal Framework for New Factual Information ......... 41

    B.      Commerce Did Not Err In Accepting Dingli's Factual Information ..................................................... 43

CONCLUSION ........................................................... 47

## TABLE OF AUTHORITIES

### CASES

*Am. Silicon Tech. v. United States,*
   261 F.3d 1371 (Fed. Cir. 2001)................................................................32

*Bristol Metals L.P. v. United States,*
   703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010).......................................29

*Calgon Carbon Corp. v. United States,*
   145 F. Supp. 3d 1312 (Ct. Int'l 2016)...................................................31

*CamelBak Products, LLC v. United States,*
   649 F.3d 1361 (Fed. Cir. 2011)........................................................39, 40

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) ................................................................................13

*Dongtai Peak Honey Indus. v. United States,*
   777 F.3d 1343 (Fed. Cir. 2015)..............................................................14

*Dorbest Ltd. v. United States,*
   462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006).......................................21

*Dorbest Ltd., v. United States,*
   602 F. Supp. 2d. 1287 (Ct. Int'l Trade 2009).......................................32

*F. W. Myers, Inc. v. United States,*
   12 CIT 566 (1988) ..................................................................................38

*Fujitsu Gen. Ltd. v. United States,*
   88 F. 3d 1034 (Fed. Cir. 1996)..............................................................13

*GODACO Seafood Joint Stock Co. v. United States,*
   435 F. Supp. 3d 1342 (Ct. Int'l Trade 2020).......................................43

*Grobest & i-Mei (Indus. (Vietnam) Co. v. United States,*
   815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012).......................................47

*Home Meridian Int'l. Inc. v. United States,*
   772 F.3d 1289 (Fed. Cir. 2014)............................................................ 17

*Jiaxing Bro. Fastener Co. v. United States,*
   11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014)......................................... 16

*Jiaxing Bro. Fastener Co., Ltd. v. United States,*
   822 F.3d 1289 (Fed. Cir. 2016).................................................... passim

*La Crosse Tech., Ltd. v. United States,*
   723 F.3d 1353 (Fed. Cir. 2013)............................................................ 39

*Mita Copystar Am. v. United States,*
   160 F.3d 710 (Fed. Cir. 1998)............................................................. 39

*Nation Ford Chem. Co. v. United States,*
   166 F.3d 1373 (Fed. Cir. 1999)..................................................... passim

*NEC Home Electronics, Ltd. v. United States,*
   54 F.3d 736 (Ct. Int'l Trade 1995) ..................................................... 45

*PAM S.p.A v. United States,*
   463 F. 3d 1345 (Fed. Cir. 2006).......................................................... 45

*PAM, S.p.A. v. United States,*
   582 F.3d 1336 (Fed. Cir. 2009).......................................................... 13

*QVD Food Co. v. United States,*
   658 F.3d 1318 (Fed. Cir. 2011)............................................................ 16

*Rhone Poulenc, Inc. v. United States,*
   899 F.2d 1185 (Fed. Cir. 1990)............................................................ 23

*Risen Energy Co. v. United States,*
   477 F. Supp. 3d 1332 (Ct. Int'l Trade 2020)....................................... 21

*Royal Thai Gov't v. United States,*
   436 F.3d 1330 (Fed. Cir. 2006)............................................................ 43

*SolarWorld Americas, Inc. v. United States,*
   962 F.3d 1351 (Fed. Cir. 2020)............................................................27

*SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n,*
   718 F.2d 365 (Fed. Cir. 1983).............................................................14

*Taian Ziyang Food Co., Ltd. v. United States,*
   783 F. Supp.2d 1292 (Ct. Int'l Trade 2011)........................................33

*Tri Union Frozen Prods., v. United States,*
   162 F. Supp. 3d 1255 (Ct. Int'l Trade 2016).......................................43

*United States v. Eurodif S.A.,*
   555 U.S. 305 (2009) .............................................................................13

*Writing Instruments Mfrs. v. United States,*
   984 F. Supp. 629 (Ct. Int'l Trade 1997)..............................................24

*Zhejiang Native Produce & Animal By-Prods. Import & Export Grp.
   Corp. v. United States,*
   227 F. Supp. 3d 1375 (Ct. Int'l Trade 2017).......................................22

*Zhengzhou Harmoni Spice Co. v. United States,*
   617 F. Supp 2d 1281 (Ct. Int'l Trade 2009)........................................19

## UNITED STATES CODE

19 U.S.C. § 1516(a)(b)(1)(B)(i).................................................................13

19 U.S.C. § 1677b(a) ................................................................................15

19 U.S.C. § 1677b(c)..................................................................................15

19 U.S.C. § 1677b(c)(1)(B) .......................................................................16

19 U.S.C. § 1677b(c)(4) ..............................................................................8

# REGULATIONS

19 C.F.R. § 351.301 ...............................................................................

19 C.F.R. § 351.301(c)(1)(iv) ................................................................ 43

19 C.F.R. § 351.301(c)(3)(i) .................................................................. 41

19 C.F.R. § 351.301(c)(3)(iv) ................................................... 41, 42, 43

19 C.F.R. § 351.408(c) .................................................................. 42, 43

19 C.F.R. § 351.408(c)(2) ..................................................................... 16

19 C.F.R. § 351.511(a)(2) ..................................................................... 42

19 C.F.R. § 353.31(a)(1)(i) ................................................................... 44

# FEDERAL REGISTER NOTICES

*Antidumping Duties: Countervailing Duties,*
    61 Fed. Reg. 7,308 (February 27, 1996) ................................................ 45

*Definition of Factual Information and Time Limits for Submission of Factual Information,*
    78 Fed. Reg. 21,246 (Dep't Commerce Apr. 10, 2013) .......................... 42

*Certain Corrosion-Resistant Steel Products from the People's Republic of China,*
    81 Fed. Reg. 35,316 (Dep't Of Commerce June 2, 2016) ...................... 23

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2013-2014,*
    81 Fed. Reg. 39,905 (June 20, 2016) .................................................... 24

*Alloy and Certain Carbon Steel Threaded Rod from the People's Republic of China,*
85 Fed. Reg. 8,821 (Dep't of Commerce Feb. 7, 2020)..........................23

*Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation,*
86 Fed. Reg. 15,922 (Dep't of Commerce March 25, 2021) ...................3

*Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value,*
86 Fed. Reg. 54,164 (Dep't of Commerce September 30, 2021) ............8

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China,*
87 Fed. Reg. 9,576 (Dep't Commerce Feb. 22, 2022)............................1

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Antidumping Duty Order,*
87 Fed. Reg. 22,190 (Dep't Commerce April 14, 2022) .......................10

*Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China, Request to Extend Deadlines for Surrogate Values Submissions,*
dated July 22, 2021..................................................................................4

*Less-Than-Fair-Value Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Surrogate Values for the Preliminary Determination,*
dated Sept. 24, 2021 ...........................................................................18

## RULES

Rule 56.2 ...............................................................................................1

