# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT, <br><br>               PLAINTIFF, <br><br> v. <br><br> UNITED STATES, <br><br>               DEFENDANT, <br><br> AND <br><br> ZHEJIANG DINGLI MACHINERY CO., LTD., <br><br>               DEFENDANT-INTERVENOR. | Court No. 22-00152 |

## <u>ORDER</u>

Upon consideration of the motion of the Coalition of American Manufacturers of Mobile Access Equipment for judgment on the agency record, and all other papers and proceedings herein, it is hereby

**ORDERED,** that the Coalition of American Manufacturers of Mobile Access Equipment's motion for judgment on the agency record is granted; and it is further

Ct. No. 22-00152

**ORDERED,** that this action is remanded to the U.S. Department of Commerce for proceedings consistent with this Court's opinion.

**SO ORDERED**.

_____

Hon. M. Miller Baker, Judge

Dated: _____, 2022
        New York, New York

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE**

| | |
|---|---|
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT, <br><br>                PLAINTIFF, <br><br>     V. <br><br> UNITED STATES, <br><br>            DEFENDANT, <br><br>     AND <br><br> ZHEJIANG DINGLI MACHINERY CO., LTD., <br><br>            DEFENDANT-INTERVENOR. | **Court No. 22-00152** |

## <u>PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, the Coalition of American Manufacturers of Mobile Access Equipment ("Petitioner") hereby moves for judgment upon the agency record with respect to the determination of the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation on *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China. See Certain Mobile Access Equipment and*

Ct. No. 22-00152

*Subassemblies Thereof From the People's Republic of China*, 87 Fed. Reg. 9,576 (Dep't Commerce Feb. 22, 2022) (final affirm. deter. of sales at less than fair value) and accompanying Issues and Decision Memorandum.

Petitioner respectfully moves, for the reasons explained in the accompanying memorandum, that this Court find that agency findings, conclusions, and/or determinations with respect to this decision are unexplained, not supported by substantial evidence, or otherwise not in accordance with law.  Petitioner further moves that the Court remand this determination to Commerce for disposition consistent with the Court's final opinion.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition of American Manufacturers of Mobile Access Equipment*

Dated:  November 8, 2022

NON-CONFIDENTIAL VERSION

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

|  |  |
|---|---|
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT, <br><br>         PLAINTIFF, <br><br> V. <br><br> UNITED STATES, <br><br>         DEFENDANT, <br><br> AND <br><br> ZHEJIANG DINGLI MACHINERY CO., LTD., <br><br>         DEFENDANT-INTERVENOR. | Court No. 22-00152 <br><br> **NON-CONFIDENTIAL VERSION** <br><br> **Business Proprietary Information Removed from Pages 18-19, 24-25, 40-44, 46, 55-56** |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Coalition of American Manufacturers of Mobile Access Equipment*

Dated: November 8, 2022

Ct. No. 22-00152                                   NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ................................................................. 1

II.   STATEMENT PURSUANT TO RULE 56.2 ............................. 1

    A.    Administrative Determination Under Review ..................... 1

    B.    Issues Presented for Review ...................................... 2

II.   GLOSSARY OF CASE-SPECIFIC ACRONYMS AND ABBREVIATIONS ................................................................ 3

III.  STATEMENT OF THE FACTS .............................................. 3

    A.    Facts Related to the Acceptance of Dingli's Factual Information ................................................... 6

    B.    Facts Related to Commerce's Selection of Certain Surrogate Values ................................................... 11

    C.    Facts Related to Commerce's Valuation of Ocean Freight ............................................................... 17

IV.   ARGUMENT ...................................................................... 20

    A.    Standard of Review .................................................. 20

    B.    Commerce's Rejection of Petitioner's Maersk Data to Value Respondent's Ocean Freight Was Unreasonable and Unsupported by Substantial Evidence .............................................................. 22

        1.    It Was Unreasonable to Conclude that the Descartes, Drewry and Freightos Data Were Representative of Respondents' Freight Costs and the Maersk Data Were Not ......................... 23

        2.    Commerce's Determination to Exclude the Maersk Data Because It Was Not Public on the Record Was Unreasonable ................................ 26

        3.    Commerce's Other Reasons to Prefer the Descartes, Drewry and Freightos Data over the Maersk Data Are Unpersuasive ....................... 33

4.    Commerce Further Erred by Failing to
Make Adjustments to the Respondents'
Data .................................................................34

C.    Commerce's Selection of Certain Surrogate
Values Was Not Supported by Substantial
Evidence Nor In Accordance With the Law .........................38

1.    Legal Standard .................................................38

2.    Commerce's Valuation of Dingli's Minor
Fabricated Steel Components Was Not
Supported by Substantial Evidence and Is
Contrary to Law .............................................39

3.    Commerce's Valuation of Dingli's Drive
Motor 1 Input Was Not Supported by
Substantial Evidence and Is Contrary to
Law .................................................................47

D.    Commerce Unreasonably and Arbitrarily
Accepted Information Filed by Dingli that Was
Untimely and Contradicted Its Own Regulations ...............53

1.    Commerce Contradicted Its Own
Regulations by Accepting Business
Proprietary Information Regarding
Surrogate Values from Dingli .....................................53

2.    Commerce Erred by Accepting Untimely
New Factual Information from Dingli .........................57

V.    CONCLUSION .................................................................63

Ct. No. 22-00152                                    NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
  618 F.3d 1316 (Fed. Cir. 2010) ............................................................ 45

*Algoma Steel Corp. v. United States*,
  865 F.2d 240 (Fed. Cir. 1989) ............................................................ 27

*Allied Pac. Food (Dalian) Co. v. United States*,
  30 CIT 736, 435 F. Supp. 2d 1295 (2006) ........................................... 32

*Altx, Inc. v. United States*,
  25 CIT 1100, 167 F. Supp. 2d 1353 (2001) ............................ 21, 51, 52

*Anshan Iron & Steel Co. v. United States*,
  27 CIT 1234 (2003) .......................................................................... 38

*Bando Chem. Indus., Ltd. v. United States*,
  16 CIT 133, 787 F. Supp. 224 (1992), *aff'd*, 26 F.3d 139
  (Fed. Cir. 1994) ................................................................................ 22

*China First Pencil Co. v. United States*,
  34 CIT 1284, 721 F. Supp. 2d 1369 (2010) ......................................... 21

*China Mfrs. All., LLC v. United States*,
  357 F. Supp. 3d 1364 (Ct. Int'l Trade 2019)...................................... 23

*Dorbest Ltd. v. United States*,
  30 CIT 1671, 462 F. Supp. 2d 1262 (2006) ......................................... 21

*F.W. Myers, Inc. v. United States*,
  12 CIT 566 (1988) ............................................................................ 50

*Guizhou Tyre Co. v. United States*,
  469 F. Supp. 3d 1338 (Ct. Int'l Trade 2020)................................. 57, 60

*Home Depot U.S.A., Inc. v. United States*,
    435 F. Supp. 3d 1311 (Ct. Int'l Trade 2020) ..................................... 50

*Home Meridian Int'l, Inc. v. United States*,
    37 CIT 983, 922 F. Supp. 2d 1366 (2013) ............................................ 39

*Huzhou Muyun Wood Co. v. United States*,
    279 F. Supp. 3d 1215 (Ct. Int'l Trade 2017) ................................ 61, 62

*Jinan Yipin Corp. v. United States*,
    35 CIT 1254, 800 F. Supp. 2d 1226 (2011) ......................................... 39

*La Crosse Tech., Ltd. v. United States*,
    723 F.3d 1353 (Fed. Cir. 2013) .......................................................... 50

*Lasko Metal Prods., Inc. v. United States*,
    43 F.3d 1442 (Fed. Cir. 1994) ............................................................ 46

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984) ............................................................ 21

*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm
    Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...................................... 22, 38

*Nation Ford Chem. Co. v. United States*,
    166 F.3d 1373 (Fed. Cir. 1999) .......................................................... 46

*Nation Ford Chem. Co. v. United States*,
    21 CIT 1371, 985 F. Supp. 133 (1997) ............................................... 23

*New Am. Keg v. United States*,
    No. 20-00008, slip. op. 21-30 (Ct. Int'l Trade Mar. 23,
    2021) .................................................................................................. 21

*Risen Energy Co. v. United States*,
    477 F. Supp. 3d 1332 (Ct. Int'l Trade 2020) ..................................... 27

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
    44 F.3d 978 (Fed. Cir. 1994) .............................................................. 20

*Taian Ziyang Food Co. v. United States* (*Taian 2009*),
   33 CIT 828, 637 F. Supp. 2d 1093 (2009) ...................................... 30, 32

*Taian Ziyang Food Co. v. United States* (*Taian 2011*),
   35 CIT 863, 783 F. Supp. 2d 1292 (2011) ...................................... 31, 55

*Tianjin Mach. Imp. & Exp. Corp. v. United States*,
   16 CIT 931, 806 F. Supp. 1008 (1992) ............................................. 22

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) ........................................................................ 20

## Statutes

19 U.S.C. § 1516a(b)(1)(B) .................................................................. 20

19 U.S.C. § 1677b(c) ........................................................................... 22

19 U.S.C. § 1677b(c)(1) ....................................................................... 38

## Regulations

19 C.F.R. § 351.102(b)(21) .............................................................. 53, 57

19 C.F.R. § 351.301(c)(1) .................................................................... 60

19 C.F.R. § 351.301 ......................................................................... 53, 57

19 C.F.R. § 351.301(c)(1) .................................................................... 58

19 C.F.R. § 351.301(c)(3) .................................................................... 58

19 C.F.R. § 351.301(c)(3)(iv) ............................................................... 54

## Administrative Materials

*Certain 53-Foot Domestic Dry Containers From the People's*
   *Repblic of China*, 80 Fed. Reg. 21,209 (Dep't Commerce
   Apr. 17, 2015) ................................................................................. 36

NON-CONFIDENTIAL VERSION

*Certain Chlorinated Isocyanurates From the People's*
   *Republic of China*, 86 Fed. Reg. 22,932 (Dep't Commerce
   Apr. 30, 2021).................................................................. 35, 36

*Certain Steel Wheels From the People's Republic of China*,
   76 Fed. Reg. 67,703 (Dep't Commerce Nov. 2, 2011) ........................ 29

*Certain Stilbenic Optical Brightening Agents From the*
   *People's Republic of China*, 76 Fed. Reg. 68,148 (Dep't
   Commerce Nov. 3, 2011) ................................................... 29

# I.   INTRODUCTION

On behalf of the Coalition of American Manufacturers of Mobile Access Equipment ("Petitioner"), we respectfully submit the following brief in support of Petitioner's motion for judgment on the agency record.

