**Slip Op. 24-66**

# UNITED STATES
# COURT OF INTERNATIONAL TRADE

### Court No. 22-00152

COALITION OF AMERICAN MANUFACTURERS
OF MOBILE ACCESS EQUIPMENT,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

ZHEJIANG DINGLI MACHINERY CO., LTD.,

*Defendant-Intervenor*.

Before: M. Miller Baker, Judge

## OPINION

[The court sustains in part the agency's final determination and remands in part for further proceedings.]

Dated: May 31, 2024

*Timothy C. Brightbill* and *Laura El-Sabaawi*, Wiley Rein LLP, Washington, DC, on the papers for Plaintiff.

*Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; *Tara K. Hogan*, Assistant Director; and *Kristin E. Olson*, Trial Attorney, Commercial Litigation Branch, Civil

Division, U.S. Department of Justice, Washington, DC, on the papers for Defendant. Of counsel for Defendant was *Brishailah Brown*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, Washington, DC.

*Ned H. Marshak*, *Dharmendra N. Choudhary*, and *Jordan C. Kahn*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, New York, NY, and Washington, DC, on the papers for Defendant-Intervenor.

*Baker*, Judge: In this case, domestic manufacturers challenge the Department of Commerce's final determination following an antidumping investigation into "mobile access equipment"—peripatetic lifting machines such as one might see used in large home improvement stores or factories—imported from China. For reasons explained below, the court sustains the agency's determination in part and remands for reconsideration of certain issues.

I

At the request of the Coalition of American Manufacturers of Mobile Access Equipment, Appx1176, Commerce opened an antidumping investigation covering the second half of 2020. 86 Fed. Reg. 15,922; Appx6778–6784. The Department selected as mandatory respondents the two largest Chinese exporters or producers during the period of investigation, Lingong Group Jinan Heavy Machinery Co., Ltd. (Jinan), and

Zhejiang Dingli Machinery Co., Ltd. (Dingli). Appx1001–1002.

Commerce found that dumping was occurring. Appx1035. After the International Trade Commission determined that these imports injure domestic industry, the former issued an antidumping order. 87 Fed. Reg. 22,190, 22,190.

## II

Invoking jurisdiction conferred by 28 U.S.C. § 1581(c), the Coalition sued under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i) to challenge Commerce's final determination. *See* ECF 8. After Dingli intervened on the side of the government, ECF 16, the Coalition moved for judgment on the agency record. ECF 55. The government (ECF 59) and the company (ECF 53) opposed. The Coalition replied. ECF 57. The court decides the motion on the papers.

In § 1516a(a)(2) actions, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). That is, the question is not whether the court would have reached the same conclusion on the same record—rather, it is whether the administrative record as a whole permits Commerce's conclusion.

Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up); *see also SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 382 (Fed. Cir. 1983) (if Commerce makes a choice between "two fairly conflicting views," the court may not substitute its judgment even if its view would have been different "had the matter been before it *de novo*") (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

## III

### A

The Coalition challenges the Department's surrogate value selections for Dingli's ocean-shipping costs, steel inputs, and drive motor inputs.[1] The court considers each in turn.

---

[1] Because China has a nonmarket economy, in antidumping cases Commerce calculates the costs of producing goods in that country and shipping them to the United States

1

Commerce requested facts and figures to value Dingli's cost of shipping cargo by sea from China to the United States. The company submitted data from Descartes, Freightos, and Drewry, Appx6908–6913, Appx7402–7465, while the Coalition provided information from Maersk, Appx3718–3732. The Department observed that in weighing this evidence, its policy is to select values that are "*publicly available*, product-specific, representative of a broad market average, . . . and contemporaneous with the [period of investigation] under consideration." Appx1042 (emphasis in original). Weighing those factors, it selected the Descartes, Freightos, and Drewry material. Appx1042–1047.

Commerce provided several reasons for this choice. Most importantly, the Coalition designated its Maersk data as business proprietary information (BPI), Appx1043, but Dingli placed information from three sources on the public record, Appx1042–1043.[2]

---

using analogous market-economy costs. *See Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1339 (CIT 2020) (describing this process).

