A-570-139
Remand – Slip Op. 24-66
Investigation
**Public Document**
E&C/OI:  Team

*Coalition of American Manufacturers of Mobile Access Equipment v. United States*,
**Consolidated Court No. 22-00152, Slip Op. 24-66 (CIT May 31, 2024)**
**Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT or the Court) in *Coalition of American Manufacturers of Mobile Access Equipment v. United States*.[1]  These final results of redetermination concern Commerce's final affirmative determination in the investigation of sales at less than fair value (LTFV) of certain mobile access equipment and subassemblies thereof (MAE) from the People's Republic of China (China) covering the period of investigation (POI) July 1, 2020, through December 31, 2020.[2]

In the *Remand Order*, the Court remanded for {Commerce} to reconsider its determination as to ocean freight and …its valuation of 'minor fabricated steel components' (as that term was used in the final determination)."[3]  In light of the Court's opinion and order, on remand, Commerce reconsidered its determination and relied on Maersk data for ocean freight and Brazilian per-unit import average unit value (AUV) for Harmonized System (HS)

---

[1] *See Coal. Of Am. Mfrs. Of Mobile Access Equip. v. United States*, Court No. 22-00152, Slip Op. 24-66 (CIT May 31, 2024) (*Remand Opinion*); *see Coal. Of Am. Mfrs. Of Mobile Access Equip. v. United States*, Court No. 22-00152, ECF No. 70 (CIT May 31, 2024) (*Remand Order*).
[2] *See Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value,* 87 FR 9576 (February 22, 2022) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Order* at 1-3.

subheading 8431.20.90 for certain minor fabricated steel components.  As a result of these final

results of redetermination, the weighted-average dumping margin and adjusted cash deposit rate

for mandatory respondent Zhejiang Dingli Machinery Co., Ltd. (Dingli) increased from 31.70

percent to 37.20 percent and 31.54 percent to 37.04 percent, respectively.  Additionally, because

the rate for non-selected separate rate companies was based, in part, on Dingli's weighted-

average dumping margin, the weighted-average dumping margin and adjusted cash deposit rate

for the non-selected separate rate companies increased from 51.83 percent to 56.50 percent and

51.66 percent to 56.33 percent, respectively.

Because certain weighted-average dumping margins are different from those in the *Final

Determination*, we intend to issue a *Timken* notice with the amended final determination should

the Court sustain these final results of redetermination.[4]

## II.    BACKGROUND

On February 26, 2021, the Coalition of American Manufacturers of Mobile Access

Equipment (the petitioner), the members of which are domestic producers of MAE, filed with

Commerce an antidumping petition concerning imports of MAE from China.[5]  On March 18,

2021, Commerce initiated an LFTV investigation of MAE from China.[6]  Because China is a non-

market economy, Commerce will typically calculate normal value using factors of production

based on available information.[7]  However, where available information is inadequate to

---

[4] *See Timken Co. v. United States*, 893 F.2d 337, 341 (Fed. Cir. 1990) ("If the CIT (or this court) renders a decision which is not in harmony with Commerce's determination, then Commerce must publish notice of the decision within ten days of issuance."); *see also Diamond Sawblades Manufacturers Coalition v. United States*, 626 F.3d 1374, 1381 (Fed. Cir. 2010).
[5] *See* Petitioner's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties," dated February 26, 2021.
[6] *See Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China:  Initiation of Less-Than-Fair-Value Investigation*, 86 FR 15922 (March 25, 2021).
[7] *See* section 773(c)(1) of the Tariff Act of 1930, as amended (the Act).

determine normal value, then surrogate values for factors of production will be used.[8] Accordingly, Commerce invited parties to comment on surrogate value selection.[9] In turn, parties submitted multiple surrogate values on the record, and relevant here, to value ocean freight costs and costs for minor fabricated steel components.[10]

For ocean freight costs, the petitioner submitted the Maersk data, which it argued were the best available information to value Dingli's ocean freight costs because the Maersk data were identical to the shipping route Dingli used for nearly all of its shipments and was specific to the quantity of goods in each shipment.[11] Dingli submitted data from Descartes, Drewry, and Freightos, arguing that those were the only publicly available information, given that the Maersk data were designated business proprietary information (BPI).[12]

For certain minor fabricated steel components, Dingli provided the name of the input, field description, classification, recommended HS subheading, HS description, a detailed description of the input, degree of fabrication or processing done to the input by suppliers, and its rationale of why its recommended HS subheading was appropriate.[13] The petitioner, on the other hand, argued that data from HS subheading 7326.90.90 is the more appropriate dataset to value Dingli's "minor fabricated steel" inputs.[14]

---

[8] *See* section 773(c)(2) of the Act.
[9] *See* Commerce's Letter, "Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information," dated June 15, 2021.
[10] *See* Dingli's Letters, "Dingli's First Surrogate Value Comments," dated July 26, 2021 (Dingli's SV Comments 1); and "Dingli's Final Surrogate Value Comments," dated August 25, 2021 (Dingli's SV Comments 2); *see also* Petitioner's Letters, "Submission of Surrogate Values," July 26, 2021; and "Submission of Surrogate Values (Ocean Freight)," dated July 26, 2021.
[11] *See* Petitioner's Letter, "Case Brief," dated November 24, 2021 (Petitioner's Case Brief).
[12] *See* Dingli's Letter, "Case Brief," dated January 19, 2021.
[13] *See* Dingli's Letter, "Pre-Preliminary Comments," dated September 8, 2021, at Exhibit 1.
[14] *See* Petitioner's Case Brief at 26.

On February 22, 2022, Commerce issued its final affirmative determination in the LTFV investigation of MAE from China.[15] For ocean freight costs, in the *Final Determination*, Commerce used surrogate ocean freight data obtained from Descartes, Drewry, and Freightos to value ocean freight cost from China to the United States for Dingli.[16]  Commerce declined to consider surrogate ocean freight data from Maersk, proffered by the petitioner, because the data were:  (1) designated, entirely, as BPI, stemming from Dingli designating its ocean shipping routes as BPI; (2) based on price quotes and, thus, not publicly available, published prices; and (3) not more specific to Dingli's ocean freight costs (*i.e.*, shipping routes and type of freight carried) than the alternative data on the record.[17]  For minor fabricated steel parts, Commerce used HS codes related to base steel inputs to value Dingli's reported inputs.[18]

The petitioner contested the *Final Determination* before the Court, and the Court remanded the *Final Determination* for Commerce to reconsider its preference of Descartes, Drewry, and Freightos ocean freight data to the ocean freight data from Maersk, as well as to reconsider its use of Dingli's proffered HS codes to value minor fabricates steel components.[19]

For ocean freight costs, first, the Court remanded for Commerce to explain why Dingli's BPI designation of its ocean shipping routes was a characterization permissible under 19 CFR 351.105(c).[20]  The Court instructed Commerce to direct Dingli, if Commerce finds that Dingli erred in designating the information in question as BPI, to withdraw its designation and to provide the petitioner a corresponding opportunity to redesignate the Maersk data.[21] Alternatively, the Court remanded for Commerce to advise the petitioner that its corresponding

---

[15] *See Final Determination*, 87 FR at 9576 and accompanying IDM.
[16] *See Final Determination* IDM at Comment 1.
[17] *Id*.
[18] *Id.* at Comment 6.
[19] *See generally Remand Order* at 1-3.
[20] *See Remand Opinion* at 7; and *Remand Order* at 1.
[21] *See Remand Opinion* at 7-8; and *Remand Order* at 1-2.

