# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE M. MILLER BAKER, JUDGE

| | | |
|---|---|---|
| ———————————————— | : | |
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT, | : : : | |
| | : | |
| Plaintiff, | : | Court No. 22-00152 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| ZHEJIANG DINGLI MACHINERY CO., LTD., | : : | |
| | : | |
| Defendant-Intervenor. | : | |
| ———————————————— | : | |

## DEFENDANT-INTERVENOR DINGLI'S COMMENTS IN OPPOSITION TO REMDAND REDETERMINATION

Ned H. Marshak
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO,
LEBOWITZ, SILVERMAN &
KLESTADT LLP

599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000

**

1201 New York Ave., NW,
Suite 650
Washington, DC 20005

*Counsel for Defendant-Intervenor
Zhejiang Dingli Machinery Co.,
Ltd.*

Dated: February 28, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

GLOSSARY ........................................................................................iv

SUMMARY OF THE ARGUMENT ............................................................. 1

I.    FOR VALUING OCEAN FREIGHT, THE REMAND ERRS BY SELECTING MAERSK DATA AND REJECTING DESCARTES, DREWRY, AND FREIGHTOS ................................................................ 2

    A.   Maersk Price Quotes are Not Reliable; in Contrast, Descartes, Drewry, and Freightos Report Reliable Transaction-Based Prices ....................................................................................... 4

    B.   There is No Support for the Remand's Preference of Maersk Data Based on Route-Specificity and Incidental Ocean Freight Charges .................................................................................. 13

    C.   The Remand Fails to Weigh Maersk SV against the Other SV Choices based on the Key Criterion of Container Weight .......... 24

II.    TO VALUE MINOR FABRICATED COMPONENTS, COMMERCE IMPROPERLY RELIED UPON HTS 8431.20.90 .......... 27

CONCLUSION ...................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Changzhou Trina Solar Energy Co. v. United States,*
492 F. Supp. 3d 1322 (CIT 2021)...................................................... 10, 11

*Changzhou Trina Solar Energy Co. v. United States,*
532 F. Supp. 3d 1333 (CIT 2021)...................................................... 11, 12

*Coalition of Am. Mgrs. of MAE v. United States,*
2024 WL 2796654 (CIT May 31, 2024) ...................................... *passim*

*CP Kelco US, Inc. v. United States,*
2015 WL 1544714 (CIT 2015)............................................................ 15

*CP Kelco US, Inc. v. United States,*
2016 WL 1403657 (CIT 2016)...................................................... 15, 16

*Downhole Pipe & Equipment, L.P. v. United States,*
776 F.3d 1369 (Fed. Cir. 2015) .............................................. 30, 31, 32

*Jiangsu Zhongji Lamination Materials Co. (HK) v. United States,*
2023 WL 3863201 (CIT 2023)...................................................... 10, 11

*Jinko Solar Import and Export Co. v. United States,*
701 F. Supp. 3d 1367 (CIT 2024)................................................. 12, 13

*SolarWorld Americas, Inc. v. United States,*
910 F.3d 1216 (Fed. Cir. 2018) .................................................. 31, 32

**Administrative Decisions**

*Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 85 Fed. Reg. 68,848 (Oct. 30, 2020)........................... 20

*Certain Walk-Behind Lawn Mowers and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 27,379 (May 20, 2021)...................................................................... 20

*Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 1167 (Jan. 11, 2016)......................... 8

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed. Reg. 35,616 (July 27, 2018) .......................................... 21

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 58,871 (Oct. 25, 2021).......................................... 23

# **GLOSSARY**

| Abbreviation | Term |
|---|---|
| Average unit value | AUV |
| Brazilian Real | BRL |
| Brokerage and Handling | B&H |
| Coalition of American Manufacturers of Mobile Access Equipment | Petitioner |
| Confidential Record | C.R. |
| Final Results of Redetermination Pursuant to Court Remand | Remand |
| Harmonized Tariff Schedule | HTS/ HS |
| Issues and Decision Memorandum | IDM |
| Kilogram | Kg |
| Mobile access equipment | MAE |
| Nonmarket economy | NME |
| People's Republic of China | China/ PRC |
| Period of Investigation | POI |
| Period of Review | POR |
| Public Record | P.R. |
| Public Remand Record | P.R.R. |
| Surrogate value | SV |
| Zhejiang Dingli Machinery Co., Ltd. | Dingli |

These Comments are filed on behalf of Defendant-Intervenor Zhejiang Dingli Machinery Co., Ltd. ("Dingli"), in opposition to the Final Results of Redetermination Pursuant to Court Remand filed on October 30, 2024, P.R.R. 17, ECF 74 ("Remand") by the U.S. Department of Commerce's ("Commerce" or "Department") in its less-than-fair value investigation of certain mobile access equipment and subassemblies thereof ("MAE") from the People's Republic of China ("China" or "PRC"), in response to this Court's order. *Coalition of Am. Mgrs. of MAE v. United States*, 2024 WL 2796654 (CIT May 31, 2024) ("Slip Op. 24-66"). The two surrogate value ("SV") issues upon which this Court ordered remand, Commerce's valuation of ocean freight and minor fabricated components, *id.* at *2-7, remain unsupported by substantial evidence for the reasons set forth below.

## SUMMARY OF THE ARGUMENT

1. For valuing ocean freight, the Remand errs by selecting Maersk data and rejecting data from Descartes, Drewry, and Freightos. Maersk price quotes are not reliable; by contrast, Descartes, Drewry, and Freightos report reliable, transaction-based prices. Commerce's twin rationales used to prefer Maersk data, route specificity and incidental

ocean freight charges, are unsupported by both record evidence and Department precedent. Finally, the Remand improperly fails to weigh the Maersk SV against the other SV choices based on the key criterion of container weight.

