THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT,<br><br>   Plaintiff,<br><br>  v.<br><br>UNITED STATES,<br><br>   Defendant,<br><br>  and<br><br>ZHEJAING DINGLI MACHINERY CO., LTD.,<br><br>   Defendant-Intervenor. | Court No. 22-0152 |

**DEFENDANT'S COMMENTS IN SUPPORT OF REMAND REDETERMINATION**

      BRETT A. SHUMATE
      ASSISTANT ATTORNEY
      GENERAL

      PATRICIA M. McCARTHY
      Director

      TARA K. HOGAN
      Assistant Director

OF COUNSEL

RUSLAN KLAFEHN
Attorney
Office of the Chief Counsel for
    Trade Enforcement &
    Compliance
U.S. Department of Commerce

KRISTIN E. OLSON
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480 | Ben Franklin
Station
Washington, D.C. 20044
Tel: (202) 307-6299
kristin.olson@usdoj.gov

*Attorneys for the United States*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... vi

GLOSSARY ............................................................................................ x

BACKGROUND ..................................................................................... 2

    I.    Case History Before the Court's May 31, 2024 Order ............ 2

        A.    Commerce Initiates The Less Than Fair Value Investigation Of Mobile Access Equipment From China And Invites Parties To Submit Surrogate Value Information ................................................... 2

        B.    Parties Submit Surrogate Value Information On Ocean Freight Costs And Costs For Minor Fabricated Steel Components, And Commerce Selects Brazil As The Surrogate Country For This Investigation ................................................. 3

            1.    Surrogate Value Data For Ocean Freight .................................................. 4

            2.    Surrogate Value Data For Certain Minor Fabricated Steel Components ................... 5

        C.    The Coalition Challenges Commerce's *Final Determination* Arguing That Commerce Should Have Considered Surrogate Ocean Freight Data From Maersk And Should Have Valued Certain Minor Fabricated Steel Parts Under HTS 7326.90.90. ...................................................... 6

    II.    This Court Remands Commerce's Determination Not To Use Maersk Data To Value Ocean Freight And Commerce's Determination To Use HTS Subheadings Related To Raw Steel Inputs To Value Certain Minor Fabricated Steel Components ................................................ 7

        A.    Surrogate Value Data For Ocean Freight .................... 7

        B.    Surrogate Value Data For Certain Minor Fabricated Steel Components .......................................... 8

III.    On Remand, Commerce Determines That The Maersk Data Is The Best Available Information To Value Ocean Freight Because It Is The Most Route-Specific Data, And Commerce Determines That HTS 8431.20.90 Is The Best Available Information To Value Certain Minor Fabricated Steel Components Because It Is The Most Product-Specific Data..........................................9

        A.    Surrogate Value Data For Ocean Freight ...................10

        B.    Surrogate Value Data For Certain Minor Fabricated Steel Components .....................................12

ARGUMENT .........................................................................................13

    I.    Standard Of Review ..............................................................13

    II.    Commerce's Determination, On Remand, To Rely Solely On The Maersk Data To Value Ocean Freight Complies With The Court's *Remand Order*, Is Supported By Substantial Evidence, And Otherwise Is In Accordance With Law .........................................................13

        A.    Commerce's Determination That The Maersk Data Is The Best Available Information After Considering That The Maersk Data Reflects Price Quotes And Is Derived From A Low Container Weight Is Supported By Substantial Evidence ...........15

            1.    Price Quotes Do Not Detract From Commerce's Reliance On The Maersk Data Because Commerce Has Discretion To Weigh Data Considerations And Reasonably Explained Why It Found The Maersk Data To Be Reliable.............................................16

            2.    The Shipping Weight Criterion Does Not Detract From Commerce's Reliance On The Maersk Data To Value Ocean Freight Because It Represents A Realistic Container Payload..................................................26

B.    Consistent With Its Practice, Commerce
Reasonably Relied On The Maersk Data To Value
Ocean Freight Because It Is The Most Route-
Specific Data And Includes Incidental Ocean
Freight Charges ........................................................... 30

    1.    Commerce's Practice Is To Rely On
Data That Is Specific To Port
Combinations Used By Respondents
And Only The Maersk Data Is Specific
To Dingli's Port Combinations Used ................... 31

    2.    The Maersk Data Are The Only
Dataset That Includes Incidental
Ocean Freight Charges Separate Of
Brokerage And Handling Expenses .................... 38

III.    Commerce's Determination To Rely Solely On HTS
Subheading 8431.20.90 To Value Certain Minor
Fabricated Components, Complies With The Court's
*Remand Order*, Is Supported By Substantial Evidence,
And Otherwise Is In Accordance With Law .......................... 45

CONCLUSION ......................................................................... 50

# TABLE OF AUTHORITIES

<u>Cases</u>                                                    <u>Page(s)</u>

*Changzhou Trina Solar Energy Co. v. United States*,
   492 F. Supp. 3d 1322 (Ct. Int'l Trade 2021) ...............................*passim*

*Changzhou Trina Solar Energy Co. v. United States*,
   532 F. Supp. 3d 1333 (Ct. Int'l Trade 2021) ..................................21, 24

*Clearon Corp. v. United States*,
   38 CIT 1122 (2014).................................................................................29

*Coalition of American Manufacturers of Mobile Access Equipment v.
   United States*, Ct. No. 22-00152, ECF No. 70 (Ct. Int'l Trade 2024)
   (*Remand Order*) ...........................................................................*passim*

*Coalition of American Manufacturers of Mobile Access Equipment v.
   United States*, Ct. No. 22-00152, Slip Op. 24-66 (Ct. Int'l Trade 2024)
   (*Remand Opinion*)........................................................................*passim*

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ...............................................................................13

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ...............................................................................13

*CP Kelco US, Inc. v. United States*,
   2015 WL 1544714 (Ct. Int'l Trade 2015) ...................................*passim*

*CP Kelco US, Inc. v. United States*,
   2016 WL 1403657 (CIT 2016).....................................................*passim*

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ............................................................21

*Giorgio Foods, Inc. v. United States*,
   Ct. No. 23-00133, Slip Op. 24-79, at 19 (Ct. Int'l Trade 2024)............32

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*,
    366 F. Supp. 2d 1264 (Ct. Int'l Trade 2005) .......................................25

*Hyundai Elec. & Energy Sys. Co. v. United States*,
    15 F.4th 1078 (Fed. Cir. 2021)..............................................................44

*Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. v. United States*,
    322 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) .......................................29

*Jiangsu Zhongji Lamination Materials Co., (HK) v. United States*,
    No. 21-00138, 2023 WL 3863201 (Ct. Int'l Trade June 7, 2023)
    ....................................................................................................*passim*

*Jinko Solar Import and Export Co. v. United States*,
    701 F. Supp. 3d 1367 (Ct. Int'l Trade 2024) ...............................*passim*

*MacLean-Fogg Co. v. United States*,
    100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) .......................................13

*Nantong Uniphos Chems. Co. v. United States*,
    415 F. Supp. 3d 1345 (Ct. Int'l Trade 2019) .......................................40

*OTR Wheel Eng'g, Inc. v. United States*,
    901 F.Supp.2d 1375 (Ct. Int'l Trade 2013) .........................................37

*Pirelli Tyre Co., Ltd. v. United States*,
    128 F.4th 1265 (Fed. Cir. 2025)............................................................42

*Taian Ziyang Food Co. v. United States*,
    783 F. Supp. 2d 1292 (Ct. Int'l Trade 2011) .................................24, 49

Statutes

19 U.S.C. § 1516a(b) ...................................................................................13

19 U.S.C. § 1677b(c).....................................................................................2

Regulations

19 C.F.R. § 351.102(b) ............................................................... 10

19 C.F.R. § 351.105(c) ................................................................. 7

19 C.F.R § 351.408(c) ................................................................ 10

Administrative Determinations

*Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2019-2020*,
86 Fed. Reg. 73,731 (Dep't of Commerce Dec. 28, 2021), and accompanying IDM ............................................................... 23

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*,
86 Fed. Reg. 54,164 (Dep't of Commerce Sept. 30, 2021) (*Preliminary Determination*), and accompanying Preliminary Decision Mem. (PDM) ........................................................................ *passim*

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*,
87 Fed. Reg. 9576 (Dep't of Commerce Feb. 22, 2022) and accompanying IDM ................................................................ *passim*

*Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*,
86 Fed. Reg. 15,922 (Dep't of Commerce March 25, 2021).................... 2

*Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*,
85 Fed. Reg. 68,848 (Oct. 30, 2020), and accompanying PDM ........... 40

*Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 1167 (Dep't of Commerce Jan. 11, 2016), and accompanying IDM ................................................................. 16, 17, 18

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed. Reg. 35,616, (July 27, 2018), accompanying IDM .................. 42

GLOSSARY

| Abbreviation | Term |
|---|---|
| AD | Antidumping duty |
| AUV | Average unit value |
| B&H | Brokerage and Handling |
| BPI | Business proprietary information |
| Coalition | Coalition of American Manufacturers of Mobile Access Equipment |
| Commerce | U.S. Department of Commerce |
| C.R. | Confidential Record |
| Dingli | Zhejiang Dingli Machinery Co., Ltd. |
| Final Remand Results | Final Results of Redetermination Pursuant to Remand Order (October 30, 2024), ECF No. 74 |
| HTS | Harmonized Tariff Schedule |
| IDM | Issues and Decision Memorandum |
| Kg | Kilogram |
| LGMG | Lingong Group Jinan Heavy Machinery Co., Ltd. |
| MAE or mobile access equipment | Certain mobile access equipment and subassemblies, as defined in *Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: Initiation of Less-Than-Fair-Value* |

| | |
|---|---|
| | *Investigation*, 86 Fed. Reg. 15922 (Dep't of Commerce March 25, 2021) |
| NME | Non-market economy |
| PDM | Preliminary Decision Memorandum |
| POI | Period of Investigation |
| POR | Period of Review |
| P.R. | Public Record |
| P.R.R. | Public Remand Record |
| *Preliminary Determination* | *Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 54,164 (Dep't of Commerce Sept. 30, 2021) |
| *Remand Opinion* | *Coalition of American Manufacturers of Mobile Access Equipment v. United States*, Ct. No. 22-00152, Slip Op. 24-66 (Ct. Int'l Trade 2024) |
| *Remand Order* | *Coalition of American Manufacturers of Mobile Access Equipment v. United States*, Ct. No. 22-00152, ECF No. 70 |
| SV | Surrogate value |

Defendant, the United States, respectfully submits this response to the comments by Defendant-Intervenor, Zhejiang Dingli Machinery Co., Ltd., (Dingli), concerning the Department of Commerce's Final Results of Redetermination Pursuant to Court Remand Order filed with this Court on October 30, 2024.  Final Results of Redetermination Pursuant to Remand Order (October 30, 2024), P.R.R. 17, ECF No. 74 (Final Remand Results), Appx22045-22077;[1] *see also Coalition of American Manufacturers of Mobile Access Equipment v. United States*, Ct. No. 22-00152, Slip Op. 24-66 (Ct. Int'l Trade 2024) (*Remand Opinion*); *Coalition of American Manufacturers of Mobile Access Equipment v. United States*, Ct. No. 22-00152, ECF No. 70 (Ct. Int'l Trade 2024) (*Remand Order*).

---

[1] In this brief, we use "P.R." and "C.R." to refer to the public and confidential records of Commerce's original determination.  We use "P.R.R." and "C.R.R." to refer to the public and confidential records of Commerce's redetermination on remand.

BACKGROUND

I.    Case History Before the Court's May 31, 2024 Order

    A.    Commerce Initiates The Less Than Fair Value Investigation
         Of Mobile Access Equipment From China And Invites
         Parties To Submit Surrogate Value Information

On March 18, 2021, following the filing of a petition by the
Coalition of American Manufacturers of Mobile Access Equipment
(Coalition), Commerce initiated a less-than-fair-value investigation of
mobile access equipment from China. *See Certain Mobile Access
Equipment and Subassemblies Thereof From the People's Republic of
China: Initiation of Less-Than-Fair-Value Investigation*, 86 Fed. Reg.
15,922 (Dep't of Commerce March 25, 2021), P.R. 46, Appx6778-6784.
Commerce selected Dingli as one of the mandatory respondents.
Commerce's Mem. "Respondent Selection," dated April 23, 2021, P.R.
110, Appx2061-2068.

In a less-than-fair-value proceeding involving a non-market-
economy (NME), Commerce is required to make a comparison between
the U.S. price and the NME producer's factors of production as valued
by a "surrogate" country to determine whether there is dumping. *See
generally* 19 U.S.C. § 1677b(c). Because China is an NME country,
Commerce placed the surrogate country list on the record of the

investigation, identifying countries that are at a level of economic development comparable to China, and invited interested parties to submit surrogate value data. *See* Commerce's Letter, "Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information," dated June 15, 2021, P.R. 195, 197, Appx22000-22002.

B.    Parties Submit Surrogate Value Information On Ocean Freight Costs And Costs For Minor Fabricated Steel Components, And Commerce Selects Brazil As The Surrogate Country For This Investigation

During the investigation, Dingli and the Coalition each submitted, as relevant to this remand, Brazilian surrogate value data for valuing ocean freight costs and the costs of certain minor fabricates steel components, and Commerce selected Brazil as the primary surrogate country for this investigation. *See Certain Mobile Access Equipment and Subassemblies Thereof From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 54,164 (Dep't of Commerce Sept. 30, 2021), P.R. 422 (*Preliminary Determination*), Appx1031-1034, and

3

accompanying Preliminary Decision Mem., P.R. 407 (PDM) at 9,

Appx1008.

        1.   <u>Surrogate Value Data For Ocean Freight</u>

In response to Commerce's request for ocean freight surrogate

value data, the Coalition provided Maersk ocean freight data but

designated all of the Maersk data as business proprietary information

(BPI) because Dingli had not publicly disclosed its trade routes used.

*See e.g.*, Coalition's Letter, "Final Submission of Surrogate Values

(Confidential Data)," dated August 25, 2021 (Coalition's Final SV

Comments), C.R. 260, at Ex. 1, Appx3703-3705, Appx3719-3732; *see*

*also* Coalition's Letter, "Case Brief," dated Nov. 24, 2021, P.R. 471, C.R.

456 (Coalition's Case Brief), at n. 9, Appx6530-6532.  The Maersk data

was predicated on a container weight of 18,000kg and matched exactly

the route used for the overwhelming majority of Dingli's sales to the

United States.  *See* Coalition's Final SV Comments at Ex. 1, Appx3720-

3732; *see also* Dingli's Letter, "Dingli Response to Sections C&E

Questionnaires," dated June 21, 2021, P.R. 200, C.R. 119 (Dingli's

Sections C&E Response), at 24-25, Appx2098-2099.

Dingli, on the other hand, provided surrogate value data from Descartes, Drewry, and Freightos. *See e.g.,* Dingli's Letter, "Dingli's Final Surrogate Value Comments," dated August 25, 2021 (Dingli's Final SV Comments), P.R. 242, at Exhibits 7A, 7A(i), 7A(ii), and 7A(iii), Appx7402-7424. Dingli argued that the Descartes, Drewry, and Freightos data were the only publicly available information because the Maersk data were designated as BPI and were not superior in terms of specificity. Dingli's Letter, "Dingli's Redacted Rebuttal Brief," dated January 19, 2022, P.R. 496, C.R. 463, at 5-9, Appx6645-6649.

## 2.    Surrogate Value Data For Certain Minor Fabricated Steel Components

In response to Commerce's request for certain minor fabricated steel components surrogate value data, Dingli provided the names of the inputs, field description, classification, recommended Harmonized Tariff Schedule (HTS) subheading, HTS description, a detailed description of the input, degree of fabrication or processing done to the input by suppliers, and its rationale of why its recommended HTS subheading was appropriate. Dingli's Letter, "Dingli's Rebuttal to Petitioner's Pre-Preliminary Comments," dated September 14, 2021, P.R. 400, C.R. 331, at 7-9, and Ex. 1, Appx4846-4848, Appx4857-4859.

5

The Coalition, however, provided HTS subheadings for further processed inputs, reflecting that Dingli's inputs had undergone further processing.  Coalition's Letter, "Pre-Preliminary Comments," dated September 8, 2021, P.R. 393, C.R. 327, at 14-21, Appx4792-4799.

C.  The Coalition Challenges Commerce's *Final Determination* Arguing That Commerce Should Have Considered Surrogate Ocean Freight Data From Maersk And Should Have Valued Certain Minor Fabricated Steel Parts Under HTS 7326.90.90.

The Coalition challenged the final determination, arguing that the Maersk data were publicly available and more specific to Dingli's trade routes used and goods shipped, such that they were the best available information to value ocean freight.  Pl.'s Rule 56.2 Mot., ECF No. 55, at 24-25.  On the publicly available criterion, the Coalition argued that Dingli's trade routes are a matter of public information and were improperly designated as BPI.  *Id.* at 26-28.