GLOSSARY

| Abbreviation | Term |
|---|---|
| AD | Antidumping duty |
| AUV | Average unit value |
| Coalition | Coalition of American Manufacturers of Mobile Access Equipment |
| Commerce | U.S. Department of Commerce |
| Dingli | Zhejiang Dingli Machinery Co., Ltd. |
| HTS | Harmonized Tariff Schedule |
| IDM | Issues and Decision Memorandum |
| LGMG | Lingong Group Jinan Heavy Machinery Co., Ltd. |
| MAE or mobile access equipment | Certain mobile access equipment and subassemblies, as defined in *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 86 Fed. Reg. 15922 (Dep't of Commerce March 25, 2021) (P.R. 46), Appx6778–6784 |
| NME | Non-market economy |
| PDM | Preliminary Decision Memorandum |
| SV | Surrogate value |

Pursuant to Rule 56.2 of the Rules of United States Court of

International Trade, defendant, the United States, respectfully submits

this response in opposition to the motion for judgment on the

administrative record filed by the plaintiff, the Coalition of American

Manufacturers of Mobile Access Equipment (Coalition).  The Coalition

challenges certain aspects of the Department of Commerce's final

affirmative determination in the antidumping investigation covering

certain mobile access equipment and subassemblies thereof from the

People's Republic of China.  For the reasons explained below, the Court

should sustain the final determination because it is supported by

substantial evidence and is otherwise in accordance with law.

STATEMENT PURSUANT TO RULE 56.2

I.    <u>The Administrative Determination Under Review</u>

Plaintiff challenges certain aspects of Commerce's final

determination in the investigation of the certain mobile access

equipment and subassemblies thereof from the People's Republic of

China.  *See Certain Mobile Access Equipment and Subassemblies*

*Thereof From the People's Republic of China*, 87 Fed. Reg. 9,576 (Dep't

Commerce Feb. 22, 2022) (final affirm. deter. of sales at less than fair

value) (*Final Determination*) (P.R. 514), Appx1172–1175,[1] and

accompanying Issues and Decision Memorandum (IDM) (P.R. 504),

Appx1035–1171.  The period of investigation is July 1, 2020, through

December 31, 2020.

II.    Issues Presented For Review

1.    Whether Commerce's determination that an average of the

Descartes, Freightos, and Drewry ocean freight data was the best

available information to value the cost incurred by mandatory

respondent Dingli to ship subject merchandise from China to the United

States is supported by substantial evidence and in accordance with law.

2.    Whether Commerce's selection of data from multiple HTS

subheadings to value respondent's minor fabricated steel components is

supported by substantial evidence and in accordance with law.

3.    Whether Commerce's valuation of drive motors, based on

data from HTS subheading 8501.32, is supported by substantial

evidence and in accordance with law.

---

[1]  "P.R." and "C.R." refer to documents in the public and confidential records, respectively.

4.     Whether Commerce's acceptance onto the record of factual information submitted by the respondent is supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

I.     Initiation Of The Antidumping Duty Investigation

On March 18, 2021, Commerce initiated an antidumping duty (AD) investigation concerning imports of certain mobile access equipment and subassemblies thereof (mobile access equipment).  *See Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 86 Fed. Reg. 15,922 (Dep't of Commerce March 25, 2021) (P.R. 46), Appx6778–6784.

On April 23, 2021, Commerce selected the two exporters or producers with the largest unit volume of entries of mobile access equipment from China during the period of investigation—Lingong Group Jinan Heavy Machinery Co., Ltd. (LGMG) and Zhejiang Dingli Machinery Co., Ltd. (Dingli)—as mandatory respondents.  *See* Commerce's Memorandum, "Less-Than-Fair-Value Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the

People's Republic of China: Respondent Selection" (Dep't of Commerce

April 23, 2021) (P.R. 110) (C.R. 42), Appx2061–2068.

II.   <u>The Parties' Submission Of Factual Information</u>

Commerce's regulations prescribe how and when parties may

provide factual information to the agency in an antidumping

proceeding.  *See generally* 19 C.F.R. § 351.301.  Consistent with those

regulations, Commerce set a schedule for interested parties to submit

information relevant to the surrogate market economy analysis,

including surrogate value information.  *See* Letter from Minoo Hatten,

Program Manager, AD/CVD Operations, Off. I to All Interested Parties,

re: *Less-Than-Fair-Value Investigation of Certain Mobile Access*

*Equipment and Subassemblies Thereof from the People's Republic of*

*China: Request for Economic Development, Surrogate Country and*

*Surrogate Value Comments and Information*, dated June 15, 2021 (P.R.

195) at 2, Appx6904.[2]  According to Commerce's schedule, the parties

were permitted to submit publicly-available information to value factors

---

[2]  Certain deadlines were later extended.  *See* Letter from Minoo Hatten,
Program Manager, AD/CVD Operations, Off. I to All Interested Parties, re: *Certain
Mobile Access Equipment and Subassemblies Thereof from the People's Republic of
China, Request to Extend Deadlines for Surrogate Values Submissions*, dated July
22, 2021 at 1 (P.R. 239), Appx6906.

of production until August 25, 2021 (30 days before the scheduled date of the preliminary determination).  *Id.* at 2.  After an interested party was served with factual information, it received one opportunity to submit publicly-available information "to rebut, clarify, or correct such factual information."  *Id.*

On September 2, 2021, Dingli submitted pre-preliminary determination comments focusing on surrogate value issues, in which it compared the surrogate value proposed by Dingli with that proposed by the Coalition for each of the reported factors of production.  *See* Dingli's Letter, "Dingli's Pre-Preliminary Comments in the Antidumping Duty Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: (A-570-139)," dated September 2, 2021 (Dingli's Pre-Preliminary Comments) (P.R. 344), Appx21353–21363.

Five days later, the Coalition challenged Dingli's September 2 submission as untimely and asked Commerce to reject Dingli's pre-preliminary determination comments.  *See* Petitioner's Letter, "Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Request to Reject Dingli's Pre-Preliminary

Determination Comments," dated September 7, 2021 (Petitioner's Request to Reject I) (P.R. 348), Appx21415-21419.  The Coalition argued that Dingli's submission contained "extensive amounts of untimely new factual information that is not already on the record of this investigation" concerning Commerce's choice of surrogate value data. *Id*. at 1-2, Appx21415–21416.

On September 8, 2021, Dingli filed rebuttal comments.  *See* Dingli's Letter, "Dingli's Rebuttal to Petitioner's Request to Reject Dingli's Pre-Preliminary Determination Comments in the Antidumping Duty Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: (A-570-139)," dated September 8, 2021 (Dingli Rebuttal to Reject I) (P.R. 350), Appx21420–21424.  Dingli argued that the Coalition erred by conflating the deadline for rebuttal surrogate value factual information with the deadline for final surrogate value information.  *Id*. at 2, Appx21421. Since Dingli's pre-preliminary determination comments only included new rebuttal factual information, Dingli maintained that its submission was timely.  *Id*. at 2-3, Appx21421–21422.