# II.   STATEMENT PURSUANT TO RULE 56.2

## A.   Administrative Determination Under Review

The administrative determination under review is the U.S. Department of Commerce's ("Commerce") final determination in the antidumping duty investigation of *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*.  The final determination was issued on February 14, 2022 and published in the Federal Register on February 22, 2022.  *See Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China*, 87 Fed. Reg. 9,576 (Dep't Commerce Feb. 22, 2022) (final affirm. deter. of sales at less than fair value), P.R. 514, Appx1172-1175 ("Final

Determination") and accompanying Issues and Decision Memorandum ("I&D Memo"), P.R. 504, Appx1035-1171.[1]

B.  Issues Presented for Review[2]

1.  Was Commerce's decision to use Descartes, Drewry and Freightos shipping rate data alone to value respondents' international ocean freight supported by substantial evidence and otherwise in accordance with law?

2.  Was Commerce's selection of surrogate values to value respondents' minor fabricated steel components supported by substantial evidence and in accordance with law?

3.  Was Commerce's selection of surrogate values to value respondents' drive motors supported by substantial evidence and in accordance with law?

---

[1]  "P.R." denotes the Public Record document item number identified in the Index to Administrative Record filed in this action on July 25, 2022, ECF No. 20; "C.R." denotes the Confidential Record document item number.

[2]  Petitioner does not pursue several of the arguments included in its complaint in this briefing, and accordingly waives its allegations at Counts III, IV, V, VI, VII, VIII, IX and X of its Complaint.  *See* Compl. at 5-7 (June 13, 2022), ECF No. 8.

4     Was Commerce's determination to accept onto the record certain information submitted by a respondent, which Petitioner alleged was untimely, reasonable, supported by substantial evidence, and otherwise in accordance with law?

## II.   GLOSSARY OF CASE-SPECIFIC ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| **AUV** | Average unit value |
| **Commerce** | U.S. Department of Commerce |
| **Dingli** | Zhejiang Dingli Machinery Co., Ltd. |
| **GDLSK** | Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP |
| **LGMG** | Lingong Group Jinan Heavy Machinery Co., Ltd. |
| **MAE** | Mobile access equipment |
| **Petitioner** | Coalition of American Manufacturers of Mobile Access Equipment |

## III.   STATEMENT OF THE FACTS

On February 26, 2021, Petitioner filed a petition with Commerce and the International Trade Commission alleging that the mobile access equipment ("MAE") industry in the United States was materially injured or threatened with material injury by reason of dumped and subsidized MAE imports from China.  Petition for the Imposition of

Antidumping and Countervailing Duties, *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China* (Feb. 26, 2021) at 6, C.R. 1-15, P.R. 1-16, Appx1193. On March 25, 2021, Commerce published its notice of initiation of an antidumping duty investigation into imports of MAE from China. *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China*, 86 Fed. Reg. 15,922 (Dep't Commerce Mar. 25, 2021) (initiation of less-than-fair-value investigation), P.R. 46, Appx6778-6784. The investigation covered a period of investigation of July 1, 2020, through December 31, 2020. I&D Memo at 4, Appx1038. Commerce selected Lingong Group Jinan Heavy Machinery Co., Ltd. ("LGMG") and Zhejiang Dingli Machinery Co., Ltd. ("Dingli") as mandatory respondents in the investigation. *See* Commerce Memorandum, re: *Less-Than-Fair-Value Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Respondent Selection* (Apr. 23, 2021), C.R. 42, P.R. 110, Appx2061-2068.

On September 30, 2021, Commerce published its preliminary determination in the antidumping duty investigation. *Certain Mobile*

*Access Equipment and Subassemblies From the People's Republic of China*, 86 Fed. Reg. 54,164 (Dep't Commerce Sept. 30, 2021) (prelim. affirm. deter. of sales at less than fair value, postponement of final deter. and ext. of provisional measures), P.R. 422, Appx1031-1034 ("Prelim. Determination") and accompanying Preliminary Decision Memorandum, P.R. 407, Appx1000-1030.  In part as a result of the findings discussed below, Commerce calculated a dumping margin of 275.06% for LGMG, 17.78% for Dingli, 56.55% for the separate rate companies and 275.06% for the China-wide entity.  Prelim. Determination at 54,165, Appx1032.

On February 22, 2022, Commerce published its final determination in the antidumping duty investigation.  *See* Final Determination at 9,576, Appx1172.  In part as a result of the findings discussed below, Commerce calculated a final antidumping margin of 165.30% for LGMG, 31.70% for Dingli, 51.83% for the separate rate companies, and 165.30% for the China-wide entity.  *Id.* at 9,577, Appx1173.  *See also* I&D Memo, Appx1035-1171.

A.   Facts Related to the Acceptance of Dingli's Factual
Information

Consistent with its normal practice in antidumping proceedings

concerning non-market economies, including China, Commerce's

questionnaires to the respondents requested information and set

specific deadlines for the submission of such information. *See*

Antidumping Request for Information, *Certain Mobile Access*

*Equipment and Subassemblies Thereof*, Sections A, C-E (Apr. 26, 2021),

P.R. 118-121, Appx6785-6791 ("Initial DOC Questionnaire").  In

particular, Section D of the questionnaire requested information about

the factors of production for subject merchandise that was sold to the

United States, including detailed information about respondents'

production process and material inputs.  *See, e.g.*, *id.* at G-2, D-2-D-3,

Appx6793, Appx6852-6853.

Dingli submitted a response to Commerce's Section D

questionnaire, in which Dingli identified its raw material inputs.

Letter from GDLSK to Sec'y Commerce, re: *Dingli Response to Section*

*D Questionnaire in the Antidumping Duty Investigation of Certain*

*Mobile Access Equipment and Subassemblies Thereof from the People*

*Republic of China (A-570-139)* (June 24, 2021) at Exhibit D-2, C.R.

144-148, P.R. 208-209, Appx2692-2699 ("Dingli June 2021 Section D

Response").  In a supplemental questionnaire, Commerce asked for

further information on Dingli's raw material inputs, including "detailed

information regarding the nature, form, degree of fabrication or

processing, grade, and size of each input," with parts catalogues and

product schematics, and Dingli submitted a response.  Letter from

GDLSK to Sec'y Commerce, re: *Dingli Response to Supplemental*

*Questionnaire: Part II (Section D) in the Antidumping Duty*

*Investigation of Certain Mobile Access Equipment and Subassemblies*

*Thereof from the People Republic of China: (A-570-139)* (Aug. 16, 2021)

at 4, C.R. 241-258, P.R. 285-289, Appx3048 ("Dingli Aug. 2021 Supp.

Section D Response").

    During the same period, Petitioner and Dingli also made

surrogate value submissions and filed rebuttals to those submissions.

Letter from GDLSK to Sec'y Commerce, re: *Dingli's First Surrogate*

*Value Comments in the Antidumping Duty Investigation of Certain*

*Mobile Access Equipment and Subassemblies Thereof from the People*

*Republic of China: (A-570-139)* (July 26, 2021), P.R. 242-249,

Appx6908-6913 ("Dingli July 2021 SV Submission"); Letter from Wiley

Rein LLP to Sec'y Commerce, re: *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Submission of Surrogate Values* (July 26, 2021), C.R. 188, P.R. 260, Appx3000-3002 ("Petitioner July 2021 SV Submission"); Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final Submission of Surrogate Values* (Aug. 25, 2021), P.R. 295-300, Appx8815-8820 ("Petitioner Aug. 2021 SV Submission"); Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final Submission of Surrogate Values (Confidential Data)* (Aug. 25, 2021), C.R. 260-261, P.R. 294, Appx3703-3732 ("Petitioner Aug. 2021 Confidential SV Submission"); Letter from GDLSK to Sec'y Commerce, re: *Dingli's Final Surrogate Value Comments in the Antidumping Duty Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People Republic of China: (A-570-139)* (Aug. 25, 2021), P.R. 302-315, Appx17761-17767 ("Dingli Aug. 2021 SV Submission").

The parties also filed comments in advance of the agency's
preliminary determination.  Letter from GDLSK to Sec'y Commerce, re:
*Dingli's Pre-Preliminary Comments in the Antidumping Duty
Investigation of Certain Mobile Access Equipment and Subassemblies
Thereof from the People Republic of China: (A-570-139)* (Sept. 2, 2021),
P.R. 344-345, Appx21353-21363 ("Dingli Pre-Prelim. Comments");
Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Mobile
Access Equipment and Subassemblies Thereof from the People's
Republic of China: Pre-Preliminary Comments* (Sept. 8, 2021) at 14-21,
C.R. 327-329, P.R. 393-395, Appx4792-4799 ("Petitioner Pre-Prelim.
Comments").