[2] In response to the Coalition's claim that it was forced to designate its Maersk data as proprietary because Dingli had so designated its shipping routes, the Department explained that it wasn't clear why the former "treated the entirety of the Maersk ocean freight data as BPI rather than simply [so] treating the shipping routes." Appx1043. Had

Moreover, the Coalition's Maersk data were based on "price quotes . . ., which are not data [the Department] prefers to use." Appx1044. In contrast, "the Descartes data for ocean freight charges represent actual, consummated transactions." *Id*. Further, and again unlike the Descartes, Freightos, and Drewry price quotes, the Maersk data were not "[p]ublicly available, published prices," Appx1043–1044, meaning they could not be obtained except through a private inquiry.

Addressing the Coalition's contention that the Maersk data were more specific, i.e., they more closely resembled Dingli's ocean freight costs, the Department opined that the Descartes, Drewry, and Freightos information reflected routes used by both Dingli and Jinan, Appx1043, and that freight carried by both Maersk and Descartes covered "a broad class of merchandise that do[es] not specifically pertain to mobile access equipment or subassemblies thereof." Appx1044. Although the Drewry and Freightos data did "not specify the precise types of commodities being shipped," *id*., their rates appeared to be "representative of, and equally applicable to, all types of merchandise," *id*.

---

the Coalition only treated the routes "as BPI, the ocean freight rates could have been considered because there is no presumption that the shipping routes referenced in Maersk's ocean freight rates are necessarily identical to those used by respondents." *Id*.

The Coalition attacks these findings on several grounds:

### *The Agency Preference for Public Data*

The Coalition argues that the Department improperly accepted Dingli's designation of its ocean freight routes as proprietary. ECF 55, at 27. According to the Coalition, this forced it to similarly denominate its Maersk shipping data to avoid breaching the agency's protective order. *Id*. at 27–28.

The government does not defend Commerce's acceptance of Dingli's BPI designation of ocean freight routes, instead arguing that regardless of whether the company erred in so doing, the agency prefers using public rather than confidential data. *See* ECF 59, at 20. For its part, the company does not justify characterizing its sea lanes as proprietary. Rather, it contends—echoing the Department's reasoning, *see above* note 2—that the Coalition only has itself to blame for erroneously denominating the Maersk shipping *rates* as BPI when Dingli only so labeled its *routes*. ECF 53, at 5.

As neither the government nor Dingli defends the latter's BPI designation of its routes, the court remands for the agency to explain why such characterization was permissible under 19 C.F.R. § 351.105(c). Insofar as the Department finds that the company erred, the former must direct the latter to withdraw

its designation. *See* 19 U.S.C. § 1677f(b)(2).[3] If Dingli declines, then the agency must return the submission and allow the company to proffer "other material." *Id*.

On the other hand, if the Department finds that Dingli properly designated its shipping routes as proprietary, Commerce must then advise the Coalition that its corresponding designation of "ocean freight rates" was—as explained in the agency's final determination—improper and ask for an "explanation." *Id*. If the agency is unpersuaded, it must allow the Coalition to withdraw the designation. *See id*. What the agency cannot do under § 1677f(b)(2) is what it did here—*accept* an interested party's BPI designation, only later characterize that denomination as erroneous, and then cite that error as a reason *not* to use the information because of the agency's preference for using publicly available data.[4] Commerce has a statutory

---

[3] The agency must also provide a corresponding opportunity for the Coalition to do the same as to the Maersk data.

[4] The Coalition does not contest Commerce's "view" that the agency "preference for publicly available information [is] one that requires information to be placed *on the public record*." *Jinko Solar Imp. & Exp. Co. v. United States*, Consol. Ct. No. 22-00219, Slip Op. 24-53, at 34–35, 2024 WL 2078453, at *13 (CIT May 1, 2024) (emphasis added). Far from it—as explained below in connection with certain BPI rebuttal material submitted by Dingli, the Coalition seeks to *enforce* that preference. *Cf. id*. at 36–37, 2024 WL 2078453, at *14 (remanding for the agency to "consider or

duty to allow an interested party to cure unwarranted BPI designations. *See* 19 U.S.C. § 1677b(f)(2).