designation of ocean freight rates[22] was improper, ask for an explanation and, if not persuaded, to allow the petitioner to withdraw the designation.[23] Second, the Court remanded for Commerce to reconcile its finding that the Maersk data are not publicly available when Commerce's prior case decisions found that the Maersk data are publicly available.[24] Third, observing that Dingli shipped virtually all MAE by sea to the U.S. west coast (with only a small fraction going to the Port of New York) the Court found that, concerning Dingli's shipping routes, Commerce's failure to recognize that the Descartes, Freightos, and Drewry data are less specific than the Maersk information is unreasonable.[25] Thus, the Court remanded for Commerce to explain why the shipping route reflected in the Descartes, Freightos, and Drewry information is more specific to Dingli's routes than the Maersk data.[26] Fourth, the Court remanded for Commerce to identify the specific data in the record that support its conclusion of certain incidental ocean freight charges being included in the brokerage and handling surrogate value, insofar as it again chooses to use the Descartes ocean freight data on remand.[27]

For minor fabricated steel components, the Court remanded the *Final Determination* for Commerce to reconsider its valuation of "minor fabricated steel components" and to resolve the internal inconsistencies in its original analysis.[28] Specifically, the Court remanded for Commerce to explain how it can find that some of Dingli's suppliers "do more in-depth fabrication or processing," while nonetheless finding that there is no evidence on the record demonstrating that the suppliers provided fabricated steel components, instead of raw steel.[29]

---

[22] Commerce respectfully believes that Item 2.c of the *Remand Order* inadvertently refers to "ocean freight routes," but should have referred to "ocean freight rates."
[23] *See Remand Opinion* at 8; and *Remand Order* at 2.
[24] *See Remand Opinion* at 10; and *Remand Order* at 2.
[25] *See Remand Opinion* at 12.
[26] *See Remand Order* at 2.
[27] *See Remand Opinion* at 13-16; and *Remand Order* at 2.
[28] *See Remand Opinion* at 16-20; and *Remand Order* at 2-3.
[29] *See Remand Opinion* at 18; and *Remand Order* at 2-3.

Commerce released its draft results of redetermination on September 3, 2024.[30]  The petitioner and Dingli submitted timely comments on the Draft Results on September 30, 2024.[31]

## III.    ANALYSIS

*Ocean Freight*

Commerce normally will consider the "{d}istribution costs (**but not channels of distribution**)," "{p}rices of individual sales, likely sales, or other offers (**but not components of prices, such as transportation**, if based on published schedules …," and "{n}ames of particular customers, distributors, or suppliers (**but not destination of sale**…)" to be BPI, if so designated by the submitter, as well as "{a}ny other specific business information the release of which to the public would cause substantial harm to the competitive position of the submitter."[32] Further, Commerce typically requires the designation of the names of ports of export and import as public information, because ocean freight surrogate values are reliant on shipping quotes and pricing information reflective of the respondent's ocean routes.[33]  In light of 19 CFR 351.105(c), which defines more narrowly what constitutes specific BPI, 19 CFR 351.102(b)(21), which requires publicly available information to value ocean freight be reflective of a respondent's specific ocean routes, and the Court's remand instructions,[34] Commerce finds that Dingli's BPI designation of its ocean shipping routes may have been an impermissible characterization under 19 CFR 351.105(c).  Accordingly, on June 12, 2024, Commerce directed Dingli to withdraw its

---

[30] *See* Draft Results of Redetermination Pursuant to Court Remand, *Coalition of American Manufacturers of Mobile Access Equipment v. United States*, Court No. 22-00152, Slip Op. 24-66 (CIT May 31, 2024), dated September 3, 2024 (Draft Results).

[31] *See* Petitioner's Letter, "Comments on Draft Remand Determination Pursuant to Court Remand," dated September 30, 2024 (Petitioner's Draft Remand Comments), and Dingli's Letter, "Dingli's Comments pursuant to Draft Remand Redetermination," dated September 30, 2024 (Dingli's Draft Remand Comments).

[32] *See* 19 CFR 351.105(c)(3), (5), (6), and (11), respectively (emphasis added).

[33] *See* 19 CFR 351.102(b)(21)(iii) (defining factual information as, *inter alia*, "publicly available information submitted to value factors {of production} under {19 CFR 351.408(c)}").

[34] *See Remand Order* at 2.

designation of the names of ports of export and import as BPI, or explain how the public release of such information would cause substantial harm to Dingli's competitive position.[35]  On June 14, 2024, Dingli provided redesignated information as public information, without objection.[36] Further, because Dingli publicly disclosed its ocean shipping routes, on July 3, 2024, consistent with the Court's remand instructions,[37] Commerce provided the petitioner a corresponding opportunity to redesignate, as public information in its entirety, the Maersk information originally provided in Exhibit 1 of its August 25, 2021, submission.[38]  On July 5, 2024, the petitioner provided redesignated ocean freight surrogate value information.[39]

In light of the Court's *Remand Order*, Commerce confirms, consistent with many of its past pronouncements, that the data from Maersk constitute publicly available ocean freight prices and are reliable.[40]  Commerce evaluated all publicly available information concerning the valuation of ocean freight costs for Dingli.  Dingli reported two ocean freight routes associated with period shipments of MAE from China to the United States during the POI:  Shanghai port to New York, NY port, and Shanghai port to Oakland, CA port.  As the Court observed in the

---

[35] *See* Commerce's Letter, BPI Designation, dated June 12, 2024.

[36] *See* Dingli's Letter, "Dingli's Response to Commerce's June 12 letter," dated June 14, 2024.

[37] *See Remand Order* at 2.

[38] *See* Commerce's Letter, "Request to Redesignate BPI," dated July 3, 2024.

[39] *See* Petitioner's Letter, "Resubmission of Surrogate Value Information," dated July 5, 2024 (Ocean SV).

[40] *See, e.g., Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 FR 58871 (October 25, 2021), and accompanying IDM at Comment 10 ("… the underlying Maersk rate are publicly available") (*Crystalline Silicon Photovoltaic Cells*); *Certain Metal Lockers and Parts Thereof from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 FR 9123 (February 9, 2024), and accompanying IDM at Comment 4 ("… we note that the underlying data source, Maersk freight rate quotes, is a publicly-available source and is a common source of ocean freight SV information accepted by Commerce"); *Pure Magnesium from the People's Republic of China:  Final Results of 2004-2005 Antidumping Duty Administrative Review*, 71 FR 61019 (October 17, 2006), and accompanying IDM at Comment 6 ("… we calculated the surrogate value for international freight by using a generally publicly available price quote from Maersk Sealand …"); and *Saccharin from the People's Republic of China:  Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 71 FR 7515 (February 13, 2006), and accompanying IDM at Comment 8 ("Maersk data are obtained from a public source that has often been used by {Commerce} in non-market-economy cases to value ocean freight.  Additionally, {Commerce} has consistently found rate quotes from Maersk to be reliable").

*Remand Opinion*, the predominant majority of Dingli's POI sales of MAE were shipped from China to the U.S. West Coast, specifically from Shanghai to Oakland, CA.[41]  The only source of information on the record that matches exactly Dingli's predominant ocean shipping route for the POI shipments of MAE is that from Maersk (offering information limited strictly to the Shanghai to Oakland, CA route).