2. To value Minor Fabricated Components, Commerce improperly relied upon Harmonized Tariff System ("HTS" or "HS") subheading 8431.20.90. Specifically, the Remand's choice strictly follows the analysis used to classify goods for Customs purposes in deviation from Commerce's normal practice that favors a HTS subheading yielding a more reliable, representative, and accurate value – even though it may not be the most suitable for classification purposes. The Remand improperly fails to adhere to such Department practice, which has been repeatedly affirmed by the Federal Circuit.

## I.   FOR VALUING OCEAN FREIGHT, THE REMAND ERRS BY SELECTING MAERSK DATA AND REJECTING DESCARTES, DREWRY, AND FREIGHTOS

The Remand selects Maersk data, reversing the Final Determination choices of Descartes, Drewry, and Freightos, to value Dingli's ocean freight charges. As set forth below, this choice is

unsupported by substantial record evidence and Commerce's well-established practice.

To support Maersk over Descartes, Drewry, and Freightos, the Remand reasons that the Maersk data is superior to the other three alternative choices in terms of its route specificity and its inclusion of all incidental ocean freight charges. Remand at 7-9, Appx22053-22055. However, as explained below, these conclusions are contrary to Commerce's reasonable prior practice. Moreover, the Remand errs by engaging in a *disjunctive analysis* instead of a faithful side-by-side *conjunctive analysis* of all four data sets. In doing so, the Remand fails to compare Maersk data against the other three data sources based on established criteria, such as their reliability and the container weight of the shipment. Most notably, the Remand overlooks the critical distinction between Maersk data – a mere price quote – and Descartes / Drewry / Freightos data – reporting prices based on consummated commercial transactions.

**A.    Maersk Price Quotes are Not Reliable; in Contrast, Descartes, Drewry, and Freightos Report Reliable Transaction-Based Prices**

In selecting the best SV choice, *reliability* of data is the paramount consideration. Accordingly, Commerce's practice is to first evaluate whether a price data set is reliable and accurately reported. Only thereafter does Commerce determine whether a data set fulfills technical criteria such as product specificity, broad market considerations, contemporaneity, etc. In other words, if a data set is unreliable, its fulfilment of other criteria is academic. The Remand overlooks this threshold aspect by failing to consider record evidence that because Maersk data are price quotes rather than actual transaction-based prices, they are unreliable for valuing ocean freight cost and unrepresentative of market economy prices actually paid for a commercial ocean shipment, which is a critical consideration in selecting SV data. Dingli's Redacted Rebuttal Brief (Dec. 8, 2021), C.R. 330, P.R. 496, at 9-10, Appx6649-6650.

First, Maersk "ocean freight quotes" are not based on actual shipments or actual payments. Each of the Maersk price quotes are formatted identically and contain the following boilerplate inscriptions:

4

> *Lookup Details . . . .*
> Please notice! *This look up is not covered by a service*
> *contract, therefore tariff rates have been applied. . . .*
> *Rate information is an indication only* and Maersk rates are
> subject to our terms and conditions.

Petitioner's Resubmission of Surrogate Value Information (July 5,

2024), P.R.R. 5, Exhibit 1 (emphases added), Appx22016-22027. These

proclamations confirm that Maersk price quotes are:

- "not covered by a service contract,"

- are based on notional "tariff rates," and

- are "an indication only."

*Id.*

Moreover, the above-quoted uniform boilerplate notice flashed

across all of the Maersk price quotes confirm that all of these quotes are

electronically generated through online research by inputting various

unknown shipment parameters. This fact impugns the reliability of the

Maersk price quotes as actual "prices" and instead confirms that they

are mere price quotations divorced from the actual ocean freight charges

incurred by shippers during the period of investigation ("POI"). This

critical fact establishes that Maersk should not be selected as an SV

source, thereby obviating the need to evaluate the technical merits of

the Maersk data.

In contrast, Descartes data contains ocean freight charges that represent actual, consummated transactions. Dingli's Final SV Comments (Aug. 25, 2021), P.R. 295-300, Exhibit 7A(i), Appx18256-18262. Unlike Maersk quotes, Descartes price data sheets are distinct from one another and do not conform to a predesigned pattern, further affirming these represent prices paid for actual shipments. *Id*. Indeed, this Court affirmed that Descartes prices are based on consummated transactions:

> Dingli points to a certain code (the "Transshipment Local Instructions") which it asserts "establishes that all Descartes price data represent actual transactions on those dates." . . . The Coalition's failure to confront this point on reply leads the court to infer that substantial evidence supports the Department's finding.

 Slip Op. 24-66, 2024 WL 2796654 at *4.

This Court's affirmation of Descartes' actual transaction-based prices implicitly rejects Petitioner's arguments that:

> the Descartes data to which Commerce cites state, on page after page: "*Estimates* of freight charges are furnished as a convenience to the shipping public and represent *nothing more than an approximation* of freight charges which is *not binding* either on the carrier or shipper. Rates are *subject to change* and should be verified prior to shipment."

Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record (Nov. 9,

6

2022), ECF 26, at 34 (emphasis in original).

Additionally, this Court implicitly endorsed Dingli's rebuttal to Petitioner's speculative claims, explaining that "Descartes' declaration . . . simply cautions the public against relying, for current shipments planning, on a historical transaction-specific price data." Defendant-Intervenor Dingli's Response to Plaintiff's Motion for Judgment on the Agency Record Pursuant to Rule 56.2 (Mar. 27, 2023), ECF 35-36 ("Dingli Response Br."), at 7-8.