The Coalition also challenged Commerce's valuation of certain minor fabricated steel parts.  It contended that Commerce incorrectly used HTS subheadings covering raw steel inputs to value Dingli's minor fabricated steel component inputs notwithstanding Dingli's admission

that it purchased fabricated components and not raw steel. *Id.* at 39-45.

II. **This Court Remands Commerce's Determination Not To Use Maersk Data To Value Ocean Freight And Commerce's Determination To Use HTS Subheadings Related To Raw Steel Inputs To Value Certain Minor Fabricated Steel Components**

On May 31, 2024, this Court remanded the final determination, with respect to the surrogate values for ocean freight and certain minor fabricated steel components, instructing Commerce to reconsider its selection of the Descartes, Drewry, and Freightos ocean freight data as opposed to the Maersk data, and to reconsider its use of Dingli's proffered HTS subheadings to value certain minor fabricated steel components.

A. Surrogate Value Data For Ocean Freight

In remanding Commerce's determination not to use the Maersk data to value ocean freight, the Court first instructed Commerce to explain why Dingli's BPI designation of its ocean shipping routes was a permissible characterization under 19 C.F.R. § 351.105(c). *Remand Order* at 1. The Court also instructed Commerce to direct Dingli, if Commerce finds that Dingli erred in designating the information in question as BPI, to withdraw its designation and to provide the

Coalition a corresponding opportunity to redesignate the Maersk data.
*Id.* at 1-2. Alternatively, if Commerce found that Dingli's BPI designation of its shipping routes was proper, the Court instructed Commerce to advise the Coalition that its own BPI designation of ocean freight rates was improper and give the Coalition an opportunity to redesignate information. *Id.* at 2.

The Court further instructed Commerce to explain why the Descartes, Drewry, and Freightos data is more route-specific than the Maersk data, and why it found that the Maersk data was not publicly available despite past determinations finding that they are publicly available. *Id.* at 2. Lastly, the Court instructed "insofar as, on remand, the agency again chooses to use the Descartes data, to identify the specific data in the record on which it relies to support its conclusion about what sorts of costs the brokerage and handling surrogate value includes." *Id.*

B. Surrogate Value Data For Certain Minor Fabricated Steel Components

In remanding Commerce's determination to use certain HTS subheadings for raw steel inputs, the Court instructed Commerce to reconsider its valuation of minor fabricated steel components and

resolve internal inconsistencies present in Commerce's original

analysis. *Id.* at 2-3. Specifically, the Court remanded for Commerce to

explain how it can find that some of Dingli's suppliers "do more in-depth

fabrication or processing," while nonetheless finding that there is no

evidence on the record demonstrating that the suppliers provided

fabricated steel components, instead of raw steel. *Id.*

III.    On Remand, Commerce Determines That The Maersk Data Is The
        Best Available Information To Value Ocean Freight Because It Is
        The Most Route-Specific Data, And Commerce Determines That
        HTS 8431.20.90 Is The Best Available Information To Value
        Certain Minor Fabricated Steel Components Because It Is The
        Most Product-Specific Data

Pursuant to the Court's remand order and in light of the now

public information on the record, Commerce issued its draft remand

results. Draft Results of Remand Redetermination Pursuant to Court

Remand (Draft Remand Results) on September 3, 2024, P.R.R. 6,

Appx22030-22044. Upon consideration of the parties' comments on the

draft remand redetermination, Commerce continued to find that the

Maersk data constituted the best available information for purposes of

valuing ocean freight because it was the most specific to the routes used

by Dingli, and that HTS 8431.20.90 constituted the best available

information for purposes of valuing certain minor fabricated steel

components because HTS 8431.20.90 was the most specific to the inputs used by Dingli. *See* Final Remand Results, at 7-9, 12-13, Appx22053-22055, Appx22058-22059. As a result, Commerce made certain changes to the margin calculations determined in the final determination. Final Remand Results at 1-2, Appx22047-22048.

A.   Surrogate Value Data For Ocean Freight

On remand, and as instructed by the Court, Commerce explained that Dingli impermissibly characterized its shipping routes as BPI and directed Dingli to either publicly disclose the ports of exportation and importation used by Dingli, or alternatively to justify its BPI designation. *See* Commerce's Letter, "BPI Designation," dated June 12, 2024, P.R.R. 1 (BPI Letter), Appx22003-22004; Final Remand Results at 6-7, Appx22052-22053 (citing 19 C.F.R. § 351.102(b)(21)(iii) (defining factual information as, inter alia, "publicly available information submitted to value factors {of production} under {19 C.F.R. 351.408(c)}")). In response, Dingli publicly disclosed the ports of exportation and importation. *See* Dingli's Letter, "Dingli's Response to Commerce's June 12 Letter," dated June 14, 2024, P.R.R. 2, Appx22005-22006. Commerce also provided the Coalition a corresponding

opportunity to redesignate, as public information in its entirety, the Maersk information originally provided in Exhibit 1 of its August 25, 2021 submission. *See* Commerce's Letter, "Request to Redesignate BPI," dated July 3, 2024, P.R.R. 4, Appx22008. The Coalition responded and provided the redesignated ocean freight surrogate value information. *See* Coalition's Letter, "Resubmission of Surrogate Value Information," dated July 5, 2024, P.R.R. 5 (Coalition's Ocean SV), Appx22009-22029.

Commerce also confirmed, consistent with past decisions, that the Maersk data constituted publicly available ocean freight prices and was otherwise reliable. Final Remand Results at 7, Appx22053. In light of the Court's remand order and having evaluated the record on remand, Commerce found, consistent with its practice to use ocean freight data that are specific to port combinations that a respondent uses, that the Maersk data was the best available information to value ocean freight based on route specificity and inclusion of all incidental ocean freight charges. *Id.* at 8-9, Appx22054-22055.

B.    Surrogate Value Data For Certain Minor Fabricated Steel
       Components

On remand, Commerce also addressed the internal inconsistencies

in its original analysis with respect to the appropriate HTS subheading

to use for valuing certain minor fabricated steel components.

Commerce found that the record demonstrated that "Dingli sourced

minor inputs that were fabricated, to a certain degree" and, as a result,

the record did not support using Dingli's proffered HTS subheadings,

which reflected base steel materials, to value certain minor fabricated

steel components that are useful only for a specific purpose and

unusable as a raw input.  Final Remand Results at 11-12, Appx22057-

22058.  In selecting HTS 8431.20.90, Commerce reasoned that

Commerce has found previously that inputs which are parts of products

specifically named in the HTS should be valued using the subheading

for those parts.  *Id.* at 11-12, Appx22057-22058.  Therefore, HTS

8431.20.90 which covers parts of mobile access equipment was the

appropriate HTS subheading to value Dingli's minor fabricated steel

components.  *Id.* at 11-13, Appx22057-22059.

<u>ARGUMENT</u>

I.    <u>Standard Of Review</u>

In remand proceedings, the Court will sustain Commerce's determination if it is "in accordance with the remand order," and is "supported by substantial evidence and otherwise in accordance with law." *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The possibility of drawing inconsistent conclusions from the record does not prevent Commerce's finding from being supported by substantial evidence. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

II.   Commerce's Determination, On Remand, To Rely Solely On The Maersk Data To Value Ocean Freight Complies With The Court's *Remand Order*, Is Supported By Substantial Evidence, And <u>Otherwise Is In Accordance With Law</u>

Dingli argues that "Commerce baselessly asserts that this Court restricted it to examine only route specificity (and incidental charges) and precluded a comprehensive comparative analysis of all four data

sources," and thus that Commerce's determination is not supported by substantial evidence. Dingli's Comments at 8-9. Dingli is mistaken.

The remand order instructed Commerce first to resolve the issue of whether Dingli's Ocean shipping routes were improperly designated as BPI. *Remand Order* at 1-2. Commerce complied with that instruction. After Dingli redesignated the information as public, Commerce allowed the Coalition to redesignate the Maersk data as public information. *See* Final Remand Results at 6, Appx22052; BPI Letter, Appx22003-22004; Commerce's Letter, "Request For SV Resubmission," dated July 3, 2024, Appx22008. In doing so, Commerce also "reconcile{d} its finding that the Maersk data are not publicly available, published prices with its past pronouncements finding that they are," *Remand Order* at 2, and confirmed the Maersk data constitute publicly available ocean freight prices. Final Remand Results at 7, Appx22053 (internal citations omitted).