On September 14, 2021, the Coalition requested that Commerce reject portions of several additional filings made by Dingli—including portions of its July 26, 2021, September 7, 2021, and September 10, 2021 submissions. *See* Petitioner's Letter, "Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Request to Reject Portions of Dingli's Affirmative and Rebuttal Surrogate Value Comments," dated September 14, 2021 (Petitioner's Request to Reject II) (P.R. 401) (C.R. 332), Appx4860–4880.  The Coalition claimed that certain information contained in those submissions should be struck from the record because: it was not available through public sources such as the internet, data storage databases, manifest databases or through any other means; it contained business proprietary information that was  not publicly available; it contained information that had not been translated and therefore violated Commerce's regulations; or it contained publicly available price information that constituted untimely surrogate value information. *See id.*

Two days later, Dingli submitted a rebuttal, arguing that the input purchase transactions between a Turkish supplier and Dingli's

U.S. affiliate were released by Dingli as public information. *See* Dingli's Letter, "Opposition to Petitioner's Request to Reject Portions of Dingli's Affirmative and Rebuttal Surrogate Value Comments in the Antidumping Duty Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: (A-570-139)," dated September 16, 2021 (Dingli's Opposition to Petitioner's Request to Reject) (P.R. 402) (C.R. 333), Appx4881–4890.

III.  Preliminary Determination

Commerce published its preliminary determination on September 30, 2021. *See Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 54,164 (Dep't of Commerce September 30, 2021) (*Preliminary Determination*) (P.R. 422), Appx1031–1034, and accompanying Preliminary Decision Memorandum (Dep't of Commerce September 24, 2021) (PDM) (P.R. 407), Appx1000-1030.

Pursuant to its obligation under 19 U.S.C. § 1677b(c)(4), Commerce identified Brazil as a market economy that is economically comparable and a significant producer of merchandise, and selected

surrogate values from Brazil to value the respondent's factors of production. *See* PDM at 5-8, Appx1004–1007.  No parties challenge that finding.

In evaluating the factors of production, Commerce preliminarily determined that an average of three different ocean freight sources—Descartes, Freightos and Drewry ocean freight rates—were the best surrogate sources for valuing the cost incurred by Dingli to ship subject merchandise from China to the United States.  PDM at 22, Appx1021. Instead of using data from the 8-digit HTS subheading 7326.90.90 "Other Article Of Iron Or Steel" suggested by the Coalition, Commerce valued 18 various inputs categorized as "minor fabricated components" using multiple HTS subheadings provided by Dingli.  *See* PDM at 24, Appx1023.  Commerce used data from HTS subheading 8501.32 "Dc Motors N.E.S.O.I. And Generators Of An Output Exceeding 750 W But Not Exceeding 75 Kw" to value the drive motor input.  *See id*.

IV.   <u>Final Determination</u>

In February 2022, Commerce issued its final affirmative determination.  In the final determination, Commerce continued to rely on the Descartes, Freightos, and Drewry ocean freight rates to value

Dingli's cost incurred to ship subject merchandise from China to the United States. IDM at 9, Appx1043. Commerce also continued to value 18 various inputs categorized as "minor fabricated steel" components using data from multiple HTS subheadings and to assign HTS subheading 8501.32 to Dingli's drive motor input as the best available information. IDM at 37-38, 67-68, Appx1071–1072, Appx1101–1102.

Commerce rejected the Coalition's arguments that Dingli filed untimely new factual information and accepted Dingli's submission as a timely rebuttal of factual information related to the Coalition's allegations. IDM at 25, Appx1059.

After the U.S. International Trade Commission issued its final affirmative determination, Commerce issued its antidumping order. *See Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Antidumping Duty Order*, 87 Fed. Reg. 22,190 (Dep't Commerce April 14, 2022) (P.R. 521), Appx21451–21454.

<u>SUMMARY OF THE ARGUMENT</u>

Commerce's final determination is supported by substantial evidence and in accordance with law. First, contrary to the Coalition's arguments, substantial evidence supports Commerce's selection of the

Descartes, Freightos, and Drewry rates as the source to value Dingli's freight costs. The Descartes, Freightos and Drewry data satisfied all of Commerce's surrogate value criteria for contemporaneity, public availability, product specificity, broad market average representation, and tax exclusivity. The Coalition's disagreement with Commerce's exercise of discretion fails to demonstrate error.

Second, Commerce's selection of a surrogate value for the 18 inputs categorized as "minor fabricated steel" components is supported by substantial evidence. Commerce found that data from multiple HTS subheadings were the best available information to value the 18 different inputs used by Dingli specific to the description of the input and the amount of processing performed on the input evidenced by the record.

Third, the record supports Commerce's selection of a surrogate value for drive motors. Based upon Dingli's description of its input, Commerce determined that data from Brazilian HTS category 8501.32 "Dc Motors N.E.S.O.I. And Generators Of An Output Exceeding 750 W But Not Exceeding 75 Kw" constituted the best available information to value Dingli's drive motor input. Because record evidence indicates

that Dingli's drive motor input is both a motor and a generator,

Commerce selected data from HTS subheading 8501.32, which

encompasses both of the applicable HTS eight-digit subheadings, as the

most representative of Dingli's input.

Finally, Commerce acted within its discretion and consistent with

its regulations governing the submission of factual information in

accepting Dingli's rebuttal comments containing new factual

information as a timely rebuttal of factual information in the

petitioner's surrogate value comments.  Although Dingli claimed

business proprietary treatment for the mill test steel certificates,

Commerce recognized that was the only manner in which Dingli could

rebut, clarify, or correct petitioner's claim.  Commerce also found no

prejudice resulted from accepting this information because this

information was already on the record.

Therefore, Commerce's reasoned determination should be

sustained, and judgment entered in favor of the United States.

ARGUMENT

## I.   Standard Of Review

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' found by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F. 3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).  "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009) (citation omitted). "Substantial evidence" amounts to "more than a mere scintilla" of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009).  Substantial evidence is also "less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent {Commerce's} finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  If Commerce makes a choice

13

between "two fairly conflicting views," the Court may not substitute its judgment, even though the Court could "justifiably have made a different choice had the matter been before it *de novo*." *SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 382 (Fed. Cir. 1983).

This Court reviews Commerce's conduct of its administrative proceedings for abuse of discretion. *See Dongtai Peak Honey Indus. v. United States*, 777 F.3d 1343, 1350 (Fed. Cir. 2015).

II.   Commerce's Surrogate Value Selections Are Supported By Substantial Evidence And Are Otherwise In Accordance With Law

The Coalition challenges three of Commerce's surrogate value selections: (1) the Descartes, Freightos, and Drewry rates to value ocean freight, (2) data from 9 different HTS subheadings to value 18 inputs categorized as "minor fabricated steel" components, and (3) data from HTS subheading 8501.32 to value the drive motor input. Pl. Br. 22-52. As we explain below, Commerce's surrogate value selections are supported by substantial evidence and are otherwise in accordance with the law.

A.   Legal Framework For Surrogate Value Selection

The antidumping statute charges Commerce with determining if goods are being sold, or are likely to be sold, in the United States at a

less than fair market value.  19 U.S.C. § 1677b(a).  Commerce compares

the subject normal value (home market price) and export price (United

States price).  *Id*.  An antidumping duty is "the amount by which the

normal value exceeds the export price (or constructed export price) for

the merchandise."  *Id*. § 1673.