Soon after Dingli's surrogate value submissions and pre-
preliminary comments, Petitioner submitted two requests to Commerce
that the agency reject portions of Dingli's submissions as containing
untimely filed new factual information.  Letter from Wiley Rein LLP to
Sec'y Commerce, re: *Certain Mobile Access Equipment and
Subassemblies Thereof from the People's Republic of China: Request to
Reject Dingli's Pre-Preliminary Determination Comments* (Sept. 7,
2021), P.R. 348, Appx21415-21419 ("Petitioner Sept. 7, 2021 Request to

9

Reject"); Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Request to Reject Portions of Dingli's Affirmative and Rebuttal Surrogate Value Comments* (Sept. 13, 2021), C.R. 332, P.R. 401, Appx4860-4880 ("Petitioner Sept. 13, 2021 Request to Reject"). Specifically, Petitioner alleged that, in its submissions, Dingli submitted new factual information to further describe its factors of production – information that was responsive to the requests in Commerce's Section D questionnaire and supplemental Section D questionnaire and that should have been filed at that time. *See generally* Petitioner Sept. 7, 2021 Request to Reject, Appx21415-21419; Petitioner Sept. 13, 2021 Request to Reject, Appx4860-4880.  Petitioner further explained that Dingli had submitted business proprietary information in its rebuttal surrogate value submission, contrary to agency regulations, which required rejection of the non-public information.  Petitioner Sept. 13, 2021 Request to Reject at 2, 4-6, Appx4861, Appx4863-4865.  Petitioner reiterated these arguments in its case brief.  Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Mobile Access Equipment and Subassemblies Thereof from the People's*

*Republic of China: Case Brief* (Nov. 24, 2021) at 65-75, C.R. 456, P.R. 468, Appx6510-6511, Appx6522-6524, Appx6592-6602 ("Petitioner Case Brief").

In the final determination, Commerce did not reject any of the relevant submissions by Dingli and continued to consider the information in selecting from among the best information available on the record to serve as surrogate values. *See* I&D Memo at cmt. 5, Appx1053-1060.

B.    Facts Related to Commerce's Selection of Certain Surrogate Values

Commerce solicited and collected information from interested parties regarding the selection of surrogate value data to be used to value the respondents' factors of production, including for ocean freight and various raw material inputs.  Letter from Commerce to All Interested Parties, re: *Less-Than-Fair-Value Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information* (June 15, 2021), P.R. 195, Appx6903-6905.  The respondents in this investigation reported hundreds of material inputs requiring surrogate valuation.

Both Petitioner and respondent Dingli made several submissions of potential surrogate value data for the agency's consideration. Dingli July 2021 SV Submission at Exhibits 1 and 7, Appx6908-6913; Petitioner July 2021 SV Submission, Appx3000-3038; Petitioner Aug. 2021 SV Submission, Appx8815-8820; Petitioner Aug. 2021 Confidential SV Submission, Appx3703-3732; Dingli Aug. 2021 SV Submission, Appx17761-17767. In its surrogate value submission and in pre-preliminary comments, Dingli asserted that 26 of its fabricated welded steel inputs should be valued using HTS subheading 8431.20.90 (with an average unit value ("AUV") of $5.30 per kilogram), and that another 22 of its fabricated welded steel inputs should be valued using HTS subheading 7308.90.90 (with an AUV of $3.65 per kilogram). Dingli Pre-Prelim. Comments at 7-9 and Exhibit 1, Appx21353-21363. Dingli also argued that a number of its minor fabricated steel components should be valued using a variety of HTS subheadings, including, for example, 7211.14 (AUV of $4.16 per kilogram) for board bracket steel welding plate and 7208.54 (AUV of $4.69 per kilogram) for board platform control box. *Id.* at Exhibit 1, Appx21353-21367.

Petitioner, however, maintained that these fabricated steel components were better classified under HTS number 7326.90.90 (with an AUV of $12.12 per kilogram), in order to reflect the substantial degree of processing that the inputs had undergone and because it is the actual HTS subheading covering these components.  Petitioner Pre-Prelim. Comments at 14-21, Appx4792-4799. Dingli responded to these arguments in rebuttal pre-preliminary comments. Letter from GDLSK to Sec'y Commerce, re: *Dingli's Rebuttal to Petitioner's Pre-Preliminary Comments in the Antidumping Duty Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People Republic of China: (A-570-139)* (Sept. 14, 2021) at 7-10, C.R. 331, P.R. 400, Appx4846-4849 ("Dingli Rebuttal Pre-Prelim. Comments").

Petitioner and Dingli also submitted arguments regarding the proper surrogate value for Dingli's drive motor input.  Dingli asserted that its two types of drive motor inputs should be valued using HTS subheading 8501.32, which covers "Dc Motors N.E.S.O.I. And Generators Of An Output Exceeding 750 W But Not Exceeding 75 Kw." Dingli Pre-Prelim. Comments at Exhibit 1, Appx21353-21365, Appx21385; Commerce Memorandum, re: *Certain Mobile Access*

*Equipment and Subassemblies Thereof from the People's Republic of China: Final Analysis Memorandum for Zhejiang Dingli Machinery Co., Ltd.* (Feb. 14, 2022) at Attachment III, C.R. 464-466, P.R 505-509, Appx6771-6777 ("Dingli Final Calc Memo"); I&D Memo at cmt. 6 (p. 64), Appx1098.  In addition to arguing that much of Dingli's description regarding its drive motor input was untimely, as further discussed above, *see* Petitioner Pre-Prelim. Comments at 8-9, Appx4786-4787, Petitioner maintained that Dingli's drive motors were properly valued using HTS subheading 8501.32.10, which covers "Electric Motor{s} Of Continuous Current, 750W<Pot<=75Kw."  Petitioner Aug. 2021 SV Submission at Exhibit 1, Appx8821-8828; Dingli Final Calc Memo at Attachment III, Appx6777; I&D Memo at cmt. 6 (p. 64), Appx1098.

In the preliminary determination, Commerce valued nearly all of Dingli's fabricated steel components using the HTS numbers proposed by Dingli (either 8431.20.90 and 7308.90.90), as well as a combination of 9 HTS numbers proposed by Dingli for 18 more minor steel components (including, *e.g.*, 7208.54 and 7211.14).  Commerce Memorandum, re: *Less-Than-Fair-Value Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People's*

*Republic of China: Surrogate Values for the Preliminary Determination* (Sept. 24, 2021), at Attachment I, P.R. 415, Appx21434-21446 ("Prelim. SV Memo").  Commerce valued one of Dingli's drive motor inputs (DRIVE_MOTOR1) with the HTS number proposed by Dingli (8501.32), and the other of Dingli's drive motor inputs (DRIVE_MOTOR2) with the HTS number proposed by Petitioner (8501.32.10).  *Id.*

In its case brief, Petitioner argued that, for the final determination, Commerce should value Dingli's fabricated steel components using HTS numbers 7326.90.90 or 8431.20.90, as those subheadings were more reflective of Dingli's actual inputs, including the significant fabrication and processing they had undergone, and were consistent with U.S. Customs and Border Protection rulings on the exact inputs in question.  Petitioner Case Brief at 13-24, Appx6539-6550.  Petitioner further argued that Commerce should value both of Dingli's drive motor inputs using HTS subheading 8501.32.10 for the final determination because it functioned primarily as a motor (and not a generator) and thus this HTS classification was more specific to the input.  *Id.* at 43-46.  Dingli responded in its rebuttal brief, urging the agency to maintain its preliminary surrogate value selections for these

inputs.  Letter from GDLSK to Sec'y Commerce, re: *Dingli's Redacted Rebuttal Brief: Antidumping Duty Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People Republic of China: (A-570-139)* (Jan. 19, 2022) at 31-50 and 78-86, C.R. 463, P.R. 496, Appx6671-6690, Appx6718-6726 ("Dingli Rebuttal Brief").[3]

In the final determination, Commerce modified its surrogate value selection to use HTS subheading 8431.20.90 (with an AUV of 28.805 BRL per kilogram, or approximately $5.71 USD per kilogram), one of the subheadings recommended by Dingli, for all fabricated steel components.  Dingli Final Calc Memo at 2, Appx6772; I&D Memo at cmt. 6 (pp. 29-38), Appx1063-1072.  For the 18 minor fabricated steel component inputs, Commerce continued to use the HTS subheadings it utilized in the preliminary determination.  I&D Memo at cmt. 6 (pp. 35-38), Appx1069-1072.  Commerce also made no changes to its surrogate

---

[3]     Dingli initially filed its rebuttal brief on December 8, 2021. However, Commerce rejected the brief for its inclusion of untimely new factual information and permitted Dingli to refile without that information on January 19, 2022.  *See* Letter from Commerce to Zhejiang Dingli Machinery Co., Ltd., re: *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Rejection of Rebuttal Brief* (Jan. 18, 2022), P.R. 494, Appx21447-21450.

values for Dingli's drive motor inputs, declining to use a motor surrogate value for the drive motor 1 input and instead using a value for both motors and generators, as before.  *Id.* at cmt. 6 (pp. 64-68), Appx1098-1102.

C.    <u>Facts Related to Commerce's Valuation of Ocean Freight</u>

Commerce also collected information from interested parties regarding the proper valuation of ocean freight.  Dingli submitted data from three sources: Descartes, Drewry and Freightos.  Dingli July 2021 SV Submission at Exhibits 1 and 7, Appx6908-6923.

In addition to other data, Petitioner submitted data to value respondents' ocean freight from Maersk.  Petitioner Aug. 2021 Confidential SV Submission, Appx3703-3732.  Petitioner submitted the average shipping cost per kilogram for the period of investigation publicly.  *Id.* at Exhibit 1, Appx3719-3732.  However, as Petitioner had previously explained, Petitioner July 2021 SV Submission, Appx3000-3002 because the respondents had requested and were granted business proprietary treatment for their specific trade routes, and thus the information was protected under Administrative Protective Order, Petitioner was required to treat the specific freight

routes and monthly per-kilogram shipping rates as confidential.  *See* Petitioner Aug. 2021 SV Submission at Exhibit 1, Appx8821-8828.  *See also* Letter from GDLSK to Sec'y Commerce re: *Dingli Response to Section C&E Questionnaires in the Antidumping Duty Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People Republic of China: (A-570-139)* (June 21, 2021) at 25, C.R. 119-135, P.R. 200-206, Appx2099 ("Dingli Sections C&E Response") (claiming business proprietary treatment for the bracketed freight routes).