### *Price Quotes Versus Consummated Transactions*

The Coalition argues that Commerce cited no evidence to support its finding that Dingli's Descartes data reflect consummated transactions, unlike the Maersk price quotes. *See* ECF 55, at 33–34. But Dingli

---

explain how publicly available information on the confidential record fails to promote accuracy, fairness, and predictability").

The court observes that it appears the agency's preference for non-BPI data is based on the interplay between three regulations. One authorizes interested parties to submit "factual information"—defined by another as "[p]ublicly available information," 19 C.F.R. § 351.102(b)(21)(iii)—"to value factors of production under § 351.408(c)," i.e., in non-market-economy country cases, *id.* § 351.301(c)(3)(i). A third, in turn, explains that "[t]here are four categories of information in an antidumping or countervailing duty proceeding," *id.* § 351.105(a), two of which are "public" and "[BPI]," *id.* The former "is information that may be made available to the public, whereas [the latter] may be disclosed (if at all) only to authorized applicants under an [administrative protective order]." *Id.* Putting all this together, the Department requires interested parties to submit non-BPI data to value the factors of production in non-market-economy cases. The court reserves for another day whether that requirement conflicts with the statute, which directs—subject to an exception not relevant here—that in such cases the Department's valuation of those factors "shall be based on *the best available information . . . .*" 19 U.S.C. § 1677b(c)(1) (emphasis added).

points to a certain code (the "Transshipment Local Instructions") which it asserts "establishes that all Descartes price data represent actual transactions on those dates." ECF 53, at 8. The Coalition's failure to confront this point on reply leads the court to infer that substantial evidence supports the Department's finding, even if the agency did not cite that evidence.

## Are the Maersk Data Public?

The Coalition objects to Commerce's characterization of the Maersk information as not "[p]ublicly available, published prices." ECF 55, at 29–30 (quoting Appx1044). Neither the government nor Dingli seriously disputes this point, with the latter reduced to complaining that the Coalition failed "to establish how Maersk data can be publicly accessed." ECF 53, at 5–6. On reply, however, the Coalition observes that the Department "has acknowledged the public nature of the Maersk data many times" and cites two such examples. *See* ECF 57, at 6–7.[5] In view of Commerce's past pronouncements bearing directly on the question, the court remands so the agency can reconcile its finding with those previous determinations.

---

[5] Consistent with Commerce's previous acknowledgements, the court observes that the Maersk website provides shipping price quotes to the public. *See* https://www.maersk.com/onlinequote/standard.

*Specificity*

The Coalition argues its Maersk data were more reflective of Dingli's ocean freight costs than the Descartes, Freightos, and Drewry information used by Commerce. According to the Coalition, the former data were limited to the sea route (to the U.S. West Coast) Dingli used for the overwhelming majority of its exports, *see* ECF 54, at 24, but the latter included routes for *both* the U.S. East and West Coasts, *see* ECF 55, at 24–25.

Commerce explained that the Descartes, Freightos, and Drewry data replicated not only Dingli's routes, but Jinan's as well, Appx1043—a non sequitur, because the Department was calculating just the former's ocean shipping costs. The government repeats that error, ECF 59, at 24, and further observes that Dingli shipped to both coasts, *id.* at 22–23, but does not acknowledge that the company's exports to the East Coast were de minimis. Dingli, to its credit, acknowledges that fact, *see* ECF 53, at 3–4, but argues that there is no administrative or judicial precedent requiring the agency to weigh the "number of shipments for each port combination used," *id.*

The lack of precedent, however, is not dispositive because the relevant question is whether Commerce's specificity determination is reasonable. And "what is reasonable depends on the context." *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985)). Dingli ships

almost all its lifting machines by sea to the U.S. West Coast, with only a small fraction going to the Port of New York.[6] Elementary geography dictates that, all other things being equal, it's cheaper to transport cargo by sea from China to the former rather than the latter.[7] At least as to Dingli's ocean shipping routes, the Department's failure to recognize that the Descartes, Freightos, and Drewry data are less specific than the Maersk information is unreasonable.