As the record shows, the ocean freight information from Descartes, proffered by Dingli and used in the *Final Determination*, is limited to the Shanghai to New York route;[42] the ocean freight information from Drewry, proffered by Dingli and used, in part, in the *Final Determination*,[43] is limited to the following ocean freight routes:  Shanghai to New York, NY, Shanghai to Los Angeles, CA, and Shanghai to Houston, TX,[44] and the ocean freight information from Freightos proffered by Dingli and used in the *Final Determination*, is limited to the following ocean freight routes:  Ningbo to New York, NY, and Shanghai to Long Beach, CA.[45] Accordingly, concerning Dingli's POI shipments of MAE from China to the United States, the Maersk data offer ocean freight rate information most specific and identical to the ocean freight route that Dingli utilized for the vast preponderance of POI transactions.

Commerce's practice is to use ocean freight surrogate value data that are specific to the port combinations a respondent uses for its shipments of merchandise under consideration.[46]  As

---

[41] *See Remand Opinion* at 11-12.

[42] *See* Dingli's SV Comments 1 at Exhibits 7A and 7A(i).  Dingli provided the same information in its subsequent SV comments.  *See* Dingli's SV Comments 2 at Exhibit 7.

[43] In the *Final Determination*, Commerce used information from Drewry with respect to the Shanghai to New York route only.  *See* Memorandum, "Final Analysis Memorandum for Zhejiang Dingli Machinery Co., Ltd.," dated February 14, 2022 (Final Analysis Memorandum), at Attachment 3 – Final Surrogate Value Spreadsheet, Microsoft Excel Tab "Ocean Freight"; and Dingli's SV Comments 1 at Exhibits 7A and 7A(iii).

[44] *See* Dingli's SV Comments 1 at Exhibits 7A and 7A(iii).

[45] *Id.* at Exhibits 7A and 7A(ii).

[46] *See, e.g.*, *Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2019-2020*, 86 FR 73731 (December 28, 2021) (*Activated Carbon from China*), and accompanying IDM at Comment 8; and *Notice of Final Determination of Sales at Less Than Fair Value:  Polyvinyl Alcohol from the People's Republic of China*, 68 FR 47538 (August 11, 2003), and accompanying IDM at Comment 11.

explained above, the Maersk data afford the exact specificity with respect to the shipping route predominantly utilized by Dingli during the POI. Therefore, based on the specificity concerning the ocean freight routes reported by Dingli, Commerce finds that the Maersk information offers a choice superior to the Descartes, Freightos, and Drewry information and is the best available information on the record to value ocean freight.

The Maersk data also offer ocean freight data that includes all incidental ocean freight charges. Specifically, the Maersk data provide ocean freight rate detail, which demonstrates that in addition to basic ocean freight, other charges, *i.e.*, export service fees, terminal handling service fees (origin), documentation fees, bunker adjustment factor fees, low sulfur surcharge, and terminal handling service fees (destination) are included in the rate.[47] Conversely, the Descartes, Freightos, and Drewry information offer no accompanying rate details (or accompanying information explaining the methodology for price data collection and reporting).[48] Therefore, it cannot be determined whether the ocean freight rates in the Descartes, Freightos, and Drewry information include all, or any, ocean freight incidental charges. On this basis, for purposes of these draft results of redetermination, Commerce used the per-kilogram ocean freight surrogate value of U.S. dollar 0.3143 from the Maersk data.[49]

*Minor Fabricated Components*

In the *Final Determination*, Commerce valued 16 various inputs categorized as "minor fabricated components,"[50] using multiple HS subheadings from three HS chapters, 7208, 7211,

---

[47] *See* Ocean SV at Attachment.
[48] *See* Dingli's SV Comments 1 at Exhibits 7A, 7A(i), 7A(ii), and 7A(iii).
[49] *See* Ocean SV at Attachment.
[50] The FOP names of these inputs are: BOARD_BRACKET_PLATE, BOARD_CONTROLBOX_PLATE, BOARD_HANGING_PLATE, CHARGER_WINDOW_STPLATE, CYLINDER_HOLDER_STPLATE, RETRACTOR_STPLATE, ROLLER_BRACKET_STPLATE, SAFETY_ARM_STPLATE, ST_COLDDRAWN_BOX, ST_CONNECT_BLOCK_PLATE, ST_POTHOLE_PLATE, STEERING_CONNECT_STROD, SWITCH_COVER_STPLATE, SWITCH_STPLATE_BELOW_4_75, SWITCH_STPLATE_OVER_4_75, and A_ST_ADJUST_PLATE.

and 7214, which capture flat-rolled non-alloy steel, whether hot-rolled or cold-rolled, and hot-rolled non-alloy bars and rods, respectively.[51]  Commerce is not reexamining the valuation of two minor fabricated components, A_CLAMP_BASE_STPLATE and A_ST_COVER, because these inputs were valued using HS subheadings 7308.90.90 and 7216.99, "Oth.structures and their parts, of fused iron/iron/steel" and "Angles, Shapes And Sections Iron Or Nonalloy Steel {Not Elsewhere Specified or Included}," respectively, which are HS subheadings that do not capture base steel materials.

In the *Final Determination*, Commerce explained that the petitioner failed to provide evidence to support its claim that Dingli's suppliers are not supplying steel plate to Dingli but, instead, are supplying fabricated components from purchased steel plate.[52]  Commerce further elaborated that:

> Although the letters from certain suppliers provided on the record indicate a wide range of fabrication that may be involved, depending on the input and specification requirements, record evidence demonstrates that Dingli's suppliers may do minimal work on a particular part, such as cutting, bending, or punching holes or in some cases, they may do more in-depth fabrication or processing.[53]

As the Court held, however, "{w}ith agency findings like that, {petitioner} didn't *need* any evidence."[54]  The Court added that "Commerce's determination is internally inconsistent:"

> While it said the Coalition failed to substantiate its allegation that Dingli's suppliers provide fabricated components rather than plate steel, it turned around and acknowledged the company's evidence that some suppliers "do more in-depth fabrication or processing."[55]

Commerce concedes the internal inconsistency highlighted by the Court.  Indeed, Commerce is required to resolve whether 16 inputs which Commerce valued using raw steel categories under

---

[51] *See Final Determination* IDM at Comment 6.
[52] *Id*.
[53] *Id*.
[54] *See Remand Opinion* at 19 (emphasis in original).
[55] *Id*.

HS chapters 7208, 7211, and 7214 were products purchased by Dingli as minor fabricated steel parts or raw steel, *i.e.*, plate, sheet, bar, rod.

The record shows that these inputs are fabricated by Dingli's input suppliers, to varying degrees, based on Dingli's specified dimensional requirements, for eventual incorporation into Dingli's MAE machines.  Thus, Dingli purchased minor fabricates steel components as opposed to raw steel.  Indeed, Dingli confirms that fabrication/processing activities were performed by Dingli's input suppliers:

> Dingli never claimed that it purchased plates or sheets from suppliers and did in-house processing.  Instead, Dingli's submissions are unambiguous:  it purchased minimally processed steel plates / sheets from its suppliers.  As such, the essential nature of those minor fabricated steel components did not materially change from those of the primary steel materials (plates, sheets).[56]

Moreover, before the agency,[57] Dingli relied on evidence summarizing "the degree of fabrication or processing" for all sourced material inputs of production.[58]  Record evidence concerning the degree of fabrication or processing for the inputs in question shows that, to varying degrees, these inputs get laser cut, or punched out, or sawed to specific dimensions, sometimes followed by punching or drilling of holes and/or bending and, less rare, welding.[59]  Once a set of fabrication processes dedicated to a specific outcome is performed on the purchased primary steel, that primary steel is no longer usable to customers other than Dingli and is only usable for incorporation into Dingli's MAE machines.  Therefore, because Dingli sourced minor inputs that were fabricated, to a certain degree, we find Dingli's proposition to value these inputs with HS categories that reflect base steel material, based on its characterization that minor fabricated steel

---

[56] *See* Dingli's Letter, "Dingli's Redacted Rebuttal Brief," dated January 19, 2022 (Dingli's Case Brief), at 46-49.
[57] *Id.*
[58] *See* Dingli's Letter, "Dingli Response to Supplemental Questionnaire: Part II (Section D)," dated August 16, 2021, at Exhibit SD-3A.
[59] *Id.*

components retain the "the essential nature" of primary steel from which they are made, unfounded.