In sum, Commerce errs by failing to recognize that unlike Descartes' transaction-specific prices, Maersk price data are merely price quotes, and accordingly are unreliable for SV purposes. Further, record evidence supports the fact that Freightos data and Drewry data are also based on actual arm's length transactions. The Remand does not contest this threshold fact. Therefore, all three data sources that the Remand improperly disfavors are – unlike Maersk price quotes – based on actual transaction prices. Consequently, the Remand is inconsistent with Commerce's well-established policy favoring actual transaction-based price data over mere price quotes:

> The Thai domestic price quotes for urea from the ISS study
> are not contemporaneous with the POR and do not represent

actual prices paid for urea (*i.e., these are quotes/offers, not the results of consummated transactions). The Department's preference*, also stated above, *is to use published prices that are widely available*, rather than price quotes from a limited number of suppliers that can only be obtained through direct enquiry. Publicly available, published prices generally do not suffer from potential biases compared to those price quotes obtained through research by private firms.

*Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 1167 (Jan. 11, 2016), accompanying Issues and Decision Memorandum ("IDM"), Comment 2 (emphases added).

This distinction – actual prices versus price quotes – constitutes a sufficient standalone reason to reject the Maersk price quotes in favor of the Descartes, Drewry, and Freightos actual transaction-based price data. Yet the Remand brushes aside the most critical argument regarding Maersk price quotes' unreliability for surrogate valuation purposes, claiming that "pursuant to the Court's directive, Commerce is required to resolve whether the shipping route reflected in the Descartes, Drewery, and Freightos information is *more specific* to Dingli's routes than the Maersk data." Remand at 15 (emphasis in original), Appx22061.

Commerce baselessly asserts that this Court restricted it to

examine only the route specificity (and incidental charges) and

precluded a comprehensive comparative analysis of all four data

sources. The Remand was not so narrowly worded since it directed

"Commerce to reconsider its determination as to ocean freight costs . . .

*including*," Remand at 1 (emphasis added), Appx22047, a comparative

analysis of data sources with regard to their route specificity and

incidental charges reporting. As such, this Court did not prohibit

Commerce from conducting a comparative analysis of other data

attributes that are relevant to their selection for SV purposes. Indeed,

this Court noted:

> Commerce's choice of data to value Dingli's ocean freight
> costs is a *mixed bag*. Certain aspects of that decision are
> supported by substantial evidence, but others are not. It's
> not clear the agency would have reached the same result had
> it properly analyzed the record, so the court remands for
> reconsideration.

 Slip Op. 24-66, 2024 WL 2796654 at *5 (emphasis added).

Such language demonstrates that this Court's remand for

reconsideration was open-ended, without tying Commerce's hands from

examining all aspects of the four data sources. To the contrary, while

specifically requiring Commerce to probe the public availability, route

specificity and incidental charges issues, this Court expressly

recognized that it was a case of "mixed bag" and therefore, instructed that Commerce "properly analyze{d} the record" in order to select the statutorily mandated "best available information." Slip Op. 24-66, 2024 WL 2796654 at *5. Therefore, the Remand's overly narrow disjunctive analysis misinterprets this Court's directive.

Alternatively, the Remand asserts that "even if the Descartes, Drewry, and Freightos data represent consummated transactions, there are circumstances in which 'it is reasonable for Commerce to choose price quotes over broad data sets.'" Remand at 15, Appx22061. To support this proposition, the Remand relies on "*Jiangsu Zhongji Lamination Materials Co., (HK) v. United States*, 2023 WL 3863201, *10 . . . (CIT 2023) (*Jiangsu*) (citing *Changzhou Trina Solar Energy Co. v. United States*, 492 F. Supp. 3d 1322, 1330 (CIT 2021) (*Changzhou*))." Remand at 15, n. 72, Appx22061. However, as discussed below, *Jiangsu* is distinguishable while *Changzhou* repudiates Commerce's proposition.

*Jiangsu* is distinguishable based on its facts. The Remand states that "in *Jiangsu,* Commerce evaluated whether to use Maersk data over Descartes . . . data was reasonable considering that Descartes ocean freight data was based on actual transactions, and . . . Commerce,

10

analyzing data considerations in Policy Bulletin 4.1, weighted, *inter alia*, public availability more heavily in finding that Maersk data was the best available information," Remand at 16, Appx22062, despite representing mere price quotes. However, the facts of *Jiangsu* do not apply because there "Descartes . . . had the disadvantage of including impermissible data from Chinese shipping." *Jiangsu*, 2023 WL 3863201 at *8.

In contrast to *Jiangsu*, there is no evidence that the specific set of Descartes as well as Drewry and Freightos data on this record include Chinese shipping data. Additionally, unlike *Jiangsu*, on this record, Descartes, Drewry, and Freightos data also are publicly available. As such, *Jiangsu* fails to support Commerce's decision to prefer Maersk price quotes over actual prices reported by Descartes, Drewry, and Freightos.

Further, *Changzhou* is diametrically opposite because there "Commerce abandon{ed} its reliance on Maersk data . . . , and instead use{d} data from Xenata." *Changzhou Trina Solar Energy Co. v. United States*, 532 F. Supp. 3d 1333, 1334 (CIT 2021). Notably, Commerce contrasted the two datasets based on the fact that "the Xeneta data

"includes thousands of actual shipments covering every day of the POR while the Maersk data comprise 32 price quotes." *Id.* at 1337 (CIT 2021). Similarly, on this record, because Descartes, Drewry and Freightos – like Xeneta – are based on actual shipments while Maersk data are mere price quotes, *Changzhou Trina*, contrary to Commerce's claims, undermines Maersk quotes in favor of Descartes / Drewry / Freightos actual price data.