With the Maersk data now on the record as public information, Commerce evaluated all four data sets on the record (Maersk, Descartes, Drewry, and Freightos). *See id.* at 6-9, 14-22, Appx22052-22055, Appx22060 -22068. Thus, contrary to Dingli's claim, Commerce

14

engaged in "a comprehensive comparative analysis of all four data sources" in complying with the remand order.

Dingli argues that Commerce's sole reliance on the Maersk data to value ocean freight is unsupported by substantial evidence because (1) the Maersk data are price quotes and the container weights underlying the Maersk data are anomalous, and either makes the Maersk data unreliable, and (2) Commerce has not supported its preference for route-specificity and reporting of incidental ocean freight charges. *See* Dingli's Comments at 2-24. Dingli's arguments are without merit.

> A.    Commerce's Determination That The Maersk Data Is The Best Available Information After Considering That The Maersk Data Reflects Price Quotes And Is Derived From A Low Container Weight Is Supported By Substantial Evidence

Commerce's determination to rely solely on the Maersk Data is supported by substantial evidence. The fact that the Maersk data are comprised of price quotes does not undermine their reliability. Although Commerce prefers that surrogate value data be based on actual transactions, it is only a preference, not a bright line rule. That preference may be overcome by other data quality considerations, which

were present here.  Similarly, the fact that the container weight underlying the Maersk data is 18,000 Kg is of no moment because it more closely resembles shipments of subject merchandise rather than a theoretical container load, satisfying Commerce's preference to rely on data comprised of actual quantities rather than theoretical quantities. Further, after evaluating the totality of the record evidence, Commerce found that the Maersk data were the superior choice to the Descartes, Drewry, and Freightos data.

      1.     Price Quotes Do Not Detract From Commerce's Reliance On The Maersk Data Because Commerce Has Discretion To Weigh Data Considerations And Reasonably Explained Why It Found The Maersk Data To Be Reliable

Dingli asserts that Commerce overlooked a "threshold aspect" in failing to consider that the Maersk data are unreliable because they "are not based on actual shipments or actual payments," unlike the Descartes data which "represent actual, consummated transactions." Dingli's Comments at 4-8.  Citing *Chlorinated Isocyanurates from China*, Dingli concludes that "{t}his distinction – actual prices versus price quotes – constitutes a sufficient standalone reason to reject the Maersk price quotes."  *Id.* at 8 (citing *Chlorinated Isocyanurates from*

*the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 81 Fed. Reg. 1167 (Jan. 11, 2016), accompanying Issues and Decision Memorandum ("IDM"), Comment 2). However, price quotes are not *per se* unreliable.

Commerce expresses a *preference* for data based on actual transactions rather than price quotes, but that preference is not a bright-line rule. That preference may be overcome if other considerations weigh towards price quote data as the best available information. *See Jiangsu Zhongji Lamination Materials Co., (HK) v. United States*, No. 21-00138, 2023 WL 3863201, at *10 (Ct. Int'l Trade June 7, 2023) ("But we also stated 'it is reasonable for Commerce to choose price quotes over broad data sets in some circumstances.'"). Here, Commerce found the price quotes to be the superior data because they are route-specific and include incidental ocean freight charges not included in the Descartes, Drewry, and Freightos data. Final Remand Results at 15-19, Appx22061-22065.

In support of its argument that price quotes are *per se* unreliable, Dingli cites *Chlorinated Isos*. Dingli's Comments at 7-8 (citing *Chlorinated Isocyanurates from the People's Republic of China: Final*

*Results of Antidumping Duty Administrative Review; 2013-2014*, 81

Fed. Reg. 1167 (Dep't of Commerce Jan. 11, 2016), and accompanying

IDM at Comment 2).  However, in *Chlorinated Isos*, Commerce

considered more than just whether the data submitted was a price

quote or based on actual transactions: Commerce evaluated

contemporaneity, public availability, and broad-market averages in

evaluating the ISS study at issue.  *See Chlorinated Isos* IDM at

Comment 2.

Moreover, in *Chlorinated Isos*, Commerce was evaluating whether

price quotes contained in a study *from a private market research firm*

were the best available information to value the item as opposed to a

publicly available source.  In rejecting the private market research

study, Commerce determined that the study was not contemporaneous

with the period of review, was not publicly available, was not based on

actual transactions as *preferred* by Commerce, and was only arguably

more specific.  Here, unlike in *Chlorinated Isos*, the Maersk data, while

price quotes and thus less preferred than actual transactions, are

publicly available, are contemporaneous with the period of

investigation, and are specific to the exact port combinations used by

Dingli.  Thus, Commerce reasonably determined that in this case, its preference for actual transactions was overcome by the other factors.

Further, in *Chlorinated Isos*, Commerce was concerned about potential biases with the private market research study.  Here, however, there is no such concern with the Maersk data because Commerce knows the search parameters used to populate the Maersk data.  *See* Final Remand Results at 17-18, 21, Appx22063-22064, Appx22067 (discussing port combinations, incidental ocean freight charges, and container weight).  Thus, Dingli's contention that "{t}his distinction – actual prices versus price quotes – constitutes a sufficient standalone reason to reject the Maersk price quotes," Dingli's Comments at 8, is incorrect, especially when viewed in context of what information is on the record in this case.

Dingli argues that Commerce impermissibly selected price quote data over transaction-specific data in this case, and that Commerce misrelied on *Jiangsu, Changzhou*, and *Jinko Solar* in finding it was reasonable for Commerce to choose price quotes over actual prices.  *See* Dingli's Comments at 10 (citing *Jiangsu*, 2023 WL 3863201 at *10; *Changzhou Trina Solar Energy Co. v. United States*, 492 F. Supp. 3d

19

1322, 1330 (Ct. Int'l Trade 2021) (*Changzhou II*)); *id.* at 12-13 (citing

*Jinko Solar v. United States*, 701 F. Supp. 3d 1367 (Ct. Int'l Trade

2024).  Dingli misinterprets all three cases.

First, Dingli contends *Jiangsu* does not apply because in *Jiangsu*

the data set was rejected because it had non-market economy

transactions and was proprietary, whereas here, the Descartes, Drewry,

and Freightos data do not have non-market economy transactions and

are public.  Dingli's Comments at 10-11.  However, in *Jiangsu*,

Commerce evaluated numerous factors in weighing the reliability of

differing ocean freight data sets.  The fact that Maersk data was based

on price *quotes*, rather than prices paid, was considered a disadvantage,

but not dispositive.  Maersk also had two major advantages: it was

publicly available (as compared to the proprietary Xeneta set), and it

excluded rates from China (the Xeneta and Descartes data sets did not).

*See Jiangsu*, 2023 WL 3863201, at *8-10.  Commerce ultimately found

the Maersk data to be superior.  *Id.*

The Court sustained, as reasonable, Commerce's determination to

rely on the Maersk data over the Xeneta data, explaining that the

defendant met the burden required by the substantial evidence

standard "{b}ecause weighting each aspect of the Policy Bulletin is within Commerce's discretion." *See Jiangsu*, 2023 WL 3863201, at *10.

Second, Dingli argues that *Changzhou* repudiates Commerce's position in this case because in *Changzhou*, Commerce relied on transaction-specific data as opposed to Maersk price quotes. Dingli's Comments at 10-12. In *Changzhou II*, the Court assessed whether Commerce reasonably relied on Maersk data over Xeneta data in its first remand redetermination. In remanding Commerce's determination again, the Court held that Commerce failed to address evidence that detracted from its determination and failed to address comparative representativeness of the two data sets. *See Changzhou II*, 492 F. Supp. 3d at 1329-31. The Maersk data was not route-specific because it lacked data on two routes used by the respondent. *Id.* at 1330. Additionally, the Maersk data only had price quotes "on a few days in the {period of review}," whereas the Xeneta data covered the entire period of review. *Id.* at 1330. The Court concluded, however its role was not to "choose the best information available, . . . only to ensure that Commerce's choice was reasonable." *Id.* at 1331 (*citing Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1043 (Fed. Cir. 1996)).

Commerce ultimately relied on the Xeneta data, abandoning the
Maersk data, because the Maersk data did not cover the entire period of
review and were not route-specific.  *See Changzhou Trina Solar Energy
Co. v. United States*, 532 F. Supp. 3d 1333, 1337 (Ct. Int'l Trade 2021)
(*Changzhou III*) (sustaining Commerce's Second Remand Results).
Here, however, the Maersk data *does* cover the entire period of review
and is route specific—in fact it is the only data which exactly match
Dingli's port combinations used.  As such, Commerce found it reliable.
*See* Final Remand Results at 17-18, Appx22063-22064.