In proceedings involving a non-market economy country, such as

China, Commerce determines normal value by relying on the "best

available information" from a market economy country to derive

surrogate valuations for the entity's factors of production, including raw

materials, labor, and utilities.  *See id*. § 1677b(c).  To those factors,

Commerce adds "an amount for general expenses and profit plus the

cost of containers, coverings, and other expenses."  *Id*.  The statutory

scheme "construct{s} a hypothetical market value" of the subject

merchandise in the non-market economy.  *See Nation Ford Chem. Co. v.*

*United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

Commerce must select the "best available information" on the

record to value factors of production.  *Jiaxing Bro. Fastener Co., Ltd. v.*

*United States,* 822 F.3d 1289, 1294 (Fed. Cir. 2016) (*Jiaxing II*) (citing

19 U.S.C. § 1677b(c)(1)(B)).  However, because the statute is silent

regarding what constitutes the "best available information," Commerce

has "broad discretion" to decide what evidence meets that criterion.

*QVD Food Co. v. United States,* 658 F.3d 1318, 1323 (Fed. Cir. 2011);

*Nation Ford*, 166 F.3d at 1377 ("wide discretion in the valuation of

factors of production"). In practice, Commerce selects, to the extent

practicable, surrogate values that are product-specific, representative of

a broad-market average, publicly available, contemporaneous with the

period of review, and tax and duty exclusive. *See* Policy Bulletin 04.1:

Non-Market Economy Surrogate Country Selection Process (Dep't of

Commerce Mar. 1, 2004) (Policy Bulletin 04.1), *available at*

https://enforcement.trade.gov/policy/bull04-1.html; *Jiaxing II*, 822 F.3d

at 1293.

Commerce also has a regulatory preference to use as much data as

possible from a single surrogate country. 19 C.F.R. § 351.408(c)(2).

Commerce will "only resort to a secondary surrogate country if data

from the primary surrogate country are unavailable or unreliable." *See*

*Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1332–

33 (Ct. Int'l Trade 2014) (*Jiaxing I*) (citations omitted), *aff'd*, *Jiaxing II*,

822 F.3d 1289.

The data relied on need not be perfect. *Jiaxing II*, 822 F.3d at 1301 (quoting *Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)).  Nor is Commerce required to duplicate the precise experience of the manufacturer in the non-market economy. *Nation Ford*, 166 F.3d at 1377.  Instead, Commerce seeks to identify and rely on the record data that "most accurately represents the fair market value" of the relevant factor of production.  *Id.*

B.   Substantial Evidence Supports Commerce's Determination That The Descartes, Freightos, and Drewry Data Were The Best Available Information To Value Dingli's Ocean Freight Costs

Commerce was presented with a choice between two sets of data to value ocean freight: (1) Descartes, Freightos, and Drewry data, submitted by Dingli, and (2) Maersk data, submitted by the Coalition. *See* Petitioner's Letter, "Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final Submission of Surrogate Values (Confidential Data)," dated August 25, 2021 (Coalition Aug. 2021 Confidential SV Submission) (C.R. 260-261) at Exhibit 1, Appx3703–3818; Dingli's Letter, "Dingli's First Surrogate Value Comments in the Antidumping Duty Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People's

Republic of China: (A-570-139)," dated July 26, 2021 (Dingli July 2021 SV Submission) (P.R. 242-249) at Exhibit 7, Appx6908–8814; *see also* Commerce Memorandum, re: *Less-Than-Fair-Value Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Surrogate Values for the Preliminary Determination*, dated Sept. 24, 2021 (SV Memorandum) (P.R. 415), at Attachment I, Appx21434–21446.

The Descartes, Freightos, and Drewry data were publicly available and contemporaneous with the period of investigation. *See* Dingli July 2021 SV Submission at Exhibit 7, Appx6908-8814. The Maersk data, by contrast, consisted of business proprietary information. *See* Coalition Aug. 2021 Confidential SV Submission at Exhibit 1, Appx3703–3818. Commerce therefore reasonably determined that the Maersk data were not appropriate for use and the Descartes, Freightos, and Drewry data were the best available information to value the cost incurred by Dingli to ship subject merchandise. Commerce's decision to use the Descartes, Freightos, and Drewry data to value ocean freight is supported by substantial record evidence and is otherwise lawful.

As explained above, one of the criteria that  Commerce uses to evaluate surrogate value data is whether the prices are from publicly available data.  *See* IDM at 8, Appx1042; *see also* Policy Bulletin 04.1. Although neither the statute nor the regulations define "public availability," the preference for publicly available data is aimed at promoting transparency, which is paramount in conducting investigations and reviews for the benefit of all interested parties.  S*ee SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 840-41 (Fed. Cir. 2020); *Zhengzhou Harmoni Spice Co. v. United States*, 617 F. Supp 2d 1281, 1311 (Ct. Int'l Trade 2009) (recognizing Commerce's preference for publicly available information).

For this investigation, Commerce found that the Descartes, Freightos, and Drewry data were publicly available, as well as representative of a broad market average, contemporaneous with the period of investigation, aligned with the container size used by the respondents, and included product-specific rates for shipments from China to the United States that are similar shipping routes to those used by Dingli.  *Id.*; *see also* Dingli's Final SV Submission at Exhibit 7. Additionally, unlike the Maersk data, the Descartes, Freightos, and

Drewry data were based on an average of three different ocean freight sources, therefore representing a broad market average.  IDM at 9, Appx1043.  Thus, Commerce reasonably found that the Descartes, Freightos, and Drewry data were the best information to value Dingli's freight costs.

The Coalition's arguments to the contrary are unavailing.  First, the Coalition argues that it was forced to treat the Maersk data as business proprietary information because Dingli chose not to make its shipping routes public on the record of this investigation, and the quotes in the Maersk data were specific to the Coalition's routes.   Pl. Br. 27-28.  Since Dingli improperly chose to keep its freight routes confidential, the Coalition was forced to treat the public Maersk data as confidential and bracket the data to comply with the Administrative Protective Order.  Pl. Br. at 27.

Notwithstanding the Coalition' explanation about *why* the Maersk data are non-public, this claim fails to overcome the fact that the Maersk data are not public.  By contrast, the Descartes, Freightos, and Drewry data are public, and as a result they satisfied more of Commerce's stated selection criteria than the Maersk data.  *See* IDM at

9, Appx1043.   Commerce exercised its discretion in selecting the best available information and used information that was publicly available. *See Nation Ford*, 166 F.3d at 1377.

The Court has previously upheld Commerce's determination to reject Maersk freight data in a similar case in which the petitioner was forced to keep the Maersk data confidential because the respondents had kept their freight routes confidential.  *See Risen Energy Co. v. United States*, 477 F. Supp. 3d 1332, 1346-1347 (Ct. Int'l Trade 2020); *see also* Pl. Br. 26 n.4.  So, despite the Coalition's claim to the contrary, Commerce's determination to use the Descartes, Freightos, and Drewry data aligned with its practice to find the best information available by focusing on contemporaneity, public availability, and its other stated criteria.  *See id.*

Second, the Coalition claims that the fact that the Maersk data were not publicly available does not undermine the data's reliability "or in any way implicate{} the agency's preference for public sources."  *Id*. at 29.  To choose the best available information, Commerce must conduct a fair comparison of the data sets on the record.  *Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1269 (Ct. Int'l Trade 2006).  Public

availability aside, the reliability of Maersk data is not a dispositive

factor when compared to an equally or more reliable source of data.