In pre-preliminary comments, Petitioner argued that Commerce should rely on the Maersk ocean freight data for the preliminary determination, which was superior in several important respects.  In particular, the Maersk data were: (1) [

]; (2) [

]; (3) for a specified quantity of goods as opposed to a "container load" where quantity is unknown; and (4) reflective of shipments of [

] to the United States.  Petitioner Pre-Prelim. Comments at 22,

Appx4800.  Dingli argued that Commerce should rely on its data from Descartes, Freightos and Drewry to value ocean freight.  Dingli Rebuttal Pre-Prelim. Comments at 12-13, Appx4851-4852.

In the preliminary determination, Commerce relied on Dingli's data to calculate respondents' international ocean freight expenses. Prelim. SV Memo at 4, Appx21437.

In its case brief, Petitioner again argued that Commerce should use its Maersk data to value ocean freight in the final determination, because the data itself was publicly available and freely accessible, [                                        ] that Dingli used for [      ] of its U.S. shipments during the period of investigation, and reflected specific quantities of goods shipped that were similar or identical to the merchandise under consideration.  Petitioner Case Brief at 1-10, Appx6527-6536.  At the same time, Petitioner argued that Dingli's data from Descartes, Drewry and Freightos [

                        ], not specific to the merchandise under consideration, and based on unknown quantities.  *See id.*  Dingli responded in its rebuttal brief.  Dingli Rebuttal Brief at 3-27, Appx6643-6667.

In the final determination, Commerce rejected Petitioner's arguments and continued to value Dingli's ocean freight with the data from Descartes, Drewry and Freightos. *See* I&D Memo at cmt. 1, Appx1040-1047; Dingli Final Calc Memo at Attachment III, Appx6777.

## IV.  ARGUMENT

### A.  <u>Standard of Review</u>

This Court will "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).

Substantial evidence "is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence is measured by the entire record, and Commerce "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir.

1994).  "{I}t is not enough for Commerce simply to 'determine' . . . that the record does not support a particular conclusion without addressing the evidence both in support of and in derogation of that conclusion, and it is likewise not enough for Commerce to 'continue to find' something that is unsupported by a discussion of the evidence in the first instance."  *New Am. Keg v. United States*, No. 20-00008, slip. op. 21-30 at 48-49 (Ct. Int'l Trade Mar. 23, 2021).  Although Commerce need not address every single piece of evidence, "it must address significant arguments and evidence which seriously undermines its reasoning and conclusions." *Altx, Inc. v. United States*, 25 CIT 1100, 1117, 167 F. Supp. 2d 1353, 1374 (2001).

The court must determine whether the evidence and reasonable inferences from the record support the agency's findings.  *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Careful scrutiny of surrogate value choices is particularly important because "{i}f the proxy values selected prove unrepresentative, reliance on them defeats their purpose, namely, to derive a dumping margin that is as accurate as possible." *Dorbest Ltd. v. United States*, 30 CIT 1671, 1677, 462 F. Supp. 2d 1262, 1269 (2006).

Finally, Commerce "may not act arbitrarily in reaching its decision." *China First Pencil Co. v. United States*, 34 CIT 1284, 1289, 721 F. Supp. 2d 1369, 1375 (2010).  Its determinations "must have a reviewable, reasoned basis" to be affirmed.  *Bando Chem. Indus., Ltd. v. United States*, 16 CIT 133, 136, 787 F. Supp. 224, 227 (1992), *aff'd*, 26 F.3d 139 (Fed. Cir. 1994).  "{T}he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

### B.   Commerce's Rejection of Petitioner's Maersk Data to Value Respondent's Ocean Freight Was Unreasonable and Unsupported by Substantial Evidence

In antidumping proceedings involving non-market economy countries, Commerce calculates a dumping margin by comparing U.S. sales to the cost of the factors of production used to produce the subject merchandise in a surrogate market economy country.  19 U.S.C. § 1677b(c).  The purpose of this methodology is to calculate a normal value for the non-market economy producer as close as possible to the

NON-CONFIDENTIAL VERSION

value "if such prices or costs were determined by market forces."  *See*

*Tianjin Mach. Imp. & Exp. Corp. v. United States*, 16 CIT 931, 940, 806

F. Supp. 1008, 1018 (1992).  Commerce thus attempts to select

surrogate values that are "as representative of the situation in the non-

market economy as is feasible."  *Nation Ford Chem. Co. v. United*

*States*, 21 CIT 1371, 1375, 985 F. Supp. 133, 137 (1997).  In addition to

values for items such as raw material inputs, Commerce values

respondents' costs incurred for international ocean freight for its subject

exports using surrogate values.  *See, e.g.*, *China Mfrs. All., LLC v.*

*United States*, 357 F. Supp. 3d 1364, 1368 (Ct. Int'l Trade 2019).

Commerce must therefore select the best available information to value

international freight.

 As explained below, Commerce's determination as to how to value

respondents' ocean freight in the underlying investigation was not

supported by substantial evidence and thus not in accordance with law.

  1. <u>It Was Unreasonable to Conclude that the</u>
    <u>Descartes, Drewry and Freightos Data Were</u>
    <u>Representative of Respondents' Freight Costs and</u>
    <u>the Maersk Data Were Not</u>

Commerce did not have a reasoned basis or substantial evidence

to support its determination that respondents' data were reflective of

respondents' international ocean freight costs, but Petitioner's Maersk data were not.

First, the Maersk data were specific to the freight route actually used by Dingli for its shipments of subject merchandise. During the period of investigation, Dingli [

] for export price sales, and

[                    ] sales to/through its affiliate CMEC. Dingli Sections C&E Response at 25, Appx2099. Dingli's Section C U.S. sales database showed that [                    ] – [      ] – of Dingli's sales were made to/through its affiliated U.S. party CMEC, through

[       ]. *Id.* at 24, Appx2098.

The Maersk freight rate data on the record reflected shipments from Shanghai, China to the port [             ] – the U.S. port actually used by Dingli during the period of investigation for [           ] its shipments. Petitioner Aug. 2021 SV Submission at Exhibit 1, Appx8821-8828. By contrast, respondents' freight data predominantly reflect shipments from Shanghai to New York. Dingli July 2021 SV Submission at Exhibit 7A, Appx7403-7424. That data is therefore not

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

reflective of Dingli's actual shipments during the period of
investigation.

Second, the Maersk data most specifically reflected the actual
types of merchandise shipped by Dingli to the United States during the
period of investigation: "[

]."  Petitioner Aug. 2021 SV Submission at
Exhibit 1, Appx8821-8828.  By contrast, respondents' Descartes data
reflected a much broader, and less representative, pool of merchandise:
"Furniture, Machinery Parts, Bearings, Chains, Hub, Plastic Bags,
Fabric, Gate Valve, Plastic Tube, Pallet Cable, Hardwares, Drilling
Parts, Bakery Machines, TBEP, Paper Cup and Cones, Suspension
Assembly, Sofa Cover, Vanilin, NOS."  Dingli July 2021 SV Submission
at Exhibit 7A(i), Appx7409-7415.  It is simply unreasonable to conclude
that rates for shipments including plastic bags, paper cups and sofa
covers would be more representative of shipments of MAE than rates
for shipments only including machinery parts.  And Dingli's other data
sources – Drewry and Freightos – did not specify at all what types of
merchandise the shipment rates reflected.  *See id.* at Exhibits 7A(ii) and
7A(iii), Appx7416-7424.  *See also* I&D Memo at cmt. 1 (p. 10), Appx1044

("{W}e agree with the petitioner that the ocean freight rates provided in Drewry and Freightos do not specify the precise types of commodities being shipped . . . .").

As such, the evidence indicated that the Maersk data was the "best available information" on the record to value respondents' ocean freight, and Commerce erred in excluding the data.

> 2. Commerce's Determination to Exclude the Maersk Data Because It Was Not Public on the Record Was Unreasonable

Despite the significant record evidence demonstrating that the Maersk data was substantially more representative of respondents' ocean freight costs than respondents' data, Commerce refused to utilize the Maersk data in the final determination.  Commerce's primary reason for this refusal was that it prefers to select publicly available surrogate values in antidumping duty proceedings, and the Maersk ocean freight rates were treated as business proprietary information on the record.[4]  I&D Memo at cmt. 1 (pp. 9-10), Appx1043-1044.

---

[4]     Petitioner notes that the CIT has previously upheld Commerce's determination to reject Maersk freight data, where, among other reasons, the respondents in that case also had kept their freight routes confidential, requiring the petitioner to keep the Maersk data confidential.  *See Risen Energy Co. v. United States*, 477 F. Supp. 3d

The problem with this argument is that Dingli chose, improperly, to keep its freight routes confidential.  Commerce improperly allowed Dingli to do so, and therefore Petitioners were forced to treat the public Maersk data as confidential.  *See id.* at cmt. 1 (p. 9), Appx1043 (citing Petitioner July 2021 SV Submission at Exhibit 1, Appx8821-8828 ("that because Dingli did not make its shipping routes public on the record of this investigation, it was forced to make the China to the United States Maersk ocean freight rates {business proprietary information} to avoid breaching Commerce's protective order")).

As Petitioner explained to the agency, Maersk data is publicly available and freely accessible.  However, Petitioner was required to treat the specific Maersk data submitted to the record as proprietary information only because the quotes were specific to the routes reported in the respondents' Section C databases, which *the respondents* had

---

1332, 1346-1347 (Ct. Int'l Trade 2020). However, the CIT largely did not address the petitioner's arguments regarding why the Maersk data was actually publicly available, and why it was required to bracket it as confidential.  *See id.*  Regardless, as a decision by another judge on the Court, such decision is not binding here. *Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989) (holding that a judge at the CIT is not bound by another judge's decision at the CIT).

treated as business proprietary information.  Dingli Sections C&E

Response at 24-25, Exhibit C-1, Appx2098-2099, Appx2124-2141.