The Coalition's second specificity challenge is to Commerce's finding that the Descartes, Freightos, and Drewry rates were for cargo essentially comparable to the goods used for the Maersk price quotes. The Coalition argues that the Department's decision is unreasonable because its Maersk data involved machinery parts, *see* ECF 54, at 25, that more closely resembled Dingli's lifting equipment than the array of both mechanical parts and non-machinery goods reflected in

---

[6] Notwithstanding that Dingli's shipping routes are purportedly BPI, its public brief discloses that the company "actually used the Shanghai–New York route." *See* ECF 53, at 3.

[7] For example, it's 5398 nautical miles from Shanghai to San Francisco, to take one West Coast port. A vessel steaming at 10 knots would take 22 days to transit that distance. From Shanghai to New York at the same speed would take 44 days via the Panama Canal (10,582 nautical miles), 51 days via the Suez Canal (12,370 nautical miles), 60 days via the Cape of Good Hope (14,468 nautical miles), and 69 days via the Strait of Magellan (16,684 nautical miles). *See* https://Sea-Distances.org.

the Descartes data, including furniture, plastic bags, fabric, paper cups, and sofa covers, *see* ECF 55, at 25.

The court disagrees. Commerce weighed this evidence and explained that neither the Coalition's data nor Dingli's "specifically pertain[ed] to mobile access equipment or subassemblies thereof." Appx1043. Both covered a "broad class of merchandise" that included various mechanical parts. *Id.* That Dingli's data included non-mechanical products had to be weighed against the fact that *neither* data set replicated the mobile access equipment. Unlike the Department's treatment of shipping routes, there's nothing unreasonable in how the agency weighed the competing considerations as to cargo specificity.

\* \* \*

Commerce's choice of data to value Dingli's ocean freight costs is a mixed bag. Certain aspects of that decision are supported by substantial evidence, but others are not. It's not clear the agency would have reached the same result had it properly analyzed the record, so the court remands for reconsideration.

*Adjustments to Descartes Data (If Selected Again)*

Finally, Commerce rejected the Coalition's assertion that "Dingli improperly excluded certain charges in its reported Descartes freight data when shipping goods to the United States." Appx1046. The Department found that the Descartes rates "are clearly

identified as only ocean freight charges," which "indicates that the rates do not cover non-ocean freight charges, such as brokerage and handling fees, U.S. inland freight charges (*i.e.*, destination delivery charges)[,] or truck-freight services." Appx1046–1047. It added that those sorts of costs "are included in the brokerage and handling [surrogate value]" based on World Bank data. Appx1047.

The Coalition now raises a contingent argument that, if Commerce justifiably selected Dingli's proffered shipping data, the Department needed to "adjust it" by adding certain fees to the rate so that it would more closely match the company's "experience" during the period of investigation. ECF 55, at 34. The Coalition asserts that Dingli omitted certain charges that a customer would have to pay when using Descartes to transport goods by sea—including a "bunker adjustment factor," a "destination delivery charge," and local port fees—and contends that those charges should have been part of the freight rates. *Id.* at 34–35. It also argues that the "other excluded charges . . . 'are all part of the price that a customer would have to pay and are separate from brokerage and handling expenses.'" *Id.* at 35 (quoting Appx6534). Lastly, it maintains that Commerce's finding that the World Bank data included these amounts in brokerage and handling expenses "does not appear to be true" because the "brokerage and handling" information the Department used had a narrow scope. *Id.* at 36–37 (citing Appx7143–7266, Appx6777(e)–6777(f)).