Simply put, the fabrication of a component, in itself, naturally transforms the "essential nature" of primary steel material.[60]  Although a fabricated part and its input (*i.e.*, primary steel material) are both steel material, a fabricated part achieves a further value added to it by a physical transformation, thus making it useful only for a specific purpose and unusable as a raw input.  Accordingly, we find that Commerce erred in the *Final Determination* by valuing the minor fabricated parts in question using HS categories for primary steel.[61]  For this reason, on remand, we are using HS subheading 8431.20.90 – "Parts suitable for use solely or principally with machinery of heading 8427, other than Fork lift trucks," because the inputs in question are fabricated parts destined for incorporation into Dingli's MAE machines.

Still, we agree with Dingli that we have expressly held that inputs which are parts of products specifically named in the HS (*e.g.*, parts of MAE) should be valued using the HS subheading for those parts (*e.g.*, 8431.20.90), rather than an HS heading defined solely by the part's material composition, steel (*e.g.*, 7326.90) as petitioner suggests.[62]  Indeed, the petitioner's preferred HS category, 7326.90.90, is not appropriate for valuing the inputs in question when the HS category 8431.20.90 serves as the most precise HS subheading for valuing said inputs and, thus, provides the best available information.  Instead, we agree with Dingli that:

> The 6-digit {HS} 7326.90 for "Other articles of iron or steel: Other," is the ultimate residual basket category for iron or steel articles that are not specifically covered in any other subheadings of Chapter 73 (articles of steel) or Section V (which includes Chapter 84).  {HS} 7326.90.90 covers an even narrower category of residual steel

---

[60] *See* Dingli's Case Brief at 46-47.
[61] *See Final Determination* IDM at 37-41.
[62] *See* Dingli's Case Brief at 32-33 (citing *Certain Vertical Shaft Engines Between 99cc and Up to 225cc, and Parts Thereof, from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 86 FR 14077-80 (March 12, 2021), and accompanying IDM at Comment 4).

articles "Other articles of iron or steel: Other: Other".  The Explanatory Notes to Heading 7326 confirms its extremely narrow scope: "*{t}his heading covers all iron or steel articles {…}* **other than** *articles included in the preceding headings of this Chapter or covered by Note 1 to Section XV or included in Chapter 82 or 83 or* **more specifically covered elsewhere** *in the Nomenclature."*  In other words, when goods are classified under other tariff subheadings in Chapter 73 or Section XV (such as, Chapter 84) those more precise {HS} subheadings are used for valuing steel inputs.  The residual basket {HS} 7326.90.90 is used only as a last resort and in the rare instance when it is not possible to classify the steel inputs anywhere else.[63]

Accordingly, for these final results of redetermination, Commerce used the Brazilian per-unit import AUV for HS category 8431.20.90 of 28.8059 Real,[64] to value 16 minor fabricated steel parts, which were originally valued using HS categories for raw steel.

<u>Separate Rate for Non-Selected Companies</u>

Because the rate for non-selected separate rate companies was based, in part, on Dingli's weighted-average dumping margin,[65] we have recalculated the weighted-average dumping margin for these companies for purposes of these final results of redetermination.[66]

## IV.    INTERESTED PARTY COMMENTS

**Comment 1:  Ocean Freight**

The following is a verbatim summary of argument submitted by the petitioner.[67]  For further details, *see* Petitioner's Draft Remand Comments at 3.

*Petitioner's Comments*

Additionally, pursuant to the court's opinion and remand order, {Commerce} has properly revised its surrogate values for ocean freight to rely only on the Maersk data provided by the Coalition.  In this remand proceeding, {Commerce} asked Dingli to {redesignate} certain shipping route information a public, which permitted the Coalition to redesignate its Maersk ocean freight data as public

---

[63] *Id.* at 32 (citing Dingli's SV Comments 1 at Exhibit 13 (emphases in original)).
[64] *See* Final Analysis Memorandum at Attachment 3 – Final Surrogate Value Spreadsheet. Microsoft Excel Tab "Master."
[65] *See Final Determination*, 87 FR at 9576.
[66] For details of the rate calculation, *see* memorandum, "Draft Results of Redetermination - Separate Rate for Non-Selected Companies," dated concurrently with these draft results of redetermination.
[67] *See* Petitioner's Draft Remand Comments.

information.  This allowed {Commerce} to appropriately find that the public Maersk data was superior to the limited Descartes and Freightos data previously submitted by Dingli.  Thus, in its draft remand results, {Commerce} correctly relied exclusively on the Maersk data to calculate ocean freight surrogate values.  The agency should reach the same decision in its final remand determination.

The following is a verbatim summary of argument submitted by Dingli.[68]  For further details, *see* Dingli's Draft Remand Comments at 2.

*Dingli's Comments*

For valuing ocean freight, the Draft Remand errs by selecting Maersk data and rejecting data from Descartes, Drewry, and Freightos.  Maersk price quotes are not reliable; by contrast, Descartes, Drewry, and Freightos report reliable, transaction-based prices.  The Draft Remand's twin rationales used to prefer Maersk data, route specificity and incidental ocean freight charges, are unsupported by both record evidence and {Commerce} precedent.  Finally, the Draft Remand improperly fails to weigh the Maersk SV against the other CV choices based on the key criterion of container weight.

**Commerce's Position**: We disagree with Dingli that the Maersk data is unreliable and, therefore, continue to find that the Maersk data is the best available information to value ocean freight because it:  (1) is the most specific and identical to the ocean freight route that Dingli utilized for the vast preponderance of POI transactions; and (2) offers ocean freight data that includes all incidental ocean freight charges, unlike the Descartes, Drewry, and Freightos data subsets for which inclusion of ocean freight incidental charges cannot be determined.  Thus, the Maersk data is the best available information to value ocean freight.

Dingli argues that because unlike the Descartes, Drewry, and Freightos data, the Maersk data reports ocean freight based on price quotes rather than actual transactions consummated, the Maersk data is unreliable and not the best information available.  Dingli cites to the disclaimer in the Maersk data to establish that the Maersk data are price quotes and cites to this Court's opinion to establish that the Descartes, Drewry, and Freightos data generally represent

---

[68] *See* Dingli's Draft Remand Comments.

consummated transactions. Dingli misinterprets the issue that Commerce must resolve on remand.