The Remand also misplaces reliance upon *Jinko Solar Import and Export Co. v. United States*, 701 F. Supp. 3d 1367 (CIT 2024). It claims that "the CIT affirmed Commerce's determination explaining that, '{a}though the Maersk data does not reflect actual transactions … the data reflected *daily reported prices* at which international ocean freight is offered by Maersk.'" Remand at 16, n. 75 (emphasis added) (quoting *Jinko Solar*, 701 F. Supp. 3d at 1385), Appx22062. *Jinko Solar* is readily distinguishable for the reasons set forth below.

First, the Maersk data on this record are monthly instead of daily prices. Petitioner's Resubmission of Surrogate Value Information, Exhibit 1, Appx22015-22027. Second, in *Jinko Solar*, "Commerce did not rely solely on the Maersk data . . . {but} both the Descartes and Maersk

rates." *Jinko Solar*, 701 F. Supp. 3d at 1385-86. As such, *Jinko Solar* at minimum does not support the Remand's rejection of Descartes. Third, *Jinko Solar* endorsed Commerce's rationale to reject Drewry and Freightos: "Drewry and Freightos data fail to identify the types of materials shipped . . . ." *Id.* at 1386. Yet this Court already disposed of this issue in the context of Descartes / Drewry / Freightos, reasoning that "there's nothing unreasonable in how the agency weighed the competing considerations as to cargo specificity." Slip Op. 24-66, 2024 WL 2796654 at *5.

### B.    There is No Support for the Remand's Preference of Maersk Data Based on Route-Specificity and Incidental Ocean Freight Charges

The Remand is premised on Maersk data being purported superior quality in terms of route specificity and reporting of incidental ocean freight charges. As explained below, both rationales are unpersuasive and unsupported by agency precedent.

First, the Remand unpersuasively expresses a preference for Maersk data based on the route specific considerations that "the only source of information on the record that matches exactly Dingli's predominant ocean shipping route for the POI shipments of MAE is

that from Maersk (offering information limited strictly to the Shanghai to Oakland, CA route)." Remand at 8, Appx22054. However, record evidence also shows that the underlying datasets for the ocean freight SV used in the Final Determination include Shanghai to Los Angeles, CA (Drewry) and Shanghai to Long Beach, CA (Freightos). Dingli's Redacted Rebuttal Brief at 7, Appx6647; *see* Remand at 8, Appx22054.

The record reveals that the U.S. ports – Los Angeles, CA and Long Beach, CA – are longitudinally adjacent to the port of Oakland, CA. Dingli's Redacted Rebuttal Brief at 7, Appx6647. All three ports are proximate to each other on the West Coast of the United States. As a result, the distance from Shanghai to Long Beach, CA or Los Angeles, CA is nearly the same as the distance from Shanghai to Oakland, CA. Consequently, freight charges for Shanghai-Long Beach, CA and Shanghai-Los Angeles, CA shipments should be nearly equal to Shanghai-Oakland, CA freight charges. Therefore, contrary to the Remand's conclusions, these two port combinations are nearly as route-specific as Maersk's Shanghai-Oakland route.

Rather than address this demonstrated route-specificity equivalence in its multi-factor comparative analysis, the Remand

14

summarily dismisses this argument: "Commerce need not engage in determining whether certain freight charges *should be* nearly equal, as Dingli states, because the Maersk data is specific to Dingli's actual shipping routes . . . which makes the Maersk freight data superior to the Descartes, Drewry, and Freightos freight data, in terms of route specificity." Remand at 17-18, Appx22063-22064.

Such a binary determination is unlawful because "when presented with multiple imperfect potential surrogate-data sources, Commerce must faithfully compare the strengths and weaknesses of each before deciding which to use." *CP Kelco US, Inc. v. United States*, 2015 WL 1544714, at *7 (CIT 2015); *see CP Kelco US, Inc. v. United States,* 2016 WL 1403657, at *5 (CIT 2016) ("Although Commerce paid lip service to the Thai Ajinomoto statements' evidence of countervailable subsidies, the agency never plumbed the implications as it had plumbed the issues caused by incompleteness. This was not a faithful side-by-side comparison, because such a comparison requires an evenhanded analysis of both sets of financial statements, complete with an evaluation of the statements' relative strengths and weaknesses.").

15

Likewise, the Remand impermissibly "never plumbed the implications {of the unreliability of Maersk's price quote} as it . . . plumbed the issues caused by {minor variations in route-specificity of Descartes / Drewry / Freightos actual price data}." *CP Kelco*, 2016 WL 1403657 at *5.

Further, on the China side, Ningbo is likewise longitudinally adjacent to Shanghai. Dingli's Final SV Comments, Exhibit 7D, Appx18679-18680. Descartes, Drewry, and Freightos data used in the Final Determination include Shanghai-New York (Descartes, Drewry) and Ningbo-New York (Freightos) ocean freight data. *Id*. Exhibit 7, Appx18257-18262,Appx18264-18269,Appx18271. Relative to the China-U.S. distance, the distance between East Coast ports like New York on the one hand and West Coast ports like Los Angeles / Long Beach / Oakland on the other, is not that significant. Indeed, in the Freightos database, the freight difference between Ningbo-New York and Shanghai-Long Beach, CA is insignificant. *Id*. Therefore, the Remand's product-specificity rationale – based on the exact port combination predominantly used by Dingli – and conversely excluding the nearly equivalent port combinations, is unsupported by substantial evidence.

16

As its second rationale, the Remand explains that unlike Descartes / Drewry / Freightos: "the Maersk data provide ocean freight rate detail, which demonstrates that in addition to basic ocean freight, other charges, *i.e.*, export service fees, terminal handling service fees (origin), documentation fees, bunker adjustment factor fees, low sulfur surcharge, and terminal handling service fees (destination) are included in the rate." Remand at 8-9, Appx22054-22055. This rationale is misleading because inclusion of the so-called additional incidental charges, instead of enhancing accuracy as the Remand claims, potentially results in a distortive calculation.