Third, Dingli contends that Commerce's reliance on *Jinko Solar* is
similarly misplaced because *Jinko Solar*'s acceptance of the Maersk
data was predicated on the fact that the Maersk data reflected daily
reported prices (whereas the Maersk data in this case contains monthly
prices) and that "Commerce did not rely solely on the Maersk data," but
also relied on the Descartes data.  Dingli's Comments at 12-13 (citing
*Jinko Solar Import and Export Co. v. United States*, 701 F. Supp. 3d
1367 (Ct. Int'l Trade 2024)).

In *Jinko Solar*, the Court sustained Commerce's use of both the
Maersk and Descartes data because both contained ocean freight rates

specific to the subject merchandise and for freight routes used. *Jinko Solar*, 701 F. Supp. 3d at 1384-85. In finding that Commerce could rely on the Maersk data, the Court reasoned that "{a}lthough the Maersk data does not reflect actual transactions, it is reasonably discernable that Commerce viewed the data as reliable." *Id.* at 1385. Commerce relied upon Maersk data in part because it "reflected daily reported prices at which international ocean freight is offered by Maersk." *Id.* Commerce relied on multiple data sets because multiple sets were "needed to value ocean freight expenses for multiple routes." *Id.* at 1385.

*Jiangsu*, *Changzhou II*, and *Jinko Solar* each confirm, as Commerce explained in the final remand results, that it is within Commerce's discretion to use data derived from price quotes rather than actual transactions, so long as Commerce provides a reasonable explanation. *Jiangsu*, 2023 WL 3863201 at *10; *Changzhou II*, 492 F. Supp. 3d at 1331; *Jinko Solar*, 701 F. Supp. 3d at 1385; *see also* Final Remand Results at 16-17, Appx22062-22063. Here, Commerce reasoned that route-specificity should be afforded more weight because "Commerce's practice is to use ocean freight surrogate value data that

are specific to the port combinations a respondent uses for its shipments of merchandise under consideration." Final Remand Results at 8, Appx22054 (citing *e.g., Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2019-2020*, 86 Fed. Reg. 73,731 (Dep't of Commerce Dec. 28, 2021), and accompanying IDM at Comment 8).

Indeed, the *Jinko Solar* and *Changzhou III* decisions identified route-specificity as a reasonable explanation for finding Maersk data price quotes reliable. *See Jinko Solar*, 701 F. Supp. 3d at 1385;[2] *Changzhou III*, 532 F. Supp. 3d at 1337. As stated throughout, the Maersk data is the only data that matches the exact port combinations used by Dingli. Thus, the Maersk data is reliable with respect to that

---

[2] Relatedly, Dingli argues that *Jinko Solar* "at minimum does not support the Remand's rejection of Descartes" because Commerce relied on both Descartes and Maersk rates in *Jinko Solar*. Dingli's Comments at 12-13. Yet, that was because the Descartes data covered at least some routes used by respondents that the Maersk data did not and thus was necessary. *See Jinko Solar*, 701 F, Supp. 3d at 1385. Here, no such issue exists. Rather, the Maersk data is the *only* data set that is specific to the port combinations used by Dingli, obviating the need to resort to additional data sets.

point.  Similarly, unlike in *Changzhou II & III*, the Maersk data on this record covers the entire period of investigation, rather than "just a few days."  In the words of *Jiangsu*, the Maersk data "beats" the Descartes, Drewry, and Freightos data on the criterion of specificity, a primary criterion, identified by Policy Bulletin 04.1.  *See Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292, 1330 (Ct. Int'l Trade 2011) ("If a set of data is not sufficiently 'product specific' it is of no relevance whether or not the data satisfy the other criteria set forth in Policy Bulletin 04.1." (citing *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 366 F. Supp. 2d 1264, 1273-74 (Ct. Int'l Trade 2005))); Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), https://enforcement.trade.gov/policy/bull04-1.html (Policy Bulletin 04.1).

Accordingly, because Commerce reasonably explained why it found that the Maersk data price quotes are reliable and the most specific data on the record, this Court should sustain Commerce's final remand results.

25

> 2. The Shipping Weight Criterion Does Not Detract From Commerce's Reliance On The Maersk Data To Value Ocean Freight Because It Represents A Realistic Container Payload

On remand, Commerce selected the Maersk data as the best information to value ocean freight because that data represented a "specified quantity of goods," whereas the Descartes, Drewry, and Freightos data use "a theoretical load of merchandise." Final Remand Results at 21, Appx22067. Dingli claims that the Maersk data are unreliable because the payload underlying the Maersk data is "unrealistically low" when compared to prior Commerce decisions and when compared to data published by Maersk itself. Dingli's Comments at 24-25. Those assertions are incorrect.

First, Dingli appears to conflate *payload* with *container capacity* and, as a result, assumes that it is possible to load each container to capacity.[3] Dingli argues that the 18,000 Kg payload for a 40-foot dry

---

[3] Dingli also seems to conflate weight with volume in stating that the payload is unusual because it is "half full, half-empty." Dingli's Comments at 25. By Dingli's logic, a container is only full if it has reached its weight capacity. However, elementary logic militates against such a conclusion. For example, a cubic foot of lead weighs more than a cubic foot of feathers but occupies the same volume. Thus, a shipping container could become "full" under Dingli's logic without the

container is anomalous compared to the "prescribed industry standard payload of 28,800 Kg." Dingli's Comments at 24-25. Dingli's only evidence for its statement that the industry standard *payload* for a 40-foot dry container is 28,800 Kg other is a citation to the Coalition's administrative case brief which provided a survey of various *container*

---

good shipped taking up the entire volume of a shipping container. The reverse is also true.

This is why Commerce engaged in analyzing volume and weight as distinct metrics in determining the payload for a shipping container. *See* Final Remand Results at 21, Appx22067 (citing *Final Determination* IDM at 11 (discussing volumetric and weight approaches to assessing maximum container load)). The type of machinery comprising subject merchandise includes "boom lifts, scissor lifts, and material telehandlers." *Final Determination*, 87 Fed. Reg. at 9,578, Appx1174. Further, Dingli reported sales of finished mobile access equipment. *See Final Determination* IDM at n. 79, Appx1046 (citing Dingli's Sections C&E Response," at 9-10, and Ex. C-1 (reporting a code 99 under the SUBASSEMWU field number, indicating finished mobile access equipment)). This type of subject merchandise, by its very nature, may not easily fit into a standard 20- or 40-foot container, as compared to pallets of more standard sized merchandise, such that only a few units would fit into a single container. As a result, the volumetric limit would be reached far sooner than the weight limit.

Consequently, Dingli's argument that Commerce should derive an ocean freight surrogate value from the Descartes, Drewry, and Freightos data, which use a theoretical container load is misguided. Under the substantial evidence standard both interpretations could be supported, and given that "weighting each aspect of the Policy Bulletin is within Commerce's discretion," Commerce has supported its determination with respect to the container weight criterion with substantial evidence. *See Jiangsu*, 2023 WL 3863201 at * 10.

*capacities.  See* Dingli's Comments at 24 (citing the Coalition's Case
Brief at Attachment 3B).  Yet the survey of container capacities,
Coalition's Final SV Comments at Exhibit 10, undermines Dingli's
assertion regarding the industry standard because only one freight
service, albeit Maersk, even has a container capacity equating to the
supposed industry standard payload.  *See* Coalition's Case Brief at
Attachment 3B, Appx6621-6622 (reprinting Coalition's Final SV
Comments at Exhibit 10).  Thus, Dingli's statement of the industry
standard payload is unsupported by the record evidence.

Commerce, however, must base its data set selection on record
evidence rather than theoretical assumptions about the payload.  As
Commerce explained in the Final Remand Results, the payload used in
the Maersk data is both for a specified quantity of goods and very close
to the lowest container capacity within the survey provided by the
Coalition.  *See* Final Remand Results at 21-22, Appx22067-22068.
Thus, the Maersk data accounts for near full utilization of at least one
freight services' capacity limitation and is based on record evidence.
Therefore, Commerce found that "that the Maersk's 18,000-kilogram
containers are not so anomalous as to be unreliable as Dingli claims."

Final Remand Results at 22, Appx22068 (citing *Final Determination IDM* at 14).