"After comparing the available data sets, where there exist on the

record alternative sources of data that would be equally or more

reliable . . . it is within Commerce's discretion to use either set of data."

*Zhejiang Native Produce & Animal By-Prods. Import & Export Grp.*

*Corp. v. United States*, 227 F. Supp. 3d 1375, 1381 (Ct. Int'l Trade 2017)

(citation omitted).  Therefore, in accordance with its practice, Commerce

chose the publicly available Descartes, Freightos, and Drewry ocean

freight data.

Third, the Coalition argues that the Maersk data was superior

because they were specific to the freight route used by Dingli for its

shipments of subject merchandise.  Pl. Br. at 24.  Dingli entered goods

into the United States [


] .  Dingli's Section C and E Questionnaire at 25, Appx2099.

The Maersk data reflects shipments from Shanghai, China to [


] .  *Id.*  The data from Descartes, Freightos, and Drewry


22

covers ocean freight rates for shipments between Shanghai to New York, and Shanghai to Long Beach, California. IDM at 9, Appx1043. These shipping routes from China to the east and west coasts of the United States are very similar to those used by Dingli. *Id*.

Commerce is not required to duplicate the precise experience of the manufacturer in the non-market economy. *Nation Ford*, 166 F.3d at 1377. Instead, Commerce seeks to identify and rely on the record data that "most accurately represents the fair market value" of the relevant factor of production. *Id*. To determine the dumping margins as accurately as possible, Commerce applies shipping rates in a destination-specific, as well as product-specific, manner based on the relevant region. *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *see also Certain Corrosion-Resistant Steel Products from the People's Republic of China*, 81 Fed. Reg. 35,316, and accompanying issues and decision memorandum at Comment 1 (Dep't of Commerce June 2, 2016); A*lloy and Certain Carbon Steel Threaded Rod from the People's Republic of China*, 85 Fed. Reg. 8,821, and accompanying issues and decisions memorandum at Comment 11 (Dep't of Commerce Feb. 7, 2020). The ocean freight data from Descartes,

Freightos, and Drewry cover rates for shipments between Shanghai to New York, and Shanghai to Long Beach, California, as well as other Chinese ports and other U.S. entry ports that reflect the surrogate shipping rates of not only Dingli, but of the other mandatory respondent, LGMG, as well.  IDM at 9, Appx1043.

Commerce prefers to use published prices that are widely available, rather than price quotes from a limited number of suppliers that can only be obtained through direct inquiry. *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2013-2014*, 81 Fed. Reg. 39,905 (June 20, 2016), and accompanying issues and decisions memorandum at Comment 10.  This is because publicly available, published prices generally do not suffer from potential biases when compared to those price quotes obtained through research by private firms.  *See Writing Instruments Mfrs. v. United States*, 984 F. Supp. 629, 644 (Ct. Int'l Trade 1997) (sustaining Commerce's rejection of a private study in favor of prices taken from a trade journal noting that the journal prices were preferable to the private study, because the

journal prices provided accurate, market-based information and represented "a reliable source insulated from conflicts of interest.").

Plaintiff argues that because the Descartes data for ocean freight rates contains language that says that "{e}stimates of freight charges are furnished as a convenience to the shipping public and represent nothing more than an approximation of freight charges which is not binding on either the carrier or shipper" it is not superior to the Maersk data.  Pl. Br. at 34.  However, the Maersk data includes similar language stating that "{r}ate information is an indication only and Maersk rates are subject to {} terms and conditions."  *See* Petitioner's Final Submission of Surrogate values (August 21, 2021); *see also Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1302 (Fed. Cir. 2016) (where record evidence showed that two sets of surrogate value data were "equally usable," "Commerce's choice to use {one set over the other} is supported by substantial evidence.").

Just as Commerce is not required to use data reflecting the exact route, Commerce is not required to use data reflecting the exact types of merchandise shipped.  The Coalition argues that the Maersk data reflected the actual types of merchandise shipped by Dingli to the

United States, whereas the Descartes, Freightos, and Drewry data reflect a "broader, and less representative, pool of merchandise." Pl. Br. 25. However, both sets of data cover a broad range of merchandise that are not specific to mobile access equipment or subassemblies thereof. IDM at 10. The boilerplate description of goods from the Maersk data describes "40-foot standard container of auto parts, car parts, vehicle parts, motorcycle parts, bicycles parts, new." *Id.* Similarly, the Descartes ocean freight rates also covers a broad class of goods. For example, the commodity specified indicates that "MIXED OR STRAIGHT LOADOF, VIZ: Machinery & Parts, Tools," "FURNITURE, MACHINERY PARTS, BEARINGS, CHAINS, HUB; NOS," "FREIGHT ALL KINDS, FAK," "IRON AND STEELWARE, N.O.S," "STEEL CASTINGS, N.O.S{.}" *Id.* (alteration in IDM). Therefore, Commerce reasonably found that Descartes's, Freightos's, and Drewry's published ocean freight rates suggest that the ocean rates are representative of, and equally applicable to, the subject merchandise.

Although the ocean freight rates provided in the Descartes, Freightos, and Drewry data does not specify the precise types of commodities being shipped, this fact alone does not render the ocean

freight rates unusable. "{W}hile a surrogate value must be as representative of the situation in the NME country as is feasible," Commerce is not required to "duplicate the exact production experience of the Chinese manufacturers." *Nation Ford*, 166 F.3d at 1377 (cleaned up). In evaluating Commerce's data choice, "{t}his court's duty is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351, 1356 (Fed. Cir. 2020) (cleaned up).

Finally, the Coalition claims that if Commerce was going to use the Descartes, Freightos, and Drewry data in the calculation of ocean freight, it was required to adjust the data "to more closely match the experience of the respondents during the period of investigation." Pl. Br. 34. The Coalition argues that Dingli omitted from the freight rates provided items such as the bunker adjustment factor of $65.00, the destination delivery charge of $485.00 that is added to the freight charge, and local port surcharges of $66.00. Pl. Br. 34-35. But, in its final determination, Commerce explained that it excluded these charges because they are included in the brokerage and handling surrogate

value, based on the World Bank's Doing Business in Brazil 2020 report. IDM at 13, Appx1047; SV Memorandum at 5, Appx21438.

The Coalition claims that this is not true. Pl. Br. at 36. It argues that the brokerage and handling surrogate value used by Commerce in the final determination reflects only amounts of "Border Compliance" and "Documentary Compliance." *Id.* at 37. However, Commerce explained its reasoning for not making adjustments to Dingli's surrogate value data. Because there was no record evidence to support the petitioner's assertion that the Descartes, Freightos, and Drewry ocean freight data did not include all the appropriate ocean freight charges or that any charges were unaccounted for, Commerce did not adjust Dingli's surrogate value data. IDM at 13, Appx1047.