Petitioner and Commerce were, therefore, required to treat Maersk's

route-specific, publicly available data as proprietary, so as not to reveal

the respondents' international freight routes, which Dingli claimed were

confidential.  *Id.*  Again, Dingli's choice forced Petitioner and Commerce

to treat the otherwise-public Maersk data as confidential, and, based on

that, Commerce declined to use it.

Commerce instead blamed Petitioner, stating that "it is not clear

from the petitioner's explanation why it treated the entirety of the

Maersk ocean freight data as {business proprietary information} rather

than simply treating the shipping routes as {business proprietary

information}."  I&D Memo at cmt. 1 (p. 9), Appx1043.  However, if the

Maersk rates were revealed, it would have been possible to relatively

easily derive Dingli's proprietary shipping routes.  Thus, Petitioner was

required to bracket the data in order to comply with the agency's

Administrative Protective Order.

Petitioner should not be, in effect, punished for its adherence to

Commerce's own regulations on the protection of business proprietary

information.  And such adherence does not alter the reliability of the

Maersk's underlying data or in any way implicate the agency's

preference for public sources as opposed to proprietary sources such as,

for example, prices actually paid by a respondent to an affiliated freight

service provider, which would be impossible to reproduce and thus could

have been manipulated.  To the contrary, Maersk *is* a public source.

Indeed, Commerce has previously explained that certain international

freight data is considered public when it can be accessed by the

government online without charge.  *See, e.g.*, *Certain Stilbenic Optical

Brightening Agents From the People's Republic of China*, 76 Fed. Reg.

68,148, 68,153 (Dep't Commerce Nov. 3, 2011) (prelim. deter. of sales at

less than fair value and postponement of final deter.) (unchanged in

final deter.) ("The Descartes database is a web-based service, which

publishes the ocean freight rates of numerous carriers. We find that

this database is accessible to government agencies without charge, in

compliance with Federal Maritime Commission regulations and, thus, is

a publicly available source").  *See also Certain Steel Wheels From the

People's Republic of China*, 76 Fed. Reg. 67,703, 67,712 (Dep't

Commerce Nov. 2, 2011) (prelim. deter. of sales at less than fair value,

partial affirmative prelim. deter. of critical circumstances, and postponement of final deter.) (unchanged in final deter.).  Under this reasoning, the Maersk data is also publicly available.

As the CIT has previously explained in a similar circumstance, "to the extent that the reliability of data is the true concern behind Commerce's policy favoring publicly-available information, the nature of the Descartes data should go a long way toward assuaging Commerce's fears. . . . {P}ublished rates must be accurate to the best of the carrier's knowledge in order to comply with the Federal Maritime Commission's tariff publication regulations." *Taian Ziyang Food Co. v. United States* (*Taian 2009*), 33 CIT 828, 907, 637 F. Supp. 2d 1093, 1161 (2009).  Here too, the Maersk data were publicly published rates.  Thus, Commerce's statement in the final determination that "{p}ublicly available, published prices generally do not suffer from potential biases compared to those price quotes obtained through research by private firms" was inapposite.  I&D Memo at cmt. 1 (p. 10), Appx1044.  The Maersk data is publicly available and published, and thus does not suffer from the biases noted by the agency.

Similarly, Commerce has stated that its preference for public surrogate values is intended to "reduce the possibility of manipulation." *See Taian Ziyang Food Co. v. United States* (*Taian 2011*), 35 CIT 863, 891, 783 F. Supp. 2d 1292, 1318 (2011) (citation omitted).  Yet, in effect, Commerce's decision in fact encouraged manipulation, by permitting (if not encouraging) respondents to classify certain information as proprietary, thus forbidding the petitioner to submit public surrogate value data related to that confidential information.  This is a dangerous precedent, as it threatens to eliminate an important source of freight data at a time when container freight rates have been particularly volatile due to the COVID-19 pandemic and global supply chain issues.

As such, Commerce's determination that the Maersk data could not be used because they were not publicly available is unavailing and unreasonable.  The Court should remand to Commerce, where Commerce can request the respondents to submit their freight routes publicly and the Maersk data can then be treated as public as well, as Commerce as done in several more recent cases.

Moreover, even if Commerce's finding that the data were not publicly available was reasonable, the Maersk data should still be used

because it is more accurate. "Public availability is merely one of a number of considerations to be weighed by Commerce in evaluating the relative merits of competing sources of data. In valuing factors of production, Commerce must balance the interest in accurate information against the interest in publicly-available information, ever cognizant of its primary, overarching objective -- to calculate dumping margins as accurately as possible." *Taian 2009*, 33 CIT at 906 n.74, 637 F. Supp. 2d at 1160. *See also Allied Pac. Food (Dalian) Co. v. United States*, 30 CIT 736, 760-62, 435 F. Supp. 2d 1295, 1316-17 (2006) (explaining that the statute "does not require Commerce to use publicly available information to value the factors of production . . . {the agency} must balance the interests of transparency and verification that are served by public availability with other considerations, including the desirability of data that are as specific as possible"). By refusing to include data in the calculation that was representative of the respondents' costs of ocean freight, Commerce failed to achieve its objective of calculating dumping margins as accurately as possible.

### 3. Commerce's Other Reasons to Prefer the Descartes, Drewry and Freightos Data over the Maersk Data Are Unpersuasive

The agency briefly noted two additional reasons that it found the respondents' data to be preferable to the Maersk data, both of which are unpersuasive.

First, Commerce stated: "further, the ocean freight rates used in the *Preliminary Determination* are based on three different ocean freight sources, whereas the Maersk ocean freight data are based on only one source," citing the agency's reluctance to refer on data from "a limited number of suppliers . . . ." I&D Memo at cmt. 1 (p. 9), Appx1043. This, of course, fails to justify Commerce's determination to fully exclude the Maersk data from the calculation. If a greater number of data sources are preferable, why are four sources not better than three?

Second, Commerce stated that the Maersk data reflected price quotes, while the "Descartes data for ocean freight charges represent actual, consummated transactions." *Id.* at cmt. 1 (p. 10), Appx1044. Commerce cited no evidence on the record to establish that purported fact. It merely points to Dingli's surrogate value submission that

includes the data.  To the contrary, the Descartes data to which

Commerce cites state, on page after page: "*Estimates* of freight charges

are furnished as a convenience to the shipping public and represent

*nothing more than an approximation* of freight charges which is *not*

*binding* either on the carrier or shipper. Rates are *subject to change* and

should be verified prior to shipment."  Dingli July 2021 SV Submission

at Exhibit 7A(i), Appx7409-7415 (emphasis added).  Thus, rather than

supporting the agency's decision to exclude Maersk data, Commerce's

factual assertion in its final determination appears to directly

contradict the record and requires remand.

### 4. Commerce Further Erred by Failing to Make Adjustments to the Respondents' Data

Commerce also failed to make certain required adjustments to the

respondents' selected data.  If Commerce was insistent to keeping the

Descartes, Drewry and Freightos data in the calculation of ocean

freight, it was at least required to adjust it to more closely match the

experience of the respondents' during the period of investigation.

With regard to the Descartes data, Dingli omitted from the freight

rates provided items such as the bunker adjustment factor of $65.00,

the destination delivery charge of $485.00 that is added to the freight

charge, and local port surcharges of $66.00.  Indeed, Commerce acknowledged that "{t}he Descartes ocean freight rates are clearly identified as only ocean freight charges and are called 'Base Freight' rates."  Yet the other excluded charges, as Petitioner explained to the agency, "are all part of the price that a customer would have to pay and are separate from brokerage and handling expenses."  Petitioner Case Brief at 8, Appx6534.

In other proceedings, Commerce has specifically rejected freight rates that are simply based on the base movement charge.  In *Chlorinated Isocyanurates from the People's Republic of China*, Commerce explicitly rejected Descartes data because the Descartes price quotes were based on "a single base rate that includes no additional reference to or itemization of other associated charges related to freight costs (*e.g.*, terminal handling charges, documentation fees, surcharge rate, and bunker adjustment factor)."  Issues and Decision Memorandum accompanying *Certain Chlorinated Isocyanurates From the People's Republic of China*, 86 Fed. Reg. 22,932 (Dep't Commerce Apr. 30, 2021) (final results of antidumping duty admin. Rev., and final deter. of no shipments; 2018-2019) at cmt. 2 (p.

11).  Commerce thus found that the Descartes rates were "not fully inclusive of all freight costs."  *Id.*  Similarly, in *53-Foot Domestic Dry Containers from the People's Republic of China*, Commerce stated that charges such as bunker adjustment fees are "a component of international freight . . . that is not accounted for in the domestic brokerage and handling expenses" and that, because the fee{s} "related to international freight itself," it "needs to be accounted for in the surrogate value for ocean freight."  Issues and Decision Memorandum accompanying *Certain 53-Foot Domestic Dry Containers From the People's Replic of China*, 80 Fed. Reg. 21,209 (Dep't Commerce Apr. 17, 2015) (final affirmative countervailing duty deter.) at cmt. 2 (p. 18).  Yet Commerce improperly permitted those necessary fees to be excluded here.

In response to Petitioner's argument, Commerce stated that the expenses were properly excluded from ocean freight because they were "included in the brokerage and handling SV based on the World Bank's Doing Business in Brazil 2020 report," I&D Memo at cmt. 1 (p. 13), Appx1047, but that does not appear to be true.  The brokerage and handling SV used by Commerce in the final determination reflects only

amounts of "Border Compliance" and "Documentary Compliance." Dingli Final Calc Memo at Attachment III, Appx6777.  And, for example, the World Bank Doing Business in Brazil 2020 report does not appear to even reference a bunker adjustment factor rate.  *See* Dingli July 2021 SV Submission at Exhibit 6, Appx7143-7266.  Thus, consistent with the agency's findings in prior cases, such fees should have been included in the surrogate value for international ocean freight and were improperly excluded here.