Neither the agency discussion nor the parties' arguments allow the court to resolve this issue. Insofar as the court can discern from the pages cited by Commerce and the parties in their briefing, it's impossible to tell what the "brokerage and handling" fees included or excluded. The Department cited its surrogate value memorandum prepared before the preliminary determination. *See* Appx1047 (citing Appx21434–21446). The text of that memorandum contains no explanation of this issue, and the attachment simply contains three different line items for "brokerage & handling" with no detail about what those amounts represent, although it does break out "truck freight" separately from "ocean freight." Appx21446(e)–21446(f). The Coalition notes that the page in the record showing what the "brokerage and handling" fees include mentions only two components—"border compliance" and "documentary compliance." ECF 55, at 37 (citing, *inter alia*, Appx7146). The government essentially just repeats the agency conclusion that the "brokerage and handling" value includes the charges, *see* ECF 59, at 27–28 (citing Appx1047, Appx21438), and says the data "satisfied Commerce's surrogate value criteria," *id.* at 28–29. Dingli contends the Coalition did not show how the various charges are *not* part of "brokerage and handling." *See* ECF 53, at 8–9.

The problem the court has, for purposes of substantial evidence review, is that the Department's decision appears to assume what the brokerage and handling

surrogate value includes.[8] The court has "no basis for thinking that [the assumption] is a matter of common knowledge or otherwise can be presumed true without evidence." *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1374 (Fed. Cir. 2016); *OCP S.A. v. United States*, 658 F. Supp. 3d 1297, 1324 (CIT 2023) (noting that agency discretion "does not include the ability to assume facts for which there is insufficient evidence"); *cf. DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1367 (Fed. Cir. 2006) ("[A]ssumptions about common sense cannot *substitute* for evidence thereof . . . .") (emphasis in original). The court therefore remands so the agency—insofar as it once again chooses to use the Descartes information—can point to the specific data in the record on which it relies to support its conclusion about what costs the brokerage and handling surrogate value includes.

2

The Coalition challenges Commerce's use of certain Harmonized Tariff Schedule (HTS) subheadings to value "minor fabricated steel components."[9] It argues

---

[8] The court has no difficulty accepting the agency's conclusion about inland freight charges and truck freight because, as noted above, the cited pages break those out separately from ocean freight.

[9] As used by the Department and the parties, this term refers to 18 various inputs. *See* Appx1071; ECF 55, at 39 &

that these subheadings "relate to raw steel inputs (in other words, plain steel) rather than manufactured products and thus did not accurately reflect the substantial further processing that Dingli's steel components had undergone," such that the Department undervalued the inputs and understated the company's dumping margin. ECF 55, at 39–40.

Commerce described the Coalition's theory as being that Dingli's inputs are "fabricated steel components that the company's suppliers have already fabricated into components for incorporation into finished mobile access equipment goods." Appx1070. The Coalition contended that the appropriate HTS subheading for such components was therefore 7326.90.90. Appx1070–1071. Dingli responded that it purchased "minimally processed steel plates/sheet" from its suppliers such that the "essential nature" did not change from the primary steel material. Appx1071. The Department agreed with the company and said the Coalition "did not provide any evidence to support its allegation" that the former misrepresented the degree of processing its suppliers performed, while Dingli produced letters from various suppliers describing production of the components. Appx1072.

The Coalition now argues that Commerce erred by treating "numerous manufactured parts and [mobile

---

n.5; ECF 59, at 29 & n.3 (citing Appx21446 for a full list of what the 18 inputs are).

access equipment] components as plain steel." ECF 55, at 40. It asserts that the evidence shows that Dingli's suppliers sold components, not plain steel, *id.* at 40–41, and that the Department erred by valuing all the inputs using HTS subheadings for plain steel fresh from a mill, *id.* at 43–44. It also emphasizes that the agency contradicted itself by acknowledging record evidence that Dingli's suppliers "may do minimal work on a particular part . . . or in some cases, they may do more in-depth fabrication or processing," *id.* at 45 (quoting Appx1072), but still concluding that HTS subheadings for raw steel that state that the steel must be "not further worked" are somehow appropriate, *id.* (citing Appx1070).