Pursuant to the Court's directive, Commerce is required to resolve whether the shipping route reflected in the Descartes, Drewery, and Freightos information is *more specific* to Dingli's routes than the Maersk data.[69] To that extent, Dingli's citation to this Court's opinion is misplaced because the cited language only demonstrates that this Court affirmed Commerce's finding that the Descartes data reflected consummated transactions, and that the Maersk data reflect price quotes.[70] Indeed, the Court's opinion addresses specificity of ocean freight surrogate values separately.[71] As explained above, and in following the Court's instructions, we continue to find that the Maersk data is the best available information to value ocean freight because the Maersk data is the only source of information on the record that offers information limited strictly to the Shanghai to Oakland, CA route, Dingli's predominant ocean shipping route for its shipments of MAE during the POI. Conversely, the Descartes, Drewry, and Freightos data subsets do not include ocean freight rates for Shanghai to Oakland, CA. Therefore, Commerce continues to find that the Maersk data is the most product-specific data to value ocean freight.

Further, even if the Descartes, Drewry, and Freightos data represent consummated transactions, there are circumstances in which "it is reasonable for Commerce to choose price quotes over broad data sets."[72] In other words, the fact that the Maersk data reflects price quotes and the Descartes data represent consummated transactions is not dispositive as to the reliability

---

[69] *See Remand Order* at 1-2.
[70] *See Remand Opinion* at 9-10.
[71] *Id.* at 11-13 (specificity).
[72] *See Jiangsu Zhongji Lamination Materials Co., (HK) v. United States*, 2023 WL 3863201, *10, 2023 Ct. Intl. Trade LEXIS 88, *23-24 (CIT 2023) (*Jiangsu*) (citing *Changzhou Trina Solar Energy Co. v. United States*, 492 F. Supp. 3d 1322, 1330 (CIT 2021) (*Changzhou*)).

of the Maersk data in valuing ocean freight.  For example, in *Jiangsu,* Commerce evaluated whether to use Maersk data over Descartes and Xeneta ocean freight data was reasonable considering that Descartes ocean freight data was based on actual transactions, and Xeneta's ocean freight data was proprietary.[73]  Commerce, analyzing data considerations in Policy Bulletin 4.1, weighted, *inter alia*, public availability more heavily in finding that Maersk data was the best available information.  The CIT affirmed Commerce's decision to use Maersk freight data over Descartes' and Xeneta's freight data reasoning that "{b}ecause weighting each aspect of the Policy Bulletin is within Commerce's discretion, {Commerce} met the burden required by the substantial evidence standard."[74]

Similarly, in the underlying administrative review of *Jinko Solar*, Commerce determined that Maersk data was the best available information because it was product-specific in that the Maersk source data reflected rates for the same type of containers and the same size of shipments for electronic goods, which Commerce considered to be comparable to subject merchandise.[75] The CIT affirmed Commerce's determination explaining that, "{a}though the Maersk data does not reflect actual transactions, it is reasonably discernable that Commerce viewed the data as reliable.  In particular, Commerce explains that it relied upon Maersk data in part because the data reflected daily reported prices at which international ocean freight is offered by Maersk."[76]

Taken together, *Jiangsu* and *Jinko Solar* give Commerce the discretion to weigh data considerations on a case-by-case basis and based on the record evidence to determine what data is the best available information for determining surrogate values such that the fact that the

---

[73] *Id.*

[74] *Id*.  The CIT agreed with Commerce that the Descartes source ocean freight data included shipping data from China, which is an impermissible source for surrogate valuation.

[75] *See Jinko Solar Import and Export Co., Ltd., et al. v. United States*, 701 F. Supp. 3d 1367, 1385 (*Jinko Solar*).

[76] *Id.* at 1385.

Maersk data reflects price quotes does not preclude Commerce from finding that it is the best available information to value ocean freight. Indeed, contrary to Dingli's assertions, the reliability of surrogate value data cannot be divorced from an analysis of the data considerations present in Policy Bulletin 4.1. As explained above, Commerce determined that route specificity should be accorded more weight in determining what data subset constituted the best available information because only one data subset proffered on the record is actually specific to Dingli's shipping routes used during the POI.

Still, Dingli argues that Commerce's focus on route specificity is unsupported, reasoning that because the distance between Shanghai-Long Beach, CA and Los Angeles, CA is substantially similar to the distance between Shanghai, Oakland, CA, freight charges *should be* nearly equal. Dingli claims that the Long Beach, CA and Los Angeles, CA port combinations are nearly as route specific as the Maersk data. Dingli also argues that the difference between ocean freight charges for shipment to the East Coast and the West Coast is insignificant. Dingli's arguments are meritless.

Nowhere does Dingli dispute that the Maersk freight data is more specific than the Descartes, Drewry, and Freightos freight data. Moreover, Dingli ignores that "a freight rate is a function of not only the container, but also the route."[77] Indeed, it is Commerce's practice to use ocean freight surrogate value data that are specific to the port combinations a respondent uses for its shipments of merchandise under consideration.[78] Therefore, Commerce, on remand, chose the only data on the record that reflects Dingli's actual shipping routes used for shipment of MAE during the POI, *i.e.*, the Maersk data. Commerce need not engage in determining whether certain freight charges *should be* nearly equal, as Dingli states, because the Maersk data is

---

[77] *See Changzhou*, 492 F. Supp. 3d at 1330.
[78] *See Activated Carbon from China.*

specific to Dingli's actual shipping routes (and specific to each month corresponding to the POI), which makes the Maersk freight data superior to the Descartes, Drewry, and Freightos freight data, in terms of route specificity.  As a result, the Maersk data is also the best available information by which to value ocean freight.

Further, as explained above, the Maersk source data offers ocean freight data that includes all incidental ocean freight charges such as export service fees, terminal handling service fees (origin), documentation fees, bunker adjustment factor fees, low sulfur surcharge, and terminal handling service fees (destination) are included in the rate.[79]  Whereas, the Descartes, Drewry, and Freightos freight data offer no accompanying rate details (or accompanying information explaining the methodology for price data collection and reporting).[80]

In addition, the Court remanded for Commerce to point to a specific data on the record to support its conclusion about the expenses associated with the brokerage and handling surrogate value if it determined to select the use of the Descartes, Drewry and Freightos freight data on remand.[81]  In response to the Court's directive, Commerce carefully evaluated the record and finds that it cannot definitively conclude that the brokerage and handling expenses include the incidental ocean freight charges that are included in the Maersk source data.  For instance, in the *Doing Business 2020 (Brazil)* report,[82] which is the source for the brokerage and handling surrogate value, it does not provide sufficient details to decipher what is actually included under the "Documentary compliance," and "Border compliance," requirements, which outline the type of document required for export and associated expenses.[83]  Further, the *Doing Business 2020*

---

[79] *See* Ocean SV at Attachment.
[80] *See* Dingli's SV Comments 1 at Exhibits 7A, 7A(i), 7A(ii), and 7A(iii).
[81] *See Remand Opinion* at 16.
[82] *See* Dingli's SV Comments 1 at Exhibit 6C; *see also*, "Economy Profile Brazil Doing Business Brazil 2020 Report – Comparing Business Regulation in 190 Economies – World Bank Group," (*Doing Business (Brazil) 2020*).
[83] *See* Dingli's SV Comments 1 at Exhibit 6C.