As Commerce is aware, documentation fees, export services fees and terminal handling fees are already included in the brokerage and handling ("B&H") surrogate value based on the World Bank's Doing Business in Brazil 2020 report. Commerce Preliminary SV Memorandum (Sept. 24, 2021), P.R. 415-16, accompanying Excel Workbook Tab: "Brazilian B&H." The B&H SV represents a sum total of cost covering two broad categories of indirect movement expenses – border compliance and documentary compliance. Settled agency precedent, discussed *infra*, informs that the border compliance cost in

World Bank's Doing Business reports encompasses local port surcharges and handling fees. Therefore, the inclusion of these two costs in the ocean freight SV in the Remand results in an impermissible double counting.

Further, the Remand fails to tie the nature of the bunker adjustment factor with any record evidence that would support its inclusion in the basic ocean freight cost. As such, its inclusion results in a potential distortion of the ocean freight SV.

Even so, the Remand avers that "it cannot definitively conclude that the brokerage and handling expenses include the incidental ocean freight charges that are included in the Maersk source data." Remand at 18, Appx22064. However, this conclusion is directly contradicted by the B&H cost elements enumerated under "Documentary compliance" (*e.g.*, "submitting documents during transport, clearance, inspections and port or border handling in origin economy") and "Border compliance" (*e.g.*, "handling and inspections that take place at the economy's port or border"), showing that Maersk's "export service fees, terminal handling service fees (origin), documentation fees" overlap with B&H expenses

18

calculated based on the World Bank's *Doing Business 2020 (Brazil)* report. Remand at 19, Appx22065.

Instead of recognizing this obvious overlap between Maersk's incidental charges and B&H expenses, the Remand hurls a red herring: "The *Doing Business 2020 (Brazil)* report then states that 'Insurance cost and informal payments for which no receipt is issued are excluded from the cost recorded.' This indicates that any ocean freight incidental charges are likely not included in the brokerage and handling surrogate value, as informal payments may be related to these incidental charges." Remand at 19, Appx22065 (quoting Dingli First SV Comments (July 26, 2021), P.R. 242-49, Exhibit 6, Appx7228-7229). Such speculative Commerce reasoning is baseless because it is not based on any record evidence.

Indeed, in the context of Maersk ocean freight data, longstanding Department precedent underscores the problem of double counting of incidental ocean freight charges (which overlap with B&H charges):

> The petitioner placed ocean freight rates from Maersk on the record. Specifically, the petitioner provided the average freight cost for CRS from Long Beach, CA; Newark, NJ; and Savannah, GA to the port of Shanghai, China, which consists of: (1) basic ocean freight; (2) bunker adjustment factor; (3) low sulfur surcharge; (4) terminal handling service -

19

destination; and (5) documentation fee - destination. The petitioner also provided the costs to import to Shanghai and Beijing, which include *border compliance fees (i.e., clearance and inspection, and port or border handling)* and documentary compliance fees for Shanghai and Tianjin as reported in the World Bank's *Doing Business in China: 2020* (Doing Business in China). For this preliminary determination, *we used only the petitioner's ocean freight estimates from Maersk to avoid double- counting as some of the border compliance fees and documentary compliance* fees reported in Doing Business in China appear to overlap with the ocean freight cost in the Maersk data.

*Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 85 Fed. Reg. 68,848 (Oct. 30, 2020), accompanying Preliminary Decision Memorandum at 4 (emphasis added), unchanged in *Certain Walk-Behind Lawn Mowers and Parts Thereof From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 27,379 (May 20, 2021). The Remand does not contest this persuasive precedent.

Likewise, in *Certain Crystalline Photovoltaic Cells, Whether or Not Assembled Into Modules from China*, when relying on Maersk data, Commerce excluded all additional charges in order to avoid double counting the B&H charges:

the Maersk data includes, but itemizes, charges identified as documentation, export, and terminal handling fees (for both origin and destination), and charges associated with freight such as low sulfur surcharge and bunker adjustment factor. . . . Maersk data, which itemizes the amount of the handling charge. Hence, we can remove the handling charge when calculating the net U.S. price. . . . We agree with Trina that we double counted brokerage and handling expenses. The Maersk rates that we used to value international freight expenses in the *Preliminary Results* include brokerage and handling expenses incurred in China. However, we also separately valued brokerage and handling incurred in China using the World Bank's publication, *Doing Business 2017 (Thailand)* and subtracted both the international freight expenses and the separate brokerage and handling expenses from the gross U.S. price when calculating the net U.S. . . . We disagree with the petitioner that the fees included in the Maersk international freight rate which are labeled as "Documentation Fee – Origin" and "Terminal Handling Service – Origin" are not brokerage and handling fees. Preparing documentation for export is part of the broker's fees, and terminal handing service, as its name indicates, corresponds to handling. The surrogate value for brokerage and handling advocated by both the petitioner and Trina was identified as "Cost to Export. Border compliance" and "Cost to Export. Documentary compliance" in the *Doing Business 2017 (Thailand)* publication.

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed. Reg. 35,616, (July 27, 2018), accompanying IDM Comment 8.

21

The Remand fails to distinguish the "'Cost to Export Border compliance,' and the 'Cost to Export: Documentary compliance,' requirements in the *Doing Business 2017 (Thailand)* report", Remand at 20-21, Appx22066-22067, from the corresponding data reported in the *Doing Business 2020 (Brazil)* report. Commerce's effort to do is without merit because both reports provide substantially the same cost elements.

Therefore, the Remand runs afoul of the longstanding Department findings holding that Maersk's incidental ocean freight charges overlap with the B&H expenses reported in the World Bank's Doing Business reports. At a minimum, these additional incidental expenses cannot support Commerce's decision to prefer a facially distortive Maersk data over the fully loaded and undistorted Descartes / Drewry / Freightos ocean freight data.