Second, the fact that in prior proceedings, Commerce used a higher container weight to value ocean freight does not render the use of Maersk's data in this case unreliable. Dingli has not identified any prior case in which Commerce found Maersk data unreliable because it was based on *allegedly* low container weights. Moreover, references to container weights in prior proceedings do not constitute factual information in this case. "Although Commerce can and does take into consideration its policies and methodologies as expressed in different administrative case precedent when making its determination, it cannot take the factual information underlying those decisions into consideration unless those facts are properly on the record of the proceeding before it." *Clearon Corp. v. United States*, 38 CIT 1122, 1147 (2014) ; *see also Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. v. United States*, 322 F. Supp. 3d 1308, 1324 (Ct. Int'l Trade 2018) (stating that legal references such as precedents are not factual information).

29

In assessing the "container weight" factor, Dingli believes that the Descartes, Drewry, and Freightos data is superior to Maersk data. Commerce disagrees, as it prefers that the Maersk data represented a "specified quantity of goods as opposed to a theoretical 'container load' of merchandise." Final Remand Results at 21, Appx22068. Commerce's determination regarding the container weight criterion is supported by substantial evidence. *See Jiangsu*, 2023 WL 3863201 at * 10. Even if reasonable minds could disagree regarding which data set is superior in regards to the container weight criterion, that is not a basis to overturn Commerce's decision. Therefore, this Court should reject Dingli's arguments.

> **B.    Consistent With Its Practice, Commerce Reasonably Relied On The Maersk Data To Value Ocean Freight Because It Is The Most Route-Specific Data And Includes Incidental Ocean Freight Charges**

Commerce's determination to rely solely on the Maersk Data is supported by substantial evidence. The Maersk data is the only data set on the record that is specific to the exact port combinations used by Dingli and includes incidental ocean freight charges, two points that the Court specifically instructed Commerce to reconsider. *See Remand Order* at 2. Yet, Dingli argues that Commerce's rationales as to route-

30

specificity and incidental ocean freight charges do not support

Commerce's determination to rely solely on the Maersk data.  As

explained below, Dingli is mistaken.

      1.    Commerce's Practice Is To Rely On Data That Is
             Specific To Port Combinations Used By Respondents
             And Only The Maersk Data Is Specific To Dingli's Port
             Combinations Used

Dingli argues that Commerce's focus on route-specificity is

unsupported by substantial evidence because Commerce was required

to compare the strengths and weaknesses of using exact port

combinations with that of "nearly equivalent port combinations."

Dingli's Comments at 13-16.  Dingli's argument is unpersuasive.

This Court found that "Dingli ships almost all its lifting machines

by sea to the U.S. West Coast, with only a small fraction going to the

Port of New York." *Remand Opinion* at 11-12.  On this basis, this Court

concluded "that the Descartes, Freightos, and Drewery data are less

specific than the Maersk information." *Remand Opinion* at 12.  Thus,

the Court remanded for Commerce "to explain why the shipping route

reflected in the Descartes, Freightos, and Drewry information is more

specific to Dingli's routes than the Maersk data." *Remand Order* at 2.

On remand, Commerce explained that its practice is to use ocean freight surrogate value data that are specific to the port combinations a respondent uses for its shipments of merchandise under consideration. Final Remand Results at 17, Appx22063. Dingli reported that most of its sales of mobile access equipment was shipped from Shanghai to Oakland, CA. Dingli's Sections C&E Response at 24-25, Appx2098-2099 . However, none of Dingli's proffered data matches its actual routes used. *See* Dingli's Final SV Comments at Exhibits 7A, 7A(i), 7A(ii), and 7A(iii), Appx7402-7424. In contrast, the Maersk data is limited to the Shanghai to Oakland, CA route. *See* Coalition's Final SV Comments at Ex. 1, Appx3719-3732. Therefore, consistent with its practice to use ocean freight surrogate value data that is specific to port combinations used by a respondent, Commerce selected the only data set that is route-specific—the Maersk data. Final Remand Results at 17, Appx22063.

Dingli argues that Shanghai to Los Angeles, CA, and Shanghai to Long Beach, CA, routes are "nearly as route-specific" and as a result ocean freight for those port combinations *should be* nearly equal to the Shanghai to Oakland, CA route. Dingli's Remand Comments at 14.

This is speculation, and, as this Court has held before, "Congress has not authorized the {Department} to exercise its {Tariff Act} powers based on speculation, conjecture, divination, or anything short of factual findings based on substantial evidence." *Giorgio Foods, Inc. v. United States*, Ct. No. 23-00133, Slip Op. 24-79, at 19 (Ct. Int'l Trade 2024) (internal citations omitted). Thus, if Dingli believed that these routes *should be* nearly equal, then it should have supported that contention with record evidence. In the absence of evidence substantiating Dingli's claim, Commerce's determination to use the only data on the record that *does reflect the actual port combinations* Dingli used and is otherwise reliable, complies with this Court's remand order and is supported by substantial evidence.

Dingli does not dispute that the Maersk data are more specific than the Descartes, Drewry, and Freightos data, but instead argues that Commerce erred by engaging in a "binary determination" instead of "faithfully compar{ing} the strengths and weaknesses of each {surrogate data source} before deciding which to use." Dingli's Remand Comments at 14-15. The fact that Commerce found Maersk freight data superior to Descartes, Drewry, and Freightos freight data in terms

of route specificity (which Dingli characterizes as a "binary determination") does not change the fact that Commerce *did* compare the strengths and weaknesses of each data set, and found the Maersk Data to be the best available information on the criterion of route specificity, inclusion of incidental ocean freight charges, and reflection of price quotes vs. consummated transactions. Final Remand Results at 8-9, 14-15, Appx22054-22055, Appx22060-22061. The cases cited by Dingli do not undermine Commerce's decision. Dingli's Remand Comments at 15 (citing *CP Kelco US, Inc. v. United States*, 2015 WL 1544714, at *7 (Ct. Int'l Trade 2015) (*CP Kelco I*), and *CP Kelco US, Inc. v. United States*, 2016 WL 1403657, at *5 (CIT 2016) (*CP Kelco II*)).

In *CP Kelco I*, the Court assessed whether Commerce's selection of Thai Ajinomoto's financial statements rather than Thai Fermentation's financial statements, based in effect on completeness, was unsupported by substantial evidence. *CP Kelco*, 2015 WL 1544714, at *7. Commerce had rejected the use of the Thai Fermentation financial statements, and those of another Thai company, reasoning that the Thai Fermentation financial statements were incomplete and, therefore, unusable. *Id.* at *6. Commerce relied on the Thai Ajinomoto financial statements only

because, despite evidence of receipt of countervailable subsidies, these financial statements were the only statements left on the record. *Id.*

In remanding Commerce's final determination, the Court reasoned that "Commerce's only reason for accepting the Thai Ajinomoto statements was that there were no other financial statements left on the record," and that "Commerce should have compared the two side-by-side." *Id.* at *7. The Court instructed Commerce to "explain why, on the whole, the Thai Ajinomoto statements were a better source than the Thai Fermentation statements." *Id.* Here, Commerce did not reject Dingli's preferred data sets for lack of route-specificity; it simply found the Maersk data to be a better source. Nor did Commerce decide which data set was best solely based on one factor—it evaluated multiple factors, not just route-specificity.

In *CP Kelco II*, the Court assessed whether Commerce had complied with the Court's remand instructions to evaluate the Thai financial statements side-by-side in determining which was the best available information. *CP Kelco II*, 2016 WL 1403657, at *5. In remanding Commerce's remand results, the Court reasoned that

Commerce did not comply with the remand instructions because (1) it devoted only a single paragraph to "accepting the subsidy-affected Thai Ajinomoto statements" and devoted three pages to issues with incomplete statements, and because (2) Commerce failed to support that it had a practice of rejecting incomplete financial statements, especially because Commerce had "sometimes accepted partially incomplete financial statements when the statements still include the data points necessary for {} the agency's calculations." *Id.*

Here, unlike in *CP Kelco I* & *II*, Commerce evaluated each data sets' level of route specificity by examining port combinations contained within the data and concluded that the Maersk data was the most specific of the data-sets. Thus, Commerce *did* engage in a side-by-side comparison of the four data sets on the record on the route-specificity criterion, as well as other criteria. *See* Final Remand Results at 17, Appx22063. Commerce "consider{ed} the totality of the facts on the record," in finding that the Maersk data were the superior choice to the Descartes, Drewry, and Freightos data, and therefore, the best available information to value ocean freight. *See* Final Remand Results at 14-21, Appx22060-22067.