When, as here, Commerce provides a reasoned basis for its finding that the selected data satisfy its criteria and constitute better data than alternatives on the record, and the Court should not "substitute its own judgment for the agency's in considering and weighing the relative importance of various criteria applied." *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1376 (Ct. Int'l Trade 2010). Because the Descartes, Freightos, and Drewry data satisfied Commerce's surrogate

value criteria for contemporaneity, public availability, product specificity, broad market average representation, and tax exclusivity, and Commerce provided a reasoned explanation for finding such data to be the best available information, the Court should sustain Commerce's determination.

    C.    Surrogate Value For Minor Fabricated Steel

Commerce reasonably determined that data from multiple HTS subheadings were the best available information to value the 18 different inputs used by Dingli and categorized as "minor fabricated components."[3]  IDM at 37, Appx1071.  Commerce considered that for each of the 18 inputs categorized as "minor fabricated steel" components, Dingli provided the name of the input, field description, classification, recommended HTS subheading, HTS description, a detailed description of the input, degree of fabrication or processing done to the input by suppliers, and its rationale of why its recommended HTS subheading was appropriate.  *Id.*; *see also* Dingli's Pre-Preliminary Comments at Exhibit 1 (PR 345), Appx21364–21414.

---

[3]  A complete list of inputs used by Dingli and categorized as "minor fabricated steel" is found in the Surrogate Value memorandum at Attachment 1, Appx21446.

Despite this evidence, the Coalition claims that Commerce committed a "fundamental error" by treating numerous manufactured parts and MAE components as plain steel.  Pl. Br. 40.  The Coalition claims that during the period of investigation, Dingli used board bracket plate (variable 2.16 "BOARD_BRACKET_PLATE") and board control box plate (variable 2.17 "BOARD_CONTROLBOX_PLATE") in its production of subject merchandise and argues that that these inputs are "a fabricated, further-processed steel input."  *Id*. at 42.

Dingli provided letters from various suppliers confirming that, in certain instances, they may do some minimal work on certain fabricated steel components.  *See* Dingli's First Section D Supplemental Questionnaire Response at Exhibit SD-3A, Appx3289-3321.  For example, one of Dingli's suppliers indicates that "{w}e cut the plates using a laser cutting machine to specific shapes and sizes. We also bend some plates to specific angles using a bending machine to meet the drawing specifications.  As required, holes are drilled into several pieces of steel plates."  IDM at 38, Appx1072; Dingli's First Section D Supplemental Questionnaire Response at Exhibit SD-3D, Appx3416. Dingli provided letters from certain suppliers confirming that it may

cut, bend, or punch holes in certain fabricated steel components, but this varies based on the input and specification requirements. *Id*. This is part of the information that Commerce considered when it selected multiple HTS subheadings to value the inputs categorized as "minor fabricated steel" components. IDM at 37, Appx1071; *see also Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312, 1323 (Ct. Int'l 2016) ("Commerce's choice of the best available information 'must evidence a rational and reasonable relationship to the factor of production it represents' to be supported by substantial evidence." (citation omitted)).

The Coalition challenges Commerce's determination to value respondent's "minor fabricated steel" inputs, claiming the surrogate value does not reflect the fact that "Dingli purchases {its input} in its already processed form." Pl. Br. 42. However, as it stated in its final determination, record evidence does not support the more in-depth fabrication or processing that the plaintiff alleges. IDM at 38, Appx1072. Even if the record contained information to allow Commerce to make the decision that Dingli's "minor fabricated steel" components are further processed as the Coalition claims, the possibility of reaching

a different "conclusion{} from {the} evidence in the record . . . does not

prevent Commerce's determination" that the data from multiple HTS

subheadings are the best available information "from being supported

by substantial evidence." *Am. Silicon Tech. v. United States*, 261 F.3d

1371, 1376 (Fed. Cir. 2001).

Before Commerce, the Coalition argued that data from HTS

subheading 7326.90.90 is the more appropriate dataset to value Dingli's

"minor fabricated steel" inputs.  Pl. Br. 13, 15.  However, this

subheading is a basket category that contains "other articles of iron or

steel, which include various types of finished steel articles including

consumer articles."  IDM at 38, Appx1072.  Selecting the plaintiff's

recommended HTS subheading would require Commerce to choose a

broad HTS category over a specific category to value the minor

fabricated steel inputs.  *Dorbest Ltd.*, 602 F. Supp. 2d at 1290

("Generally, such basket categories should be used only when no more

specific category is appropriate.").  Specificity is an important

consideration in Commerce's analysis, and Commerce prefers specific

data over less specific, broader HTS data.  Commerce selected multiple

HTS subheadings to value the respondents' "minor fabricated steel"

components because they are specific to the description of the input and the amount of processing performed on the input supported the selection of the various HTS subheadings used. IDM at 37, Appx1071; *see also Taian Ziyang Food Co., Ltd. v. United States*, 783 F. Supp.2d 1292, 1330 (Ct. Int'l Trade 2011) (explaining that, when valuing factors for production, "'product specificity' logically must be the primary consideration in determining 'best available information'").

Thus, Commerce's selection of data from various HTS subheadings as the best available information to value Dingli's "minor fabricated steel" components is supported by substantial evidence, and in accordance with law.

### D.   Surrogate Value For Drive Motor Input

The Court should also sustain Commerce's determination that data from HTS subheading 8501.32 is the best available information on the record to value Dingli's drive motor input. *See* IDM at 67*,* Appx1101; *see also* PDM at 24, Appx1023; SV Memorandum at Attachment I, Appx21446.

Chapter 85 of the Mercosur Brazil Tariff Section and Chapter describes the eight-digit HTS subheading 8501.32.10 as an "Electric

motor of continuous current, 750w<pot<=75kw," and under the eight-digit HTS subheading 8501.32.20, as "Electric generators of contin.current, 750w<pot<=75kw." *See* Dingli's Letter, "First Surrogate Value Comments in the Antidumping Duty Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: (A-570-139)," dated July 26, 2021, Appx6908–6913, at Exhibit 10, Appx8019–8302.  Dingli's described its drive motor 1 input as "a motor-generator and when accelerating or maintaining a steady speed these drive motor assemblies receive electrical power from the batter{y} via the motor controller and convert electrical energy into mechanical energy so as to propel the machine forwards or backwards at the desired speed."  *See* IDM at 67, Appx1101; *see also* Dingli's Pre-Preliminary Comments at Exhibit 1, Appx21364–21414.  Dingli's drive motor 2 input is described as an electric motor that drives a hydraulic pump and "receives electrical power from the battery via the motor controller but it cannot be driven by the hydraulic pump and cannot supply electrical energy back to the batteries."  *See* Dingli's Surrogate Value Comments (September 8, 2021) at Exhibit 2A, Appx3898–3901.

Unlike Dingli's drive motor 2 input, Dingli's drive motor 1 input is described as both an electric motor and a generator; accordingly, Commerce selected HTS subheading 8501.32 which encompasses both of the applicable HTS eight-digit subheadings, 8501.32.10—for electric motors—and 8501.32.20—for a generator. *Id.* Dingli also placed articles on motor-generators on the record—evidence supporting its position that certain vehicles do use motor generators for efficiency among other reasons and provided price quotes to corroborate the average unit values for HTS subheading 8501.32. *See* IDM at 68, Appx1102 (citing Dingli's Letter, "Dingli's Final Surrogate Value Rebuttal Comments in the Antidumping Duty Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: (A-570-139)," dated September 8, 2021, at Exhibit 2B).