In sum, the record shows that Commerce acted unreasonably in excluding the Maersk data to value international ocean freight, as such a decision was not supported by substantial evidence.  If the agency determined to maintain the respondents' data in the freight calculation, it erred by failing to adjust those rates to include certain necessary fees. Consequently, Commerce's determination is not supported by the record and is not in accordance with law, and the Court should remand it to the agency.

C.   <u>Commerce's Selection of Certain Surrogate Values Was Not Supported by Substantial Evidence Nor In Accordance With the Law</u>

1. <u>Legal Standard</u>

Pursuant to 19 U.S.C. § 1677b(c)(1), in valuing factors of production, Commerce must use the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate." Commerce's practice when selecting surrogate values is to select, to the extent practicable, surrogate values which are publicly available, broad market averages, contemporaneous with the period of review or closest in time to the period of review, product-specific, and tax-exclusive. Prelim. Decision Memo at 17, Appx1016. While the agency enjoys broad discretion in selecting surrogate values, *Anshan Iron & Steel Co. v. United States*, 27 CIT 1234, 1246 (2003), its decision must be reasonable given the record as a whole and it must articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice{s} made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (citation omitted).

In addition, Commerce's selection of the best available information must conform to its mandate to calculate antidumping margins as accurately as possible.  *See Home Meridian Int'l, Inc. v. United States*, 37 CIT 983, 987, 922 F. Supp. 2d 1366, 1371 (2013) (citation omitted). In this regard, selecting a surrogate value that is specific to the actual input consumed by the respondent is a key consideration in determining the "best available information."  *See Jinan Yipin Corp. v. United States*, 35 CIT 1254, 1348, 800 F. Supp. 2d 1226, 1304 (2011) (citing *Hebei Metals & Mins. Imp. & Exp. Corp. v. United States*, 29 CIT 288, 300, 366 F. Supp. 2d 1264, 1274 (2005)).

> 2. <u>Commerce's Valuation of Dingli's Minor Fabricated Steel Components Was Not Supported by Substantial Evidence and Is Contrary to Law</u>

In the final determination, Commerce valued 18 of Dingli's "minor fabricated steel components"[5] using 9 different HTS subheadings, I&D Memo at cmt. 6 (pp. 35-36), Appx1069-1070, which relate to raw steel

---

[5]    Due to the large number of inputs involved in the investigation, Commerce termed the group of inputs discussed here "minor fabricated steel components."  *See, e.g.*, I&D Memo at cmt. 6, Appx1060-1143. While they may have been smaller in size, the margin impact of the valuation of these components is substantial.

inputs (in other words, plain steel) rather than manufactured products and thus did not accurately reflect the substantial further processing that Dingli's steel components had undergone. Commerce's surrogate value selection thus resulted in significant undervaluation of the inputs and the understatement of Dingli's dumping margin.

The fundamental error Commerce committed here was by treating numerous manufactured parts and MAE components as plain steel. As such, Commerce's selected surrogate values could not possibly reflect the value of Dingli's minor fabricated steel components. For example, during the period of investigation, Dingli used board bracket plate (variable 2.16 "BOARD_BRACKET_PLATE") and board control box plate (variable 2.17 "BOARD_CONTROLBOX_PLATE") in its production of subject merchandise. Dingli Section D Response at Exhibit D-2, Appx2789-2796. Dingli reported that it sourced these inputs from companies [

]. Specifically, Dingli reported that it purchased these inputs from [

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

].ʺ   Dingli Section D Response at Exhibit D-13 (Tab D-13 2), Appx2881, Appx2888-2950; Petitioner Pre-Prelim. Comments at Exhibit 1 (Field 2.16), Appx4832-4833; Letter from Wiley Rein LLP to Sec'y Commerce, re: *Submission of Information to Rebut, Clarify or Correct Surrogate Value Information* (Sept. 7, 2021) at Exhibit 25, C.R. 317-323, P.R. 385-390, Appx4695-4761 ("Petitioner Final SV Rebuttal Filing"). The supplier [

].

Petitioner Final SV Rebuttal Filing at Exhibit 25, Appx4695-4761.  The company's own information indicates that it [

].  *See id.*

In addition, Dingli reported that its board bracket plate had been "*laser cut and bended to specified dimensions*."  Dingli Supp. Section D Response at Exhibit SD-3A, Appx3289-3321 (emphasis added). Moreover, Dingli [

].

Dingli Section D Response at Exhibit D-13 (Tab D-13 2), Appx2881,

Appx2888-2950; Letter from GDLSK to Sec'y Commerce, re: *Dingli*

*Response to Questionnaire In-Lieu of On-Site Verification: Part 2*

*(Section D) in the Antidumping Duty Investigation of Certain Mobile*

*Access Equipment and Subassemblies Thereof from the People Republic*

*of China: (A-570-139)* (Nov. 10, 2021) at Exhibit VD-3E, C.R. 391-452,

P.R. 450-461, Appx5619-5628.

Despite this unrefuted evidence that Dingli's board bracket plate

is a fabricated, further-processed steel input, which Dingli purchases in

its already processed form, Commerce valued the input with a HTS

subheading for plain hot-rolled steel: 7211.14, for Flat-Rolled High-

Strength Iron Or Non-alloy Steel Under 600 mm Wide Hot-Rolled, Not

Clad, Coated Or Plated 4.75 mm Thick Or More.  I&D Memo at cmt. 6

(p. 35), Appx1069; Dingli Final Calc Memo at Attachment III, row 17,

Appx6777.  That may have been the form in which Dingli's *supplier*

purchased the steel, before fabricating it and selling it to Dingli, but

that is not the form in which *Dingli* purchased the input.

Commerce made the same error with Dingli's other minor

fabricated steel components.  For example:

- Roller_Bracket_StPlate: [



], which Dingli itself explained had been *cut, punched, drilled and reamed with holes, welded on small shaft and painted,* but which Commerce valued using HTS 7211.14, for standard carbon hot-rolled steel (typically sold by a steel mill, [                    ]).[6] Dingli Section D Response at Exhibit D-13 (Tab D-13 2), Appx2881, Appx2888-2950; Petitioner Final SV Rebuttal Filing at Exhibit 25, Appx4695-4761; Dingli Aug. 2021 Supp. Section D Response at Exhibit SD-3A, Appx3289-3321; Dingli Final Calc Memo at Attachment III, row 139, Appx6777.

- St_Connect_Block_Plate: [




], and which Dingli itself explained had been "*cut and punched with holes,*" but which Commerce valued using HTS 7211.14, for standard carbon hot-rolled strip steel (typically sold by a steel mill, [                    ]).  Dingli Section D Response at Exhibit D-13 (Tab D-13 2), Appx2881, Appx2888-2950; Petitioner Final SV Rebuttal Filing at Exhibit 25, Appx4695-4761; Dingli Aug. 2021 Supp. Section D Response at Exhibit SD-3A, Appx3289-3321

---

[6]     Specifically, HTS 7211.14 covers "Flat-Rolled High-Strength Iron Or Non-alloy Steel Under 600 mm Wide Hot-Rolled, Not Clad, Coated Or Plated 4.75 mm Thick Or More."  I&D Memo at cmt. 6, Appx1060-1143.

(emphasis added); Dingli Final Calc Memo at Attachment III, row 180, Appx6777.

- Steering_Connect_Strod (Steering Connecting Steel Rod): [

  ], but which Commerce valued using HTS 7214.99, for plain hot-rolled bar steel.[7] Dingli Section D Response at Exhibit D-13 (Tab D-13 2), Appx2881, Appx2888-2950; Petitioner Final SV Rebuttal Filing at Exhibit 25, Appx4695-4761; Dingli Final Calc Memo at Attachment III, row 233, Appx6777.

- St_Colddrawn_Box (Cable box cold drawn steel plate): [

  ], and which Dingli itself explained had been "*cut, punched and trimmed*," but which Commerce valued using HTS 7211.23, for plain cold-rolled steel.[8] Dingli Section D Response at Exhibit D-13 (Tab D-13 2), Appx2881, Appx2888-2950; Petitioner Final SV Rebuttal Filing at Exhibit 25, Appx4695-4761; Dingli Aug. 2021 Supp. Section D Response at Exhibit SD-3A, Appx3289-3321 (emphasis added); Dingli Final Calc Memo at Attachment III, row 176, Appx6777.

---

[7]    Specifically, HTS 7214.99 captures "Bars And Rods Of Iron Or Nonalloy steel, *Not Further Worked* Than Hot-Rolled, Hot-Drawn Or Hot-Extruded, But Including Twisted After Rolling, N.E.S.O.I." I&D Memo at cmt. 6, Appx1060-1143 (emphasis added).

[8]    Specifially, HTS 7211.23 captures "Flat-Rolled Products Of Iron Or Nonalloy Steel, Width Less Than 600 mm, <u>Not Further Work{ed}</u> Than Cold-Rolled, Not Clad, Plated Or Coated, <0.25% Carbon." I&D Memo at cmt. 6, Appx1060-1143 (emphasis added).

In its final determination, Commerce simply brushed aside many of these arguments in Petitioner's case brief, stating: "{a}lthough the petitioner contends that Dingli's suppliers fabricate steel components to a degree more in-depth than what the record currently shows, we find no evidence on the record that this assertion is the case." I&D Memo at cmt. 6 (p. 38), Appx1072. But all of the facts described above constitute "evidence on the record," which Commerce failed to consider. Commerce also made statements that contradicted its own conclusion. For example, Commerce cited a letter from a Dingli supplier noting that it laser cuts, bends to specific angles (with a bending machine), and drills holes into Dingli's steel plates, *id.*, – *i.e.*, significant fabrication work. Commerce further stated that "depending on the input and specification requirements, record evidence demonstrates that Dingli's suppliers may do minimal work on a particular part, such as cutting, bending, or punching holes or in some cases, they may do more in-depth fabrication or processing." *Id.* Yet Commerce then concluded that HTS numbers reflecting raw steel – many of which specify that the steel classified within it be "not further worked" – were appropriate to value such fabricated/processed steel parts. *Id.* at cmt. 6 (p. 36), Appx1070.