Rather than respond to the Coalition's arguments, the government asserts that Commerce's conclusion was reasonable because it considered and accepted Dingli's explanation. ECF 59, at 29. Acknowledging that "in certain instances, [Dingli's suppliers] may do some minimal work on certain fabricated steel components," *id.* at 30 (citing Appx3289–3321),[10] the government argues that these letters are "part of the information that Commerce considered" and, apparently, contends that fact makes the Department's conclusion

---

[10] *See also id.* (quoting a supplier letter stating, "We cut the plates using a laser cutting machine to specific shapes and sizes. We also bend some plates to specific angles using a bending machine to meet the drawing specifications. As required, holes are drilled into several pieces of steel plates.") (quoting Appx1072, Appx3416).

reasonable, *id.* at 30–31 (citing Appx1071), although it offers nothing to support that implicit conclusion.

For its part, Dingli echoes Commerce's conclusion that the Coalition failed to provide any evidence. ECF 53, at 21 (quoting Appx1072). But the company block-quotes the following sentence (among others) from the final determination:

> Although the letters from certain suppliers provided on the record *indicate a wide range of fabrication that may be involved*, depending on the input and specification requirements, record evidence demonstrates that Dingli's suppliers may do minimal work on a particular part, such as cutting, bending, or punching holes[,] *or in some cases, they may do more in-depth fabrication or processing*.

ECF 53, at 21 (quoting Appx1072) (emphasis added). With agency findings like that, the Coalition didn't *need* any evidence.

Commerce's determination is internally inconsistent. While it said the Coalition failed to substantiate its allegation that Dingli's suppliers provide fabricated components rather than plate steel, it turned around and acknowledged the company's evidence that some suppliers "do more in-depth fabrication or processing." Appx1072. These contradictions mean that the Department failed to support its conclusion

with substantial evidence, so the court remands for reconsideration.

3

Two of Dingli's inputs are devices called "Drive Motor 1" and "Drive Motor 2." Before Commerce, the company offered evidence that because the latter acts solely as a motor, while the former does that *and* also functions as a generator via regenerative breaking, the two devices are not interchangeable. Appx1099. The Department accepted that characterization and used different HTS subheadings to value each input. *See* Appx1102 ("[B]ecause HTS subheading 8501.32 encompasses both of the applicable HTS eight-digit subheadings (8501.32.10—electric motor and 8501.32.20—generator), . . . HTS subheading 8501.32 is the most representative and accurate [average unit value] for this input.").

The Coalition asserts that Commerce's valuation is not supported by substantial evidence, and is contrary to law, because it overlooked that Drive Motor 1's primary function is as a motor. ECF 55, at 49 (citing Appx6571). The Coalition considers that fact essential because, when classifying "items that are composite items or have more than one function, the primary function of the items is the controlling function in terms of tariff classification." *Id.* at 50.

Although both the Coalition and the government assert various arguments based on tariff classification

principles and the General Rules of Interpretation,[11] they overlook the essential point—persuasively made by Dingli, *see* ECF 53, at 18–19—that this is an *anti-dumping* case, "*not* a customs classification case." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1379 (Fed. Cir. 2015) (emphasis in original). Consequently, rather than "engage in a classification analysis to determine which [HTS] subheading contained [the relevant input]," *id.*, Commerce "was required to determine which of the competing subheadings constituted the best available information for valuing [that] input," *id.* In classification cases, Customs and Border Protection's role is to determine how to classify merchandise for tariff purposes, while in antidumping cases the Department's job is to determine the duty needed to remedy the effects of less-than-fair-value sales of foreign merchandise in the United States. *SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216, 1224 (Fed. Cir. 2018).

To be sure, the Coalition—while not addressing Dingli's citation of *SolarWorld*—claims that its point is not that the Department and Customs are "bound by the same objectives." ECF 57, at 29. Rather, it argues, "the primary function of Dingli's merchandise

---

[11] "The proper classification of merchandise entering the United States is directed by the General Rules of Interpretation . . . of the [Harmonized Tariff Schedule of the United States] and the Additional United States Rules of Interpretation." *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998).

was a valid and important consideration regarding the appropriate [surrogate value] selection. Commerce was required to address this argument, and it failed to do so." *Id.* at 29–30. The court disagrees given the Federal Circuit's clear holding that the Department need not follow classification principles.