*(Brazil)* report under the "Documentary compliance," and the "Border compliance," explanation

page, indicates the following:[84]

### Documentary compliance

- Obtaining, preparing and submitting documents during transport, clearance, inspections and port or border handling in origin economy
- Obtaining, preparing and submitting documents required by destination economy and any transit economies
- Covers all documents required by law and in practice, including electronic submission of information

### Border compliance

- Customs clearance and inspections
- Inspections by other agencies (if applied to more than 20% of shipments)
- Handling and inspections that take place at the economy's port or border

The *Doing Business 2020 (Brazil)* report then states that "Insurance cost and informal payments

for which no receipt is issued are excluded from the cost recorded."[85]  This indicates that any

ocean freight incidental charges are likely not included in the brokerage and handling surrogate

value, as informal payments may be related to these incidental charges.  As such, because the

*Doing Business 2020 (Brazil)* report does not specify whether the brokerage and handling

surrogate value includes any incidental ocean freight charges (*i.e.*, export service fees, terminal

handling service fees (origin), documentation fees, bunker adjustment factor fees, low sulfur

surcharge, and terminal handling service fees (destination)), we find that Dingli has not met the

burden in demonstrating that including these ocean freight incidental charges somehow provides

distortive results.  Absent such evidence, we cannot assume that including such incidental ocean

freight charges leads to double counting the same charges as Dingli contends.  Moreover, Dingli

---

[84] *Id*.
[85] *Id*.

cites only to the *Doing Business 2020 (Brazil)* publication as evidence,[86] but does not specify where in the report it indicates that these incidental ocean freight fees are already included in the brokerage and handling surrogate value.[87]  As we explain above, the *Doing Business 2020 (Brazil)* does not provide enough details to make that determination.  As such, after a careful review of the *Doing Business 2020 (Brazil)* report, we do not find evidence that such incidental ocean freight fees are in fact included in the brokerage and handling value.

Dingli's reliance on *Solar Cells from China*,[88] wherein certain incidental ocean freight fees were included in a separate *Doing Business* report which was not used in this case, is misguided.  Dingli contends that the *Doing Business 2017 (Thailand)* report relied upon in *Solar Cells from China* to calculate the brokerage and handling value included the incidental ocean freight fees in question and therefore, Commerce correctly determined not to include such fees in the Maersk ocean freight data to avoid the double counting of brokerage and handling expenses.[89]  Although in *Solar Cells from China*, Commerce may have been able to determine that such incidental ocean freight fees were included in the brokerage and handling value, we find that the evidence on this record does not support such a determination.  For example, in *Solar Cells from China*, Commerce relied on the "Cost to Export Border compliance," and the "Cost to Export:  Documentary compliance," requirements in the *Doing Business 2017 (Thailand)* report to justify its decision to exclude these incidental ocean freight fees from the Maersk ocean freight data.[90]  Further, Commerce determined that based on the names of certain

---

[86] *See* Memorandum, "Surrogate Values for the Preliminary Determination," dated September 24, 2021 (Preliminary SV Memorandum).
[87] *See* Dingli's Remand Comments.
[88] *See Certain Crystalline Photovoltaic Cells, Whether or Not Assembled Into Modules from People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipment; 2015-2016,* 83 FR 35616 (July 27,2018) (*Solar Cells from China*), and accompanying IDM at Comment 8.
[89] *See* Dingli's Remand Comments at 9.
[90] *See Solar Cells from China* IDM at Comment 8.

fees (*i.e.*, "Documentation Fee – Origin," and "Terminal Handling Service – Origin,") they were part of the broker's fees and therefore, corresponded to brokerage and handling expenses, which is not the case here because the *Doing Business 2020 (Brazil)* report does not specify which, if any, of the incidental ocean freight fees are included in the brokerage and handling expenses.[91] Further, we are not bound by Commerce's determination in *Solar Cells from China*, as each case segment has its own set of facts and evidence.[92] As such, because the facts and evidence on the record of this case do not conclusively indicate that the brokerage and handling expenses include such incidental ocean freight fees, we continue to rely on the Maersk data, which include these incidental ocean freights fees, to value ocean freight. As such, after considering the totality of the facts on the record, we find that the Maersk source freight data are a superior choice to the Descartes, Drewry, and Freightos source freight data.

Regarding Dingli's argument concerning the criterion of container weight, we disagree. The record indicates that the Maersk source freight data are for a specified quantity of goods as opposed to a theoretical "container load" of merchandise.[93] In addition, the record indicates that the container weight used (*i.e.*, 18,000 kilograms) in the Maersk source freight data is within range for a 20-foot container capacity, and very close to the lowest (20,000 kilograms) container capacity for a 40-foot container capacity as illustrated in a survey of container capacities that the

---

[91] *Id.*
[92] *See Alloy Piping Prods. v. United States*, 33 CIT 349, 359-60 (2009).
 *See Clearon Corp. v. United States*, 38 CIT 1122, 1147 (2014) (*Clearon Corp.*) ("Although Commerce can and does take into consideration its policies and methodologies as expressed in different administrative case precedent when making its determination, it cannot take the factual information underlying those decisions into consideration unless those facts are properly on the record of the proceeding before it."); *see also Jiaxing Brother Fastener Co., Ltd. v. United States*, 428 F. Supp. 3d 1364, 1379-80 (CIT 2020) (*Jiaxing Brother*) ("Although Commerce notes that it relies on the same NSO quarterly data to calculate labor hours as in the previous administrative review, … the records of the two proceedings are not the same. … The agency must make its determinations based on the record before it. (Internal citations omitted)."), and *Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. v. United States*, 322 F. Supp. 3d 1308, 1324 (CIT 2018) (stating that legal references such as precedents are not factual information).
[93] *See Final Determination* IDM at 11.

petitioner placed on the record.[94]  Further, as we indicated in the *Final Determination*, because there are payloads as low as 20,000 kilograms for a 40-foot container in the survey of container weights provided by the petitioner, we continue to find that the Maersk's 18,000-kilogram containers are not so anomalous as to be unreliable as Dingli claims.[95]  We further explained that Dingli did not provide any evidence on the record to indicate that Commerce had previously denied using Maersk rates for allegedly low container weights, and determined that the China-to-Brazil Maersk rates were in fact reliable.[96]  In response to the Draft Results, Dingli still did not cite to any evidence indicating that Commerce had previously denied using Maersk rates for allegedly low container weights.[97]  As such, based on this, we are not persuaded by Dingli's container weight argument.  Thus, for these reasons, we continue to find that the Maersk source freight data are superior to the Descartes, Drewry, and Freightos source freight data, and have not altered our Draft Results.

**Comment 2:  Minor Fabricated Steel Components**

The following is a verbatim summary of argument submitted by the petitioner.[98]  For further details, *see* Petitioner's Draft Remand Comments at 3 through 5.

*Petitioner's Comments*

> Consistent with the court's opinion and remand order, {Commerce} has appropriately revalued many of Dingli's minor fabricated steel components in its draft remand analysis to no longer value these inputs under HS subheading that are specific to primary or raw steel products.  Commerce correctly finds that the record is clear that Dingli purchased fabricated steel components instead of raw steel products.  And {Commerce} rightly points to Dingli's own submissions, which acknowledge that it never purchased steel plates or sheets, or did any in-house processing.  Accordingly, on remand, {Commerce} has properly concluded that Dingli's purchased steel input were fabricated and that it would be inappropriate to

---

[94] *See* Petitioner's Case Brief at Attachment 3B.
[95] *See Final Determination* IDM at 14.
[96] *Id.*
[97] *See* Dingli's Draft Remand Comments, at 11-12.
[98] *See* Petitioner's Draft Remand Comments.

value them as primary or raw steel products. The Coalition urges {Commerce} to continue to find that Dingli's fabricated steel components are not properly valued under HS subheadings specific to raw or primary steel as the agency reaches its final remand determination.