The Remand's rationale is also inconsistent with Department precedent holding that Descartes' base ocean freight data captures all of the charges related to ocean freight while avoiding the cost elements related to the B&H charges:

> The Descartes rates are clearly identified as only ocean freight charges and are called "base freight" rates. This

indicates the rates do not cover non- ocean freight charges, such as brokerage and handling fees, or truck freight services.

For all of the above reasons, we have continued to use Descartes data, rather than Maersk data, to value the cost of ocean freight for certain shipping routes.

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019*, 86 Fed. Reg. 58,871 (Oct. 25, 2021), accompanying IDM Comment 10.

The above-quoted Department precedent impugns the Remand's selection of Maersk data while rejecting the previously-selected Descartes data that provide full ocean freight charges undistorted by B&H expenses. Record evidence likewise shows that Drewry and Freightos report fully loaded ocean freight costs for China-U.S. shipments. Dingli's Final SV Comments Exhibit 7A(ii)-(iii), Appx18264-18271. For example, Drewry explicitly qualifies its prices as an "all in rate," *id.* Exhibit 7A(iii), Appx18270-18271, *i.e.* ocean freight charges include all applicable cost elements. Likewise, there is no record evidence suggesting that Freightos ocean freight cost do not include all

applicable charges. There is also no evidence that either Drewry or

Freightos are distorted by B&H expenses. Dingli further provided

public information about Freightos and Drewry, *id.* Exhibits 7F-G,

Appx18683-18705, evidencing that both are well-established,

longstanding, and well-reputed international data providers.

In sum, the Remand's reliance on route specificity and incidental

ocean freight charges to favor Maersk over Descartes / Drewry /

Freightos is unsupported by substantial evidence and in conflict with

Department precedent.

### C.    The Remand Fails to Weigh Maersk SV against the Other SV Choices based on the Key Criterion of Container Weight

The Remand's disjunctive analysis also errs in overlooking a

critical deficiency underlying the Maersk price quotes, *i.e.* they all are

associated with a boilerplate inscription of 18,000 Kg for 40 foot dry

containers. Moreover, this payload is unrealistically low as compared to

the prescribed industry standard payload of 28,800 Kg for a 40 foot

container, published by Maersk itself. Petitioner's Case Brief (Nov. 24,

2021), C.R. 323, P.R. 471, Attachment 3B, Appx6621-6622. In fact, the

18,000 Kg weight is even lower than the 28,200 Kg weight Maersk

24

prescribes for its smaller size 20 foot containers. *Id.*

Further, record evidence shows that in prior proceedings, for Maersk price data, Commerce used an even higher container weight – 28,870 Kg (for 40 foot) – to value ocean freight. Dingli's Final SV Comments Exhibit 7C, Appx 18593, Appx18596 (a plethora of Maersk price quotes evidencing the container weight are included in this exhibit). Notably, these weights were placed on the record in the countervailing duty ("CVD") investigation of *Certain Aluminum Foil from the People's Republic of China* by Commerce itself, drawing from prior Department memoranda. *Id.* Exhibit 7C(ii), Appx18390-18600. As such, the probity of these container weights have been well established in multiple proceedings. These facts render the anemic 18,000 Kg data printed on the Maersk ocean freight quotes as anomalous and unreliable.

The Remand is bereft of a cogent explanation as to why Maersk would issue a price quote for an unusual payload – "half-full, half-empty" container load. The Remand's retort "that the Maersk source freight data are for a specified quantity of goods as opposed to a theoretical 'container load' of merchandise," Remand at 21, Appx22067, misses the point that the alleged "specified quantity" of 18,000 Kg is

arbitrary and contradicted by record evidence. Further, the Remand's alibi that this weight is "close to the lowest (20,000 kilograms) container capacity for a 40-foot container capacity," Remand at 21, Appx22067, concedes that this weight is an outlier.

Finally, the Remand unpersuasively defends that "we continue to find that the Maersk's 18,000-kilogram containers **are not so anomalous** as to be unreliable . . . {because} Dingli did not provide any evidence on the record to indicate that Commerce had previously denied using Maersk rates for allegedly low container weights." Remand at 22 (emphasis added), Appx22068. In doing so, however, the Remand impliedly concedes the infirmity underlying Maersk's boilerplate low weight. Further, regardless of prior precedent on this precise issue, Commerce was obligated to factor this acknowledged "anomaly" in formulating its choice.

This anomaly concerning the critical element of payload weight renders the Maersk price quotes unreliable. In comparison, the freight rates for Descartes, Freightos, and Drewry are based on actual shipments of containers and, therefore, in the Final Determination, Commerce properly applied the published container payload factors –

28,300 Kg (for 20 foot) and 28,700 Kg (for 40 foot) – whose probity has

been established over multiple ADD / CVD proceedings, to obtain the

unit ocean freight cost.

In sum, the anomalous payload referenced on Maersk data sheets

constitutes another important reason impugning the reliability of the

Maersk price quotes.

In view of the above, Commerce erred by preferring the unreliable,

anomalous, potentially distortive, and qualitatively inferior Maersk

data while rejecting its prior choice of SV based on averaging the

overwhelmingly superior Descartes, Drewry, and Freightos data.

## II.  <u>TO VALUE MINOR FABRICATED COMPONENTS, COMMERCE IMPROPERLY RELIED UPON HTS 8431.20.90</u>

The Remand revises the valuation of 16 minor fabricated inputs,

by relying on import data reported under HTS 8431.20.90 ("Parts

suitable for use solely or principally with machinery of heading 8427,

other than Fork lift trucks") and rejecting their prior valuation based on

HTS headings under 7208, 7211, and 7214 (covering steel plate, sheet,

bar, rod). Remand at 9-13, Appx22055-22059.