In sum, each of Dingli's arguments were given adequate weight and a side-by-side comparison was made between the Maersk data and the Descartes, Drewry, and Freightos on each point to the extent the record allowed, unlike in the administrative review under *CP Kelco II*. As explained at length, Commerce evaluated the criteria of route specificity, inclusion of incidental ocean freight charges, container weight, and price quotes in determining the Maersk data was the best available information. Final Remand Results at 14-22, Appx22060-22068.

Dingli disagrees with Commerce's weighing of the evidence. But mere disagreement does not undermine Commerce's lawful determination. "{T}he {C}ourt will not re-weigh the evidence presented to Commerce, and will uphold Commerce's determination provided it chooses from among the range of possible reasonable conclusions based on the record." *OTR Wheel Eng'g, Inc. v. United States*, 901 F.Supp.2d 1375, 1380 (Ct. Int'l Trade 2013)

2.    The Maersk Data Are The Only Dataset That Includes
       Incidental Ocean Freight Charges Separate Of
       Brokerage And Handling Expenses

Dingli argues that Commerce's reliance on the Maersk data could

be distortive because the Maersk data *may* include costs associated with

brokerage and handling expenses, which is valued separately.  Dingli's

Comments at 17-24.  Dingli cites the *Doing Business 2020 (Brazil)*

report published by the World Bank (*Doing Business* Report), to argue

that Commerce has included local port surcharges and handling fees in

calculating the ocean freight surrogate value, leading to impermissible

double counting.  Dingli's Comments at 17-18 (citing Commerce's Mem.,

"Preliminary Surrogate Value Memorandum," dated September 21,

2021).  Accordingly, Dingli contends that Commerce should have

instead relied on the Descartes, Drewry, and Freightos data which

represent ocean freight charges inclusive of all applicable cost elements

and, therefore, are not potentially distortive.  Dingli's Comments at 17-

24.

As an initial matter, Commerce found that the Descartes, Drewry,

and Freightos data did not provide any information explaining the

methodology for price data collection or reporting.  *See* Final Remand

Results at 18, Appx22064 (citing Dingli's SV Comments 1 at Exhibits 7A, 7A(i)-(iii)).[4]  Therefore, Commerce concluded that "it cannot be determined whether the ocean freight rates in the Descartes, Freightos, and Drewry information include all, or any, ocean freight incidental charges." *Id.* at 9.

The Court instructed Commerce to identify specific data only "insofar as, on remand, {Commerce} again chooses to use the Descartes data," which Commerce did not do on remand.  *Remand Order* at 2.  The Court found that Commerce's "decision appear{ed} to assume what the brokerage and handling surrogate value includes," and thus it could not "tell what the 'brokerage and handling' fees included or excluded." *Remand Opinion* at 15-16.  Commerce re-examined the record to determine what costs were tied to brokerage and handling and what costs were appropriately tied to ocean freight rates as incidental

---

[4] Dingli argues that Drewry qualifies its prices as an "all in rate," but without the methodology for calculating the "all in rate," Commerce cannot confirm that the Drewry data *actually is* inclusive of all incidental ocean freight charges.  *See* Final Remand Results at 18, Appx22064.  Dingli's appeal that Descartes, Drewry, and Freightos are "well-established, longstanding, and well-reputed international data providers" does not change the fact that Commerce is unable to determine how the prices were generated. *See id.*

charges. *See* Final Remand Results at 18-21, Appx22064-22067. On

that point, Commerce concluded that the *Doing Business* Report, used

for valuing brokerage and handling, does not conclusively include the

incidental ocean freight charges listed in the Maersk data, thus there

was no worry of double counting. *See id.* at 18. As a result, Commerce

found that the Maersk data were the best available information. *See id.*

Dingli argues that the *Doing Business* Report includes the

incidental ocean freight charges listed in the Maersk data, citing

Commerce's preliminary surrogate value memorandum. *See* Dingli's

Comments at 17-18 (citing Preliminary Surrogate Value Mem. at 5, and

Attachment at Tab "Brazilian B&H"). However, the Court has already

proscribed reliance on the preliminary surrogate value memorandum,

stating that "the text of that memorandum contains no explanation of

this issue, and the attachment simply contains three different line

items . . . with no detail about what those amounts represent." *Remand*

*Opinion* at 15. Dingli identifies no other record evidence and thus fails

to support its conclusion. *See Nantong Uniphos Chems. Co. v. United*

*States*, 415 F. Supp. 3d 1345, 1364-65 (Ct. Int'l Trade 2019) ("Plaintiffs

have the burden of placing on the record the evidence to define the fees that they believe were double counted.").

Dingli's citation to prior Commerce decisions does not undermine Commerce's remand redetermination in this case. First, these determinations are fact-specific and the records of each case, as well as evolution of Commerce's practice, dictate the outcome. *See* Dingli's Comments at 20-22.

Second, Commerce's determination to use the Maersk data in this case is consistent with *Certain Walk-Behind Lawn Mowers*. *See Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination,* 85 Fed. Reg. 68,848 (Oct. 30, 2020), and accompanying PDM at 44. In *Certain Walk-Behind Lawn Mowers*, the petitioner placed two pieces of evidence on the record: (1) ocean freight rates from Maersk which consisted of basic ocean freight, a bunker adjustment factor, low sulfur charge, terminal handling service – destination, and documentation fee – destination, and (2) costs to import from the World Bank's *Doing Business in China: 2020* Report,

41

which included border compliance fees and documentary compliance

fees.  *See id.*  Commerce decided to use only the Maersk ocean freight

rates, to avoid double-counting, but that determination was *inclusive* of

the itemized charges.  *See id.* at 45 (citing Commerce's Mem. "Zhejiang

Amerisun Preliminary Calculation Memorandum," dated October 23,

2020).[5]

    While Commerce may not have specifically addressed *Certain*

*Walk-Behind Lawn Mowers* in the remand redetermination, Commerce

did address what costs were tied to ocean freight as opposed to

---

[5] Contrary to Dingli's claim that Commerce excluded the charges, the Zhejiang Amerisun calculation memorandum did include those incidental charges:

> {F}or specific sub-charges that consist of the monthly ocean freight charge (*i.e.*, the "Basic Ocean Freight," "Bunker Adjustment Factor," Low Sulphur Surcharge," and "Terminal Handling Service – Destination" fees reported in USD), we relied on the average monthly exchange rate derived from the Federal Reserve's website instead of the petitioner's submitted data from Maersk to convert USD to RMB.

Zhejiang Amerisun Preliminary Calculation Memorandum at 4.  What Commerce excluded was the costs to import from the World Bank's *Doing Business in China: 2020* Report, which included border compliance fees and documentary compliance fees.  *See id.* at n. 14

brokerage and handling.[6]  *See* Final Remand Results at 9, 18-21, Appx22055, Appx22064-22067.

Third, Dingli's reliance on *Certain Crystalline Photovoltaic Cells, Whether or Not Assembled Into Modules from China*, (*Solar Cells from China*) is misplaced.  The factual record of *Solar Cells from China* was different than the record in this case because it relied on a different World Bank report.  *See* Final Remand Results at 20, Appx22066. Dingli argues the Doing Business 2017 (Thailand) report relied upon in *Solar Cells from China* to calculate the brokerage and handling value included the incidental ocean freight fees in question, and, therefore, Commerce correctly determined not to include such fees in the Maersk data to avoid the double counting of brokerage and handling expenses.[7] Dingli's Comments at 20-21.

---

[6] The fact that Commerce did not specifically address this case in the remand redetermination is not a basis to overturn its decision. Commerce is not required to explicitly mention and discuss every detail raised by a party.  *See Pirelli Tyre Co., Ltd. v. United States*, 128 F.4th 1265, 1271 (Fed. Cir. 2025) ("The substantial-evidence standard requires Commerce to consider all evidence on the record, but such consideration does not necessitate explicit mention and discussion of each piece of evidence.").

[7] In *Solar Cells from China*, Commerce did include several of the charges itemized in the Maersk data *e.g.* Bunker Adjustment Factor.

Although in *Solar Cells from China*, Commerce may have been able to determine that such incidental ocean freight fees were included in the brokerage and handling value, here, Commerce found that the record evidence did not support that conclusion. Final Remand Results at 20-21, Appx22066-22067. In this case, the relevant report—Doing Business 2020 (Brazil)—does not specify which, if any, of the incidental ocean freight fees are included in the brokerage and handling expenses.