The Coalition does not contest that the drive motor input functions as both a motor and a generator, but instead suggests that Commerce's valuation of drive motor 1 as both a motor and a generator is unreasonable. Pl. Br. 49 (arguing that "it was simply nonsensical for Commerce to classify Dingli's motors and a generator at the same

time"). However, Dingli explained that its mobile access equipment utilizes two types of motors, Drive_Motor 1 and Drive_Motor 2, and provided a description of the differences between the two types of motors it uses in its mobile access equipment. *See* IDM at 68, Appx1102; *see also* Dingli's Pre-Preliminary Comments at Exhibit 1, Appx21364–21414. Dingli placed on the record a technical expert's declaration and literature supporting its description of Drive_Motor 2 as an electric motor and Drive_Motor 1 as an electric motor-generator. *See* Dingli Final SV Rebuttal Comments at Exhibit 2A, Exhibit 2B, Appx3898–Appx3927. Commerce reflected the differences between these two motors in its selection of HTS subheading 8501.32 to value Drive_Motor 1 and HTS subheading 8501.32.10 to value Drive_Motor 2. *See* IDM at 68, Appx1102.

The Coalition contends that data from HTS subheading 8501.32 does not accurately reflect the nature of Dingli's drive motor 1 input. Pl. Br. 47. It claims that HTS subheading 8501.32.10 described by Chapter 85 of the Mercosur Brazil Tariff Section and Chapter notes as an "electric motor" is more specific because the respondent's drive motor input is just a motor. *Id.* The Coalition argues that the purpose of a

36

drive motor is to provide propulsion power (*i.e.*, to motor) the driving wheels.  Pl. Br. 49.  The Coalition describes the main purpose of a generator is to generate electricity through the compulsion of fuel (gasoline, propane, diesel, etc.) and transfer that fuel into electrical potential through an internal combustion engine that drives an internal combustion engine that drives an alternator or motor.  Pl. Br. 51.  The Coalition argues that Dingli's "motors obviously do not serve this purpose." *Id*.

However, substantial evidence supports Commerce's conclusion that the respondent's drive motor input is both a motor and a generator. Dingli explained that when either decelerating or descending a grade, the drive motor assemblies convert mechanical energy into electrical energy and are a generator because they provide electrical energy back into the battery via the motor controller. *See* Dingli's Pre-Preliminary Comments at Exhibit 1, Appx21364–21414.  Dingli states that this process is "known as regeneration and the principle is used on the machines manufactured by Dingli." *Id*.  Dingli further supported this description with a declaration from a technical expert indicating that because the drive motor 1 assembly propels and decelerates the

37

machines manufactured by Dingli, it is a "motor cum generator as it both uses and creates electrical power. *See* Dingli's Letter, "Dingli's Final Surrogate Value Rebuttal Comments in the Antidumping Duty Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: (A-570-139)," dated September 7, 2021, at Exhibit 2A (Dingli Final SV Rebuttal Comments), Appx3898–3901. Thus, Commerce selected data from HTS subheading 8501.32 as the best available information to value Dingli's drive motor input because substantial evidence supported Dingli's description of the input as both a motor and a generator.

Relying upon classification cases, the Coalition argues that the primary function of the input is critical to the input's valuation and that the generative quality of Dingli's Drive_Motor 1 input is a "subordinate or secondary function." Pl. Br. 50 (citing *F. W. Myers, Inc. v. United States*, 12 CIT 566, 574 (1988)). In each of the cases that the Coalition cites, the courts applied the General Rule of Interpretation (GRI) 3(b)'s "essential character test" to determine the appropriate HTS heading. The first step in analyzing the classification issue is to determine applicable subheadings, if possible, under GRI 1. *See La Crosse Tech.*,

*Ltd. v. United States*, 723 F.3d 1353, 1358 (Fed. Cir. 2013) (citing *Mita Copystar Am. v. United States*, 160 F.3d 710, 712 (Fed. Cir. 1998)).

According to GR 1, "classification shall be determined according to the terms of the headings and any relative section or chapter notes." If GRI 1 fails to classify the good, GRI 3(a) is applied. GRI 3(a) states that:

> The heading which provides the most specific description shall be preferred to headings providing a more general description. However, when two or more headings each refer to only part of the materials or substances contained in mixed or composite goods or to only part of the items in a set put up for retail sale, those headings are to be regarded as equally specific in relation to those goods, even if one of them gives a more complete or precise description of the goods.

*See also CamelBak Products, LLC v. United States*, 649 F.3d 1361, 1365 (Fed. Cir. 2011).

When two subheadings "each refer to only part of the materials ... contained in ... composite goods," they are "regarded as equally specific" under GRI 3(a) and we apply GRI 3(b) to resolve the classification. GRI 3(a). GRI 3(b) instructs that we classify composite goods made up of different components "as if they consisted of the material or component which gives them their essential character." *CamelBak,* 649 F.3d at 1365.

Data from HTS subheading 8501.32, which Commerce selected as the best available information to value Dingli's drive motor input, is described as "Dc Motors N.E.S.O.I. And Generators Of An Output Exceeding 750 W But Not Exceeding 75 Kw."  Because this HTS subheading describes the respondent's drive motor input in its entirety as both a motor and a generator, the analysis should end there. *CamelBak*, 649 F.3d at 1364 (GRI 1 is "a substantive rule of interpretation, such that when an imported article is described in whole by a single classification heading or subheading, then that single classification applies, and the succeeding GRIs are inoperative").

Nevertheless, Commerce's selection of data from HTS subheading 8501.32 as the more specific classification also meets GRI 3(a) analysis. If Commerce were deciding between two or more "equally specific" HTS subheadings referring to only part of the goods in question—such as HTS subheading 8501.32.10 "electric motor" and 8501.32.20 "generator"—then the essential character test would be relevant, though Commerce would not be bound by it.  However, HTS subheading 8501.32 encompasses both of the applicable HTS eight-digit subheadings and is therefore more representative of Dingli's input.

Thus, Commerce's selection of HTS subheading 8501.32 as the best available information to value Dingli's drive motor input is supported by substantial evidence, and in accordance with law.

III. Commerce Lawfully Accepted Timely Factual Information Submitted By Dingli in its Rebuttal

Commerce acted lawfully and within its discretion when it accepted new factual information contained in Dingli's rebuttal. Commerce reasonably determined that Dingli's responses fell within the deadlines set by Commerce's regulations.  For the reasons that follow, as reflected by the law and the record, the Coalition's challenges lack merit.

A.    Legal Framework for New Factual Information

Commerce has established deadlines for submission of factual information during an investigation.  Pursuant to 19 C.F.R. § 351.301(c)(3)(i), interested parties have forty days after the publication of the preliminary determination to submit surrogate value information.  Pursuant to 19 C.F.R. § 351.301(c)(3)(iv), an interested party is permitted one opportunity to submit publicly available information to rebut, clarify, or correct such factual information submitted pursuant to § 351.408(c) or § 351.511(a)(2) 10 days after the

41

date such factual information is served on the interested party.  An

interested party may not submit additional, previously absent-from-the-

record alternative surrogate value information under this subsection.