This determination was unreasonable and unsupported by substantial evidence on the record.

While Petitioner recognizes that Commerce has discretion in valuing respondents' factors of production in non-market economy antidumping duty cases, *see, e.g.*, *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1320 (Fed. Cir. 2010), Commerce's discretion is not boundless. In exercising its discretion, Commerce is constrained by the purpose of the antidumping statute, which is to determine antidumping margins as accurately as possible. *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994). And, Commerce's discretion notwithstanding, "a surrogate value must be as representative of the situation in the {non-market economy} country as is feasible." *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999).

In this case, by valuing Dingli's machinery parts – processed, fabricated steel components of MAE [                        ] as raw steel, Commerce did not apply surrogate values that were as representative of Dingli's Chinese production as was feasible, and it necessarily undervalued the respondent's inputs. As such, Commerce's

valuation of Dingli's minor fabricated steel components requires remand.

### 3. Commerce's Valuation of Dingli's Drive Motor 1 Input Was Not Supported by Substantial Evidence and Is Contrary to Law

In the final determination, Commerce valued Dingli's drive motor 1 input using HTS subheading 8501.32, I&D Memo at cmt. 5, Appx1053-1060, which did not accurately reflect the nature of Dingli's input. Commerce's surrogate value selection thus resulted in significant undervaluation of the drive motor and the understatement of Dingli's dumping margin. Commerce also failed to consider and address Petitioner's key arguments on this issue.

Commerce unreasonably valued Dingli's drive motor as a motor-generator when, in fact, Dingli's motor is just that – a motor. As such, it should have been valued using the more specific HTS subheading 8501.32.10, which reflects motors only. *See, e.g.*, Petitioner Case Brief at 47, Appx6573. This error appears to have resulted from Dingli's claim that its drive motor 1, in addition to being a motor, has a side benefit of acting as a generator. Dingli Pre-Prelim. Comments at Exhibit 1, Appx21373.

Dingli initially described its drive motor 1 input as a "drive motor assembly." Dingli Section D Response at Exhibit D-2, Appx2789-2796. When further detail was requested, Dingli further explained that the input was a "{d}rive motor sub-assembly made of steel welded parts, silicon steel sheet, gear and motor; up to 3.3 KW; 24/48 voltage." Dingli Supp. Section D Response at SD-3A, Appx3289-3321. In its rebuttal surrogate value submission, Dingli then asserted:

> When accelerating or maintaining a steady speed, these drive motor assemblies receive electrical power from the battery via the motor controller and convert electrical energy into mechanical energy in order to propel the machine forwards or rearwards at the desired speed. Conversely, when either decelerating or descending a grade, the drive motor assemblies convert mechanical energy into electrical energy and become a generator as they provide electrical energy back into the battery via the motor controller. This later function is widely known in industry as regenerative braking and the principle is an essential feature underlying Drive_Motor1, which both propels and decelerates the machines manufactured by Dingli. Therefore, the Drive_Motor1 assembly is a motor cum generator as it both uses and creates electrical power.[9]

---

[9]     As further detailed in Section D, Petitioner submits that this was untimely new factual information – to which Petitioner did not have an opportunity to respond – that should have been removed from the record. However, even with this information on the record, Commerce's valuation of Dingli's drive motor 1 input was unreasonable.

Letter from GDLSK to Sec'y Commerce, re: *Dingli's Final Surrogate Value Rebuttal Comments in the Antidumping Duty Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People Republic of China: (A-570-139)* (Sept. 8, 2021) at Exhibit 2A, C.R. 286-302, P.R. 356-372, Appx3898-3901 ("Dingli Sept. 2021 Rebuttal SV Submission"). Based on this characterization, Dingli asserted that its drive motor 1 was both a motor and a generator and thus should be valued under HTS 8501.32.

However, valuation of drive motor 1 as both a motor and a generator was unreasonable. As Petitioner explained to the agency, *all* motors can function as generators in some capacity. Petitioner Case Brief at 45, Appx6571. In a scissor lift like that produced by Dingli (a type of MAE), the drive and pump motors function nearly exclusively to power the vehicle's motion, and it is thus inaccurate to label any of these devices as generators. *Id.* Drive motors power traction for approximately 99% of the duty cycle, and function as generators for less than 1% of the power. *Id.* All electric drive scissor lifts that are manufactured by domestic producers utilize electric motors in the same manner. *Id.* The purpose of the drive motor is to provide propulsion

power (*i.e.*, to motor) the driving wheels.  Indeed, Dingli's own price quotes on the record confirmed that the input in question is described as a "motor," not a generator.  Dingli Sept. 2021 Rebuttal SV Submission at Exhibit 2C, Appx3928-3931.

This primary function of the drive motor 1 as a motor is critical to the input's valuation.  In classifying goods under the HTS, one of the main guiding principles of goods classifiable under Chapter 84 or 85 (Section XVI) is that items that are composite items or have more than one function, the primary function of the item is the controlling function in terms of tariff classification.  As the CIT has explained, "{i}t is well established that where merchandise has a single or primary function and an incidental, subordinate, or secondary function, the merchandise is classifiable on the basis of its primary design, construction, or function." *F.W. Myers, Inc. v. United States*, 12 CIT 566, 574 (1988) *See also, e.g.*, *Home Depot U.S.A., Inc. v. United States*, 435 F. Supp. 3d 1311, 1339 (Ct. Int'l Trade 2020) ("The primary function of an article can be an important element of an essential character analysis and can help to inform the court's identification of the essential character of the merchandise"); *La Crosse Tech., Ltd. v. United States*, 723 F.3d 1353

(Fed. Cir. 2013).  The generative quality of Dingli's drive motor 1 is, at best, a "subordinate or secondary function," yet Commerce unreasonably ignored this classification tenet in its selection of a surrogate value.  In fact, Commerce erred by failing to even address Petitioner's "primary function" argument in its final determination, which alone justifies remand.  *See* I&D Memo at cmt. 6, Appx1060-1143; *Altx*, 25 CIT at 1374, 167 F. Supp. 2d at 1117 (Commerce "must address significant arguments and evidence which seriously undermines its reasoning and conclusions").

Finally, from a factual perspective, it was simply nonsensical for Commerce to classify Dingli's motors as a motor and as a generator at the same time.  As Petitioner explained to the agency, *see* Petitioner Case Brief at 47, Appx6573, the main purpose of a generator is to generate electricity through the consumption of a fuel (gasoline, propane, diesel, etc.) and transfer of that fuel into electrical potential, through an internal combustion engine that drives an alternator or motor.  Dingli's motors obviously do not serve this purpose.  A generator will typically contain a fuel reservoir tank, an engine, a starter assembly, spark plugs, an alternator, a fuel system (carburetor, fuel

and air filter), an electric motor, an exhaust outlet, and (depending on the model) a chassis to physically move the generator. By contrast, a motor consists of a casing, a winding, a stator, a rotor, a bearing, and a transmission shaft. As discussed above, the principal operation of a motor is to turn a shaft based on the generation of an electrical field inside of the motor's winding. Thus, while a generator will have a motor incorporated within it, a motor does not have a generator incorporated within in. Yet, again, not only did Commerce misclassify Dingli's input, it failed to address these factual arguments by Petitioner. *See* I&D Memo at cmt. 6 (p. 64), Appx1098; *Altx*, 25 CIT at 1374, 167 F. Supp. 2d at 1117.

In sum, Commerce's valuation of Dingli's drive motor 1 input was unreasonable and unsupported by substantial evidence, and Commerce erred by failing to address Petitioner's arguments on this important issue, requiring remand to the agency.

D.   Commerce Unreasonably and Arbitrarily Accepted Information Filed by Dingli that Was Untimely and Contradicted Its Own Regulations

In the final determination, Commerce declined to reject from the record certain information submitted by respondent Dingli[10] that was not timely filed and that contradicted its own regulations.   In so doing, Commerce acted unreasonably and contrary to its own regulations, with the result of unlawfully prejudicing Petitioner.

1.   Commerce Contradicted Its Own Regulations by Accepting Business Proprietary Information Regarding Surrogate Values from Dingli

Commerce's regulations define admissible "factual information" and prescribe how parties may provide such information to the agency. *See* 19 C.F.R. § 351.102(b)(21) (defining "factual information"); *id.* § 351.301 (setting time limits and parameters governing how the various categories of factual information are submitted).  With regard to

---

[10]   The specific new factual information at issue is: 1) Exhibits 1A – 1I of Dingli Sept. 2021 Rebuttal SV Submission, Appx3828-3876; (2) the entirety of Exhibits 2, 3, and 5 of Dingli Sept. 2021 Rebuttal SV Submission, Appx3897-4400, Appx4407-4412; (3) the entirety of Letter from GDLSK to Sec'y Commerce, re: *Dingli's Final Surrogate Value Rebuttal Comments (Part 2)* (Sept. 8, 2022), C.R. 304-305, P.R. 354-355, Appx4413-4418; and (4) Letter from GDLSK to Sec'y Commerce, re: *Dingli's Comments on Petitioner's Final SV Rebuttal Submission* (Sept. 10, 2021), P.R. 396, Appx21428-21433.

surrogate value rebuttal information, Commerce's regulations specify

that "{a}n interested party is permitted one opportunity to submit

*publicly available* information to rebut, clarify, or correct such factual

information." *Id.* § 351.301(c)(3)(iv) (emphasis added).