The agency explained that the record shows that Drive Motors 1 and 2 are different devices with different functionality—a point no party disputes—and concluded that (1) it is therefore appropriate to use different HTS subheadings to value them and (2) 8501.32 encompasses subheadings covering both (undisputed) functions. Appx1102. The Coalition in effect asks the court to reweigh findings. "This court's duty," however, "is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that [it] chose the best available information." *Downhole Pipe*, 776 F.3d at 1379 (cleaned up). Here, a reasonable mind could so conclude that the Department chose the best available information.

B

Commerce's regulations govern when interested parties may submit certain "factual information"[12] during an administrative proceeding. *See* 19 C.F.R.

---

[12] The applicable definition of "factual information" varies with the relevant context. *See* 19 C.F.R. § 351.102(b)(21)(i)–(v).

§ 351.301. The Coalition challenges the Department's acceptance of certain such information from Dingli.[13]

1

In an antidumping investigation, an interested party may submit "factual information to value factors of production under § 351.408(c)."[14] 19 C.F.R. § 351.301(c)(3)(i); *see also id.* § 351.102(b)(21)(iii) (defining "factual information" as including "[p]ublicly available information submitted to value factors [of production] under § 351.408(c)"). Other interested parties in turn may tender "publicly available information to rebut, clarify, or correct such factual information submitted pursuant to § 351.408(c)." *Id.* § 351.301(c)(3)(iv) (emphasis added); *see also above* note 4 (explaining the regulatory basis for Commerce's preference for using non-BPI information to value the factors of production in nonmarket-economy cases).

Dingli submitted BPI mill test certificates (Appx3827–3933) to rebut data submitted by the Coalition to value certain factors of production. Over the

---

[13] The Coalition's opening brief identifies the universe of Dingli's factual submissions ostensibly at issue, *see* ECF 55, at 53 n.10, but then only addresses certain of those submissions in its ensuing discussion. The court finds the Coalition's argument waived as to submissions not so addressed.

[14] Section 351.408(c) in turn addresses valuation of factors of production for use in calculating normal value of imports from nonmarket-economy countries.

latter's objection that to do so violated § 351.301(c)(3)(iv), Commerce accepted the submission, reasoning that it was the only means available to the company to "rebut, clarify, or correct the [surrogate value] information on the record." Appx1058. Moreover, its "purpose" was "to support information . . . already on the record." *Id*. The Department added that the material did not prejudice the Coalition. Appx1058–1059. Not only was the latter able to use it, Appx1058, it did not "provide any pre-verification comments" objecting to the submission, Appx1059.

The Coalition argues that neither reason offered by the Department for accepting Dingli's non-public rebuttal information excuses disregarding the regulation's plain text. ECF 55, at 56–57. As to prejudice, it asserts that "there was no way for either the agency or [the Coalition] to corroborate or impeach this information." *Id*. at 56.

Although the government doesn't dispute that Commerce's acceptance of Dingli's BPI submission violated the Department's regulation, it argues that the agency provided a reasonable justification for doing so. ECF 59, at 44–45. It also emphasizes Commerce's finding that the Coalition was not prejudiced. *Id*. at 46.

For its part, Dingli asserts that the regulation does not expressly bar the submission of proprietary material, ECF 53, at 28, and that in any event the Coalition suffered no prejudice because it challenged the company's mill test certificates in subsequent briefing, *id*.

at 27. Dingli emphasizes—echoing the Department's finding—that by neglecting to provide pre-verification comments, the Coalition "forewent an opportunity to have Commerce assess any concerns" regarding the company's BPI certificates. *Id.* at 27–28.