The following is a verbatim summary of argument submitted by Dingli.[99]  For further details, *see* Dingli's Draft Remand Comments at 2.

*Dingli's Comments*

> To value Minor Fabricated Components, {Commerce} improperly relied upon {HS} subheading 8431.20.90. Specifically, the Draft Remand's choice strictly follows the analysis used to classify goods for Customs purposes in deviation from {Commerce'} normal practice that favors a {HS} subheading yielding a more reliable, representative and accurate value – even though it may not be the most suitable for classification purposes. The Draft Remand improperly fails to adhere to such {Commerce} practice, which has been repeatedly affirmed by the Federal Circuit.

**Commerce's Position**: We disagree with Dingli, and we continue to find that HS 8431.20.90 – "Parts suitable for use solely or principally with machinery of heading 8427, other than Fork lifts trucks," is the most suitable HS to value these 16 inputs because the inputs in question are fabricated parts destined for incorporation into Dingli's MAE machines and not raw steel inputs. Therefore, HS 8431.20.90 is the best available information on the record to value Dingli's minor fabricates steel components.

Pursuant to the Court's directive, Commerce is required to resolve whether the 16 inputs in question which Commerce valued in the *Final Determination* using raw steel categories under HS chapters 7208, 7211, and 7214 were products purchased by Dingli as minor fabricated steel parts or raw steel, *i.e.*, plate, sheet, bar, and rod. As explained above, we continue to find that Dingli purchased minor fabricated steel components as opposed to raw steel because record evidence demonstrates that the inputs in question are fabricated by Dingli's input suppliers, to

---

[99] *See* Dingli's Draft Remand Comments.

varying degrees, based on Dingli's specified dimensional requirements, for eventual incorporation into Dingli's MAE machines. Therefore, because Dingli did not purchase raw steel, but rather minor fabricated steel components, it would be inappropriate to value its inputs under HS chapters 7208, 7211, and 7214, which are categories covering raw steel inputs. Thus, in resolving internal consistencies in its original analysis, Commerce finds that HS subheading 8431.20.90 is now the best available information on the record to value Dingli's inputs.

Still, Dingli argues that Commerce in its Draft Results deviates from its normal practice that favors a HTS subheading yielding a more reliable, representative and accurate value even though it may not be the most suitable for classification purposes.[100] Dingli cites to the U.S. Court of Appeals for the Federal Circuit's (Federal Circuit) decision in *Downhole Pipe*, arguing that, "Commerce is "not required to engage in a classification analysis" but instead is "required to determine which of the competing subheadings constituted the best available information."[101] Dingli also cites to *SolarWorld Americas*, arguing further that, "{t}he fact that Commerce has at times found support for its surrogate value choices in Customs classification rulings does not lead to the conclusion that Commerce must follow such rulings in every case {when valuing factors of production}."[102] Dingli's reliance on these cases is misplaced.

In *Downhole Pipe*, Commerce, faced with the question of the appropriate HS code to value green pipe, used a process-of-elimination analysis to arrive at its answer. In doing so, Commerce eliminated broader categories of pipe finding that "each {can} be dismissed on {its}

---

[100] *See* Dingli's Draft Remand Comments. at 14.
[101] *Id*. at 15 (citing *Downhole Pipe & Equipment, L.P. v. United States*, 776 F.3d 1369, 1378-79 (Fed. Cir. 2015) (*Downhole Pipe*)).
[102] *Id.* (citing *SolarWorld Americas, Inc. v. United States*, 910 F. 3d 1216, 1223-25 (Fed. Cir. 2018) (*SolarWorld Americas*)).

face as inaccurate for the categorization of drill pipe green tube."[103]  Commerce concluded that

certain subheadings were "no longer the best available information on the record," because those

subheadings captured products that were not inputs for subject merchandise.  The Federal Circuit

upheld Commerce's surrogate value selection in *Downhole Pipe*, reasoning that Commerce's

selection process was a well-reasoned explanation.[104]

 In *Solarworld Americas*, Commerce grappled with which HS code appropriately valued

certain aluminum frames.  In selecting the appropriate HS code to value the aluminum frames,

Commerce considered customs classifications proffered by Plaintiff but found that the

classifications did not provide an explanation as to why the inputs at issue should be classified

under Plaintiff's proffered HS code.  Therefore, Commerce considered and found that HS code

proffered by the Plaintiff did not include anything similar to the inputs in question, and that

Commerce's relied on HS code was far more specific to the inputs in question.  The Federal

Circuit upheld Commerce's decision in *SolarWorld Americas*, reasoning that Commerce had

"considered the evidence and explained why the evidence should be afforded less

significance."[105]

 *Downhole Pipe* and *SolarWorld Americas* in effect stand for the proposition that to the

extent that customs classifications could assist Commerce in satisfying its requirement to

determine what subheading constitutes the best available information, Commerce *may* engage in

such analysis, but *it is not required*.  In other words, Commerce does not commit legal error by

failing to engage in a classification analysis.  Indeed, Dingli's quoted excerpt from *SolarWorld*

---

[103] *See Final Results of Redetermination Pursuant to Court Remand*, *Downhole Pipe & Equipment LP v. United States*, 36 CIT 1509 (2012), dated May 13, 2013, at 5, available at https://access.trade.gov/Resources/remands/11-00081.pdf.
[104] *See Downhole Pipe*, 776 F.3d at 1378.
[105] *See SolarWorld Americas*, 910 F.3d at 1225.

*Americas* confirms as much: "{t}he fact that Commerce has at times found support for its surrogate value choices in Customs classification rulings does not lead to the conclusion that Commerce must follow such rulings in every case {when valuing factors of production}."[106]

As a result, we find that our decision to use an alternative HS subheading to value these 16 inputs in this final remand is not in conflict with the Federal Circuit's decisions in *Downhole Pipe* and *SolarWorld Americas* because in light of the *Remand Order*, we have again considered the competing HS chapters (*i.e.*, 7326, 7208, 7211, and 7214), and determined that there is a more appropriate HS subheading on the record to value these minor fabricated components, which we have not considered in the *Final Determination*. In other words, *Downhole Pipe* does not preclude Commerce from evaluating the record to determine a more suitable HS category to value these fabricated minor components given the record evidence.

Moreover, Commerce has satisfied its requirement "to determine which of the competing subheadings constituted the best available information."[107] With respect to determining surrogate values, the Federal Circuit held that Commerce's determination concerning what constitutes the best available information is largely within Commerce's discretion.[108] The CIT held further that "{w}here Commerce is faced with the choice of selecting from among imperfect alternatives, it has the discretion to select the best available information for a surrogate value so long as its decision is reasonable."[109] Thus, what is required of Commerce in this remand segment is to provide a reasonable explanation as to why HS subheading 8431.20.90 is more representative of Dingli's purchased inputs than other HS codes on the record.[110] As explained

---

[106] *Id.*
[107] *See* Dingli's Draft Remand Comments at 15 (citing *Downhole Pipe*, 776 F.3d at 1378-79).
[108] *See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("While {section 773(c) of the Act} provide guidelines to assist Commerce in this process, this section also accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines.").
[109] *See Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1377-78 (CIT 2009).
[110] *See Downhole Pipe*, 776 F.3d at 1378.

throughout these final results of redetermination, Commerce's determination to rely on HS subheading 8431.20.90 to value Dingli's inputs is supported by substantial evidence and is in alignment with this Court's *Remand Order*.