The chart below summarizes the HTS/SV selected in the Final

Determination and the Remand.

| FOP Variable Name | Final Determination | | Remand | | % Difference |
|---|---|---|---|---|---|
| | HS Code | SV (Real/Kg) | HS Code | SV (Real/Kg) | |
| BOARD_BRACKET_PLATE | 721114 | 4.161229 | 84312090 | 28.8059 | 592% |
| BOARD_CONTROLBOX_PLATE | 720854 | 4.689720 | 84312090 | 28.8059 | 514% |
| BOARD_HANGING_PLATE | 721114 | 4.161229 | 84312090 | 28.8059 | 592% |
| CHARGER_WINDOW_STPLATE | 721123 | 5.010573 | 84312090 | 28.8059 | 475% |
| CYLINDER_HOLDER_STPLATE | 721114 | 4.161229 | 84312090 | 28.8059 | 592% |
| RETRACTOR_STPLATE | 721119 | 3.691591 | 84312090 | 28.8059 | 680% |
| ROLLER_BRACKET_STPLATE | 721114 | 4.161229 | 84312090 | 28.8059 | 592% |
| SAFETY_ARM_STPLATE | 720852 | 5.134071 | 84312090 | 28.8059 | 461% |
| ST_COLDDRAWN_BOX | 721123 | 5.010573 | 84312090 | 28.8059 | 475% |
| ST_CONNECT_BLOCK_PLATE | 721114 | 4.161229 | 84312090 | 28.8059 | 592% |
| ST_POTHOLE_PLATE | 721114 | 4.161229 | 84312090 | 28.8059 | 592% |
| STEERING_CONNECT_STROD | 721499 | 4.379687 | 84312090 | 28.8059 | 558% |
| SWITCH_COVER_STPLATE | 721119 | 3.691591 | 84312090 | 28.8059 | 680% |
| SWITCH_STPLATE_BELOW_4_75 | 721119 | 3.691591 | 84312090 | 28.8059 | 680% |
| SWITCH_STPLATE_OVER_4_75 | 721114 | 4.161229 | 84312090 | 28.8059 | 592% |
| A_ST_ADJUST_PLATE | 720854 | 4.689720 | 84312090 | 28.8059 | 514% |

As set forth below, Commerce's choice is unsupported by substantial record evidence and controlling judicial precedent.

To support its revised unitary choice of HTS 8431.20.90 (28.80 Brazilian Real ("BRL")/Kg) for valuing various minor fabricated inputs, the Remand first distinguishes the minor fabricated inputs from the underlying primary steel inputs in terms of their physical characteristics and production process.

> Dingli purchased minor fabricate{d} steel components as opposed to raw steel. . . . {T}hese inputs get laser cut, or punched out, or sawed to specific dimensions, sometimes followed by punching or drilling of holes and/or bending and, less rare, welding.

*Id*. at 11, Appx22057.

The Remand then claims that the essential character of these minor fabricated inputs is different from the underlying primary steel inputs on account of their having been substantially transformed and valued added:

> {T}he fabrication of a component, in itself, naturally transforms the "essential nature" of primary steel material. Although a fabricated part and its input (*i.e.*, primary steel material) are both steel material, a fabricated part achieves a further value added to it by a physical transformation, thus making it useful only for a specific purpose and unusable as a raw input.

*Id*. at 12, Appx22058. Finally, the Remand supports the new HTS 8431.20.90:

> we are using HS subheading 8431.20.90 – "Parts suitable for
> use solely or principally with machinery of heading 8427,
> other than Fork lift trucks," because the inputs in question
> are fabricated parts destined for incorporation into Dingli's
> MAE machines.

*Id.*, Appx22058.

As such, the Remand's choice of HTS 8431.20.90 strictly follows

the analysis used to classify goods for Customs purposes. In doing so,

the Remand deviates from Commerce's normal practice that favors a

HTS subheading yielding a more reliable, representative, and accurate

value even though it may not be the most suitable for classification

purposes.

The U.S. Court of Appeals for the Federal Circuit ("CAFC") in

*Downhole Pipe & Equipment, L.P. v. United States*, affirmed

Commerce's normal practice:

> Regarding Downhole Pipe's argument that Commerce's
> "legal analysis" of the competing tariff headings was
> insufficient because Commerce failed to employ the General
> Rules of Interpretation of the Harmonized Tariff Schedule as
> part of its evidentiary determination, this is *not* a customs
> classification case. Commerce was not required to engage in
> a classification analysis to determine which IHTS
> subheading contained entries of drill pipe green tube; rather,
> it was required to determine which of the competing
> subheadings constituted the best available information for
> valuing the green tube input.

776 F.3d 1369, 1378-79 (Fed. Cir. 2015).

The CAFC reaffirmed its *Downhole Pipe* rationale in *SolarWorld*

*Americas, Inc. v. United States*:

> Commerce is "not required to engage in a classification
> analysis" but instead is "required to determine which of the
> competing subheadings constituted the best available
> information." *Downhole Pipe*, 776 F.3d at 1379.
> Consequently, even if some aluminum frames do not contain
> perfectly uniform cross-sections as discussed in the
> explanatory note, Thai HTS Heading 7604 still constitutes
> the best available information under § 1677b(c)(1)(B), given
> the other similarities detailed above between Yingli's inputs
> and the products covered by Thai HTS Heading 7604. . . .
>
> To the extent SolarWorld argues as a legal matter that
> Customs' rulings must be afforded more weight than other
> evidence on the record, we disagree. Whereas Customs is
> tasked with "fix{ing} the final classification" of imported
> merchandise under the HTSUS, 19 U.S.C. § 1500; . . .
> (outlining Customs' role in *classification*), Commerce is
> authorized to conduct administrative reviews of an
> antidumping duty order to "determine . . . the amount of any
> antidumping duty" necessary to remedy the effect of foreign
> merchandise being sold in the United States at less than its
> fair value, 19 U.S.C. § 1675(a)(1)(B); *see id.* § 1673. . . . .
>
> Keeping in mind these differing statutory purposes that
> dictate Customs' and Commerce's respective roles, we are
> informed by Judge Pogue's conclusion in *Jiangsu Jiasheng
> Photovoltaic Technology Co. v. United States. See* 28
> F.Supp.3d 1317, 1336 (Ct. Int'l Trade 2014). There, the CIT
> held that "{t}he fact that Commerce has at times found
> support for its {SV} choices in Customs classification rulings
> does not lead to the conclusion that Commerce must follow

such rulings in every case {when valuing factors of production}."