The Court ordered Commerce to identify "the specific data in the record on which it relies to support its conclusion about what sorts of costs the brokerage and handling surrogate value includes." *Remand Order* at 2. Thus, upon a closer evaluation of the Doing Business 2017 (Thailand) report, Commerce made a different determination based on different facts. *See Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078, 1089 (Fed. Cir. 2021) ("We have rejected the notion that Commerce is forever bound by its past practices."); *see also* Dingli's Comments at 22 ("{B}oth reports provide substantially the same cost

---

*See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 Fed. Reg. 35,616, (July 27, 2018), accompanying IDM Comment 8.

elements" but not the same cost elements).  Given that *Certain Walk-Behind Lawn Mowers* (a later-in-time case) used the Maersk data *inclusive* of the incidental ocean freight charges itemized, Commerce's determination, on remand, does not run afoul of "longstanding" Commerce findings.  *See* Dingli's Comments at 22.

     In short, Commerce concluded that while it may have been able to discern which fees were contained in the brokerage and handling surrogate value at the time of *Solar Cells*, a closer evaluation of the record does not support a similar finding in this case because the relevant *Doing Business* report does not conclusively indicate that the incidental ocean freight charges are already included in brokerage and handling.  *See* Final Remand Results at 19-20, Appx22065-22066.

III.   Commerce's Determination To Rely Solely On HTS Subheading 8431.20.90 To Value Certain Minor Fabricated Components, Complies With The Court's *Remand Order*, Is Supported By <u>Substantial Evidence, And Otherwise Is In Accordance With Law</u>

     Dingli contends that Commerce's use of HTS Subheading 8431.20.90 to value certain minor fabricated steel components is unsupported by substantial evidence and law because Commerce "conduct{ed} a rigid classification analysis to value {Dingli's} minor fabricated components" thereby "deviat{ing} from Commerce's normal

practice that favors a HTS subheading yielding a more reliable, representative, and accurate value even though it may not be the most suitable for classification purposes." Dingli's Comments at 30, 32. Dingli's argument is based on the flawed premise that the fabricated steel components it purchased are materially the same as raw steel. *See* Dingli's Comments at 32-33.

In selecting HTS Subheading 8431.20.90 to value certain minor fabricated steel components, Commerce complied with the *Remand Opinion* and *Remand Order*, and did not deviate from its surrogate value practice. This Court instructed Commerce

> to reconsider its valuation of 'minor fabricated steel components' (as that term was used in the final determination) and to resolve the internal inconsistencies in its original analysis, particularly to explain how it can find that some of Dingli's suppliers 'do more in-depth fabrication or processing' while nonetheless finding that there is no evidence in the record that the suppliers provide fabricated components.

*Remand Order* at 2-3. Commerce interpreted this directive as requiring Commerce to resolve whether Dingli purchased the 16 inputs in question as raw steel materials or as minor fabricated steel parts. Final

46

Remand Results at 23, Appx22069.  Commerce found that Dingli purchased minor fabricated steel parts and not raw steel material.  *Id.*

Commerce's finding that Dingli purchased minor fabricated steel components and not raw steel materials is supported by substantial evidence.  Dingli's input suppliers fabricated the inputs in question before sale to Dingli and according to Dingli's specified dimensional requirements for eventual incorporation into Dingli's mobile access equipment machines.  For example, one of the inputs in question is a steel weldment for ladder sub-assembly.  *See* Dingli's Letter, "Dingli's Pre-Preliminary Comments in the Antidumping Duty Investigation of Certain Mobile Access Equipment and Subassemblies Thereof from the People's Republic of China: (A-570-139)," dated September 2, 2021 (Dingli's Pre-Preliminary Comments) at Exhibit 1, Appx21364- 21414.  Dingli indicated to Commerce that this particular input is made from steel plates that are cut, bent, punched, and welded, according to its specifications.  *See id.*  Furthermore, Dingli confirmed that the fabrication activities were performed by Dingli's input suppliers, not Dingli.  *See* Dingli's Letter, "Dingli's Redacted Rebuttal Brief," dated January 19, 2022, at 46-49, Appx6686- 6689.  Thus, contrary to Dingli's

47

assertion that it purchased "basic steel inputs," the record demonstrates that Dingli purchased prefabricated steel components from its input suppliers, supporting Commerce's determination.

Operating on the premise that fabricated steel parts are the same as raw steel materials, Dingli then argues "HTS subheadings 7208, 7211, and 7214 reasonably approximate the value of the primary steel inputs," citing to *Downhole Pipe* and *SolarWorld*, and therefore Commerce should have used those subheadings. Dingli's Comments at 35. But Dingli misreads the holdings in *Downhole Pipe* and *SolarWorld*. *See* Dingli's Comments at 30-33. Dingli reads these cases in conjunction to argue that Commerce, in relying on HTS classifications, "unlawfully ignore{ed} the AUVs attached to the HTS headings and whether they correlated with the intrinsic values of the upstream primary steel input and Dingli's purchased minor fabricated inputs." Dingli's Comments at 33. As Commerce explained in the Final Remand Results:

> *Downhole Pipe* and *SolarWorld Americas* in effect stand for the proposition that to the extent that customs classifications could assist Commerce in satisfying its requirement to determine what subheading constitutes the best available information, Commerce may engage in such

analysis, but it is not required. In other words, Commerce does not commit legal error by failing to engage in a classification analysis. Indeed, Dingli's quoted excerpt from *SolarWorld Americas* confirms as much: {t}he fact that Commerce has at times found support for its surrogate value choices in Customs classification rulings does not lead to the conclusion that Commerce must follow such rulings in every case {when valuing factors of production}.

Final Remand Results at 24-25, Appx22070-22071 (internal citations and quotations omitted). Neither case precludes Commerce from relying on customs classification procedures either in whole or in part.

Further, Dingli's minor fabricated steel components are not primary steel inputs because they were fabricated to Dingli's specifications and no longer usable as raw steel. As a result, valuing them using Dingli's preferred HTS subheadings capturing raw steel would be a departure from Commerce's practice to use surrogate value data that is product specific. *See Taian Ziyang Food Co.*, 783 F. Supp. 2d at 1330; *see also* Dingli's Comments at 3 ("In other words, if a data set is unreliable, its fulfillment of other criteria is academic."). Dingli points to no flaws with HTS 8431.20.90 other than its unsupported belief that the value is too high.

In light of the remand order's instruction for Commerce to resolve internal inconsistencies in its analysis of the proper HTS subheading to value the minor fabricated steel components, Commerce found that Dingli's purchased fabricated inputs are created for a specific purpose and, therefore, have ceased to become "primary steel." Final Remand Results at 11-12, Appx22057-22058. Commerce's finding is supported by the record evidence, including Dingli's own statements.

Thus, Commerce, consistent with its practice, determined that HTS Subheading 8431.20.90, which covers parts of mobile access equipment *i.e.* the minor fabricated parts Dingli purchased, is the best available information to value minor fabricated steel components. In so determining, Commerce has met its burden to provide an adequate explanation for why it reconsidered the data used to value minor fabricated steel components and why it specifically chose HTS subheading 8431.20.90 as the appropriate surrogate value.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand results and enter judgment in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
ASSISTANT ATTORNEY
GENERAL

PATRICIA M. McCARTHY
Director

s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL

s/ Kristin E. Olson
KRISTIN E. OLSON
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-6299
kristin.olson@usdoj.gov

RUSLAN KLAFEHN
Attorney
Office of the Chief Counsel for
    Trade Enforcement &
    Compliance
U.S. Department of Commerce

June 13, 2025

*Attorneys for the United States*

51

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the 10,000 word limitation authorized by the Court's scheduling order because the brief contains 9,436 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

s/ Kristin E. Olson

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| COALITION OF AMERICAN MANUFACTURERS OF MOBILE ACCESS EQUIPMENT,<br><br>          Plaintiff,<br><br>     v.<br><br>UNITED STATES,<br><br>          Defendant,<br><br>     and<br><br>ZHEJAING DINGLI MACHINERY CO., LTD.,<br><br>          Defendant-Intervenor. | Court No. 22-0152 |

## ORDER

Upon consideration of the Department of Commerce's final results of redetermination pursuant to remand, defendant's response in support thereto, and all other pertinent papers, it is hereby

ORDERED that the remand results are sustained in their entirety; and further

ORDERED that final judgment is entered in favor of the United States.

                                       _____

                                       Hon. M. Miller Baker, Judge

Dated: _____