19 C.F.R. § 351.301(c)(3)(iv); *see also Definition of Factual Information*

*and Time Limits for Submission of Factual Information*, 78 Fed. Reg.

21,246, 21,248 (Dep't Commerce Apr. 10, 2013) ("Definition of Factual

Information ") ("We also note that all interested parties may submit

factual information to rebut, clarify, or correct factual information to

value factors, as long as that information is submitted *solely for rebuttal*

*and not for purposes of establishing new surrogate values.*" (emphasis

added)).

   Additionally, all factual information submitted under this

subsection must be accompanied by a written explanation identifying

what information already on the record of the ongoing proceeding the

factual information is rebutting, clarifying, or correcting.  Information

submitted to rebut, clarify, or correct factual information submitted

pursuant to § 351.408(c) will not be used to value factors under

§ 351.408(c). 19 C.F.R. § 351.301(c)(3)(iv).

B.     Commerce Did Not Err In Accepting Dingli's Factual
       Information

This Court will uphold "Commerce's interpretation of what

constitutes factual information" "unless an 'alternative reading is

compelled by the regulation's plain language or by other indications

of . . . intent at the time of the regulation's promulgation.'" *GODACO*

*Seafood Joint Stock Co. v. United States*, 435 F. Supp. 3d 1342, 1357

(Ct. Int'l Trade 2020) (quoting *Tri Union Frozen Prods., v. United*

*States*, 162 F. Supp. 3d 1255, 1287 (Ct. Int'l Trade 2016)).  Likewise,

Commerce is entitled to deference in its interpretation of what type of

factual information is submitted by a party.  *See Royal Thai Gov't v.*

*United States*, 436 F.3d 1330, 1340 (Fed. Cir. 2006).

This situation involves "factual information" submitted by Dingli

to rebut, clarify or correct the Coalition's comments, so the appropriate

deadline for submitting new rebuttal factual information for Dingli is

provided for in section 351.301(c)(1)(iv), i.e., 10 days after Dingli was

served with the information.  In its section D questionnaire response,

Dingli identified certain steel grades in question as made of "non-alloy"

material and provided in subsequent filings the HTS headings and

surrogate values it determined to be the best match pursuant to the

input's description.  IDM at 24, Appx1058.  On September 8, 2021,

Dingli responded to the Coalition's September 7, 2021 submission,

which contained information challenging Dingli's assertion that certain

steel grades Dingli uses are, in fact, non- alloy steel grade.  Dingli

Rebuttal to Reject I, Appx21420–21424.  In response to the information

the Coalition placed on the record regarding whether certain steel grade

inputs were made of "alloy," or "non-alloy" material, Dingli placed on

the record mill test steel certificates to support its claim that certain

steel grade inputs were made from "non-alloy" materials.  IDM at 24,

Appx1058.

Commerce reasonably accepted Dingli's September 8, 2021

surrogate value submission as a timely rebuttal to the Coalition's

surrogate value submission on September 7, 2021, because it was

submitted within the 10-day deadline for a response.  19 C.F.R.

§ 353.31(a)(1)(i).  Although Dingli claimed business proprietary

treatment for the mill test steel certificates, Commerce recognized that

the only manner in which Dingli could rebut, clarify, or correct the

Coalition's claim that certain steel grades Dingli used were non-alloy

steel grade was to place the mill test steel certificates on the record.

Further, the mill test steel certificates contained in the rebuttal surrogate value submission were supporting documentation for information already on the record *i.e.*, declarations from some of Dingli's unaffiliated steel component suppliers.  IDM at 24*; see also* Antidumping Duties: Countervailing Duties, 61 Fed. Reg. 7,308, 7,355 (February 27, 1996) (stating that the Secretary will normally consider "{f}actual information of a type that has been published or otherwise made available to the public by the person submitting it" to be public information); *cf., NEC Home Electronics, Ltd. v. United States*, 54 F.3d 736, 744 (Ct. Int'l Trade 1995) (finding that an affidavit submitted by foreign producer in administrative review of antidumping order should not be disregarded, though provided after preliminary results were published, even if that publication was the deadline for submission of factual data, since all the "affidavit essentially did was to supplement information" that the foreign producer had already provided to the International Trade Administration).

The Coalition argues that Exhibit 2C of Dingli's surrogate value submission [

].  Pl. Br. 55.

45

However, exhibits 2C, 2D, 3A, and 3D of Dingli's September 7, 2021 submission do not propose a direct surrogate value source as the Coalition suggests, but rather propose publicly available price quotes. *See* Commerce's Surrogate Values for the Preliminary Determination Memorandum at 11 (Dep't of Commerce September 24, 2021), Appx21444.  The price quotes Dingli placed on the record are publicly available pricing data intended to rebut the Coalition's suggestion of certain HTS numbers that provide average unit values that are substantially higher than the HTS number suggested by Dingli.  *Id*. Similarly, Exhibit 5 shows publicly available pricing data, which was already on the record, and a conversion factor for natural gas.  *Id*. at 11–12, Appx21444–21445.  Dingli explained that the natural gas surrogate values and conversion factor rebuts the petitioner's surrogate value proposal for natural gas.  *Id*.

Commerce found no prejudice resulting from accepting this information because this information was already on the record and the petitioner was able to use the information contained in the mill test certificates to make affirmative arguments.  IDM at 24, Appx1058. Commerce's analysis of new factual information is necessarily case

46

specific, and in this case, Commerce reasonably enforced the time limits and requirements in its regulations and provided a reasoned explanation for accepting Dingli's new factual information.  *See Grobest & i-Mei (Indus. (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342, 1365 (Ct. Int'l Trade 2012).

Therefore, the Court should sustain Commerce's acceptance of Dingli's timely new factual information as consistent with its regulations, and therefore in accordance with law.

CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiff's motion for judgment on the agency record and sustain Commerce's final determination in its entirety.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant
 Attorney General

PATRICIA M. McCARTHY
Director

s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL

Brishailah Brown
Attorney
Office of the Chief Counsel for
    Trade Enforcement &
    Compliance
U.S. Department of Commerce

s/ Kristin E. Olson
KRISTIN E. OLSON
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-6299
kristin.olson@usdoj.gov

February 13, 2023

*Attorneys for the United States*

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the 14,000 word limitation authorized by the Court's scheduling order because the brief contains 8,505 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

<u>s/ Kristin E. Olson</u>

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT, <br><br>        Plaintiff, <br><br>   v. <br><br> UNITED STATES, <br><br>        Defendant, <br><br>   and <br><br> ZHEJAING DINGLI MACHINERY CO., LTD., <br><br>        Defendant-Intervenor. | Court No. 22-0152 |

## ORDER

Upon consideration of plaintiff's motion for judgment upon the agency record, defendant's and defendant-intervenor's responses thereto, plaintiff's reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is denied, and it is further

ORDERED that judgment is entered in favor of the United States.

_____

Hon. M. Miller Baker, Judge

Dated: _____

New York, NY