Dingli, however, submitted *business proprietary* information (in

addition to public information) in its rebuttal surrogate value

submission.  Dingli Sept. 2021 Rebuttal SV Submission at Exhibits 1-2

and Attachment 1, Appx3827-3933, Appx4418.  Particularly given the

agency's refusal to rely on Petitioner's ocean freight data due to its

claimed proprietary treatment, Commerce's acceptance of Dingli's

business proprietary rebuttal surrogate value information, in direct

contradiction of its regulations, was improper and arbitrary.

The relevant exhibits in Dingli's rebuttal surrogate value

submission contained confidential purchase order data, product quality

data, and offer solicitation information to which no member of the

public would have access.  This information was not publicly available.

Indeed, Dingli claimed and was granted business proprietary treatment

for it.  Dingli Sept. 2021 Rebuttal Surrogate Value Submission at 2,

Appx3820 (stating that the submission contained "business proprietary

information including Dingli's production and cost information," the release of which "could cause substantial harm to Dingli's competitive position"). Unlike Petitioner's bracketing of the Maersk freight data, which was obtained from a public, published source that could have been replicated and was only bracketed to protect Dingli's bracketed freight route, Dingli's rebuttal surrogate value information implicates the exact reliability, manipulation and transparency concerns underlying the requirement that information be public. *See Taian 2011*, 35 CIT at 891, 783 F. Supp. 2d at 1317.

For example, in Exhibit 2C of its surrogate value rebuttal submission, Dingli [

]. Dingli Sept. 2021 Rebuttal SV Submission at Exhibit 2C, Appx3928-3931. Dingli did not provide any context for the information, and the information reflects Dingli's internal company records and documentation. For example, there was no information on the record regarding how the [

].  As such, there was no way for either the agency or Petitioner to corroborate or impeach this information.  It is exactly this type of data, which provides ample opportunity for manipulation, that is targeted by Commerce's requirement that surrogate value rebuttal information be publicly available.

In the final determination, Commerce effectively ignored Petitioner's arguments on this issue.  *See* I&D Memo at cmt. 5 (p. 24), Appx1058.  Commerce stated briefly: "although Dingli claimed {business proprietary information} treatment for the mill test certificates placed on the record, we recognize that the only manner in which Dingli could rebut, clarify, or correct the SV information on the record was to place the certificates on the record.  We continue to find that the purpose of the mill test steel certificates placed on the record, is to support information in documents already on the record . . . ."  *Id.*  This analysis was insufficient and not responsive to Petitioner's arguments (in addition to inconsistent with Commerce's treatment of the Maersk freight data).  It does not matter whether the purpose of the

proprietary information was to support information already on the record.  The fact remains that the additional "supportive" information was proprietary, was inconsistent with Commerce's regulations, raised concerns regarding reliability and transparency, and prejudiced Petitioner.  Again, the implications for future investigations are significant.  Commerce cannot be permitted to ignore its own regulations about rebuttal surrogate value information.

"An agency must act consistently with its regulations where failure to do so would cause prejudice to an interested party."  *Guizhou Tyre Co. v. United States*, 469 F. Supp. 3d 1338, 1358 (Ct. Int'l Trade 2020).  Here, Commerce failed to act consistently with its regulations by permitting the respondent to violate the requirements set forth within them.  Commerce's failure to follow its own regulations here, by allowing the submission of proprietary rebuttal surrogate value information, prejudiced Petitioner and was unreasonable and unlawful.

2. <u>Commerce Erred by Accepting Untimely New Factual Information from Dingli</u>

As noted above, Commerce's regulations prescribe how parties may provide factual information to the agency.  *See* 19 C.F.R. § 351.102(b)(21); *id.* § 351.301 (setting time limits and parameters

governing how the various categories of factual information are submitted).  For example, specific deadlines apply to information submitted in response to questionnaires and to surrogate value information submitted to value the respondents' factors of production. *Id.* § 351.301(c)(1) and (3).

However, in this case, Dingli submitted information that was responsive to Commerce's Section D questionnaire and supplemental Section D questionnaire well past the deadlines for such responses. Section D of the agency's questionnaire to the respondents requested information about the factors of production for subject merchandise, including detailed information about respondents' production process and factors of production / raw material inputs.  *See, e.g.*, Initial DOC Questionnaire at G-2, D-2-D-3, Appx6793, Appx6852-6853.  In Dingli's response, it identified its raw material inputs.  Dingli June 2021 Section D Response at Exhibit D-2, Appx2789-2796.  In its response to a supplemental Section D questionnaire, Commerce requested, and Dingli provided, further description of its raw material inputs, including "detailed information regarding the nature, form, degree of fabrication or processing, grade, and size of each input," with parts catalogues and

product schematics.  Dingli Aug. 2021 Supp. Section D Response at 4, Appx3048.  This information is necessary for Petitioner, among other things, to be able to provide accurate surrogate value information.

Weeks later, Dingli submitted additional information describing its critical raw material inputs, in new ways and with additional details.  For example, in its rebuttal surrogate value submission filed more than three weeks after the deadline for its supplemental Section D questionnaire response, Dingli submitted mill test certificates more specifically defining several of its steel inputs, information (including an affidavit from its engineer) that provided new information on the nature of its drive motor inputs, and new factual information redefining its cast iron billet inputs.  Dingli Sept. 2021 Rebuttal SV Submission at Exhibits 1A-3D, Appx3828-4400.  This information constituted was "detailed information regarding the nature, form, degree of fabrication or processing, grade, and size of each input" and, as such, was requested in Commerce's *questionnaire*.  *See* Dingli Supp. Section D Response at 4, Appx3048.  If Dingli wanted to submit this information for the record, it was required to do so in its Section D questionnaire response or, at

the latest, in its supplemental Section D questionnaire response, pursuant to 19 C.F.R. § 351.301(c)(1).

Because this information was instead filed late, Commerce's regulations directed the agency to reject the information. 19 C.F.R. § 351.301(c)(1) ("The Secretary *will* reject any untimely filed or unsolicited questionnaire response and provide, to the extent practicable, written notice stating the reasons for rejection") (emphasis added). As noted above, "{a}n agency must act consistently with its regulations where failure to do so would cause prejudice to an interested party." *Guizhou Tyre*, 469 F. Supp. 3d at 1358. Here, Commerce acted inconsistently with its regulations by permitting the respondent to violate the deadlines set forth within them. This had the result of prejudicing Petitioner, who did not have an opportunity to respond to the untimely filed factual information.

As noted, respondents are required to define their factors of production in their initial questionnaire responses. That timing is critical, because this information establishes the basis on which all parties submit surrogate value information for Commerce to consider in valuing those inputs. Permitting Dingli to redefine its factors of

production at such a late stage in the investigation was prejudicial, as
Petitioner then had no opportunity to submit rebuttal information or
potentially to submit new surrogate values specific to the inputs as
newly defined.  When a respondent continually redefines its factors of
production late into the investigation as Dingli did here, it significantly
hinders the petitioner's ability to submit a complete and accurate roster
of surrogate values for consideration.  Indeed, with no time remaining
to submit any additional surrogate value information, Dingli further
defined its inputs in its rebuttal surrogate value submission such that
Petitioner had *no* opportunity to respond to Dingli's revised definitions
with new information.  Commerce's acceptance of Dingli's information
thus effectively denied Petitioner the ability to provide complete
surrogate value information for the agency's consideration.

The CIT has acknowledged that "Commerce generally has
discretion to create its own rules of procedure related to the
development of the record in order to meet its statutory deadlines."
*Huzhou Muyun Wood Co. v. United States*, 279 F. Supp. 3d 1215, 1224
(Ct. Int'l Trade 2017) (citing *PSC VSMO-Avisma Corp. v. United States*,
688 F.3d 751, 760-61 (Fed. Cir. 2012)).  However, "Commerce's exercise

of its discretion . . . must be reasonable in light of Commerce's statutory obligations." *Huzhou Muyun*, 279 F. Supp. 3d at 1224 (citing *Sterling Fed. Sys. Inc. v. Goldin*, 16 F.3d 1177, 1182 (Fed. Cir. 1994)). Specifically, "Commerce is also obligated to calculate antidumping duty margins as accurately as possible," and "{p}roviding interested parties a meaningful ability to comment on the information in the record, and to submit rebuttal information, if necessary . . . support{s} that endeavor." *Id.* at 1225. Commerce failed to act consistently with those obligations in this case.

Thus, Commerce's determination in the underlying investigation to accept onto the record new factual information defining Dingli's factors of production – information that should have been provided in response to questionnaires – was unreasonable, inconsistent with its regulations and prejudicial to Petitioner, and the Court should remand this determination to Commerce.

As such, the Court should remand Commerce's acceptance of Dingli's untimely and business proprietary new factual information. In addition, should Commerce determine on remand to reject the relevant factual information, Commerce should also reconsider all other

determinations (including surrogate value selections) that were supported in whole or in part with such rejected factual information.[11]

## V.  CONCLUSION

For the foregoing reasons, we respectfully request that the Court remand the final determination in the underlying investigation to Commerce consistent with the arguments made in this brief.

Respectfully submitted,

*/s/ Timothy C. Brightbill*
Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel for the Coalition of American Manufacturers of Mobile Access Equipment*

Dated:  November 8, 2022

---

[11]    For example, if Commerce determines on remand that Exhibits 2A-2D (further defining Dingli's drive motor 1 input) should be rejected, Commerce must reexamine its selection of Dingli's drive motor 1 input surrogate value based on the evidence remaining on the record.

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Memorandum in Support of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 11,538 words.

<u>*/s/ Timothy C. Brightbill*</u>
(Signature of Attorney)

<u>Timothy C. Brightbill</u>
(Name of Attorney)

<u>*Coalition of American Manufacturers*
*of Mobile Access Equipment*</u>
(Representative Of)

<u>November 8, 2022</u>
(Date)