As the government implicitly concedes, Commerce plainly violated § 351.301(c)(3)(iv) by accepting Dingli's non-public surrogate value rebuttal information.[15] Even so, that's not the end of the inquiry. The "general principle" is "that '[i]t is always within the discretion of . . . an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it.'" *PAM S.p.A. v. United*

---

[15] The company's contention that the Department permissibly accepted proprietary material because the regulation does not expressly *prohibit* it is wrong. Under the familiar *expressio unius* canon, § 351.301(c)(3)(iv)'s authorization for an interested party to submit "publicly available information" for rebuttal purposes necessarily implies that *other* defined types of information, such as BPI, are excluded. *See* 19 C.F.R. § 351.105(a) ("There are four categories of information in an antidumping or countervailing duty proceeding: public, business proprietary, privileged, and classified."). As Scalia and Garner explain, "[w]e encounter" this canon "frequently in our daily lives. When a car dealer promises a low financing rate to 'purchasers with good credit,' it is entirely clear that the rate is *not* available to purchasers with spotty credit." *Reading Law: The Interpretation of Legal Texts* 107 (2012) (emphasis in original).

*States*, 463 F.3d 1345, 1348 (Fed. Cir. 2006) (brackets in original) (quoting *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538–39 (1970)). If an agency articulates a reasonable justification for departing from its regulation, such a departure "is only rescindable 'upon a showing of substantial prejudice.'" *Id.* (quoting *Am. Farm Lines*, 397 U.S. at 539).

Commerce provided a reasonable explanation for accepting Dingli's proprietary data here—it was the only means available to the company to "rebut, clarify, or correct the [surrogate value] information on the record," Appx1058, and "the purpose" of the submission was "to support information . . . already on the record," *id.*[16] And although the Coalition claims that it suffered prejudice because it could not corroborate Dingli's information, the Department found that the former raised no such concern in its pre-verification comments.[17] Appx1059. Because this finding is not disputed, the court holds that the Coalition has not shown substantial prejudice from the agency's acceptance of Dingli's proprietary material.

---

[16] Indeed, the Department was arguably *required* under 19 U.S.C. § 1677b(c)(1) to consider the company's BPI rebuttal submission. *See above note* 4.

[17] Presumably the Coalition could have requested that Commerce test Dingli's proprietary submission at verification.

2

Along with submitting certain BPI mill test certificates to rebut data submitted by the Coalition as described above, the company also submitted new information on its drive motor and cast-iron billet inputs. Appx3934–4400.[18] The Coalition contends that all these submissions were untimely—and thus should have been rejected by the agency—because they were responsive to Commerce's questionnaire.[19] ECF 55, at 59–60.

The problem with this argument is that the Coalition does not dispute—apart from the BPI aspect discussed above—Commerce's determination that Dingli properly and timely submitted its data as to mill test certificates, drive motor inputs, and cast-iron billets as rebuttal information *under § 351.301(c)(3)(iv)*. Indeed, as detailed above, the Coalition argues—and the court agrees, as also explained above—that § 351.301(c)(3)(iv)'s prohibition on submitting proprietary material applies here.

---

[18] The Coalition's brief identifies the asserted untimely information about mill test certificates, drive motor inputs, and iron billet inputs as encompassing Appx3828–4400. ECF 55, at 59.

[19] The 30-day deadline for Dingli to answer the questionnaire, *see* 19 C.F.R. § 351.301(c)(1)(i), had long since passed by the time the company submitted its surrogate value rebuttal containing the factual information in question.

The Coalition can't have it both ways—either § 351.301(c)(3)(iv) applies (as it contends for purposes of objecting to the portion of Dingli's rebuttal presentation that was BPI), or it doesn't. If the regulation applies, then it doesn't matter whether the company's timely submission was *also* responsive to Commerce's questionnaire (and therefore untimely for purposes of that document). The Coalition offers no reason why information responsive to a Commerce questionnaire is disqualified from presentation under § 351.301(c)(3)(iv).[20] The court accordingly concludes that the Department properly accepted Dingli's timely submission under that regulation to rebut data submitted by the Coalition.

*    *    *

The court sustains in part Commerce's decision and remands in part for further proceedings consistent with this opinion.

Dated: May 31, 2024          /s/ *M. Miller Baker*
      New York, NY          M. Miller Baker, Judge

---

[20] The court assumes, but does not decide, that Dingli's rebuttal information was so responsive.