On remand, Commerce cured its internal inconsistencies of finding that Dingli's inputs were not minor fabricated steel components despite record evidence demonstrating that Dingli's inputs were fabricated to various degrees. Specifically, record evidence demonstrates that the inputs in question are fabricated by Dingli's input suppliers, to varying degrees, based on Dingli's specified dimensional requirements, for eventual incorporation into Dingli's MAE machines. As a result, Commerce could reasonably eliminate, for use as surrogate values, HS codes that did not encompass minor fabricated steel components, *i.e.*, the HS codes encompassing raw steel materials that Dingli argues are appropriate. Instead, Commerce selected HS subheading 8431.20.90, the only HS code that encompasses parts used in production of the subject merchandise, *i.e.*, Dingli's inputs in question. Dingli acknowledged as much in the administrative briefing stage of the *Final Determination* stating that HS subheading 8431.20.90 "'is an appropriate classification for FOPs that are parts (*i.e.*, not base materials) used in the production of subject merchandise,' and trumps a basket heading based on component material, since 'the fact that the parts were dedicated for use in the subject merchandise…{is}…more important than the fact that the parts…{are}…composed of certain materials.'"[111]

As we discuss above, record evidence concerning the degree of fabrication or processing for the inputs in question shows that, to varying degrees, these inputs get laser cut, or punched out, or sawed to specific dimension, sometimes followed by punching or drilling of holes and/or

---

[111] *See* Dingli's Rebuttal Brief at 35-36.

bending and, less rate, welding.[112]  As such, as discussed above, once a set of fabrication processes are dedicated to a specific outcome is performed on the purchased primary steel, that primary steel is no longer usable to customers other than Dingli and is only usable for incorporation into Dingli's MAE machines.  Based on this, we now find that because Dingli sourced minor inputs that were fabricated, which altered the essential nature of these inputs, cannot be considered primary steel material, as Dingli suggests.

Further, although a fabricated part and its input (*i.e.*, primary steel material) are both steel materials, a fabricated part achieves a further value added to it by a physical transformation, thus making it useful for a specific purpose and unusable as a raw material input.  Because the minor fabricated components are "not base raw materials," as Dingli contends, HS subheading 8431.20.90 is better suited to accurately value these 16 material inputs.  Dingli recognized as much in the administrative briefing stage of the *Final Determination*, when it stated that, "{s}teel inputs that are especially designed, fabricated, welded, heat treated and customized for a specific end-use in assembling the MAE equipment, the best SV choice is afforded by HTS 84312090, which covers parts dedicated to the production of such MAE."[113]

In addition, we are not persuaded by Dingli's argument that assigning HS subheading 8431.20.90 to these 16 fabricated components, instead of using the HS relied upon by Commerce in the *Final Determination*, is somehow discredited because of the significant increase in the AUV under HS subheading 8431.20.90 in comparison to AUVs used for these inputs in the *Final Determination*.  In its pre-preliminary comments, Dingli states that, "Notably, the resulting AUV of 28.62 BRL/Kg (5.30 $/Kg) is almost identical to the Turkish ME prices of 5.27 $/Kg.

---

[112] *See* Dingli's Letter, "Dingli's Response to Section D Questionnaire," dated June 24, 2021, at Exhibit SD-3A (Dingli's Section D Questionnaire Response).
[113] *See* Dingli's Letter, "Dingli's Pre-Preliminary Comments," dated September 2, 2021.

Therefore, for valuing these 26 steel inputs, {Commerce} should use {HS} 84312090."[114]
Dingli placed on the administrative record publicly available market economy prices from
Türkiye of fabricated components used in MAE machinery to corroborate the recommended HS
numbers and the corresponding AUVs for various fabricated component inputs.[115]  Because the
AUV of 28.62 BRL/Kg is corroborated with market economy prices, for similar fabricated
components, we find that the record evidence further supports our use of HS 8431.20.90 to value
the inputs in question.

As such, considering the *Remand Order*, we continue to find that we erred in the *Final
Determination* by valuing minor fabricated parts in question using HS categories for primary
steel.  Thus, we find that our decision to select HS subheading 8431.20.90 to value the 16 inputs
in question follows the Court's instructions because we clarified the inconsistencies noted by the
Court and rectified an erroneous decision made in the *Final Determination*.

## V.     FINAL RESULTS OF REDETERMINATION

Consistent with the Court's remand opinion and order, Commerce has reconsidered
certain aspects of its *Final Determination*.  Specifically, on remand, we have relied on the
Maersk data for ocean freight surrogate value and the Brazilian surrogate value for HS category
8431.2090 for certain minor fabricated steel components.  As a result of these changes, the
estimated weighted-average dumping margins and adjusted cash deposit rates for Dingli and the
non-selected separate rate companies are now as follows for the POI:

---

[114] *Id.*
[115] *Id.*

| Exporter | Producer | Weighted-Average Dumping Margin (percent) | Cash Deposit Rate (Adjusted for Subsidy Offsets) (percent)[116] |
|---|---|---|---|
| Zhejiang Dingli Machinery Co., Ltd. | Zhejiang Dingli Machinery Co., Ltd. | 37.20 | 37.04 |

**Separate Rate Applicable to the Following Non-Selected Companies:**

| Non-Selected Exporter Receiving a Separate Rate | Producer Supplying the Non-Selected Exporter Receiving a Separate Rate | Weighted-Average Dumping Margin (percent) | Cash Deposit Rate (Adjusted for Subsidy Offsets) (percent) |
|---|---|---|---|
| Hunan Sinoboom Intelligent Equipment Co., Ltd. | Hunan Sinoboom Intelligent Equipment Co., Ltd. | 56.50 | 56.33 |
| Mantall Heavy Industry Co., Ltd. | Mantall Heavy Industry Co., Ltd. | 56.50 | 56.33 |
| Noblelift Intelligent Equipment Co., Ltd. | Noblelift Intelligent Equipment Co., Ltd. | 56.50 | 56.33 |
| Oshkosh JLG (Tianjin) Equipment Technology Co., Ltd. | Noblelift Intelligent Equipment Co., Ltd. | 56.50 | 56.33 |
| Sany Marine Heavy Industry Co., Ltd. | Sany Marine Heavy Industry Co., Ltd. | 56.50 | 56.33 |
| Terex (Changzhou) Machinery Co., Ltd. | Terex (Changzhou) Machinery Co, Ltd. | 56.50 | 56.33 |
| Xuzhou Construction Machinery Group Imp. & Exp. Co., Ltd. | Xuzhou Construction Machinery Group Fire-Fighting Safety Equipment Co., Ltd. | 56.50 | 56.33 |

---

[116] *See Final Determination*, 87 FR at 9576; *see also Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China:  Countervailing Duty Order and Amended Final Affirmative Countervailing Duty Determination*, 86 FR 70439 (December 10, 2021).

If Commerce's final results of redetermination are sustained by the Court, Commerce intends to publish a *Timken*[117] notice with the amended final results in the *Federal Register* and issue appropriate customs instructions to U.S. Customs and Border Protection, consistent with the discussion above.

10/28/2024

X 

Signed by: RYAN MAJERUS

Ryan Majerus,
Deputy Assistant Secretary
  for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[117] *See Timken*, 893 F.2d at 341; *see also Diamond Sawblades*, 626 F.3d at 1381.