910 F.3d 1216, 1223-25 (Fed. Cir. 2018).

The Remand's cursory analysis ignores the Department's normal practice, affirmed by the CAFC in *Downhole Pipe* and *SolarWorld*. As Commerce acknowledges, Dingli's minor fabricated steel inputs are generally produced by simple machining operations of punching, drilling, and bending of steel plates, sheets, bars, and rods. Remand at 11, Appx22057.

Commerce misconstrues Dingli's reliance on *Downhole Pipe* and *SolarWorld*. According to the Remand, this precedent "stand{s} for the proposition that to the extent that customs classifications could assist Commerce in satisfying its requirement to determine what subheading constitutes the best available information, Commerce *may* engage in such analysis, but *it is not required*." Remand at 25 (emphasis in original), Appx22071. Yet Dingli is faulting Commerce for conducting a rigid classification analysis to value its minor fabricated components in deviation from its practice to avoid doing so for SV purposes. Dingli is not claiming that Commerce was prohibited from looking at the HTS classifications, but instead claiming that the Department solely

considered the classification aspect, unlawfully ignoring the AUVs attached to the HTS headings and whether they correlated with the intrinsic values of the upstream primary steel input and Dingli's purchased minor fabricated inputs.

The Remand further misplaces reliance on Dingli's position in briefing during the underlying investigation. Dingli has consistently advocated that its minor fabricated components be valued using subheadings under HTS headings 7208, 7211, and 7214. Dingli Pre-Preliminary Comments (Sept. 2, 2021), P.R. 344-45, Exhibit 1, Appx21352-21414; Dingli Redacted Rebuttal Brief at 46-49, Appx6686-6689. Dingli having advocated that Commerce use HTS subheading 84231.20.90 for major fabricated parts that went far beyond minimal processing is not a concession as to the appropriate SV for minor fabricated inputs, despite Commerce's insistence. Remand at 27-28, Appx22073-22074.

Further, the record does not contain evidence suggesting that the value addition resulting from such simple machining operations is significant. In view of these facts, the Remand's choice of HTS subheading 8431.20.90, resulting in an astronomical value addition of 450-700 percent to the value of basic steel inputs, lacks any evidentiary

33

support. Commerce unpersuasively seeks evidentiary support for these inflated values from "the AUV of 28.62 BRL/Kg" that "Dingli placed on the administrative record . . . from Türkiye." Remand at 29, Appx22075. Yet Dingli submitted that data to value major customized fabricated subassemblies, *i.e.*, "steel inputs that are especially designed, fabricated, *welded, heat treated* and customized for a specific end-use in assembling the MAE equipment." *Id.* (emphasis added), Appx22074. Again, Dingli has consistently maintained that by contrast the minor fabricated components that are *minimally processed* – cut and bent – primary steel materials (plates, sheets, etc.) should be valued using much lower values. Dingli Redacted Rebuttal Brief at 46-49, Appx6686-6689.

Additionally, the Remand conspicuously lacks explanation supporting such outsize value addition resulting from such simple machining operations. To the contrary, the Remand's pure Customs classification based analysis improperly bypasses any analysis of the relevance and accuracy of the resulting SV. As such, the choice of HTS 8431.20.90 is unsupported by substantial record evidence.

34

As opposed to HTS subheading 8431.20.90 SV, the SVs from the initially selected subheadings under HTS headings 7208, 7211, and 7214 (covering steel plate, sheet, bar, rod) reasonably approximate the value of the primary steel inputs. The Remand does not contest this proposition; rather, it ignores this critical factor. Therefore, Commerce's Remand impermissibly declined to follow its normal practice, as affirmed by the CAFC, by considering which competing HTS subheading leads to the most accurate SV. Accordingly, Commerce should have rejected HTS subheading 8431.20.90 and categorized these minor fabricated inputs using HTS headings 7208, 7211, and 7214.

## CONCLUSION

For the foregoing reasons, Defendant-Intervenor Dingli respectfully requests that this Court remand Commerce's Remand as unsupported by substantial evidence and not otherwise in accordance with law.

Respectfully submitted,

*/s/ Dharmendra N. Choudhary*
Ned H. Marshak
Dharmendra N. Choudhary
Jordan C. Kahn

35

GRUNFELD, DESIDERIO,
LEBOWITZ, SILVERMAN &
KLESTADT LLP

599 Lexington Ave., 36th Floor
New York, New York 10022
(212) 557-4000
**
1201 New York Ave., NW,
Suite 650
Washington, DC 20005

*Counsel for Defendant-Intervenor
Zhejiang Dingli Machinery Co.,
Ltd.*

Dated: February 28, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Consolidated Defendant-Intervenors' Response Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 6,512 words, less than the 10,000 word limit.

*/s/ Dharmendra N. Choudhary*
*Counsel for Defendant-Intervenor*
*Zhejiang Dingli Machinery Co.,*
*Ltd.*

Dated: February 28, 2025